# Exhibit 2

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

        Defendants.

## DECLARATION OF FREDERIC CHAUSSY

1.     I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.     From approximately April 2, 2006 to April 19, 2007, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC at its Montgomery Street (San Francisco), Redwood Shores, Fremont and Cupertino branch offices (all in California). As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the San Francisco area, were substantially similar to mine. These duties included, but are not limited to the following:

    a.  Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

    b.  Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

    c.  Taking information from the potential customers and completing loan applications; and

    d. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3.    I spent the majority of my time and performed the vast majority of my responsibilities working from the HSBC branch offices assigned to me, or from my home office. My manager, Amy Ku, published a schedule with regular times that I was required to work from the HSBC branch offices which occupied about 40 hours of my workweek and was my primary source of sales leads.

4.    I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. From Monday to Friday, I generally began my work day from home at 6:00 a.m. and worked till 7:30 a.m. I would then get to the branch office by 9:00 a.m. and work till approximately 5:00 p.m. Each night I would work an additional one to two hours from my home office. Beginning November 2006, I also worked two Saturdays per month at the Fremont branches from 10:00 a.m. to approximately 3:00 p.m. Since I was classified as exempt, I was never paid for my overtime hours worked.

5.    I was required to work outside the office and away from my home office at night and during the weekends for approximately on average 4 hours a week to sell HSBC's mortgage and loan products in the community. These activities included, but were not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts were not my primary responsibility.

6.    I was never told by my managers about any meal and rest break policy that applied to me as a loan officer. If my managers were in the office, I was discouraged from taking meal or rest breaks. When I did eat lunch while working from the branch, I would generally eat it at my desk while I worked. I would only leave the office once or twice a week at most for my lunch breaks, and rarely took 10-minute rest breaks during the day.

7.    For the first 9 months of my employment, HSBC paid me a base salary ("non-recoverable draw"), and I was supposed to receive commission based on the volume of my mortgage sales and my number of sales. At no point during this first 9 months did my commissions exceed 50% of my total income. After the first 9 months, I was paid a "recoverable draw" and earned about $1600 per month. Since I worked well over 225 hours a month, my pay rate was below California's $7.50 minimum wage in 2007. Moreover, HSBC did not compensate me for any hours I worked over 40 per week.

8.    HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am

REDACTED

informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

12/05/07
Date

Frederic Chaussy



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; and DOES 1-50;

        Defendants.

---

## DECLARATION OF STEPHANIE CHU

---

1.      I am a Plaintiff in this action against HSBC Mortgage Corporation and HSBC Bank (hereinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.      I worked at HSBC from September 12, 2005 to October 5, 2007, as Field Administrator (also called Sales Assistant, or Senior Retail Lending Consultant Assistant). I worked in HSBC facilities in downtown Los Angeles, at 660 S. Figueroa, Los Angeles, 90017, and in Alhambra, CA, at 590 W. Main Street, Alhambra, CA. My supervisors were Godwin Tsui and, more recently, Amy Young.

3.      I worked with all the loan officers in Southern California - there were more than 20 loan officers at one point. Because I was in touch with the loan officers throughout the workday, I know that they were generally working at the HSBC branches. Some loan officers also had home offices where they worked. Though the loan officers had some client meetings, these did not consume the majority of their time by any measure. I observed that the loan officers always worked long hours trying to meet sales production goals, and it was not unusual for me to receive emails from them on my Blackberry as late as 11 p.m. Most evenings, the loan officers were inputting loan data and doing other work from their home offices.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

12/18/07
Date

Stephanie Chu

REDACTED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

        Defendants.

Case No. 07-2446 MMC

---

## DECLARATION OF DUSTIN COX

1.     I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.     From approximately April 1, 2006 to October 1, 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC in a temporary office in Los Angeles and in the Beverly Hills branch office. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the Los Angeles region, were substantially similar to mine. These duties included, but are not limited to the following:

    a.   Calling potential customers (leads) , most of which were provided to me by HSBC, in attempting to sell loans;

    b.   Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

    c.   Taking information from the potential customers and completing loan applications; and

    d.   Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3. I spent the majority of my time and performed the vast majority of my responsibilities working from the HSBC Mortgage Corporation office in Los Angeles, from the HSBC branch offices assigned to me, or from my home office. My managers, Amy Young and Godwin Tsui, published a schedule with regular times that I was required to work from the HSBC Mortgage Corporation office and from the HSBC branch offices which occupied 45 hours of my workweek and was my primary source of sales leads.

4. I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. On average, I worked 54 hours per week. I typically worked from 8:00 AM to 6:00 PM Monday through Friday and then from 10:00 AM to 3:00PM on either Saturday or Sunday throughout the month. Since I was classified as exempt, I was never paid for my overtime hours worked.

5. I was required to work outside the office and away from my home office at night and during the weekends for approximately 9 hours a week to sell HSBC's mortgage and loan products in the community. These activities included, but were not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts were not my primary responsibility.

6. I was never told by my managers about any meal and rest break policy that applied to me as a loan officer. If my managers were in the office I was discouraged from taking meal or rest breaks.

7. HSBC paid me a base salary ("non-recoverable draw"), plus commission based on the volume of my mortgage sales and my number of sales. I never received any commissions as a loan officer.

8. HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

9.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

10-02-07
Date

Dustin Cox

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; and DOES 1-50,

        Defendants.

### DECLARATION OF CHERYL DESOUZA

1.    I am a Plaintiff in this action against Defendants (hereinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately January 2004 to September 2004, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC at its Franklin Lakes, NJ, office. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the New Jersey area, were substantially similar to mine. These duties included, but are not limited to the following:

    a.    Calling potential customers (leads), in attempting to sell loans;

    b.    Speaking to potential customers (leads) working from HSBC's facility, in attempting to sell loans;

    c.    Taking information from the potential customers and completing loan applications; and

    d.  Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3.      I spent the majority of my time and performed the vast majority of my responsibilities working from the HSBC office assigned to me, or from my home office. My manager published a schedule with regular times that I was required to work from the HSBC office, which occupied at least 50 hours of my workweek and was my primary source of sales leads.

4.      I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. On average, I worked 65 hours per week. I typically worked from 8:30 A.M to 6:00 P.M. Monday through Friday at the HSBC office. I worked an additional 3 hours at least 4 weeknights per week from my home office and in the field. On the weekends I typically worked 4 hours each Saturday and then once a month for 3 hours on a Sunday. Since I was classified as exempt, I was never paid for my overtime hours worked.

5.      I was required to work outside the office and away from my home office at night and during the weekends for at least 10 hours a week to sell HSBC's mortgage and loan products in the community. These activities included, but were not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts were not my primary responsibility.

6.      I typically worked through lunch. That is, when I did eat lunch, I would have to eat it at my desk while I worked. I either brought my lunch or ordered lunch to be brought into the office.

7.      HSBC paid me based on a recoverable draw. On average, I made just under $1100 per month during the nine months that I worked at HSBC. Since I worked an average of 260 hours a month, my hourly rate averaged $4.25, which was below the minimum wage.

8.      HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. To my knowledge, none of the other loan officers employed by HSBC in my area ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

12/11/07
Date

Cheryl DeSouza

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Wong, et al.,
individually and on behalf of others
similarly situated,

      Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; and DOES 1-50;

      Defendants.

Case No. 07-2446 MMC

---

**DECLARATION OF KAREN FLANAGAN**

---

1.     I am a former employee of HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.     From approximately January 2005 to March 2006, I was employed by HSBC as a Retail Mortgage Lending Consultant ("loan officer") in Melville, New York. From March 2006 until March 2007, I was employed as a Premier Mortgage Consultant (also called "assistant vice president") by HSBC in New York City.

3.     As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the Long Island and New York City areas, were substantially similar to mine. These duties included, but are not limited to the following:

    a. Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

    b. Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

    c. Taking information from the potential customers and completing loan applications; and

    d. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department.

I did not have any supervisory responsibilities.

4.    I spent the majority of my time and performed the vast majority of my responsibilities as a loan officer working from the Huntington Branch office and my home office. Two or three times a month, I also worked at the Center Reach Mortgage Office.

5.    I worked approximately 60 hours a week from my home office and the branch, averaging more than 70% of the time in my home or branch offices, and only approximately 30% of the time in the field.

6.    As a loan officer, I was required to work outside the office and away from my home office some nights and during the weekends to sell HSBC's mortgage and loan products in the community. These outside sales efforts were not my primary responsibility.

7.    As a Premier Mortgage Consultant, I continued to perform exclusively or primarily sales duties, and to work many overtime hours. I worked from the Rockville Center Premier Branch and, most often, from my home office. In this position, my typical schedule was as follows: on two or three days a week, after working from home starting at approximately 8:30 a.m., I would arrive at the branch at 10 a.m. and remain working there typically until somewhere around 5 p.m. in the evening. After leaving the branch on these days, I would return home and work from my home office until approximately 7:30 p.m. The other two or three days a week, I worked similar hours, but 70% of the time I worked from my home office, and approximately 30% of the time I worked in the field. On two to three Saturdays per month, I would work an additional 5 hours from my home office or the branch. Every Sunday I worked 2-3 hours in my home office.

8.    I worked these long hours at both of my positions at HSBC in order to meet the sales demands and production quotas mandated by my managers, and, of course, in the hope of increasing my commissions. Since I was classified by HSBC as exempt, I was never paid for any of my overtime hours worked.

9.    I do not feel I was paid properly for the commissions I earned as a Premier Mortgage Sales Officer. What I was told would be a "base salary" was deducted as draw from my commissions. Also, I was paid none of the incentives I was promised for approximately $5 million in deposits I helped generate.

10.    HSBC did not keep any official record of my hours worked.  HSBC never provided time sheets during my employment.  I am informed and believe that none of the other loan officers or Premier Mortgage Sales Officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct.


12/10/07
Date

Karen Flanagan
Karen Flanagan

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

        Defendants.

## DECLARATION OF ALYSSE GORA

1.    I am a former employee of HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately July 1999 to early 2006, I was employed by HSBC as a Retail Mortgage Lending Consultant ("loan officer") in Melville, New York. From early 2006 until April 2007, I was employed as a Premier Mortgage Sales Officer (also called "assistant vice president") by HSBC in New York City.

3.    As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the Long Island and New York City areas, were substantially similar to mine. These duties included, but are not limited to the following:

        a. Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

        b. Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

1

    c.  Taking information from the potential customers and completing loan applications; and

    d.  Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

4.    I spent the majority of my time and performed the vast majority of my responsibilities as a loan officer working from the HSBC Mortgage Corporation office in Melville, NY. I estimate that I spent more than 80% of my working hours as a loan officer in the HSBC office there. After working from home starting at 7 a.m. most mornings, I would arrive at the branch at 9 a.m. and remain working there typically until somewhere between 7 p.m. and 9 p.m. in the evening. We would typically bring lunch into the branch to keep working through lunch. It was not unusual for me to work as late as 10 p.m., and there were instances when I would remain working at the Melville branch until 11 p.m. or midnight, when security would close the facility.

6.    As a loan officer, I was required to work outside the office and away from my home office some nights and during the weekends to sell HSBC's mortgage and loan products in the community. These outside sales efforts were not my primary responsibility.

7.    As a Premier Mortgage Sales Officer, I continued to perform exclusively or primarily sales duties, and to work many overtime hours, averaging over 50 hours/week of work. I worked from the HSBC office at 120 Broadway, in Manhattan, about 20-30% of the time. I spent the majority of the rest of my workweek performing sales functions from my home office.

8.    As a Premier Mortgage Sales Officer, I spent on average 10 hours a week visiting clients. This was not my primary responsibility.

9.    I worked these long hours at both of my positions at HSBC in order to meet the sales demands and production quotas mandated by my managers, and, of course, in the hope of increasing my commissions. Since I was classified by HSBC as exempt, I was never paid for any of my overtime hours worked.

10.    I do not feel I was paid properly for the commissions I earned as a Premier Mortgage Sales Officer.

11.    HSBC did not keep any official record of my hours worked. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers or Premier Mortgage Sales Officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct.

_____

Date

Alysse Gora

REDACTED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Wong, et al.,<br>individually and on behalf of others<br>similarly situated, | Case No. 07-2446 MMC |
| Plaintiffs, | |
| v. | |
| HSBC Mortgage Corporation (USA);<br>HSBC Bank USA, N.A; HSBC Holdings, Inc., | |
| Defendants. | |

## DECLARATION OF JASON HENRY

1.     I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.     From approximately May 2006 to September 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC at both its Montgomery Street branch office in San Francisco, CA, and its Redwood Shores, CA, branch office. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the San Francisco Bay Area, were substantially similar to mine. These duties included, but are not limited to the following:

   a.  Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

   b.  Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

   c.  Taking information from the potential customers and completing loan applications; and

    d. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3. I spent the majority of my time and performed the vast majority of my responsibilities working from the HSBC branch offices assigned to me, or from my home office. My manager, Amy Ku, published a schedule with regular times that I was required to work from the HSBC branch offices which occupied 45 hours of my workweek and was my primary source of sales leads.

4. I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. On average, I worked 55 hours per week. I typically worked from 8:00 AM to 6:00 PM Monday through Friday and then 10:00 AM to 3:00 PM on 2 Saturdays and 2 Sundays per month. Since I was classified as exempt, I was never paid for my overtime hours worked.

5. I was required to work outside the office and away from my home office at night and during the weekends for approximately 8 hours a week to sell HSBC's mortgage and loan products in the community. These activities included, but were not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts were not my primary responsibility.

6. I was never told by my managers about any meal and rest break policy that applied to me as a loan officer. If my managers were in the office, I was discouraged from taking meal or rest breaks. When I did eat lunch I would have to eat it at my desk while I worked. I would only leave the office once or twice a week at most for an uninterrupted lunch break of 15-20 minutes, and rarely took 10-minute rest breaks during the day. I never received any of the meal or rest period premiums required under California law for the meal and rest periods I consistently missed.

7. HSBC paid me a base salary ("non-recoverable draw"), plus commission based on the volume of my mortgage sales and my number of sales. I did not receive any commissions while I was a loan officer at HSBC. HSBC did not compensate me for any hours I worked over 40 per week.

8. HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

REDACTED

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

11/28/07
Date

Jason Henry

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

Defendants.

## DECLARATION OF STEPHANY HOR

1.    I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately November 2001 to July 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC at both its Los Angeles area branch offices including Encino, Chinatown, Pasadena, Arcadia, Rowland Heights, San Gabriel and Beverly Hills branches. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the Los Angeles area were substantially similar to mine. These duties included, but are not limited to the following:

   a.    Calling potential customers (leads) , most of which were provided to me by HSBC, in attempting to sell loans;

   b.    Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

   c.    Taking information from the potential customers and completing loan applications; and

    d. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3.    I spent the majority of my time and performed the vast majority of my responsibilities working from the HSBC Mortgage Corporation office in Los Angeles, from the HSBC branch offices assigned to me, or from my home office. My managers, Godwin Tsui and Amy Young, published a schedule with regular times that I was required to work from the HSBC Mortgage Corporation office and from the HSBC branch offices which occupied 48 hours of my workweek and was my primary source of sales leads.

4.    I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. On average, I worked 58 hours per week. I typically worked from 9:30 AM to 8:00 PM Monday through Friday and then 10:00 AM to 3:00 PM on 2 Saturdays 2 per month. Since I was classified as exempt, I was never paid for my overtime hours worked.

5.    I was required to work outside the office and away from my home office at night and during the weekends for approximately 10 hours a week to sell HSBC's mortgage and loan products in the community. These activities included, but were not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts were not my primary responsibility.

6.    I was never told by my managers about any meal and rest break policy that applied to me as a loan officer. If my managers were in the office I was discouraged from taking meal or rest breaks. When I did eat lunch I would have to eat it at my desk while I worked. I would only leave the office once or twice a week at most for my lunch breaks, rarely took 10-minute rest breaks during the day.

7.    HSBC paid me a base salary ("non-recoverable draw"), plus commission based on the volume of my mortgage sales and my number of sales. HSBC did not compensate me for any hours I worked over 40 per week.

8.    HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

11/27/07
Date

Stephany Hor

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,                                       Case No. 07-2446 MMC
individually and on behalf of others
similarly situated,

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

        Defendants.

## DECLARATION OF RYAN KANAZAWA

1.    I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately December 4, 2005 to October, 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC in a temporary office in the Redwood Shores branch office. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the San Francisco region were substantially similar to mine. These duties included, but are not limited to the following:

    a.  Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

    b.  Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

    c.  Taking information from the potential customers and completing loan applications; and

REDACTED

    d.  Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3.    I spent the majority of my time and performed the vast majority of my responsibilities working from the HSBC branch offices assigned to me, or from my home office. My manager, Amy Ku, published a schedule with regular times that I was required to work from the HSBC branch offices which occupied 55 hours of my workweek and was my primary source of sales leads.

4.    I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. On average, I worked 61 hours per week. I typically worked from 8:30 a.m. to 6:00 p.m. Monday through Friday and then 4 hours each weekend. Each week I worked an additional three hours at night at least two times a week. We were also assigned to attend two full day community events per month. These events took place on Saturdays and occupied an additional 14 hours per month. Since I was classified as exempt, I was never paid for my overtime hours worked.

5.    I was required to work outside the office and away from my home office at night and during the weekends for approximately 6 hours a week to sell HSBC's mortgage and loan products in the community. These activities included, but were not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts were not my primary responsibility.

6.    I was never told by my managers about any meal and rest break policy that applied to me as a loan officer. When I did eat lunch I would eat it at my desk while I worked. I would only leave the office once or twice a week at most for my lunch breaks, and rarely took 10-minute rest breaks during the day.

7.    HSBC paid me a base salary ("non-recoverable draw"), plus commission based on the volume of my mortgage sales and my number of sales. For my first 6 months at HSBC, my base salary was 93.5% of my total compensation. After the first 6 months, I was paid based on a recoverable draw for two months, during which I made approximately $4,000 per month. HSBC returned me to a non recoverable draw for the final two months of my employment. During the final two months my base salary was 82% of my total compensation. HSBC did not compensate me for any hours I worked over 40 per week.

8.    HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

REDACTED

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is
true and correct.

11-28-07
Date

Ryan Kanazawa

REDACTED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Wong, et al.,
individually and on behalf of others
similarly situated,

      Plaintiffs,

v,

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

      Defendants.

Case No. 07-2446 MMC

**DECLARATION OF AYESHAH LACY**

1.    I am a former employee of HSBC Mortgage Corporation (hereinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately September 2002 to October 2005 I was employed by HSBC as a Senior Retail Mortgage Lending Consultant ("loan officer") in Philadelphia, Pennsylvania.

3.    As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the Philadelphia area, were substantially similar to mine. These duties included, but are not limited to the following:

    a.    Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

    b.    Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

    c.    Taking information from the potential customers and completing loan applications; and

    d.    Collecting client documents and answering client questions about HSBC's mortgage and

loan products and/or answering questions from HSBC's underwriting department.

I did not have any supervisory responsibilities.

4.     I spent the majority of my time and performed the vast majority of my responsibilities as a loan officer working from my home office or the HSBC Market Avenue branch office in Philadelphia. I would arrive at the branch at 9 a.m. and remain working there till the branch closed at 5 p.m. After I left the branch I would continue my work in my home office sometimes working as late at 10 p.m. Additionally, I worked about six hours each weekend. In total, I worked on average approximately 60 hours a week.

5.     As a loan officer, I was required to work outside the office and away from my home office some nights and during the weekends to sell HSBC's mortgage and loan products in the community. I was required to attend home buying seminars, money seminars at local colleges, meet with realtors and CPAs, and participate on community boards in area neighborhoods. These outside sales efforts only took up about 10 hours a week and were not my primary responsibility.

6.     I worked these long hours at HSBC in order to meet the sales demands and production quotas mandated by my managers, and, of course, in the hope of increasing my commissions. Since I was classified by HSBC as exempt, I was never paid for any of my overtime hours worked.

7.     My compensation was based on a "recoverable draw" of $36,000 per year, or about $3,000 per month. However, after HSBC recovered my draw from me each month, I often only took home less than $1,000/month in actual income. As such, since I worked approximately 240 hours a month, I often earned less than the minimum wage.

8.     HSBC did not keep any official record of my hours worked. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct.

11/27/2007
Date

Ayeshah Lacy

REDACTED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al., 
individually and on behalf of others 
similarly situated,

Case No. 07-2446 MMC

       Plaintiffs,

v.

HSBC Mortgage Corporation (USA); 
HSBC Bank USA, N.A; and DOES 1-50,

       Defendants.

## DECLARATION OF LARRY LEE

1.    I am a Plaintiff in this action against HSBC Mortgage Corporation (hereinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately October 2005 to February 2007, I was employed as a Premier Mortgage Sales Officer by HSBC at the HSBC Corporation office and San Francisco Premier Center, 601 Montgomery Street. As a Premier Mortgage Sales Officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position were substantially similar to mine. These duties included, but are not limited to the following:

    a.  Calling potential Premier clients (leads) in attempting to sell loans;

    b.  Speaking to potential Premier clients (leads) from the San Francisco Premier Center, in attempting to sell loans;

    c.  Taking information from the potential customers and completing loan applications; and

    d.  Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I did not have any supervisory responsibilities.

3.      I spent the majority of my time and performed the vast majority of my responsibilities working from the San Francisco Premier Center. My acting managers were Paul Tan (HSBC Bank branch manager) and Rob Hunt (HSBC Premier Center manager), were both HSBC Bank employees.

4.      I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. I generally worked at the San Francisco Premier Center from 8:30 a.m. to 6:30 p.m., and was often the last person to leave the facility. I also worked Saturdays (on average, once a month) and Sundays (on average, 2-3 times a month) going to open houses from 2:00 p.m. to 4:00 p.m. I would go to community functions 2-3 times a month, on average, for about 2 hours each time. On average, I worked over 50 hours per week. Since I was classified as exempt, I was never paid for my overtime hours worked.

5.      Though I was required to work outside the San Francisco Premier Center on evenings and weekends for approximately 12 hours a month to sell HSBC's mortgage and loan products in the community, these outside sales efforts were not my primary responsibility.

6.      I also do not feel HSBC paid me properly for the bonuses and commissions I was entitled to receive. In particular, I was not paid for my last two "guaranteed" quarterly bonuses.

7.      HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other Premier Mortgage Sales Officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_12/11/07_ .
Date

Larry Lee

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

        Defendants.

Case No. 07-2446 MMC

## DECLARATION OF CHRISTINE LIM

1.    I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately March 2006 to November 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC Mortgage Corporation at its Costa Mesa, CA, office. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the Los Angeles/Orange County area, were substantially similar to mine. These duties included, but are not limited to the following:

    a.  Calling potential customers (leads), in attempting to sell loans;

    b.  Taking information from the potential customers and completing loan applications; and

    c.  Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department.

I did not have any supervisory responsibilities.

3. I spent the majority of my time and performed the vast majority of my responsibilities working from my home office and, occasionally, from the HSBC Mortgage Corporation office in Costa Mesa, Orange County, or the Los Angeles office where my managers were located. My managers were Godwin Tsui and Amy Young.

4. I often worked long hours in order to meet the sales demands and production quotas mandated by my managers. I would start the day at 7:30 or 8:00 a.m. and work until 6:30 p.m. on a typical day. I worked three Saturdays a month on average, for four hours a day, and twice a month on Sunday for two hours a day. Since I was misclassified as exempt by HSBC, I was never paid for my overtime hours worked.

5. In my workweek of over 50 hours, I would spent on average approximately 10-12 hours working outside of my home office or the HSBC facilities, including two 3-hour sales trips during the week and 4-6 hours of weekend work meeting realtors and attending open houses. These outside sales efforts were not my primary responsibility. From what I observed, I believe my fellow loan officers had a similar balance between inside and outside sales.

6. HSBC paid me a base salary ("non-recoverable draw"), plus commission based on the volume of my mortgage sales and my number of sales. My base salary was $35,000/year, and, on one occasion, I earned a $6,000 commission for a million-dollar sale I made.

7. HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Date  11/29/07

_____
Christine Lim

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

    Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A,

    Defendants.

## DECLARATION OF PETER MALONE

1.  I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.  From approximately June 1996 to January 2000, and May 2000 to June 2005, I was employed as a loan officer by HSBC Mortgage Corporation. My position was also called Senior Retail Mortgage Lending Consultant, or Mortgage Consultant. In approximately June 2005, I became also a Retail Team Leader, until October 2005, the end of my HSBC employment. During my time at HSBC, I worked at various branches throughout New York, including in Newburgh, Vails Gate, Nyack, and Poughkeepsie.

3.  As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, upstate New York, were substantially similar to mine. These duties included, but are not limited to, the following:

  a. Calling potential customers (leads), in attempting to sell loans;

  b. Taking information from the potential customers and completing loan applications; and

1

REDACTED

c. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department.

I did not have any supervisory responsibilities.

As a Retail Team Leader, my primary duty continued to be sales, with just an added ability to sign some team members' documents. I still had no hiring or firing authority or any substantial supervisory duties.

4.    I was expected to spend the majority of my time and perform the vast majority of my responsibilities covering the HSBC Newburgh, Vails Gate, Nyack, and Poughkeepsie branch offices in New York. There were times that were considered "Up Time," when it was mandatory to be in the Mortgage Center (Poughkeepsie) in order to cover the phones and answer calls. "Up Time" typically occurred once a week and the rest of the week was spent in one of the branch offices. I spent almost all of my time during my employment in one of the HSBC offices during my employment.

5.    On a typical day, I would get to the branch by 7:45 a.m., and I would leave roughly at 6:30 p.m., not including weekends. I also would work roughly two Saturdays per month from approximately 9:00 a.m. to 12:00 p.m.

5.    We were never told any policy about taking meal or rest breaks. I would typically run and grab something quick to eat or eat at my desk while working. Outside of the "Up Time," I rarely actually took any uninterrupted lunch break. I also did not regularly take any other kind of breaks during the day.

6.    We also were expected to sell loans at community events, like local business meetings, realtor functions, and trade shows at night during the week and on the weekends. In a typical month, there would be at least one community event. There were also typically two trade shows per year for which attendance was mandatory. These outside sales responsibilities did not take up the majority of my time – they took a small portion of the 55+ hours I worked in an average week. Outside sales was not my primary responsibility.

8.    I worked with other Senior Retail Mortgage Lending Consultants and observed their responsibilities and the ratio of their inside versus outside sales work to be similar to mine. Since we were misclassified as exempt by HSBC, we were never paid for my overtime hours worked.

9.    HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am

REDACTED

informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

\_\_12 - 7 - 07\_\_
Date

Peter Malone

3

REDACTED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; HSBC Holdings, Inc.,

        Defendants.

Case No. 07-2446 MMC

---

## DECLARATION OF EDWARD PINCAR

---

1.  I am a former employee of HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.  From approximately January 2006 to October 2007, I was employed as a sales manager by HSBC in New York City. I had no input into the formulation of HSBC's overtime policies or practices nationwide and have at no time communicated with or considered myself to be represented by HSBC's attorneys.

3.  My responsibility as sales manager was to oversee eight (8) Senior Retail Mortgage Lending Consultants and Retail Mortgage Lending Consultants (collectively, "loan officers"). I also shared supervisory authority (with the Brooklyn sales manager) over one Field Administrator, Jasmine Cendra.

4.  Ms. Cendra and the loan officers working under my supervision consistently worked extensive overtime hours for which, to the best of my knowledge, they were never compensated. I observed that the loan officers, in particular, often worked over 60 hours in a week, including many evenings and frequent Saturday and Sunday work, without any overtime compensation.

5.  The loan officers under my supervision were primarily or exclusively engaged in selling loans, following the company's guidelines and procedures.

6.  My loan officers worked at least 60-70% of their time working in HSBC branches responding to different branch managers' needs. The loan officers were supposed to enter into their calendars in Lotus Notes at which branches they were going to be working each day. The

1

REDACTED

loan officers did some sales work outside of HSBC branches, but this was certainly not their primary responsibility.

7.    None of the loan officers under my supervision had management or supervisory responsibilities.

8.    Though HSBC expected loan officers to work long hours in the company's branches, they were only paid on commissions, with a small draw against commissions (i.e., a sum they were required to reimburse out of commissions, or would be required to reimburse with their own money if they did not earn sufficient commissions to cover the sum). I felt that it was unfair that my employees were working long days, in HSBC facilities, with zero overtime compensation to show for it.

9.    I was aware that the loan officers in other parts of New York and New Jersey operated under the same system as the loan officers under my supervision – i.e., long hours selling loans at the HSBC facilities (or, in some cases, from their home offices), with no overtime compensation.

10.    HSBC did not keep any official record of the loan officers' hours worked. HSBC never provided time sheets, since the loan officers were apparently classified as "exempt" from overtime laws.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_11/15/07_
Date

_Edward Pincar_
Edward Pincar

2

REDACTED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

Case No. 07-2446 MMC

       Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A; and DOES 1-50,

       Defendants.

---

## DECLARATION OF JASON SCHULTES

1.    I am a Plaintiff in this action against Defendants (hereinafter, "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately November 2004 to November 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC at one of its offices in Franklin Lakes, New Jersey, which then moved to Parsippany, New Jersey. I also worked out of an office closer to home, in Stroudsburg, Pennsylvania, where HSBC rented me work space. In addition I also worked out of my home office.

3.    As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the New Jersey area, were substantially similar to mine. These duties included, but are not limited to the following:

    a.  Calling potential customers (leads), in attempting to sell loans;

    b.  Taking information from the potential customers and completing loan applications; and

1

c. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department.

I did not have any supervisory responsibilities.

4. I spent the majority of my time and performed the vast majority of my responsibilities covering the HSBC Franklin Lakes and Parsippany offices in New Jersey, and from my offices in Stroudsburg and at home. My manager was Gill Syre. I worked from the branch offices or the Stroudsburg office or my home office for far more than 8 hours a day on a regular basis.

5. On a typical weekday when I worked from the HSBC office or my Stroudsburg office, I would get to the office when it opened, by 9 a.m., and I would leave roughly at 7 p.m. When I worked from my home office, I would work even longer inside sales hours, which meant sometimes starting at 9 a.m and not being done until 11 or 12 p.m. I also typically worked on Saturday for 4-5 hours. I frequently worked without any breaks or a lunch period, trying to keep up with all of the sales work.

6. I do not recall ever being told any policy about taking meal breaks. Typically I would just eat lunch at my desk, and work while I was eating. When I was working in the Franklin Lake or Parsippany office, they would sometimes order food in for us, so we could keep working without any interruption. There was virtually no time to really take a lunch break, because you had to try to sell more loans and continue to work.

7. We also were sometimes expected to sell loans at community events, working a table, meeting/greeting, on the weekends. We were also required to have business dinners with clients, as well as other sales activities, like concerts. On average, I spent approximately 16 hours a month on these outside sales activities.

8. I worked with other Senior Retail Mortgage Lending Consultants and observed their responsibilities and the ratio of their inside versus outside sales work to be similar to mine. Since we were misclassified as exempt by HSBC, we were never paid for our overtime hours worked.

9. HSBC did not keep any official record of my hours worked. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

2

REDACTED

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

12/26/07
Date

Jason Schultes

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Wong, et al.,<br>individually and on behalf of others<br>similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>HSBC Mortgage Corporation (USA);<br>HSBC Bank USA, N.A; and DOES 1-50,<br><br>        Defendants. | Case No. 07-2446 MMC |

**DECLARATION OF PHILIP WONG**

1.      I am a Plaintiff in this action against Defendants (hereinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.      Since December 4, 2005, I have been employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC at HSBC Bank's Irving Street (San Francisco), Montgomery Street (San Francisco), Oakland, and Millbrae branch offices (all in California). As a loan officer, my job duties have been consistent throughout my employment, and are entirely focused on my selling as many loans as possible. My job is to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the San Francisco area, are and have been substantially similar to mine. These duties include, but are not limited to, the following:

      a.  Calling potential customers (leads), most of which were provided to me by HSBC, in attempting to sell loans;

      b.  Speaking to potential customers (leads) in HSBC branches, in attempting to sell loans;

      c.  Taking information from the potential customers and completing loan applications; and

1

    d. Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department

I have not had any supervisory responsibilities.

3.    I spend the majority of my time and perform the vast majority of my responsibilities working from the HSBC Mortgage Corporation office in the San Francisco area, from the HSBC branch offices assigned to me, or from my home office. My manager, Amy Ku, publishes a schedule with regular times that I am required to work from the HSBC Mortgage Corporation office and from the HSBC branch offices, which has consistently occupied more than 40 hours of my workweek and is my primary responsibility and primary source of sales leads. Ms. Ku has emphasized that branch attendance is mandatory and that, as one email stated, we are expected to be "physically at the branch as scheduled." **See ATTACHMENT 1, Ku 1/02/07 Email.**

4.    My second-line supervisor at HSBC, Jeff Needham, told certain loan officers on a conference call that the company considers us as "outside salespersons." Yet, Mr. Needham said in the same call that the loan officers' first priority was working from the branch offices and that we were required to be in the branch offices on the days mandated by the schedules received from our managers.

5.    I often work long hours in order to meet the sales demands and production quotas mandated by my managers. Prior to my brief paternity leave, I worked, on average, more than 65 hours per week. I typically worked from 6:00 or 7:00 a.m. to 7:00 or 8:00 PM Monday through Friday, from my home office and the HSBC branches. Sometimes I worked as late as 11 p.m., working with international clients. Since returning from paternity leave, I have still averaged working more than 55 hours per week. Since I am classified as exempt, I have never been paid for my overtime hours worked.

6.    On Saturdays, I generally attend workshops at least twice a month lasting 3-5 hours. We also have to attend Saturday events with the branches once every three months, where we are required to work from 9:00 AM to 4:00 PM.

7.    I am required to work outside the office and away from my home office at night and during the weekends several times each month to sell HSBC's mortgage and loan products in the community. These activities include, but are not limited to, attending trade shows, attending open houses to meet with realtors, and attending home buying seminars and other seminars in the community. These outside sales efforts are not my primary responsibility.

8.    I have never been told by my managers about any meal and rest break policy that applies to me as a loan officer. Especially if my managers are in the office, I am discouraged from taking meal or rest breaks. When I do eat lunch during the

workday, I have to eat it at my desk while I work. I rarely take 10-minute rest breaks during the day. I have never received any premium pay for the meal and rest breaks that I have missed.

9.      I was not required to have any specialized academic training to become a loan officer at HSBC. I do not possess any graduate degree and none was required of me before becoming a loan officer. I have taken some classes in economics and accounting over the years, but none of these were prerequisites to my employment at HSBC. I am informed and believe that my fellow loan officers come from a wide variety of backgrounds and do not possess and are not required to possess any specialized academic training to be able to sell loans.

10.     Initially, HSBC paid me a base salary ("non-recoverable draw"), and I was supposed to receive a commission based on the volume of my mortgage sales and my number of sales. For my first 6 months at HSBC, my base salary wound up being 100% of my total compensation. For the first year, I earned a $36,000 base salary plus approximately $20,000 commissions. After the first 12 months, I began to receive a "recoverable draw" of $23,000/year. HSBC currently requires us to pay back out of our commissions the administrative costs to cover any loans we originate that are declined. We eventually end up paying the application fees out of our own pockets. Since I worked an average of nearly 280 hours a month, my hourly rate has averaged less than minimum wage, and I am not consistently earning more than $455/week.

11.     HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers I have known who have been employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

12/ 12/ 02
Date

Phillip Wong

3

Amy S Ku/HBUS/HSBC
01/02/2007 03:53 PM

To   Philip G Wong/HBUS/HSBC@HSBC, Frederic Y
     Chaussy/HBUS/HSBC@HSBC, Abby
     Ho/HBUS/HSBC@HSBC
cc   leah.b.guttilla@us.hsbc.com@HSBC
bcc

Subject   Attendance and Punctuality.

Hi Team,

During the last team meeting on 12-18-06, I have addressed the importance of punctual branch attendance and report submission.
We are mortgage professionals and we are obligated to be punctual and committed to our own schedule. When there is a form, training or report due, we are expected to comply. In occasion that you cannot meet the above expectations, I should be notified in advance so that we can work on an alternative solution.

Effective Jan 3rd 2007, each staff is given 2 Free Passes for the year 2007 ( 2 "get out of trouble" tokens ) that can be applied for minor tardiness in attendance, reports, etc.
The 3rd strike will result in an official write up.

As mentioned in team meeting and conference calls, when you need to change your branch schedule, you simply need to email your branch staff and cc me with an explanation. This is the minimal expectation of a professional.
In case you are overwhelmed with production and thus foresee being late in report, training, etc, you are obligated to notify me in advance.

The 2007 branch compensation model expects all bank staff to refer mortgage to us. Therefore, bank staff expects us to be physically at the branch as scheduled. Every month each LO is given the chance to submit a wish list in regards to the branch schedule and I will try my best to satisfy your wish.

I hope that no LO will be using the Free Pass in 2007 because after all, like you have heard before, if your are committed to HSBC and thrive to succeed in this business, you should treat your clients, bank staff, operation staff, Leah and me the same way as how you want to be treated.

Thank you for your cooperation!

Amy S. Ku
Retail Sales Manager, Northern California Region
HSBC Mortgage Corporation (USA)
amy.s.ku@us.hsbc.com
Fax: (917) 229-5167
Cellular: (650) 222-5645

HSBC values your patronage.
We are committed to providing overall exceptional service to our customers.

# Branch Schedule - January 2007

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 1<br>Holiday | | 2<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Amy<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 3<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Amy<br>**Warm Springs:** Amy<br>**Palo Alto:** contact Amy<br>**Cupertino:** Fred | 4<br>**Montgomery:** Leah/Abby<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** Amy<br>**Cupertino:** contact Amy | 5<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 6 |
| 7 | 8<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Abby<br>**Warm Springs:** Abby<br>**Palo Alto:** contact Amy<br>**Cupertino:** Frederic | 9<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 10<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Amy<br>**Warm Springs:** Amy<br>**Palo Alto:** contact Amy<br>**Cupertino:** Fred | 11<br>**Montgomery:** Leah/Abby<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** Amy<br>**Cupertino:** contact Amy | 12<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 13 |
| 14 | 15<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Abby<br>**Warm Springs:** Abby<br>**Palo Alto:** contact Amy<br>**Cupertino:** Frederic | 16<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 17<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Amy<br>**Warm Springs:** Amy<br>**Palo Alto:** contact Amy<br>**Cupertino:** Fred | 18<br>**Montgomery:** Leah/Abby<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** Amy<br>**Cupertino:** contact Amy | 19<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 20 |
| 21 | 22<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Abby<br>**Warm Springs:** Abby<br>**Palo Alto:** contact Amy<br>**Cupertino:** Frederic | 23<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 24<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Amy<br>**Warm Springs:** Amy<br>**Palo Alto:** contact Amy<br>**Cupertino:** Fred | 25<br>**Montgomery:** Leah/Abby<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** Amy<br>**Cupertino:** contact Amy | 26<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 27 |
| 28 | 29<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Abby<br>**Warm Springs:** Abby<br>**Palo Alto:** contact Amy<br>**Cupertino:** Frederic | 30<br>**Montgomery:** Leah<br>**Irving:** Philip<br>**Oakland:** contact Amy<br>**Fremont:** Fred<br>**Warm Springs:** Fred<br>**Palo Alto:** contact Amy<br>**Cupertino:** Abby | 31<br>**Montgomery:** Leah<br>**Irving:** contact Amy<br>**Oakland:** Philip<br>**Fremont:** Amy<br>**Warm Springs:** Amy<br>**Palo Alto:** contact Amy<br>**Cupertino:** Fred | | | |

# Branch Schedule - February 2007

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | **1** Montgomery: Leah / Irving: contact Amy / Oakland: Philip / Warm Springs: Fred / Cupertino: contact Amy | **2** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: contact Amy | **3** Fremont: Fred - by appointment |
| **4** | **5** Montgomery: Leah / Irving: contact Amy / Fremont/Warm Springs: contact Amy / Oakland: Philip / Palo Alto: contact Amy / Cupertino: Fred | **6** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont/Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: contact Amy | **7** Montgomery: Leah / Irving: contact Amy / Oakland: Philip / Fremont/Warm Springs: Contact Amy / Palo Alto: contact Amy / Cupertino: Fred | **8** Montgomery: Leah / Irving: contact Amy / Oakland: Philip / Fremont: Fred / Warm Springs: Fred / Palo Alto: Amy / Cupertino: contact Amy | **9** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont: Fred / Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: contact Amy | **10** Fremont: Fred - by appointment |
| **11** | **12** Montgomery: Leah / Irving: contact Amy / Fremont/Warm Springs: Abby / Oakland: Philip / Palo Alto: contact Amy / Cupertino: Fred | **13** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont/Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: Abby | **14** *Valentine's Day* / Montgomery: Leah / Irving: contact Amy / Oakland: Philip / Fremont/Warm Springs: Contact Amy / Cupertino: Fred | **15** Montgomery: Leah/Abby / Irving: contact Amy / Oakland: Philip / Fremont: Fred / Warm Springs: Fred / Cupertino: contact Amy | **16** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont: Fred / Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: Abby | **17** Fremont: Fred - by appointment |
| **18** | **19** Montgomery: Leah / Irving: contact Amy / Fremont/Warm Springs: Abby / Oakland: Philip / Palo Alto: contact Amy / Cupertino: Fred | **20** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont/Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: Abby | **21** Montgomery: Leah / Irving: contact Amy / Oakland: Philip / Fremont/Warm Springs: Contact Amy / Palo Alto: contact Amy / Cupertino: Fred | **22** Montgomery: Leah/Abby / Irving: contact Amy / Oakland: Philip / Fremont: Fred / Warm Springs: Fred / Palo Alto: Amy / Cupertino: contact Amy | **23** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont: Fred / Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: Abby | **24** Fremont: Fred - by appointment |
| **25** | **26** Montgomery: Leah / Irving: contact Amy / Fremont/Warm Springs: Abby / Oakland: Philip / Palo Alto: contact Amy / Cupertino: Fred | **27** Montgomery: Leah / Irving: Philip / Oakland: contact Amy / Fremont/Warm Springs: Fred / Palo Alto: contact Amy / Cupertino: Abby | **28** Montgomery: Leah / Irving: contact Amy / Oakland: Philip / Fremont/Warm Springs: Contact Amy / Palo Alto: contact Amy / Cupertino: Fred | | | |

## Branch Schedule - March 2007

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | **1**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: Amy<br>Cupertino: contact Amy | **2**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **3**<br>Fremont: Fred - by appointment |
| **4** | **5**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **6**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **7**<br>Montgomery: Leah<br>Irving: contact Amy<br>Fremont/Warm Springs: Contact Amy<br>Palo Alto: contact Amy<br>Cupertino: Fred | **8**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: Amy<br>Cupertino: contact Amy | **9**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **10**<br>Fremont: Fred - by appointment |
| **11** | **12** *Regional Meeting*<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **13** *Regional Meeting*<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **14**<br>Montgomery: Leah<br>Irving: contact Amy<br>Fremont/Warm Springs: Contact Amy<br>Palo Alto: contact Amy<br>Cupertino: Fred | **15**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: Amy<br>Cupertino: contact Amy | **16**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **17**<br>Fremont: Fred - by appointment |
| **18** | **19**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **20**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **21**<br>Montgomery: Leah<br>Irving: contact Amy<br>Fremont/Warm Springs: Contact Amy<br>Palo Alto: contact Amy<br>Cupertino: Fred | **22**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: Amy<br>Cupertino: contact Amy | **23**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **24**<br>Fremont: Fred - by appointment |
| **25** | **26**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **27**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **28**<br>Montgomery: Leah<br>Irving: contact Amy<br>Fremont/Warm Springs: Contact Amy<br>Palo Alto: contact Amy<br>Cupertino: Fred | **29**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: Amy<br>Cupertino: contact Amy | **30**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont: Fred<br>Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **31**<br>Fremont: Fred - by appointment |

# Loan Officer Branch Schedule – April 2007

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 1 | **2**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **3 Staff Meeting**<br><br>Please contact your LO | **4**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **5**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: contact Abby | **6**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | 7 |
| 8 | **9**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **10**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **11**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **12**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: contact Abby | **13**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | 14 |
| 15 | **16**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **17**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **18**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **19**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: contact Abby | **20**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | 21 |
| 22 | **23**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **24**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **25**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | **26**<br>Montgomery: Leah/Abby<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: contact Abby | **27**<br>Montgomery: Leah<br>Irving: contact Amy<br>Oakland: Philip<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | 28 |
| **29** | **30**<br>Montgomery: Leah<br>Irving: Philip<br>Oakland: contact Amy<br>Fremont/Warm Springs: Fred<br>Palo Alto: contact Amy<br>Cupertino: Abby | | | | | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Wong, et al.,
individually and on behalf of others
similarly situated,

        Plaintiffs,

v.

HSBC Mortgage Corporation (USA);
HSBC Bank USA, N.A,

        Defendants.

Case No. 07-2446 MMC

## DECLARATION OF DENNIS YEE

1.    I am a Plaintiff in this action against HSBC Mortgage Corporation (herinafter "HSBC"). I am over the age of 18 and competent to testify about the matters set forth in this declaration.

2.    From approximately November 2005 to July 2006, I was employed as a Senior Retail Mortgage Lending Consultant ("loan officer") by HSBC Mortgage Corporation at its Montgomery and Irving Street branches in San Francisco, CA, office. As a loan officer, my job duties remained consistent throughout my employment, and were entirely focused on my selling as many loans as possible. My job was to sell HSBC's mortgage and loan products and generate loans for customers according to HSBC's guidelines and procedures. I am informed and believe that the duties of other persons holding my position in my region, the San Francisco Bay Area, were substantially similar to mine. These duties included, but are not limited to the following:

    a.  Calling potential customers (leads), in attempting to sell loans;

    b.  Taking information from the potential customers and completing loan applications; and

    c.  Collecting client documents and answering client questions about HSBC's mortgage and loan products and/or answering questions from HSBC's underwriting department.

I did not have any supervisory responsibilities.

1

3. At my manager's direction, I was expected to spend the majority of my time and perform the vast majority of my responsibilities covering the HSBC Montgomery and Irving Street branch offices in San Francisco. My manager was Amy Ku. I worked from the branch offices at least eight hours a day.

4. On a typical day, I would get to the branch when the branch opened, by 9 a.m., and I would leave roughly at 6 p.m., when they closed, not including weekends. Irving Street was open on Saturdays, so I also spent a good 4-5 hours there on Saturdays, at least twice a month.

5. We were never told any policy about taking meal or rest breaks. The Irving Street branch, where I worked 75% of the time, did not have a real break room. The break room was shared with the vault – the safe for the bank. So there was no place to eat, unless you could go out to eat, other than your desk. Both at the Irving and Montgomery Street branches, I would typically be working while I was eating. I virtually never took a 30-minute, uninterrupted lunch break.

6. I did not regularly take rest breaks. I do not smoke cigarettes, and I do not live close enough where I would go home on a break. I would generally work straight through, other than running out for less than 15 minutes to grab food to eat at my desk.

7. We also were expected to sell loans at community events, like local fairs, working a table, meeting/greeting, on the weekends. In a typical month, there would be at least one community event - you were not reimbursed for travel and costs, or anything like that. There were also dinners on weeknights that we were expected to attend with local business associations and real estate groups, on top of meeting with clients after hours at homes, public places, coffee shops - wherever clients wanted us to meet. On average, I would have one client meeting per week from approximately 6-8 p.m., one dinner or meeting where we were supposed to sell loans, from approximately 6-9:30 p.m., and one event per weekend for 4-5 hours. These outside sales responsibilities did not take up the majority of my time – they took maybe 10 of the 55 hours I worked in an average week. Outside sales was not my primary responsibility.

8. I worked with other Senior Retail Mortgage Lending Consultants and observed their responsibilities and the ratio of their inside versus outside sales work to be similar to mine. Since we were misclassified as exempt by HSBC, we were never paid for my overtime hours worked.

9. HSBC paid me a base salary ("non-recoverable draw"), plus (in theory) a commission based on the volume of my mortgage sales and my number of sales. My base salary was at a rate of $35,000/year, but I never earned any commissions as a Senior Retail Mortgage Lending Consultant. Though I was supposedly switched to a

2

REDACTED

recoverable draw (i.e., all commissions) after my first three months as a Senior Retail Mortgage Lending Consultant, I did not earn any commissions, but continued to earn the same salary as before until the end of my HSBC employment.

10.    HSBC did not keep any official record of my hours worked, or whether I took meal or rest breaks. HSBC never provided time sheets during my employment. I am informed and believe that none of the other loan officers employed by HSBC ever engaged in any formal timekeeping while employed at HSBC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

 11.28.07
Date

Dennis Yee

3