# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PHILIP WONG, FREDERICK CHAUSSY, )

and LESLIE MARIE SHEARN, )

individually, on behalf of all ) Case No. 07-2446

others similarly situated, and )

on behalf of the general public )

     Plaintiffs, )

  vs. )

HSBC MORTGAGE CORPORATION )

(USA), )

     Defendants. )

     The videographic deposition of DAVID
GATES, called for examination pursuant to the Rules
of Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before GINA M. LUORDO, a notary public within
and for the County of Cook and State of Illinois,
at 200 North LaSalle Street, Illinois, on the 11th
day of September, 2007, at the hour of 9:02 a.m.

Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

RECEIVED

OCT 0 1 2007

LITTLER MENDELSON

COPY



David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

19

1    that capacity?

2        A.    Yes.   In a prior description, you are

3    correct.

4        Q.    Okay.   And those people would also be

5    within the broad -- the umbrella of loan officers,

6    correct, of the 260?

7        A.    Yes.   We don't have that position today.

8        Q.    Okay.   And if I understand correctly from

9    prior discovery, today all of your loan officers

10   have been consolidated into the formal position of

11   retail mortgage lending consultants; is that

12   correct?

13       A.    Yes.

14       Q.    All right.   So if you could continue

15   describing the organizational structure of your

16   sales team from yourself down to the sales

17   assistant level, I would appreciate it.

18       A.    Within the retail channel or the wholesale

19   channel, which is the B to B?

20       Q.    Why don't you go through each so I can

21   understand how it's all set up.

22       A.    The retail channel is divided up into four

23   divisions covering specific geographies.   Those

24   managers would be Deb Dezego, who runs metro New

25   York, John Fronczak, who runs upstate New York,

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

20

1   Kathy Robinson, who runs our southeast division,

2   and then Jeff Needham would run our west coast

3   division in retail.

4        Q.    Okay.  So -- and just to locate these

5   people on the organizational chart, Exhibit 1 of

6   the deposition previously marked MORT 178, these

7   are senior vice presidents of sales for their

8   respective regions here on the organizational chart

9   under you; is that right?

10       A.    You are correct.

11       Q.    Okay.  Please continue.

12       A.    And then underneath the divisional

13  managers would be a staff of regional managers that

14  would run a particular marketplace, and then the

15  sales assistant would report to the regional

16  manager.  Loan officers may report to the regional

17  manager.  They may also -- depending upon the size

18  of the region that we're covering, we may have

19  sales managers that loan officers report to because

20  we've got span of control issues in our larger

21  markets.

22       Q.    Does any -- are there any employees who

23  report to loan officers?

24       A.    No.

25       Q.    Are there any employees who report to

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

23

1    Q.    Are there also administrative support

2    personnel like sales assistants on the wholesale

3    side?

4    A.    Yes.

5    Q.    Okay.  So approximately how many account

6    executives do you have in your organization?

7    A.    100.  Let me --

8    Q.    Go ahead.

9    A.    Regional managers and account execs, 100.

10    Q.    Okay.  And approximately how many sales

11    assistants support those wholesale folks?

12    A.    10.

13    Q.    You've got to let me finish even though

14    you know where I'm going.

15    A.    Sorry.

16    Q.    About 10.  Okay.  So if I understand

17    correctly, Mr. Needham for example, like

18    Ms. Bassett, they oversee both wholesale and retail

19    sales within their respective geographies?

20    A.    No.

21    Q.    They don't?

22    A.    Jeff does.  Debbie does not.

23    Q.    I understand.  Jeff does.  Okay.

24    Mr. Needham does.

25          And then if I'm reading your

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

24

1  organizational chart correctly, you have another

2  direct report to you who oversees marketing and

3  sales operations?

4      A.    Correct.

5      Q.    And that's Mr. Vaughn, right?

6      A.    Correct.

7      Q.    Now, could you describe what Mr. Vaughn's

8  function is in some more detail?

9      A.    Chris -- well, Chris is responsible for

10  all Mortgage Corp. marketing plans and actually

11  execution of our marketing plans within Mortgage

12  Corp. nationally.  He is also responsible for a

13  department or a team of folks who runs our sales

14  operations, which is more of a sales reporting

15  function.

16      Q.    Okay.  So Mr. Vaughn's operation is the

17  centralized sales reporting and centralized

18  marketing for all of the sales divisions at

19  Mortgage Corp., correct?

20      A.    Correct.

21      Q.    And Mr. Vaughn coordinates his marketing

22  efforts with the marketing efforts of HSBC Bank

23  presumably?

24      A.    No.

25      Q.    He doesn't?

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

25

1    A.    He -- Chris runs all marketing campaigns

2  for HSBC Mortgage Corp.  He will work with HSBC

3  Bank only on those marketing promotions in which we

4  would integrate into the branch network.

5    Q.    Okay.

6    A.    But Chris runs an independent marketing

7  team because we source business from multiple

8  channels and multiple markets, and the bank is just

9  a piece of our business.  So Chris's team acts

10  independently to source business from our B to B

11  channel and our rechannel external to the bank

12  branches.

13    Q.    Could you describe a bit more about what

14  sort -- what are the marketing efforts that

15  Mr. Vaughn undertakes that affect all of your

16  mortgage sales staff in terms of the helping to

17  generate their business?

18    A.    Can you be a little bit more specific with

19  your question, please?

20    Q.    Well, you mentioned -- you described

21  briefly what Mr. Vaughn's area of responsibility is

22  and said that he oversees the marketing efforts

23  that in a variety of ways source the business for

24  the wholesale and the retail sales folks, so I'm

25  trying to understand what source of marketing

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

29

1    is selling loans, right?

2        A.    That is correct.

3        Q.    And as such, they have a -- they operate

4    based on a retail mortgage consultant sales

5    commission plan, all of your loan officers?

6        A.    That is correct.

7        Q.    And is it pretty typical, as in this

8    instance with Mr. Chaussy, that the first six

9    months or so of employment, a loan officer -- and

10   when I use loan officer, I'm referring to that

11   whole grouping of titles we described earlier.

12   It's shorter than retail mortgage lending

13   consultant.

14            Is it typical for a loan officer that the

15   first six months or so, they'll receive some sort

16   of a regular salary after which they'll be on a

17   strictly commission basis?

18       A.    No.

19       Q.    It's not typical?

20       A.    There is no typical hire plan.  We

21   actually -- depending upon the person and the

22   experience level that we set, we can bring somebody

23   on on a straight commission plan with no fixed

24   unforgivable draw.  It could be a month.  It could

25   be two months.  It could be six months.  We've even

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

30

1    done it up to a year.

2            It's all dependent upon the experience

3    level that has happened.  It's very typical in the

4    industry to do this.  We tend to be a little more

5    conservative because some people pay signing

6    bonuses.  We don't choose to do that.  We like to

7    put that into a salary.  The mortgage industry has

8    gone to that type of recruitment strategy.

9        Q.    And salary and forgivable draw, you would

10   consider those interchangeable terms for the

11   purposes of your business?

12       A.    Yes.

13       Q.    And after whatever period of time is

14   agreed upon with the employee, be it a month or in

15   Mr. Chaussy's case, six months, at least according

16   to his offer letter, the person goes to straight

17   commission after the negotiated period of salary or

18   forgivable draw expires; is that right?

19       A.    That's typically what would happen, yes.

20       Q.    And on straight commission, there's no --

21   there's no guarantee that the employee will earn

22   anything during that period of time that they're

23   working; is that right?

24       A.    No.  We would set them up with a

25   recoverable draw, as this letter would reference,

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

31

1    after that, and that is just an advance against

2    commissions.

3        Q.    The recoverable draw --

4        A.    But that's --

5        Q.    I'm sorry.  Go ahead.

6        A.    That is not a fixed number depending upon

7    the performance of the employee.  We have ranges,

8    but that we can adjust in any point in time because

9    I'm not going to put an employee in a position with

10   a draw where they get in over their heads.

11       Q.    This recoverable draw, is that -- if

12   somebody -- if Mr. Chaussy, for example, failed to

13   make a sale, would he be required to reimburse HSBC

14   for the value of the recoverable draw?

15       A.    I don't understand the question, so could

16   you please rephrase it?

17       Q.    It just reflects my ignorance of sales.

18       A.    That's okay.

19       Q.    Recoverable draw, if Mr. Chaussy --

20   let's -- in Mr. Chaussy's case, the record will

21   show elsewhere, his recoverable draw, after he went

22   to recoverable draw, was $23,000 annually.  So if

23   you do the math, it's something shy of $2,000 a

24   month.

25             So if he failed in March of 2007, for

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

36

1    divisional, and Mr. Needham replaced him in August

2    of '06.

3        Q.    Okay.  And who is Lisa Petrus?

4        A.    Lisa runs our -- let me start over.

5            Lisa works in Tom Scanlon's world in the

6    accounting finance area, so she would track all of

7    the draws and setting people up in accounting for

8    payroll within Mortgage Corp.

9        Q.    So she works with -- based on testimony

10   we've had previously, I would assume that she

11   then -- Ms. Petrus works with HSBC Finance Corp.

12   payroll to make sure that people actually get paid

13   what they're supposed to get paid?

14       A.    No, that's not correct.

15       Q.    Okay.  Isn't there HSBC -- all of the HSBC

16   units, divisions, subsidiaries, they all physically

17   receive payroll from HSBC Payroll Services; is that

18   right?

19       A.    Correct.

20       Q.    And HSBC Payroll Services is part of HSBC

21   Finance Corp.?

22       A.    I don't have that knowledge.

23       Q.    Okay.  Ms. Petrus would work with HSBC

24   Payroll Services to make sure that the mortgage

25   division's employees are getting paid what they're

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

38

1    Q.    Okay.  And this document, the three-page

2    document, appears to be on HSBC Bank USA, N.A.

3    stationery or letterhead coming from the HSBC Bank

4    HR department.  Do you see that on the first page?

5    A.    Yes.

6    Q.    Is HSBC Bank HR department involved in all

7    the hirings that take place at Mortgage Corp.?

8    A.    Can you define involved, please?

9    Q.    I mean it in the broadest way.

10   A.    I'm still confused when you say the

11   broadest way.

12   Q.    Okay.  In what way, if any, is the HSBC --

13   is HSBC Bank USA, N.A. involved with hirings that

14   take place at Mortgage Corp.?

15   A.    Mortgage Corp. outsources their human

16   resource functions to HSBC Bank, but from a hiring

17   perspective, HSBC Mortgage Corp. makes hiring and

18   firing decisions.

19   Q.    Okay.  What do you mean when you say that

20   they outsource their human resources so HSBC Bank,

21   they meaning the Mortgage Corp.?

22   A.    All of the -- this is laymen's terms.

23   Q.    It's the only kind I can understand.

24   A.    They do the paper processing of onboarding

25   employees to HSBC from an application acceptance,

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

40

1    BY MR. SCHWARTZ:

2        Q.    This, Mr. Gates, is Ms. Shearn's, another

3    one of our named plaintiffs, offer letters.  Do you

4    see the reference in the first sentence to the loan

5    production office assistant, which we've already

6    established is also commonly known in laymen's

7    terms as sales assistant in the mortgage

8    department?

9              The reference to the mortgage department

10   is a reference to HSBC Mortgage Corp. USA; is that

11   right?

12       A.    I would assume that based on who she would

13   be reporting to.

14       Q.    And is that a common way of referring to

15   the Mortgage Corp. as the mortgage department for

16   HSBC Bank?

17       A.    This was in 2002.  I wasn't in this

18   position in 2002, but I was employed here in 2002

19   in a different capacity on the third-party side of

20   the business, and we were always Mortgage Corp., so

21   I'm not sure what mortgage department -- I wouldn't

22   say that is always.

23       Q.    Do you consider the HSBC Mortgage Corp. to

24   be the mortgage department of HSBC Bank?

25       A.    No.  We're the mortgage company owned by

David Gates 30(b)(6) 9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

41

1    the bank.

2        Q.    If you set aside Ms. Shearn's offer letter

3    for the time being and take a look at Exhibit 5 of

4    the deposition, a one-page document, which is a

5    printout from the HSBC website.

6                        (Whereupon, GATES Deposition

7                        Exhibit No. 5 was marked for

8                        identification.)

9    BY MR. SCHWARTZ:

10       Q.    Mr. Gates, do you recognize this as the

11   mortgage page of the HSBC website?

12       A.    It's one of them.

13       Q.    If you go on the HSBC Bank website and you

14   want to apply for a mortgage, that is the same as

15   applying for a mortgage at HSBC Mortgage Corp.,

16   right?

17       A.    All customers that come through HSBC Bank

18   are offered residential mortgages that are

19   available through HSBC Mortgage Corp. USA, so

20   there's a referral to Mortgage Corporation because

21   it says on here mortgages are available through

22   HSBC Mortgage Corp. USA.

23       Q.    And now, HSBC -- let's see.  I'll show you

24   another document, Exhibit 6 of the deposition.

25

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

44

1    provide us the legal structure.

2        Q.    Okay.  Now, you testified that HSBC

3    Mortgage Corp. is a wholly-owned subsidiary of HSBC

4    Bank.  What does that mean that it's wholly

5    owned -- a wholly-owned subsidiary?

6        A.    They're the only shareholder.

7        Q.    Does -- if -- if HSBC Mortgage Corporation

8    had to pay a bill for something, let's say a

9    lawsuit, for example, would HSBC Bank be the source

10   of those funds, or where would those funds come

11   from?

12       A.    Mortgage Corp. is a corporation that's got

13   a balance sheet with assets and liabilities on it.

14       Q.    What are the assets presently of HSBC

15   Mortgage Corporation USA?

16       A.    Do you want specific assets, or are you

17   asking about net worth?

18       Q.    I'm interested in both, so maybe you

19   can --

20       A.    Assets are loans, cash, furniture,

21   equipment.  That would be the --

22       Q.    The big-ticket items?

23       A.    Yeah, that's the big numbers.

24       Q.    Okay.  What's the net worth of those

25   assets currently of HSBC Mortgage Corp.?

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

45

1    A.   As of the end of 2006, it was $1.1 billion

2    approximately plus or minus.

3    Q.   And is that the information you garnered

4    from Mr. Scanlon in your conversation in

5    preparation for your deposition?

6    A.   That is correct.

7    Q.   What else did you discuss with Mr. Scanlon

8    about HSBC Mortgage Corporation's assets?

9    A.   Nothing more than just finding out what

10    our net worth is and what the balance sheet looked

11    like at year end, because that's the most available

12    statement that we have from an auditing

13    perspective.

14    Q.   If the -- if the mortgage corporation is

15    wholly owned by HSBC Bank USA, N.A., does the bank

16    control that $1.1 billion in assets then?

17    A.   No.

18    Q.   Can you explain why not?

19    A.   HSBC Mortgage Corporation is run by Steve

20    Tich and the management team and, from a governance

21    perspective, is responsible for the corporation, so

22    all assets on the balance sheet of Mortgage Corp.

23    would be controlled by Steve and his team.

24    Q.   But Mr. Tich reports to Mr. Newman up at

25    HSBC Bank --

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

52

1    the country.

2         Q.    And do they -- are they primarily working

3    out of their homes, or do they spend most of their

4    time out at customer sites, or how do they operate?

5         A.    They have a book of business where they're

6    out -- they're out of their office calling on

7    mortgage brokers and mortgage banks throughout

8    their assigned territories, so they're on-the-road

9    sales reps.

10        Q.    Okay.  And the loan officers primarily

11   operate out of those -- out of the branches?

12        A.    They have touchdown spaces within the

13   mortgage offices in which Mortgage Corp. -- the

14   39 Mortgage Corp. offices.

15        Q.    What's a touchdown space?

16        A.    Some of them have -- depending upon the

17   office, the offices are configured substantially

18   different, I guess.  In our big major metropolitan

19   areas like New York City where we've got a lot of

20   concentration, you may have an office of 20 or so

21   loan officers, and there may be desk space for 10

22   or 12 because they're in and out of the office all

23   day, so they may not all have permanent desks in

24   those offices because of space constraints.  And

25   this is not a -- we don't -- we want people -- this

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

53

1    is a place where they can go and conduct business,

2    make phone calls, meet clients, but it's not a desk

3    that they go to every single day.

4         In other offices that are smaller, there

5    may be two or three people working out of the

6    office, and we have desk space.  There's enough

7    space in those offices so that they each have a

8    desk to work out of.  So when I mean touchdown,

9    they share desks in certain offices.  In other

10   offices, they don't.

11       Q.    Okay.  Now, while we're on the subject of

12   the physical location of the loan officers, I'll

13   show you a document, Exhibit No. 8 of the

14   deposition.

15                   (Whereupon, GATES Deposition

16                   Exhibit No. 8 was marked for

17                   identification.)

18   BY MR. SCHWARTZ:

19       Q.    This is a five-page document, which begins

20   with an e-mail from Ms. Ku, who you identified

21   earlier, and is directed to, among others, two of

22   our named plaintiffs, Mr. Wong and Mr. Chaussy.

23   And then it contains an attachment with branch

24   schedules for the first four months of 2007.

25                   Is this fairly typical that when your loan

David Gates 30(b)(6) 9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

54

1    officers are not in the Mortgage Corp. offices that

2    they are out at the HSBC branch offices?

3        A.    We have varying degrees of coverage for

4    branch offices, so not all loan officers have

5    branches where they can go get mortgage referrals

6    out of.  I'm sorry about that.  My phone was going

7    off.  I just turned if off.  That was the only

8    reason I reached into my pocket.

9              We have New York, Florida, California with

10   different concentrations of branches, and in

11   California, this must be how they've assigned how

12   they're going to help support those branches and

13   get leads out of those branches.  Whereas, in New

14   York, there may be a loan officer assigned to one

15   branch, two branches, three branches because we

16   have 400 some odd branches within the HSBC network.

17             This is just one source of referrals for

18   them.  They have branches, but they also go out and

19   call on real estate agents, accountants, attorneys

20   within the marketplaces which they reside as well.

21   So I can't say that this is typical because

22   California, we have very few branches, so it's a

23   little different, and they're spread out from a

24   geography perspective because HSBC is a very small

25   player in California.  Whereas, in New York state,

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

55

1    especially in Manhattan, they're on every street

2    corner, so it's a totally different coverage

3    strategy as to how they call on branches.

4        Q.   With that said, would you anticipate that

5    loan officers will spend most of their time either

6    in the branches or at the -- one of the 39 offices

7    described before, Mortgage Corp. offices?

8        A.   I would tell you that it varies by sales

9    rep because each sales rep sources their business

10   differently.  And most branch offices being bank

11   branch locations, there's typically not enough

12   space for them to spend a significant amount of

13   time.  There's not enough branch space.  There's

14   not a desk for them to sit, so they would go in.

15   They would bond.  They would build relationships.

16   They would educate branch staff on referring first

17   mortgage business to them, but that would be just a

18   sales call.

19             Typically they're out soliciting business

20   in the marketplace in attempting to generate

21   business.  So do they spend all of their time?  I

22   think it depends upon the sales rep and their sales

23   strategies for actually soliciting within those

24   marketplaces.

25       Q.   So you're not in a position to testify as

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

56

1    to what percentage of time loan officers typically

2    spend at an HSBC facility versus outside of an HSBC

3    facility as a general rule?

4        A.    I think it would be very difficult because

5    each sales rep sources their business differently,

6    so I don't know if I can give you a number that

7    would be typical because I think it's all over the

8    board as to how they choose to source their

9    business.

10       Q.    What are other ways that -- apart from

11   going to HSBC branches and working out of the HSBC

12   Mortgage Corp. offices, what are the other ways

13   that you're aware that loan officers source

14   business?

15       A.    They call on real estate offices.  They

16   call on builders.  They will call on financial

17   planners.  They will call on accountants and any

18   other network that they've developed from a

19   referral perspective to source business.

20             And those strategies differ.  Some people

21   focus on builder business.  Some people focus on

22   real estate business.  Some people focus on

23   accountants and financial planners for their

24   referrals of their mortgages.  Some like to look at

25   their past book of business and continue to

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

57

1    advertise to their past book of business in terms

2    of keeping in touch with their past book of

3    business.

4           So there's multiple strategies.  No one

5    person does it all, but the branches are a piece to

6    their overall origination strategy.

7       Q.    In order to know what percent of time loan

8    officers spend inside HSBC facilities versus

9    outside HSBC facilities, would we need to speak to

10   somebody -- would we need to speak to all of the

11   officials at the regional manager level, people

12   like at Amy Ku's level?

13      A.    I think that you could get a better

14   understanding, but I guess it would be very -- if I

15   understand your question, I don't know if there's a

16   typical answer because some loan officers don't

17   even have branches assigned to them, so it would be

18   different for different people.  I can't say that

19   there's an exact number that they spent X percent

20   of their time in a facility and X percent of their

21   time outside.  So I don't know.

22           Amy and the regional managers would give

23   you a better understanding of each one of their

24   individual market situations, but I think it would

25   depend upon the location as to the time people

David Gates 30(b)(6) 9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

64

1    packages managed through Chris Vaughn's sales

2    operations organization?

3        A.    No.

4        Q.    Where do these get managed?

5        A.    Hardware, software configurations would

6    all be part of our HTS group, which is an

7    outsourced provider.

8        Q.    That's the HSBC Technical Services?

9        A.    I think that's the correct legal name.

10        Q.    Okay.  Now, loan officers, when they're --

11    if they're accessing through their laptop remotely,

12    say, are they able to use the Loan Quest software?

13        A.    Yes.

14        Q.    Is that something that works -- excuse me.

15            Is that something that works out when

16    you're out in the field with any kind -- does it

17    work as a practical matter?  I mean, sometimes

18    these loan software can be very slow when you're

19    actually not in the office.  Do you know?

20        A.    Let me go back and just -- through

21    laptops, Loan Quest is accessible.  Blackberries,

22    it's not.  And some of our sales force will

23    actually use Loan Quest in front of a customer, and

24    some will not.

25        Q.    And what does it depend on whether or not

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

65

1   they use Loan Quest in front of a customer or not?

2       A.   I think it's a customer -- it's a sales

3   rep's personal comfort level, customer experience.

4   Some are much more proficient at utilizing the

5   system, and some of them are what I would consider,

6   you know, technologically challenged.  So it's more

7   of whether they feel comfortable with a pen and

8   paper or they feel comfortable taking data in

9   electronically.

10      Q.   Okay.

11      A.   That's with Loan Quest.

12      Q.   Okay.  I understand.  Are the loan

13  officers told how much time they're expected to

14  spend at the bank branches or at -- in the Mortgage

15  Corp. offices or in home offices versus how much

16  time they're expected to spend somewhere else out

17  in the field?

18      A.   No.  They do have set routines typically

19  with all of their customer base, whether it's a

20  branch, a real estate office, a builder where

21  they've got set times where they'll stop by to see

22  folks, but there's no set time that says they have

23  to be in the office other than they do have, from

24  time to time, an opportunity to get on calls so

25  they can actually have call desk time where they

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

66

1    can actually answer calls as referrals.

2         And it depends upon the office.  Some of

3    them have opportunities to do that, and others do

4    not.  It depends on the office and the call volumes

5    that come into those offices of the 39.  Some are

6    larger, and they get a lot of calls, and then there

7    are some that are remote outposts that may get one

8    or two a day, so there would be no need for that.

9         Q.    Would the -- would your system track in

10   any way whether a loan officer was accessing the

11   system remotely versus in an HSBC facility?

12        A.    I do not know that, but I would assume so

13   because the access point is via the internet, so

14   there's a log-on to our secure network, so I would

15   imagine there's got to be some footprint behind

16   that, but I don't have knowledge of that

17   specifically.

18        Q.    When you say the access point is via the

19   internet, are you referring to when someone is

20   operating remotely versus out of an HSBC facility?

21        A.    That is correct.

22        Q.    If someone has a home office that they do

23   their sales work out of primarily, are they --

24        A.    That would be accessing it remotely.

25        Q.    I see.  So you wouldn't be able to track

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

74

1   business plan reconciliation.

2     Q.  Do you know if -- do you consider the loan

3   officers to be inside salespeople?

4     MS. BARRETT:  Objection.  Calls for a legal

5   conclusion.

6     THE WITNESS:  Inside salespeople, no.  I would

7   not consider a loan officer to be an inside

8   salesperson.

9   BY MR. SCHWARTZ:

10     Q.  So do you consider loan officers to be

11   outside salespeople?

12     MS. BARRETT:  Objection.  Calls for a legal

13   conclusion.

14     THE WITNESS:  I would consider them outside

15   sales.

16   BY MR. SCHWARTZ:

17     Q.  And what's the basis of that?

18     MS. BARRETT:  Objection.  Calls for a legal

19   conclusion.

20     THE WITNESS:  My definition of an inside

21   salesperson is someone who sits and answers the

22   phone all day and waits for customers to come in.

23   Whereas, an outbound sales rep, where someone that

24   would be an outside sales rep would be someone that

25   would be out calling on referral sources within the

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

75

1    marketplace and is sourcing business from multiple

2    locations and by definition, has to go outside of

3    an HSBC facility to get business.

4          That is, I guess, the business plan we

5    talked about with goal settings and referrals and

6    realtors and builders and the infinity groups and

7    attorneys and CPAs and physicians and nonprofits.

8    I would assume that they would have to go out and

9    go out into the community to get those types of

10   leads and relationships.  I don't think they all

11   walk in the door.

12   BY MR. SCHWARTZ:

13       Q.   Can loan officers access realtors?  For

14   example, can they contact them on the internet?

15       A.   I'm sure that once you get a -- I'm sure

16   you can prospect over the internet because realtors

17   are all over the internet trying to sell their

18   properties.  I'm sure you could access them by

19   e-mail.

20       Q.   Would that also be builders, attorneys and

21   some of the other potential client bases you

22   mentioned?

23       A.   Yes, but that would be -- yes.

24       Q.   Does the job description for the loan

25   officers and the various titles that they've had

David Gates 30(b)(6)  9/11/2007
Phillip Wong, et al. v. HSBC Mortgage Corporation, et al.

110

1    within the organization.

2        Q.    Where do they -- what's the trip?

3        A.    It depends upon the year and where we go,

4    but usually it's somewhere -- two years ago it was

5    in Palm Springs.  Last year it was in Key West.

6    It's usually the top 20 sales reps in the country

7    will go away for two or three days.

8        Q.    Is that -- that's an annual contest?

9        A.    Yes.

10       Q.    Are there other contests that crop up

11   periodically for loan officers?

12       A.    Yeah.  That would be done at the local

13   level, though.  That would not be something that we

14   would orchestrate corporately.  That would be

15   incentives that the regional managers would run

16   within their respective regions.  Some of them do a

17   salesman of the month.  Some of them -- you know,

18   there's all kind of annual -- we don't dictate down

19   corporate standards if they want to run a contest

20   to generate business because they manage the

21   marketplace.  It gives them the ability with a

22   little flexibility.  We have just have the annual

23   corporate trip.

24       Q.    And aside from what you testified about

25   earlier regarding the changes in distinguishing

1  STATE OF ILLINOIS  )

2                     )   SS:

3  COUNTY OF C O O K  )

4          I, GINA M. LUORDO, a notary public within

5  and for the County of Cook County and State of

6  Illinois, do hereby certify that heretofore,

7  to-wit, on September 11, 2007, personally appeared

8  before me, at 200 North LaSalle Street, Chicago,

9  Illinois, DAVID GATES, in a cause now pending and

10  undetermined in the United States District Court of

11  the Northern District of California, wherein PHILIP

12  WONG, et al. are the Plaintiffs, and HSBC MORTGAGE

13  CORPORATION (USA), et al. are the Defendants.

14          I further certify that the said DAVID

15  GATES was first duly sworn to testify the truth,

16  the whole truth and nothing but the truth in the

17  cause aforesaid; that the testimony then given by

18  said witness was reported stenographically by me in

19  the presence of the said witness, and afterwards

20  reduced to typewriting by Computer-Aided

21  Transcription, and the foregoing is a true and

22  correct transcript of the testimony so given by

23  said witness as aforesaid.

24          I further certify that the signature to

25  the foregoing deposition was not waived by counsel

1  for the respective parties.

2          I further certify that the taking of this

3  deposition was pursuant to notice and that there

4  were present at the deposition the attorneys

5  hereinbefore mentioned.

6          I further certify that I am not counsel

7  for nor in any way related to the parties to this

8  suit, nor am I in any way interested in the outcome

9  thereof.

10          IN TESTIMONY WHEREOF:  I have hereunto set

11  my hand and affixed my notarial seal this 26th day

12  of September, 2007.

GINA M. LUORDO
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 05, 2010

13

14

15

16

17  _____

18  NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19  LIC. NO. 084-004143

20

21

22

23

24

25

149