# EXHIBIT 6

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

RECEIVED    1

JAN 03 2008

LITTLER MENDELSON

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

COPY

PHILIP WONG, FREDERIC              )
CHAUSSY, and LESLIE MARIE          )
SHEARN, individually, on           )
behalf of all others               )
similarly situated, and            )
on behalf of the general           )
public,                            )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )No. 3:07-cv-2446 MMC
                                   )
HSBC MORTGAGE CORPORATION          )
(USA); HSBC BANK USA,              )
N.A.; and DOES 1 through           )
50, inclusive,                     )
                                   )
        Defendants.                )


        30(b)(6) VIDEOTAPED DEPOSITION OF
              JEANETTE JENNINGS

           Taken December 19, 2007
           Commencing at 9:08 a.m.



REPORTED BY:  MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CSR
        PARADIGM REPORTING & CAPTIONING INC.
              1400 RAND TOWER
           527 MARQUETTE AVENUE SOUTH
        MINNEAPOLIS, MINNESOTA  55402-1331
    612-339-0545 * 800-545-9668 * Fax 612-337-5575

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

2

1          30(b)(6) videotaped deposition of
2    JEANETTE JENNINGS taken on December 19, 2007,
3    commencing at 9:08 a.m., at the law firm of Littler
4    Mendelson, P.C., Suite 2900, 200 North LaSalle
5    Street, before Melanie L. Humphrey-Sonntag,
6    Registered Diplomate Reporter, Certified Realtime
7    Reporter, and Notary Public of and for the State of
8    Illinois.
9
              * * * * * * * * *

10              APPEARANCES
11
12   On Behalf of the Plaintiffs:
13         Mr. Bryan J. Schwartz
           Nichols, Kaster & Anderson, LLP
14         Suite 720
           One Embarcadero Center
15         San Francisco, California 94111
           (415) 277-7235
16
17   On Behalf of the Defendants:
18         Ms. Michelle R. Barrett
           Littler Mendelson, P.C.
19         20th Floor
           650 California Street
20         San Francisco, California 94108-2693
           (415) 433-1940
21
     Also Present:  Mr. Bruce Witty, Videographer
22
23
24         NOTE:  The original transcript will be filed
     with Mr. Schwartz, pursuant to the applicable Rules
25   of Civil Procedure.

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

41

1   one of our colleagues to assist us.  That's rare but

2   it's usually when we have an uptick in hiring, but

3   that is -- that is very rare.  I can't say -- name

4   just anyone because it could be anyone to assist us.

5       Q.  Now, what are you typically looking for in

6   a -- a loan officer that you're seeking to -- a loan

7   officer vacancy that you're seeking to fill?

8       A.  You mean skills?  What exactly -- what do

9   you mean?  I'm looking for them --

10      Q.  What criteria do you have?  Yeah.

11      A.  As far as a loan officer, typically what

12  we're looking for, obviously, is having some

13  industry experience.  It would also depend upon the

14  manager.  The manager may say, "I'm willing to train

15  on that mortgage experience.  I'm looking for

16  someone who has certain behaviors, retail

17  experience, sales experience," that kind of thing.

18          But predominantly, if we're looking at -- on

19  average, it would be someone who has retail-type

20  sales experience, whether in financial services

21  industry or within mortgage industry.

22          And, obviously, appear to have been

23  successful in doing so.

24      Q.  The primary thing that you'd be looking for

25  would be somebody who has demonstrated or who you

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

42

1    believe would be a good salesperson?

2         A.   Having a true entrepreneurial spirit, that's

3    right.

4         Q.   Entrepreneurial spirit?

5         A.   Uh-huh.

6         Q.   How do you differentiate that from a good --

7    good sales -- good potential as a salesperson?

8         A.   I would differentiate between the two, as

9    far as being a good salesperson -- one is someone

10   who is able to counsel their employee -- excuse me,

11   their -- their customers, provide the right advice,

12   doing all of the right things in order to make sure

13   the sale is -- is -- is closed and it goes through

14   successfully.

15        As far as an entrepreneurial, having that

16   spirit, is making sure they're surrounding

17   themselves with the right centers of influence,

18   they're seeking out -- in this case of loan

19   consultants, are they visiting the Realtors?  Are

20   they visiting the accountants?  Are they visiting

21   attorneys? anyone who would be able to give them

22   those referrals, as well as visiting the branches,

23   making sure that -- "Hey, you know, I'm referring

24   business to you.  All right.  How can I assist you?"

25   You know, making sure that those relationships are

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

43

1    maintained.

2          So it's -- relationship manager type of

3    entrepreneurial is also what we would -- we would

4    expect because that is the expectation.

5          So that's how I would differentiate between,

6    you know, sales -- you have to have that to be the

7    entrepreneur, but the entrepreneur is also knowing

8    what needs to be done and going out to do that, to

9    build my business.

10    Q.    Now, these employees, the loan officers,

11    would acquire their skill by experience, rather than

12    by some advanced, specialized intellectual or

13    academic instruction; correct?

14    A.    I'm -- I'm not quite -- I'm not quite sure

15    of your question.  Can you clarify?

16    Q.    That the -- that the loan officers would

17    acquire their skill -- they would hone their loan

18    officer abilities by experience, as opposed to by

19    advanced, specialized academic or intellectual

20    instruction?

21    A.    I would disagree.  I would think it would be

22    both.  All right.  Some who have -- if you have

23    the -- the advanced degrees, if you will --

24    obviously, with finance and understanding that --

25    that also -- that's also a help.

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

91

1    commissions are paid?

2         A.  Not the policies, no.

3         Q.  She just --

4         A.  They're strictly on the financial end.

5         Q.  She administers the commission system

6    that's --

7         A.  Right.

8         Q.  -- developed elsewhere?

9         A.  Right.

10        Q.  And who develops the policies as to how loan

11   officers get paid on a -- their commissions?

12        A.  It's between the business -- so the head of

13   the business, David Gates -- with the approval of

14   the executive vice president, in conjunction with

15   finance.  In other words, do they all make sense?

16   Once we put all the plans together collectively, are

17   the commissions appropriate?

18        Secondly would be myself.  The other would

19   be compensation and then, lastly, compliance and

20   legal.

21        So that isn't just one person.

22        Q.  Who is the relevant person in compensation

23   that you refer to?

24        A.  Robert Lampka, who I had referred to

25   earlier, L A M P K A.

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

93

1    know, the general, overarching policy of incentive

2    plans -- and then we would add the business

3    specific.

4        Q.   What are the business-specific details of

5    the incentive plans that relate to the mortgage

6    division?

7        A.   We have a number of plans.  Are you speaking

8    only to sales officers?  Who are you speaking to?

9        Q.   Yeah.  I'm speaking to -- when you say

10   "sales officers," you're referring to loan

11   officers --

12       A.   Yes.

13       Q.   -- and all those other positions?

14       A.   I'm sorry.

15       Q.   That's fine.  I just -- they're all

16   synonyms; correct?  Sales officers?

17       A.   Yeah.

18       Q.   Okay.  So the loan officers or sales

19   officers, what incentive -- what variations are

20   there in the incentive plans for them that are

21   different from the policies -- incentive policies

22   North America-wide for -- that are established

23   with -- by Miss Kalamaras' group?

24       A.   Well, for example, these folks are a

25   commissioned sales group, so, obviously, it has to

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

94

1    do partially with their draw; it has to do with --

2    that they're paid on fundings, as well as -- or

3    number of units, whichever is greater.

4            The basis points, how it's calculated, that

5    is done by the business.  What is excluded, such as

6    employee loans, and it's all documented within the

7    plan itself.

8            What happens if people transfer within the

9    mortgage sales -- so if I'm going from one sales

10   manager to another sales manager, how those loans

11   transfer with me and how they're paid, so --

12   variations strictly to how the individual might be

13   paid is -- is really -- is the main thrust of it.

14               THE WITNESS:  May I get a Kleenex?

15               MR. SCHWARTZ:  Yeah.  We can go off the

16   record.

17               THE VIDEOGRAPHER:  You're attached.

18               MS. BARRETT:  Not anymore.

19               THE WITNESS:  Not anymore.

20               THE VIDEOGRAPHER:  Going off the record

21   at 11:32 a.m.

22                    (Whereupon, a recess was had at

23                     11:32 a.m., after which the

24                     deposition was resumed at

25                     11:39 a.m. as follows:)

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

107

1   customers, not the loan officers' customers, so they

2   can't sell away, they can't solicit, that kind of

3   thing.

4        As far as -- there's additional information

5   regarding exclusions, such as following our

6   statement of principle and business ethics.  If they

7   aren't -- that they can't accept gifts over a

8   certain dollar amount, according to policies,

9   anything that -- that kind of thing that follows our

10  North American policies that they can't accept.

11       So those are offhand -- and, again, I'm

12  speaking in only general terms because I don't have

13  the newest and latest version with me.

14       But the overall -- if I might add, the

15  overall premise and meat of it as to how they're

16  paid is -- has pretty much remained the same.

17       Q.  How do you decide, for a particular loan

18  officer, how long they are salaried before they go

19  to a recoverable draw system?

20       A.  Well, first, they're not salaried.  All

21  right?  And we have a draw policy, and, typically,

22  it is a six-month time period that is a

23  nonrecoverable draw.  So it's forgiven.

24       If it's anything beyond that, it would

25  depend upon the individual, their knowledge, their

Paradigm Reporting & Captioning Inc.
612-339-0545

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

108

1    skills, their experience in the industry, what they

2    can bring forward to us as -- as additional

3    guaranteed loans, but that is rare, and it's

4    considered an exception if it's beyond the six

5    months.

6         There would have to be a case-by-case

7    scenario on each one.

8      Q.  The typical six-month nonrecoverable draw,

9    you said it's not a salary.  What difference, if

10   any, is there between a salary and the

11   nonrecoverable draw?

12            MS. BARRETT:  Objection; calls for a

13   legal analysis and conclusion.

14            MR. SCHWARTZ:  Go ahead.

15     A.  I -- I just don't -- they're not salaried

16   employees, which would possibly put them in a

17   different class.  They're a commissioned employee,

18   so they would, in other words, receive commissions

19   on top of that draw while it's forgiven for the

20   first six months or whatever that time period is.

21   BY MR. SCHWARTZ:

22     Q.  Okay.  But they get a -- for -- typically

23   for the first six months, sometimes longer in

24   special cases, they get a base -- they get a base

25   pay -- if you want to call it a salary or

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

109

1    nonrecoverable draw or whatever it is, it's a base

2    pay that they're going to get, regardless of what

3    sales they do?

4        A.    That's correct.

5            I do want to clarify that further.  There --

6    that draw continues as a regular biweekly pay, just

7    like any other employee within North America.

8            So, in other words, they're prepaid their

9    commissions.  So if I earn -- as an example, I've --

10   I'm paid 4,000 -- or $2,000 biweekly, but in that

11   month I had 5,000 in commissions, then I am due, at

12   the end of the month, an additional $1,000 for

13   commissions.  All right?

14           On the other hand of that, being a

15   commissioned employee, if I've gone beyond my

16   forgivable -- forgiveness period, if I've earned

17   only 3,000 but I was paid 4,000, then I turn into a

18   deficit, and that deficit would come out of any

19   future commissioned earnings.

20           And they receive monthly statements, you

21   know, from finance detailing all of the commissions

22   paid.

23       Q.   Did there come a time when you changed the

24   commission system -- or commission -- sorry --

25   the -- the base pay system such that the loan

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

110

1    officers are only receiving $23,000 a year as -- as

2    a base?

3        A.  As part of the draw policy, it -- the draw

4    is based upon the individual -- all right? -- and

5    there is a tier based upon loan production.

6            So if I'm earning historically enough

7    fundings that I can have a hundred-thousand-dollar

8    draw, well, then I can have a hundred-thousand-

9    dollar draw.

10            If I'm not and my draw doesn't support that,

11    the minimum draw is the -- the Federal minimum, the

12    23, what, 660?  I can't remember the exact numbers

13    but in the $23,000 annual range.

14            But they're notified in advance that "Your

15    draw can change at the end of the six months,"

16    whatever that period is.

17            And if they aren't meeting the minimum

18    production, their manager should be having

19    conversations with them, and they would know by

20    their own monthly statements that they're not

21    meeting the minimum production standards.

22        Q.  Loan officers, as -- as you said, will be in

23    a deficit situation if they -- after the . . . the

24    first six months typically -- if they don't fund

25    enough loans to pay for the -- the draw.

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

111

1          Do they have -- they then have to pay that

2    money back to the company?

3        A.   Well, as I stated, if they are in a deficit

4    period, it would come out of any future commissions.

5          So the next month I might very well make

6    that up.  I might make -- do that 5,000.

7          So the thousand dollars I was a deficit

8    from, then I've broken even.  I've earned my 4,000

9    because, again, your commissions are being prepaid.

10   We prepay the draw, so that's really what that is.

11         So if I didn't make it and I only made

12   enough to recover 500, well, then, the next month

13   that would carry over; it would come off of those

14   future commissions.

15       Q.   Right.  But the month that you failed to

16   produce enough loans, you could -- you could be paid

17   zero and receive a -- a check that says "Negative a

18   thousand"?

19       A.   No.

20       Q.   No?

21       A.   No.  They receive their biweekly draw.

22   Despite the fact of whatever they -- they've earned,

23   they are going to receive a biweekly draw.

24       Q.   So you're saying, no matter what deficit an

25   employee is carrying, they're receiving their

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

124

1    A.    Uh-huh.

2    Q.    Are you aware that loan officers are -- have

3  required attendance at HSBC facilities?

4    A.    For meetings or -- I'm not sure --

5    Q.    That they're required to report -- that loan

6  officers are required to report to HSBC's facilities

7  on a regular basis.

8    A.    "HSBC's facilities" is pretty broad.  If

9  it's a regular basis for a monthly meeting,

10  quarterly meeting -- I'm not sure -- if it's a

11  day-to-day basis, no, they shouldn't be required to

12  be doing that.

13        Because, again, the branch is only one piece

14  of their referral source.  Do they have to let that

15  branch know where they are so that appointments can

16  be made for them?  Sure.  But for them to be

17  physically at that location, in presence, eight

18  hours a day, no, that is not a requirement.

19            MR. SCHWARTZ:  I'll show you a

20  document, Exhibit 4.  This was previously marked by

21  Defendant MORT 174.

22                    (The document was thereupon

23                    marked Deposition Exhibit

24                    No. 4 for identification as of

25                    December 19, 2007.)

Paradigm Reporting & Captioning Inc.
612-339-0545

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

125

1    BY MR. SCHWARTZ:

2        Q.   Have you ever seen this document or a

3    document of this nature before?

4        A.   No.

5        Q.   Okay.

6        A.   Excuse me.   Other than reviewing it in Sue

7    Marczak's deposition.

8        Q.   Okay.

9        A.   But prior to that, no.

10       Q.   You did review it prior to the deposition

11   today, though?

12       A.   Yeah.

13       Q.   Okay.  So you knew that, in fact, loan

14   officers -- and this is just an example -- are

15   required to attend at HSBC Bank branches on a daily

16   basis here, as exhibited here in Exhibit 4?

17            MS. BARRETT:   Objection.   The document

18   speaks for itself.

19       A.   I would say this is -- this would

20   identify -- and in looking at this -- that you have

21   to have coverage for a branch.   Let me explain.

22            Our loan officers -- the bank is the

23   customer of the mortgage corporation.   We're

24   servicing their customers.

25            So if I'm given three branches that are part

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

126

1    of my territory that I'm covering, that would be

2    indicated so that my branches know who to call and

3    when to call.  And, if I'm out of the office -- oh,

4    and there's another loan officer to assist you --

5    that's all this identifies to me.  This is stating

6    that you have to have branch coverage but not that

7    you have to be physically there.

8            I would dispute that.

9            If I can continue to clarify --

10   BY MR. SCHWARTZ:

11       Q.  No.  I don't think there's a question

12   pending.

13           So I -- just to -- the question I have is,

14   so it's your testimony that -- that the managers in

15   the mortgage division do not require their employees

16   to be physically present at the HSBC branches?

17           MS. BARRETT:  Objection; misstates

18   testimony.

19       A.  That the loan officers -- and -- and I can

20   testify that I've also recruited some of these loan

21   officers, not Philip Wong or Frederic by any means.

22   But part of that recruitment process and

23   interviewing process is that they are entrepreneurs,

24   that the branch is just one piece of their referral

25   source.

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

127

1    They're expected to have the face time --

2    and, again, the face time is just what I explained

3    to you, was attending meetings, making sure they

4    know who they are, they're referring business back

5    and forth to one another, that the business -- the

6    branches are their clients, so, of course, they want

7    to keep them happy.

8    That they are going to be there on a

9    day-to-day basis?  No.  That they should be in one

10   office on a day-to-day basis?  No.  They should be

11   out and about.  They're an outside sales force, and

12   that's clearly reiterated to them a number times and

13   what the expectations are for them to get the

14   business.

15   And to get the business in a day-to-day

16   branch, sitting there is not going to make them

17   successful.

18   And that's also explained to them.  The

19   branch is only one source.

20   BY MR. SCHWARTZ:

21   Q.  You just testified a number of things.  You

22   said that -- that the loan officers are an outside

23   sales force and that this is clearly reiterated to

24   them a number of times.

25   A.  Uh-huh.

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

137

1   were -- but it's not your testimony they were told

2   that they should be spending more than 50 percent of

3   their time outside of the branch?

4      A.  As I stated before, we don't say how much

5   percentage that they should be out; they should not

6   be tied to the branch.

7      Q.  Okay.

8      A.  The expectation is they don't have to be

9   there and shouldn't be there eight hours a day every

10   day.  That is just one referral source.

11      Q.  Do you know to what extent, if any, loan

12   officers are told that their primary responsibility

13   is to the branch?

14      A.  I -- I couldn't comment to that.  Sales

15   managers -- it depends upon the territory.

16      Q.  And the . . . the term "outside sales," what

17   conversations did you use that term in with -- you

18   said you -- you've used that in conversations with

19   the loan officers.

20      A.  It . . . just reclarifying that you're

21   outside salespeople.  You're entrepreneurs, you're

22   commissioned a sales force, and again, hence,

23   that -- it's implied just by the term of

24   "commissioned sales force" and how they're paid.

25      What -- when and how I used it -- I use it

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

144

1              AFTERNOON SESSION

2          WEDNESDAY, DECEMBER 19, 2007

3                  1:23 P.M.

4          THE VIDEOGRAPHER:  This marks the

5    beginning of Tape 3 in the deposition of Jeanette

6    Jennings.  Going on the record.  The time is now

7    1:23 p.m.  Please proceed.

8    BY MR. SCHWARTZ:

9       Q.  Miss Jennings, are you in a position to

10   answer questions on behalf of the company about

11   technology issues like how long particular data is

12   retained and what systems are used and how they

13   function, things of that nature?

14      A.  No.  No.  I would have to say no.

15      Q.  Okay.  Well, the -- you gave some testimony

16   referencing job descriptions for the sales

17   assistants and for the loan officers.  How -- how

18   are those drafted?  What's the process?

19      A.  Input from the manager.  We have particular

20   job description templates that you use which will

21   identify a summary of the role, the knowledge and

22   duties of the role, the requirements of the role,

23   such as if there's a required degree or anything

24   like that, experience level.

25          The manager would come up with that.  We

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

145

1   would review it for the manager -- does it make

2   sense?  Did it contain the pertinent details of what

3   was required? -- and then compensation would review

4   those, put them in the right format -- they might

5   revise slightly -- and then do the necessary

6   testing, if you will, for any FLSA and then

7   market-price them and put them in the proper

8   banding.

9       Q.  The testing for the FLSA that you described,

10  what are you referencing there?

11      A.  As to whether they're exempt or nonexempt,

12  the determination.

13      Q.  How do you do that?

14      A.  That you would have to confer with Bob

15  Lampka on.  We don't do that in human resources.

16  The compensation division does that.

17      Q.  So you have no involvement with any of the

18  classifications of loan officers or sales assistants

19  or, as they're now called, mortgage . . . sales

20  support specialists?

21      A.  We don't get involved in any of the

22  classifications for any job.  That is all

23  compensation.

24      Q.  And whenever you reference "compensation,"

25  you're referring to HSBC Finance Corporation?

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

158

1    Q.  Do you have . . . national performance

2  standards that apply to all of your loan officers

3  and -- and standards that apply to all of your

4  mortgage sales support specialists?

5    A.  As far . . . let me -- can I narrow that

6  down a little bit?

7    Q.  Yes, please.

8    A.  All right.

9      As far as national standards, every employee

10  has standards they have to -- to meet.  It's their

11  key accountabilities.  It's their job.  All right?

12      And then we have annual reviews that are

13  reflected upon that.

14      So, for example, if we're talking about --

15  again, the two roles.  There's mortgage support, the

16  clerical function.  It would be whatever they need

17  to be doing, and their manager would review that on

18  an annual basis with them.

19      What they might be doing in their duties in

20  New York might be different in California, based

21  upon what their manager needs.  Okay?  But the

22  overall crux of it, the overall core

23  responsibilities would be the same, and that's what

24  they would be evaluated on.  So a relative

25  assessment of people in like jobs.

Jeanette Jennings  30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

160

1     And that is then chunked down based upon

2  geographics and regions -- I don't get involved into

3  that process -- and from there, based upon like

4  regions, what are the minimum standards that

5  everyone needs to meet.

6     And, yes, there is a minimum standard that

7  loan officers need to meet.  What that is, I'd have

8  to look back at their annual review because it's

9  inserted into their annual review process --

10     Q.   That would be --

11     A.   -- and as part of their business plan.

12     Q.   Right.

13     A.   Excuse me.

14     Q.   And that would be -- David Gates would --

15  would be the person who would be involved in

16  figuring out what the actual numbers were for --

17     A.   Yes.

18     Q.   -- for -- sorry -- the actual numbers were

19  for sales targets for the loan officers?

20     A.   Yes.

21     Q.   But in terms of the overall structure of the

22  performance accountability and assessment, that

23  would be the same formula for each position

24  nationwide?

25     A.   For the core responsibilities, yes.  If

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

161

1    there's anything beyond that, just as my own

2    position -- my manager and I may set , "Oh, and, by

3    the way, I'm giving you some additional things that

4    I require of you this year --"

5        Q.  Right.

6        A.  "-- in addition to these," so that might be

7    also between manager and the employee, as well.

8        Q.  Right.

9        A.  But the core, yes, they're the same

10   nationwide.

11       Q.  Right.  And then, likewise, there's a . . .

12   there's a national protocol with respect to how

13   employees are disciplined; is that right?

14       A.  We have a performance management process, yeah.

15       Q.  Could you describe your performance

16   management process.

17       A.  Well, the overall performance management

18   process -- there -- there are certain steps.  Now,

19   depending upon what the infraction is that that

20   person's being disciplined, all those steps may or

21   may not have to be followed.

22           So, obviously, if it's a regular performance

23   issue, we would begin with, obviously -- there would

24   be verbal discussions ahead of time.  My manager, if

25   I'm not meeting my goals, would be having a

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

162

1    conversation with me about -- with coaching and

2    mentoring -- to help me succeed: "Okay.  You don't

3    seem to be -- you seem to be struggling.  What are

4    you struggling about?"

5            And if it continues, the manager would have

6    to indicate that -- you know, "I have to tell you

7    you aren't meeting the minimum requirements as

8    necessary, and if this continues -- you know, I hate

9    to see you continue down this path because then I

10   might have to take further disciplinary process."

11   So during that verbal discussion, the manager would.

12           If it still doesn't improve, the manager can

13   then go to a final written warning to say, "There's

14   still no improvement."  All right?

15           Now, if the employee is inconsistent -- they

16   might improve and they might come up a little bit

17   and then a slight back down -- that manager may

18   or -- may take one other step and just say, "You

19   know what, I might -- let's just do a written

20   warning because I think I'm seeing something here.

21   We want to see you succeed."  So they can go from a

22   verbal to a written or skip right to the final.

23           And then, if there is still no improvement,

24   then there would be a termination process.

25           But, again, that's just basic performance.

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

163

1    Depending upon what the infraction was, all of those

2    steps may be completely skipped and go right to

3    termination, such as defalcation or fraud or forgery

4    or something like that, something very serious.

5          Q.   What's defalcation?

6          A.   Stealing.

7          Q.   Oh.  Wow.  I passed the bar.  I've never

8    even heard that word.  I know a few synonyms for

9    "stealing."  That's a whole new one.  This is great.

10         So this performance management process,

11   where is it published?

12         A.   I believe it's right on Inside HR.  There's

13   also training that we've given the managers, and

14   there's a managers guide that we've produced.  So

15   it's within our intranet system.

16         Because the employees can access it

17   themselves to ensure that -- "Am I being given my

18   due?" if you will.  So it's public.

19         Q.   When you say "Inside HR," what does that

20   mean?

21         A.   That is our -- Inside HR is where all

22   policies related to employees are posted.

23         Q.   Okay.

24         A.   So it has to do with benefits, time-off

25   policy, adoption policy.  Anything and everything

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

166

1    Q.   -- would follow the same performance

2    management process?

3    A.   They should be, yes.

4    Q.   Okay.  And that process requires ongoing

5    coaching or mentoring, first of all; right?

6    A.   It -- it's recommended for the ongoing

7    coaching and mentoring, yes.  That should be at

8    least a monthly review -- it's also in their

9    business plan, a monthly review with the manager.

10   Q.   And -- and then the -- the first step of

11   progressive discipline would be a -- a verbal

12   warning?

13   A.   Right.

14   Q.   Followed by a -- either a first written

15   warning or a final written warning; right?

16   A.   Right, either one.

17   Q.   And then how long after that written

18   warning -- again, assuming this has to do with

19   inadequate sales or kind of a run-of-the-mill

20   performance issue -- how long before the

21   termination -- the employee could be terminated?

22   A.   It would depend upon that individual's

23   performance and what is a reasonable amount of time

24   for us to see has there been any improvement.

25   Typically speaking, we're looking for the

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

167

1    30 days; however, if it's within the first 2 weeks,

2    2 1/2 weeks that there isn't one application, they

3    haven't done anything further on the call

4    monitoring, they're not doing any of the things they

5    need to do to improve, it can be sooner.

6            But, typically, we would want to see a

7    reasonable amount of time, and that's typically

8    30 days, you know.  We want to see at least that.

9    But it's dependent upon the individual and their own

10   performance.

11       Q.  And is that 30-day norm set forth in your

12   online -- in your performance management process?

13       A.  We don't specify time frames.  We specify

14   reasonable amounts of time to pass in order for you

15   to reasonably assess that individual's performance

16   for their improvement or that it hasn't improved

17   and -- in order to take the necessary steps.

18            You have managers that may give longer than

19   that.  It all depends upon, you know, the

20   performance of the person.

21            Are they truly trying to do the right things

22   and you can see that they're trying to do the right

23   things?  That makes a difference.  If someone has

24   shut down and isn't doing anything -- not reporting,

25   not responding or whatever the case might be -- it

Jeanette Jennings  30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

168

1   could be sooner than that, so it's really a

2   case-by-case scenario.

3           But in answer to your question, it doesn't

4   specify an exact time frame.

5       Q.  But you train managers that the norm of a

6   reasonable time would be about 30 days?

7           MS. BARRETT:  Objection; assumes facts

8   not in evidence.

9           MR. SCHWARTZ:  Go ahead.

10      A.  We recommend to our managers what is

11  reasonable.  Thirty days is normally reasonable, and

12  we explain the same thing -- just as I said to

13  you -- "But if you don't see any performance, please

14  contact us."  If we have to take that time -- we

15  have to up that time frame, it has to be sooner.

16  BY MR. SCHWARTZ:

17      Q.  Okay.  And . . . as a manager goes through a

18  progressive discipline policy, through this

19  progressive discipline policy or this -- I guess

20  you're calling it performance management process --

21  are they required to interact with HR, with your

22  team for the mortgage division folks -- are they

23  required to interact with you about meeting each of

24  these steps?

25      A.  Not about meeting each of these steps.

Jeanette Jennings  30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

195

1    STATE OF ILLINOIS )
                      ) SS.
2    COUNTY OF DU PAGE )

3

4         I, Melanie L. Humphrey-Sonntag,

5    Certified Shorthand Reporter No. 084-004299, CSR,

6    RDR, CRR, FAPR, and a Notary Public in and for the

7    County of DuPage, State of Illinois, do hereby

8    certify that previous to the commencement of the

9    examination, said witness was duly sworn by me to

10   testify the truth; that the said deposition was

11   taken at the time and place aforesaid; that the

12   testimony given by said witness was reduced to

13   writing by means of shorthand and thereafter

14   transcribed into typewritten form; and that the

15   foregoing is a true, correct, and complete

16   transcript of my shorthand notes so taken as

17   aforesaid.

18        I further certify that there were present at

19   the taking of the said deposition the persons and

20   parties as indicated on the appearance page made a

21   part of this deposition.

22        I further certify that I am not counsel for

23   nor in any way related to any of the parties to this

24   suit, nor am I in any way interested in the outcome

25   thereof.

196

1        IN TESTIMONY WHEREOF I have hereunto set my

2    hand and affixed my Notarial Seal this 28th day of

3    December, A.D. 2007.

4

5

6                                    Certified Shorthand Reporter

                                     Registered Diplomate Reporter

7                                    Certified Realtime Reporter

                                     Fellow of the Academy of

8                                    Professional Reporters

9

10   My commission expires

     February 17, 2010

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"OFFICIAL SEAL"
M. L. HUMPHREY-SONNTAG
Notary Public, State of Illinois
My Commission Expires 02/17/10