# EXHIBIT 7

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PHILIP WONG, FREDERIC CHAUSSY,
And LESLIE MARIE SHEARN,
Individually, on behalf of all
Others similarly situated, and
On behalf of the general public,
    Plaintiffs,
  vs.           NO. 3:07-CV-2446 MMC
HSBC MORTGAGE CORPORATION (USA)
HSBC BANK, USA, N.A.; and
DOES 1 through 50, inclusive,
    Defendants.

DEPOSITION OF PHILIP WONG

SAN FRANCISCO, CALIFORNIA

NOVEMBER 29, 2007

Reported by Yvonne Fennelly, CSR No. 5495

PAULSON

34

1    Q.    Yes.

2    A.    Each person has different base salaries.  So we
3 were paid base plus commission, and for compensation
4 purposes it varied from time to time.

5    Q.    And is that because you received additional
6 monies by virtue of commissions?

7    A.    Yes.

8    Q.    And you've told us already that the commissions
9 varied with regard to the amount of the loan?

10    A.    Yes.

11    Q.    And how did the commission vary in regard to
12 the amount of the loan?

13    A.    If a loan was 400,000, we get paid a certain
14 percentage called BPS, B-P-S.  And if it's 400,000, we
15 get paid .4 BPS.  However, if we were trying to be
16 competitive with other competitors in the industry, we
17 would lower commission standards so we'll take a lower
18 pay cut just to make a loan work with HSBC's guidelines.

19    Q.    Okay, so the amount of the commission was
20 described as BPS.  Now, what does BPS stand for?

21    A.    Basis points.

22    Q.    Okay.

23          It's based on basis points.

24          So what are basis points?

25    A.    Basis points are basically the size of the loan

41

```
 1  in New York?
 2      A.  No.
 3      Q.  Have you ever worked for the mortgage company
 4  in New Jersey?
 5      A.  No.
 6      Q.  Have you ever worked for the mortgage company
 7  in any state other than California?
 8      A.  No.
 9      Q.  Have you worked side by side with any of the
10  loan officers who worked for the mortgage company in any
11  location other than in the San Francisco Bay Area?
12      A.  No.
13      Q.  Do you know anything about how those loan
14  officers or retail mortgage lending consultants
15  performed their jobs?
16      A.  Can you be more specific as performance-wise?
17      Q.  No.
18          MR. TICHY:  Will you read the question back to
19  him, please?
20          (Record read.)
21          THE WITNESS:  I do not.
22  BY MR. TICHY:
23      Q.  Do you know anything about the hours that they
24  work?
25      A.  I do not.
```

94

1  A. A majority of the time we are forced to because
2  we were losing deals to other competition due to the
3  fact that our rates, with competition, were half a
4  percent different.
5  Q. Okay.
6      But that's a decision that you make in order to
7  sell the product; right?
8  A. That's a decision that I make, but at the same
9  time it was always preached in our meetings.
10 Q. I understand that.
11     But you are the decisionmaker. It is your
12 judgment to do that or not do it, simply put; correct?
13 A. Yes.
14 Q. Okay, thank you.
15     I'm going to show you Exhibit No. 3.
16     Do you recognize this document?
17 A. Yes.
18 Q. I notice it's got what purports to be a
19 signature on the last page.
20     Is that your signature?
21 A. Yes, it is.
22 Q. I notice it also has a date which is 2005.
23 November of 2005.
24     Do you see that?
25 A. Yes.

                                    100

1  was the greatest opportunity for you to achieve success,
2  and you indicated walk-in traffic and people/clients
3  they encounter on a daily basis.
4          So you believe that the greatest opportunity
5  for business was through the branches; is that right?
6      A.   Yes.
7      Q.   By the way, when you filled out the answers
8  here, did you take time to evaluate the questions before
9  you answered?
10     A.   We did it as a group.
11     Q.   Is this a loan officer business plan for all of
12 the loan officers or is this your business plan?
13     A.   It's my business plan.
14     Q.   Okay.
15          And you filled out the responses which are
16 here; is that right?
17     A.   Yes, I did.
18     Q.   These are your judgments as to the questions
19 which are asked; is that right?
20     A.   This is my personal feelings.
21     Q.   Yes, your personal judgment as to the
22 appropriate answer to the question; is that right?
23     A.   Yes.
24     Q.   I noticed on page 4 that there is an Item
25 No. 3.

                              102

1  branch schedule.
2     Q.   You mentioned other sources, though, besides
3  the bank.
4          And did you take advantage of these other
5  sources to develop business?
6     A.   No.
7     Q.   Okay, let's look on page 11.
8          The question was, in the second paragraph, How
9  and where will you target your efforts and with who?
10         Do you see that?
11    A.   Yes.
12    Q.   You said that you would target branch
13 referrals, which you've already mentioned.
14         Also an old book of clients.
15         What does that refer to?
16    A.   My personal database.
17    Q.   And what was in your personal database?
18    A.   That was a list of my old clients.
19    Q.   Then you would also expand outwards into
20 various areas of the community; right?
21    A.   It said I would also expand outwards, but also
22 that I would use the CIF system.
23    Q.   What is the CIF system?
24    A.   It's a bank system.
25    Q.   System of what?

103

1  A. It's a bank employee system that shows account
2  information alongside with mortgage information.
3  Q. So what does CIF stand for?
4  A. I believe it's customer information.
5  Q. Okay.
6     Now, one more paragraph. It asked about your
7  commitment to take appropriate action.
8     And you said you would walk open houses on the
9  weekend to meet people as they were buying homes; am I
10 correct?
11 A. Yes.
12 Q. Did you do that?
13 A. Yes, after I went to visit the branches.
14 Q. You also said you'd be attending, in addition
15 to open houses, broker tours and seminars involving
16 realtors and brokers.
17    Did you do any of that?
18 A. No.
19 Q. Did you fill out expense statements during the
20 time you worked at the mortgage company?
21 A. Yes.
22 Q. And do you continue to do that until the
23 present time?
24 A. Yes.
25 Q. Now, I notice that in this particular document

193

1  processors in New York?
2      A.  No, unfortunately I do not know that either.
3      Q.  Do you know whether or not other loan
4  officers -- and, of course, since we've been using the
5  term "loan officers," this is to refer to the people who
6  are in your position or other mortgage or lending
7  consultants.  You've understood that through our
8  deposition; is that right?
9      A.  Yes.
10     Q.  Do you know whether or not other loan officers
11 stay at the branch till 7:30 at night?
12     A.  I do not know that as well.
13     Q.  Do you know if they leave work early during the
14 day?
15     A.  I do not know.
16     Q.  Do you know whether they arrive after
17 9:00 o'clock in the morning?
18     A.  I do not know.
19     Q.  Do you know any of their hours at work?
20     A.  I do not.
21     Q.  Okay.
22         What percentage of your income is from
23 commissions?
24     A.  Without looking at numbers, I can't really tell
25 you.



PAULSON
REPORTING & LITIGATION SERVICES

800 300 1214                                          415 591 3333

222

REPORTER'S CERTIFICATION

You, Yvonne Fennelly, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, you have subscribed my name this __14th__ day of __December__, 2007.

/S/ Yvonne Fennelly
Yvonne Fennelly, CRP, CSR No. 5495