# Exhibit 3

```
00001
 1  IN THE UNITED STATES DISTRICT COURT

 2  NORTHERN DISTRICT OF CALIFORNIA
    --------------------------------------------- x
 3  PHILIP WONG and FREDERIC CHAUSSY,
    individually, on behalf of others
 4  similarly situated, and on behalf of
    the general public,
 5
                  Plaintiffs,
 6
                       Case number
 7      -against-      07-cv-2446 MMC

 8  HSBC MORTGAGE CORPORATION (USA); HSBC
    BANK USA, N.A.; HSBC HOLDINGS, INC.;
 9  and DOES 1 through 50, inclusive,

10               Defendants.
    --------------------------------------------- x
11

12

13         DEPOSITION of DAVID PETERS, taken

14  pursuant to Notice, held at the offices of

15  Littler Mendelson, Esqs., 885 Third Avenue, New

16  York, New York, on August 14, 2008, at

17  a.m., before Fran Insley, a Notary Public of

18  the States of New York and New Jersey.

19

20

21

22

23

24

25
```

**Peters, David 8/14/2008**                                              **Page 1**

```
00002
 1  A P P E A R A N C E S:

 2

 3     NICHOLS KASTER & ANDERSON, LLP

 4        Attorneys for Plaintiffs

 5        One Embarcadero Center
          Suite 720
 6        San Francisco, California  941

 7     BY:  BRYAN J. SCHWARTZ, ESQ.
             (415) 277-7235
 8           schwartz@nka.com

 9

10

11     LITTLER MENDELSON, ESQS.

12        Attorneys for Defendants

13        750 California Street
          20th Floor
14        San Francisco, California  941

15     BY:  MICHAEL F. MC CABE, ESQ.
             (415) 433-1940
16           mmcabe@littler.com

17

18

19  ALSO PRESENT:

20        DAVID JIMENEZ, Videographer

21

22
                xxxxx
23

24

25
```

**Peters, David 8/14/2008**                                    **Page 2**

```
00003
 1 ------------------ I N D E X ------------------
 2 WITNESS        EXAMINATION BY       PAGE
 3 DAVID PETERS       MR. SCHWARTZ         4
 4                    MR. MC CABE        123
 5
 6
 7 ---------------- E X H I B I T S ----------------
 8 PETERS    DESCRIPTION            PAGE
 9 Exhibit 1   A business card of Mr. Peters    5
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

00004
1        THE VIDEOGRAPHER:  Here begins
2    tape 1 in the deposition of Mr. David
3    Peters in the matter of Philip Wong, et
4    al., versus HSBC Mortgage Corporation
5    (USA), et al.
6        Today's date is August 14, 2008.
7    The time is 10:01 a.m.  Video operator is
8    David Jimenez of Paradigm Digital
9    Videography.
10        Would counsel please identify
11    themselves and state whom they represent.
12        MR. SCHWARTZ:  Bryan Schwartz for
13    the plaintiffs.
14        MR. MC CABE:  Michael McCabe,
15    Littler Mendelson, for the defendants.
16        THE VIDEOGRAPHER:  Would the court
17    reporter please swear in the witness.
18
19   D A V I D   P E T E R S,
20      having been first duly sworn by the
21      Notary Public, was examined and
22      testified as follows:
23
24   EXAMINATION BY
25   MR. SCHWARTZ:

**Peters, David 8/14/2008**                                                                                        **Page 4**

00013
1   Q.   What is your title with the company?
2   A.   A team leader and a manager.
3   Q.   So you have both titles, team leader
4   and manager?
5   A.   A lot of titles in a bank.
6   Q.   Right. One of your titles, it
7   appears on Exhibit 1, your business card, is
8   also AVP, which I assume means assistant vice
9   president?
10  A.   Correct.
11  Q.   So that's at least three titles
12  there. What is the -- what, actually, what are
13  your job responsibilities?
14  A.   I am a loan officer. I need to
15  produce loans, close loans, originate loans, to
16  make income. I'm a manager of eight loan
17  officers, a sales assistant to train and follow
18  up on their sales production. In general,
19  that's it.
20  Q.   How does the team leader function or
21  title differ from sales manager, those
22  different capacities, or it's basically the
23  same capacity?
24  A.   Are those really the same thing?
25  Q.   Of your -- you said you need to sell

00062

1  Q.  And your evaluations, are you using

2  some kind of form that you get from HR or

3  something like that?

4  A.  Yes.

5  Q.  Who do you get it from specifically,

6  the evaluation forms?

7  A.  I believe it is generated directly

8  from HR. Origination is from HR, I believe.

9  Q.  Who in HR do you get stuff like that

10  from, your management paperwork like that?

11     MR. MC CABE: Objection. Vague and

12  ambiguous.

13  A.  Specific name, I don't know. It

14  comes from HR.

15  Q.  Is HR, as far as you know, is it

16  Mortgage Corp. HR, bank HR? Do you know who HR

17  works for?

18  A.  The HR that is direct with us would

19  be the Mortgage Corp., HR for Mortgage Corp.

20  Q.  So it's your impression that the HR

21  for Mortgage Corp., that they are Mortgage

22  Corp. employees?

23  A.  I believe so.

24  Q.  Are those -- but in terms of names

25  of people of HR that you work with in

00063
1  particular, you can't remember anyone at HR as
2  you sit here today; is that right?
3      A.  One supervisor's name is Willie
4  Daniels. More than that --
5      Q.  More than that you don't know?
6      A.  No.
7      Q.  The evaluations that you do of your
8  team members, do you evaluate them at all based
9  on where, physically where they are when they
10 are producing business? Is that a factor at
11 all that you consider in your evaluations?
12     A.  No.
13     Q.  Again, what you are focusing on is
14 are they generating money or not?
15         MR. MC CABE: Objection. Asked and
16     answered.
17     Q.  Go ahead.
18     A.  Production.
19     Q.  Do all of the -- did you say
20 eighteen or fifteen branches in your area, bank
21 branches?
22     A.  Sixteen. I said sixteen, because
23 the eight loan officers I have, everybody has
24 approximately two branches.
25     Q.  So the sixteen branches, does each

00074
1  bank relationships, meaning deposits at the
2  HSBC Bank, then they can -- that would also
3  give them preferred treatment in terms of
4  pricing exceptions and things of that nature,
5  right?
6     A.  It can. It can.
7     Q.  If it meets whatever criteria is set
8  by upper management for a pricing exception; is
9  that right?
10    A.  When you say exception, I may define
11 it differently than you may be saying it. To
12 me, an exception in the mortgage, HSBC Mortgage
13 Corp. side is more to allow something outside
14 of the box rather than fall in the normal
15 guidelines of the loan program or something.
16 That's why I'm making the clarification on
17 that.
18    Q.  Okay. That makes sense.
19        So, say, for example, somebody
20 sought a loan that was $10,000 more than what
21 they could qualify for based on the normal
22 guideline, but they have an existing banking
23 relationship with HSBC Bank, you might be able
24 to -- they might get an exception that somebody
25 who did not have that existing HSBC Bank could

00075
1  not get; is that right?

2   A.  It's possible, yes.

3   Q.  When you say it's possible does that

4  happen in your experience that those kinds of

5  exceptions are made for existing bank

6  customers?

7   A.  They can happen, yes.  There are

8  times that they are not allowed as well.

9   Q.  But you wouldn't make those kinds of

10  exceptions for customers from Citibank or

11  something?  The reason you're giving the

12  exception is to encourage people to have this

13  relationship across the board with the bank; is

14  that right?

15   A.  It's easier to get an exception for

16  an HSBC customer, yes.  Have I gotten

17  exceptions for non-HSBC customers?  On a rare

18  occasion, yes.

19   Q.  When you say, "Have I gotten an

20  exception," who do you go to to get pricing

21  exceptions?

22   A.  I would have to go directly through

23  Theresa Davis, my boss, or I have the authority

24  at times to go directly to underwriting or the

25  secondary department, which is the pricing

00076
1  department.

2  Q.  Who is your contact in underwriting

3  department?  Who do you deal with there?

4  A.  It's multiple people.  It's team

5  leaders.  There is twelve different teams, so

6  it depends upon what team I happen to be

7  dealing with based on what loan program I'm in.

8      So I -- Debbie Monesi would be a

9  supervisor of many of those team leaders.  Don

10  Mattea would be another individual that I would

11  go to, or sometimes just the team leader.

12  Q.  These individuals, Debbie Monesi,

13  Don Mattea, they deal with underwriting across

14  the company; is that right?

15      MR. MC CABE:  Objection.  Lack of

16      foundation.

17  A.  Yes.

18  Q.  And then the pricing department you

19  mentioned, who are the people that you

20  typically will deal with there?

21  A.  Timothy Taggart, Dana Nolte I used

22  to deal with.  Unfortunately, she is not there

23  anymore.  Marianne -- Marybeth -- Bethanne

24  Malicki is the other person I would deal with.

25  Q.  Again, these pricing officials will

00077
1  deal with pricing issues companywide; is that
2  right?
3          MR. MC CABE:  Objection.  Lack of
4     foundation.
5     A.   I believe so.
6     Q.   Do you have goals that you get from
7  upper management as to how much business you
8  were supposed to source from particular
9  branches?
10    A.   We have overall goals, not
11 specifically from the branches.
12    Q.   So you don't have a -- so you don't
13 have any branch-specific goals as to how much
14 business you're supposed to source?
15    A.   We have a range of business that
16 they want from the branches.  It is a range.
17 It's not a specific number.  Again, it's more
18 the overall number that they want the loan
19 officers to produce.
20    Q.   What is the range that they are
21 hoping that will be attained in terms of
22 business sourced from the branch?
23    A.   It varies dramatically based on the
24 branch's capability.  Smaller branches will be
25 a much smaller range.  Smaller branches based

00046
1  can be altered.

2  Q.  When you say weekly call report, are
3  you referring to telephone calls, or what do
4  you mean by that?

5  A.  More so of where they are trying to
6  solicit referral sources from, branch coverage,
7  LIBOR events, that type of thing. Specifically
8  management, upper management wants to know
9  about extracurricular events over and above
10 just normal coverage of branches and stuff.

11 Q.  The weekly call report, it wouldn't
12 necessarily tell you from where somebody is
13 calling to solicit new business? For example,
14 somebody could be calling from their home.
15 They could be calling from a bank branch. They
16 could be actually going out to a location to
17 meet outside of their home office or a bank
18 branch to meet with somebody, correct?

19 A.  Correct.

20 Q.  As far as you're concerned, it
21 doesn't matter where somebody is meeting
22 customers or soliciting customers so long as
23 they are bringing in business, correct?

24 A.  Correct.

25 Q.  You mentioned normal coverage of

00060
1  the applications you take in terms of where you
2  are taking them?
3      A.  In the last couple of years they
4  would tend to be more -- to be phone
5  applications 60 percent of the time,
6  approximately.  Face to face in my office,
7  approximately 20 percent.  Face to face,
8  approximately 20 percent in the branches and
9  maybe one or two percent at the customer's
10  house.  It is very rarely done anymore.  I know
11  that's more than a hundred percent.
12     Q.  Is it?  It's 102 percent of the
13  time?
14     A.  102 percent of the time.
15         MR. MC CABE:  You're the definition
16     of a go-getter.
17         THE WITNESS:  I got a calculator if
18     we need.
19         MR. SCHWARTZ:  No, I think I got it.
20     Q.  60 percent of the time the
21  applications are taken on the phone, 20 percent
22  of the time you take it at a loan production
23  office and 20 percent of the time you take it
24  at an HSBC branch, and very occasionally, one
25  or two percent of the time you're out at some

00061
1 other location, their home or someplace?

2   A.   Correct.

3   Q.   In your experience, is that a

4 similar ratio in terms of taking applications

5 that you're seeing with your team in the

6 locations, where they are taking applications?

7   A.   I can't give you a fair answer on

8 that.

9   Q.   Would that data, at least some of

10 that data be on the 1003's?

11   A.   1003 asks for face to face of it or

12 by mail, so some of that information would be

13 there.

14   Q.   But you wouldn't know in terms of

15 the face-to-face, you wouldn't know where the

16 face-to-face --

17   A.   Correct.

18      MR. MC CABE:  Again, you have to

19    wait until he finishes his question.

20      THE WITNESS:  Right.

21   Q.   Now, as the team leader/sales

22 manager, do you evaluate your loan officers, is

23 that part of your duties, your supervisorial

24 duties?

25   A.   Yes.

```
00088
 1            We are now on the record at
 2     p.m., August 14, 2008.
 3
 4     EXAMINATION (continued)
 5     BY MR. SCHWARTZ:
 6     Q.    Mr. Peters, have you heard -- in the
 7  context of your job, have you ever heard from
 8  any company official the phrase "outside
 9  sales"?
10     A.    Outside sales, the phrase, yes.
11     Q.    In what context?
12     A.    Outside sales in the context of
13  business coming from other sources than the
14  bank.
15     Q.    Who did you -- who have you heard
16  about outside sales from?
17     A.    Truthfully, nobody specifically.
18  It's literally you're just referring to
19  business coming from nonbank sources.
20     Q.    Have you heard, has any company
21  official discussed with you anything with
22  respect to outside sales and your loan officers
23  in terms of the percentage of their work that
24  is supposed to be outside sales?
25     A.    Would you mind rephrasing that? I'm
```

00089
1  not sure exactly what you're asking.
2    Q.  Yes. If you've ever been notified
3  or informed by any company official that there
4  is a particular percentage of work that your
5  loan officers are supposed to do that is
6  outside sales.
7    A.  No, no.
8    Q.  So you're not aware of any policy
9  from the company on loan officers doing inside
10 sales versus outside sales?
11   A.  Never heard of any requirement as
12 far as percentages or anything regarding where
13 that business is coming from, as long as the
14 business gets written.
15   Q.  Are you aware of how your loan
16 officers are classified under the Fair Labor
17 Standards Act and under New York law in terms
18 of exempt or nonexempt?
19   A.  No.
20   Q.  No managers or no company officials
21 have ever trained you with respect to any
22 differences that exist between exempt or
23 nonexempt status?
24   A.  No, sir.
25   Q.  Have you ever heard of outside sales

00120
1  an application fee?

2   A.  Still there would have to be an

3  exception or a VIP filled out with prior

4  approval that the application would be --

5  application fee would be waived, and even prior

6  to Terry there was very little -- the company's

7  rule was there was no waiving of application

8  fee.

9       There are sometimes when it became,

10 I guess, more prudent as far as a managerial

11 decision to waive it.  It was very rarely done,

12 however.

13  Q.  When you say very rarely, what are

14 you talking about?

15  A.  Three times a year for my team.

16  Q.  Those three times a year where

17 application fees were waived, the 325 would

18 come out of the loan officer's commission?

19  A.  There were times it was waived,

20 period, so it would not come out of the loan

21 officer's commissions, but 99 percent of the

22 time it would have to come out of the loan

23 officer's commission.  It would have to be a

24 very rare instance that the company would be

25 willing to eat it, so to speak.

```
00126
 1          C E R T I F I C A T E
 2
 3       I, FRAN INSLEY, hereby certify that
 4  the Deposition of DAVID PETERS was held before
 5  me on the 14th day of August, 2008; that said
 6  witness was duly sworn before the commencement
 7  of testimony; that the testimony was taken
 8  stenographically by myself and then transcribed
 9  by myself; that the party was represented by
10  counsel as appears herein;
11       That the within transcript is a true
12  record of the Deposition of said witness;
13       That I am not connected by blood or
14  marriage with any of the parties; that I am not
15  interested directly or indirectly in the
16  outcome of this matter; that I am not in the
17  employ of any of the counsel.
18       IN WITNESS WHEREOF, I have hereunto
19  set my hand this 20th day of August, 2008.
20
21           - - - - - - - - - - - -
              FRAN INSLEY
22
23
24
25
```