# Exhibit 5

00001

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3      UNLIMITED JURISDICTION

4

5      ---o0o---

6

7  PHILIP WONG and FREDERIC CHAUSSY, )
   individually, on behalf of others )
8  similarly situated, and on behalf )
   of the general public,      )
9               )
         Plaintiff(s),  )
10             )
    vs.         )CASE: 07-cv-2446 MMC
11            )
   HSBC Mortgage Corporation (USA); )
12 HSBC Bank USA, N.A.; HSBC    )
   Holdings, Inc.; and DOES 1    )
13  through 50, inclusive,     )
               )
14      Defendant(s).   )
               )
15          )

16

17      DEPOSITION OF

18      AMY KU

19      _____

20      June 6, 2008

21

22

23  REPORTER:  SHAARON M. SHIGIO, CSR # 12286 JOB 6914

24

25

00199

1    Q.   Was it generally understood between you and

2  your management that -- that your loan officer's first

3  responsibility was to ensure branches were covered?

4        MR. McCABE:  Objection; vague and ambiguous.

5        THE WITNESS:  The first responsibility is to

6  create enough production to satisfy what they want to

7  set the goal as per what they originally design for

8  themselves, which we agree upon as per the business

9  plan or the minimum requirement as per the Mortgage

10  Corporation.

11        MR. SCHWARTZ:  Q.  Did you ever -- I'm sorry.

12  Go ahead.

13        THE WITNESS:  Again, I don't really make my

14  loan officer to say, you know, you have to generate

15  business today or tomorrow or whenever, as long as at

16  the end of the month the production go as met, I have

17  no problem.

18    Q.   Did you tell your loan officers that their

19  first responsibility is to the branches?

20        MR. McCABE:  Objection; vague and ambiguous as

21  to context.

22        THE WITNESS:  If they get a lead from a loan

23  office -- from a branch, of course, it's the loan

24  officer's responsibility to respond to the lead.  If

25  this lead comes from a bank, yes.

00044

1  York, correct?

2  A.  Yes.

3  Q.  Next you mentioned in terms of the 10 to 15

4  e-mails a day that you will receive from your loan

5  officers requiring your intention, that there may be

6  something regarding exception considerations.  What did

7  you mean there?

8     MR. McCABE:  I believe the record was

9  exception situation, but the record will speak for

10 itself.

11     THE WITNESS:  Exception means loan amount or

12 something that is not within the HSBC guidelines.

13     MR. SCHWARTZ:  Q.  And you have in place a --

14 a process or a process flow for pricing exceptions; is

15 that right?

16     THE WITNESS:  Yes.

17 Q.  And the process flow that you have for pricing

18 exceptions, when you're selling loans to -- to bank

19 customers is -- when I say bank customers, I mean HSBC

20 Bank USA, N.A. customers, is that you -- you have to --

21 the loan officer has to come to you about the

22 exception, and then you will approach Jeffrey Needham

23 and Brian Gregson, who are the mortgage company and the

24 HSBC Bank USA, N.A. senior managers about that

25 exception; is that right?

00045

1      MR. McCABE:  Could I have that question

2  re-read, please?  There was a lot in there.

3            (Record read.)

4      MR. McCABE:  Counsel, when you say HSBC Bank

5  customers, are you referring to customers referred by a

6  branch to Mortgage Corporation?

7      MR. SCHWARTZ:  I'm referring to bank customers

8  to whom Ms. Ku and her team are selling mortgages.

9      MR. McCABE:  I'm sorry.  Bank customers.  Not

10  just mortgage customers, but specifically bank

11  customers?

12      MR. SCHWARTZ:  Correct.

13      MR. McCABE:  Okay.

14      THE WITNESS:  If it is an exception request

15  then, yes, I will have to make sure that, you know,

16  Brian Gregson and Jeff agree, such as Jeff agree,

17  "Okay.  We're going to ask -- request -- consider

18  request exception approval for this loan amount

19  exception," for example.

20      Okay.  And then Brian has to verify whether

21  this is really a bank customer, because normally we

22  grant exception based on relationship.

23      MR. SCHWARTZ:  Q.  What do you mean when you

24  say, "Normally we grant exceptions based on

25  relationships"?

**Ku, Amy - 06/06/2008**                    **Page 45**

00046

1      THE WITNESS: Maybe we will see that, you

2  know, customer wants a mortgage that is maybe 10,000

3  above whatever the guideline.  Sometimes when the -- if

4  it is a referral from the bank, then the customer

5  actually have a length of -- extensive length of

6  relationship with us, then we will consider whether we

7  should be able to, you know, lift that bar a little

8  higher and get that extra $10,000 loan.

9      Q.  And when you say, "with us," you mean with the

10  HSBC Family, correct?

11     A.  Yes, with the family.

12     Q.  So -- and you don't have a policy for granting

13  exceptions like that to potential customers other than

14  HSBC Bank customers, correct?

15     A.  Not true.  We will see -- if it is a potential

16  customer that doesn't bank with HSBC yet, no

17  relationship with our family yet, but we see -- we see

18  that if we can offer the customer the mortgage with a

19  reasonable exception request, if that will actually

20  expand our potential relationship with this customer --

21  again, "our" meaning the entire HSBC relationship --

22  then, yes, you will see this kind of request also.

23     Q.  In other words, for that non-HSBC Bank

24  customer, existing bank -- HSBC Bank customer who is

25  seeking an exception to your -- a pricing exception,

00047

1  you may grant an exception if they agree to open an

2  HSBC Bank USA, N.A. account in addition to their

3  mortgage loan request; is that right?

4      A.   No, not really.  We have different pricing.

5  We have relationship pricing.  We have pricing that's

6  available for customer that has a bank relationship.

7  We also have pricing that is available for customer,

8  same product line and everything for customer who

9  doesn't have relationship.

10     It's our loan officer's job to profile the

11  customer, to understand the needs and to, you know,

12  advise them whether -- what are the options available

13  for them.  We don't make our customer to have an

14  account open in order to grant them a mortgage.  By the

15  same token, we'll ask, "What type of relationship do

16  you have with us?"

17     They may tell us that, "Okay.  I already have,

18  you know, two CD or checking account."

19     Then if it is -- everything is within

20  guidelines, then we're not going to ask for exception.

21  But if there is one exception arise, it will be a

22  compensating factor for us when we ask for exception

23  approval that -- to tell the underwriting department

24  that this customer has a relationship with us.

25     Q.   With the HSBC Family?

00048

1    A.  Yes.

2    Q.  And the relationship pricing you referenced,

3  that means that typically you will offer incentives or

4  better prices to existing HSBC Bank customers, correct?

5    A.  If they qualify, correct.  If they qualify,

6  because there will be minimum credit requirement,

7  income requirement, and everything.

8    Q.  Assuming two customers who have identical

9  credit scores and identical income, you will give

10  better pricing, relationship pricing, to the existing

11  HSBC Bank customer, correct?

12    A.  No, if they qualify.  Again, the customer can

13  still choose to go for a normal program versus program

14  A or B.  You see what I'm trying to tell you?

15    Q.  Not really.

16    A.  Okay.  One customer may qualify for multiple

17  programs, so our job is to actually show the customer

18  what are the options available for them, and then they

19  get to pick and choose which one they want to go for.

20    Q.  Right, I understand that, but in terms -- my

21  question had to do with relationship pricing.  So

22  relationship pricing means you get a better price on

23  your mortgage if you have a relationship with HSBC

24  Bank, correct?

25    A.  Yes.

00114

1  your loan officers are working?

2    A.  True.

3    Q.  If we wanted to find out how much time loan

4  officers spent at any particular location, be it the

5  home office or the branch or the loan production office

6  or at a client site, we'd have to talk to the loan

7  officers themselves; is that right?

8    A.  True.

9    Q.  Your only concern was that they make the

10  sales, ultimately, right?

11      MR. McCABE:  Objection; vague and ambiguous.

12      MR. SCHWARTZ:  Q.  In an ethical way.  I'm not

13  trying to say you encouraged anyone to break the law.

14  I mean, your only concern is that they make proper

15  sales?

16      THE WITNESS:  Legally and ethically, yes.

17    Q.  Okay.  My point is, you didn't care whether

18  your loan officers made sales at the branch, at their

19  home office, you know, on the phone at a loan

20  production office or out at some site other than that?

21  It wasn't important to you where the sale was made,

22  correct?

23    A.  Correct.

24    Q.  And in the same vein, you didn't really track

25  loan officers' precise hours, correct?

**Ku, Amy - 06/06/2008**                    **Page 114**

00115

1    A.  Correct.

2    Q.  You never gave loan officers a quota saying

3  you need to spend X percentage of your time outside of

4  the branch and X percentage of your time inside the

5  branch, correct?

6    A.  Correct.

7    Q.  And you never disciplined a loan officer?  By

8  discipline, I mean any kind of corrective action or

9  termination for not spending enough time outside the

10  branch or not spending enough time in the branch; is

11  that true?

12    A.  Correct.

13    Q.  You never told your loan officers a specific

14  percentage of the time that you expected that they

15  would be spending making sales outside of the HSBC

16  facility or home office versus inside, true?

17    A.  True, there is no percentage.

18    Q.  A part of your role was to make sure that your

19  loan officers had desks where they could work at the

20  HSBC Bank branches, right?

21    A.  We'll try to make sure if our loan officer is

22  going to a branch, hopefully, there is some space for

23  him to park his laptop or sit at ideally, if possibly,

24  yes.

25    Q.  So, for example, you helped work on ensuring

00189

1    Q.  Have you had discussions with loan officers

2  about waiving application fees to HSBC's application --

3  HSBC Mortgage's application fees in order to make a

4  loan deal more attractive to a customer?

5    A.  It is strongly discouraged.  Company policy is

6  to submit the appropriate application fee along with

7  the application.

8    Q.  When did that policy come out to your

9  knowledge?

10    A.  From when I joined, I already know that there

11  is an application fee for conforming loans.

12    Q.  Other than Mr. Wong, have other loan officers

13  waived application fees at different times?

14      MR. McCABE:  Well, objection.  I'll object to

15  the reference to Mr. Wong as lacking foundation.

16      MR. SCHWARTZ:  Q.  To your knowledge?

17      THE WITNESS:  So I should exclude Mr. Wong and

18  think of other loan officer, if there is --

19    Q.  Well, you know, Mr. Wong has waived

20  applications fees and had to repay the company,

21  correct?

22    A.  Yes.

23    Q.  Other than Mr. Wong, have other loan officers

24  had the same kind of thing happen?

25    A.  Maybe once or twice incident for other loan

00190

1  officer, if they decided to do so.

2      Q.   Which other loan officers have had to repay

3  the company application fees from a failed loan?

4      A.   As I recall Abby Ho.

5      Q.   Any others?

6      A.   No.

7      Q.   To the best of your knowledge, is the $325

8  application fee, is that a nationwide -- is that the

9  same standard?

10     A.   To the best of my knowledge, yes.

11     Q.   And to the best of your knowledge, nationwide,

12  if a loan officer waives an application fee and the

13  loan fails, is the policy that they have to pay the

14  company back?

15        MR. McCABE:  Objection; lacks foundation.

16        THE WITNESS:  To the best of my knowledge,

17  yes.

18        MR. SCHWARTZ:  Now about Fred Chaussy.  Before

19  his -- well, you knew -- well, I'll just show you the

20  document.  Exhibit 13 to the deposition, NKA 1910.

21        [Whereupon, Deposition Exhibit 13, an

22        E-mail dated 2/3/2007, was marked for

23        identification.]

24        THE WITNESS:  Thank you.

25        MR. SCHWARTZ:  Q.  Ms. Ku, you recall you were

**Ku, Amy - 06/06/2008**                    **Page 190**

00199

1    Q.  Was it generally understood between you and

2  your management that -- that your loan officer's first

3  responsibility was to ensure branches were covered?

4        MR. McCABE:  Objection; vague and ambiguous.

5        THE WITNESS:  The first responsibility is to

6  create enough production to satisfy what they want to

7  set the goal as per what they originally design for

8  themselves, which we agree upon as per the business

9  plan or the minimum requirement as per the Mortgage

10  Corporation.

11        MR. SCHWARTZ:  Q.  Did you ever -- I'm sorry.

12  Go ahead.

13        THE WITNESS:  Again, I don't really make my

14  loan officer to say, you know, you have to generate

15  business today or tomorrow or whenever, as long as at

16  the end of the month the production go as met, I have

17  no problem.

18    Q.  Did you tell your loan officers that their

19  first responsibility is to the branches?

20        MR. McCABE:  Objection; vague and ambiguous as

21  to context.

22        THE WITNESS:  If they get a lead from a loan

23  office -- from a branch, of course, it's the loan

24  officer's responsibility to respond to the lead.  If

25  this lead comes from a bank, yes.

00044

1  York, correct?

2    A.  Yes.

3    Q.  Next you mentioned in terms of the 10 to 15

4  e-mails a day that you will receive from your loan

5  officers requiring your intention, that there may be

6  something regarding exception considerations.  What did

7  you mean there?

8        MR. McCABE:  I believe the record was

9  exception situation, but the record will speak for

10  itself.

11        THE WITNESS:  Exception means loan amount or

12  something that is not within the HSBC guidelines.

13        MR. SCHWARTZ:  Q.  And you have in place a --

14  a process or a process flow for pricing exceptions; is

15  that right?

16        THE WITNESS:  Yes.

17    Q.  And the process flow that you have for pricing

18  exceptions, when you're selling loans to -- to bank

19  customers is -- when I say bank customers, I mean HSBC

20  Bank USA, N.A. customers, is that you -- you have to --

21  the loan officer has to come to you about the

22  exception, and then you will approach Jeffrey Needham

23  and Brian Gregson, who are the mortgage company and the

24  HSBC Bank USA, N.A. senior managers about that

25  exception; is that right?

00045

1      MR. McCABE:  Could I have that question

2  re-read, please?  There was a lot in there.

3            (Record read.)

4      MR. McCABE:  Counsel, when you say HSBC Bank

5  customers, are you referring to customers referred by a

6  branch to Mortgage Corporation?

7      MR. SCHWARTZ:  I'm referring to bank customers

8  to whom Ms. Ku and her team are selling mortgages.

9      MR. McCABE:  I'm sorry.  Bank customers.  Not

10  just mortgage customers, but specifically bank

11  customers?

12      MR. SCHWARTZ:  Correct.

13      MR. McCABE:  Okay.

14      THE WITNESS:  If it is an exception request

15  then, yes, I will have to make sure that, you know,

16  Brian Gregson and Jeff agree, such as Jeff agree,

17  "Okay.  We're going to ask -- request -- consider

18  request exception approval for this loan amount

19  exception," for example.

20      Okay.  And then Brian has to verify whether

21  this is really a bank customer, because normally we

22  grant exception based on relationship.

23      MR. SCHWARTZ:  Q.  What do you mean when you

24  say, "Normally we grant exceptions based on

25  relationships"?

00046

1          THE WITNESS: Maybe we will see that, you

2    know, customer wants a mortgage that is maybe 10,000

3    above whatever the guideline.  Sometimes when the -- if

4    it is a referral from the bank, then the customer

5    actually have a length of -- extensive length of

6    relationship with us, then we will consider whether we

7    should be able to, you know, lift that bar a little

8    higher and get that extra $10,000 loan.

9      Q.  And when you say, "with us," you mean with the

10   HSBC Family, correct?

11     A.  Yes, with the family.

12     Q.  So -- and you don't have a policy for granting

13   exceptions like that to potential customers other than

14   HSBC Bank customers, correct?

15     A.  Not true.  We will see -- if it is a potential

16   customer that doesn't bank with HSBC yet, no

17   relationship with our family yet, but we see -- we see

18   that if we can offer the customer the mortgage with a

19   reasonable exception request, if that will actually

20   expand our potential relationship with this customer --

21   again, "our" meaning the entire HSBC relationship --

22   then, yes, you will see this kind of request also.

23     Q.  In other words, for that non-HSBC Bank

24   customer, existing bank -- HSBC Bank customer who is

25   seeking an exception to your -- a pricing exception,

00047

1  you may grant an exception if they agree to open an

2  HSBC Bank USA, N.A. account in addition to their

3  mortgage loan request; is that right?

4      A.  No, not really.  We have different pricing.

5  We have relationship pricing.  We have pricing that's

6  available for customer that has a bank relationship.

7  We also have pricing that is available for customer,

8  same product line and everything for customer who

9  doesn't have relationship.

10      It's our loan officer's job to profile the

11  customer, to understand the needs and to, you know,

12  advise them whether -- what are the options available

13  for them.  We don't make our customer to have an

14  account open in order to grant them a mortgage.  By the

15  same token, we'll ask, "What type of relationship do

16  you have with us?"

17      They may tell us that, "Okay.  I already have,

18  you know, two CD or checking account."

19      Then if it is -- everything is within

20  guidelines, then we're not going to ask for exception.

21  But if there is one exception arise, it will be a

22  compensating factor for us when we ask for exception

23  approval that -- to tell the underwriting department

24  that this customer has a relationship with us.

25      Q.  With the HSBC Family?

**Ku, Amy - 06/06/2008**                    **Page 47**

00048

1   A.  Yes.

2   Q.  And the relationship pricing you referenced,

3  that means that typically you will offer incentives or

4  better prices to existing HSBC Bank customers, correct?

5   A.  If they qualify, correct. If they qualify,

6  because there will be minimum credit requirement,

7  income requirement, and everything.

8   Q.  Assuming two customers who have identical

9  credit scores and identical income, you will give

10  better pricing, relationship pricing, to the existing

11  HSBC Bank customer, correct?

12   A.  No, if they qualify. Again, the customer can

13  still choose to go for a normal program versus program

14  A or B. You see what I'm trying to tell you?

15   Q.  Not really.

16   A.  Okay. One customer may qualify for multiple

17  programs, so our job is to actually show the customer

18  what are the options available for them, and then they

19  get to pick and choose which one they want to go for.

20   Q.  Right, I understand that, but in terms -- my

21  question had to do with relationship pricing. So

22  relationship pricing means you get a better price on

23  your mortgage if you have a relationship with HSBC

24  Bank, correct?

25   A.  Yes.

00114

1 your loan officers are working?

2 A. True.

3 Q. If we wanted to find out how much time loan

4 officers spent at any particular location, be it the

5 home office or the branch or the loan production office

6 or at a client site, we'd have to talk to the loan

7 officers themselves; is that right?

8 A. True.

9 Q. Your only concern was that they make the

10 sales, ultimately, right?

11      MR. McCABE: Objection; vague and ambiguous.

12      MR. SCHWARTZ: Q. In an ethical way. I'm not

13 trying to say you encouraged anyone to break the law.

14 I mean, your only concern is that they make proper

15 sales?

16      THE WITNESS: Legally and ethically, yes.

17 Q. Okay. My point is, you didn't care whether

18 your loan officers made sales at the branch, at their

19 home office, you know, on the phone at a loan

20 production office or out at some site other than that?

21 It wasn't important to you where the sale was made,

22 correct?

23 A. Correct.

24 Q. And in the same vein, you didn't really track

25 loan officers' precise hours, correct?

**Ku, Amy - 06/06/2008**                                    **Page 114**

00115

1    A.  Correct.

2    Q.  You never gave loan officers a quota saying

3  you need to spend X percentage of your time outside of

4  the branch and X percentage of your time inside the

5  branch, correct?

6    A.  Correct.

7    Q.  And you never disciplined a loan officer?  By

8  discipline, I mean any kind of corrective action or

9  termination for not spending enough time outside the

10  branch or not spending enough time in the branch; is

11  that true?

12    A.  Correct.

13    Q.  You never told your loan officers a specific

14  percentage of the time that you expected that they

15  would be spending making sales outside of the HSBC

16  facility or home office versus inside, true?

17    A.  True, there is no percentage.

18    Q.  A part of your role was to make sure that your

19  loan officers had desks where they could work at the

20  HSBC Bank branches, right?

21    A.  We'll try to make sure if our loan officer is

22  going to a branch, hopefully, there is some space for

23  him to park his laptop or sit at ideally, if possibly,

24  yes.

25    Q.  So, for example, you helped work on ensuring

**Ku, Amy - 06/06/2008**                    **Page 115**

00189

1    Q.  Have you had discussions with loan officers

2  about waiving application fees to HSBC's application --

3  HSBC Mortgage's application fees in order to make a

4  loan deal more attractive to a customer?

5    A.  It is strongly discouraged.  Company policy is

6  to submit the appropriate application fee along with

7  the application.

8    Q.  When did that policy come out to your

9  knowledge?

10    A.  From when I joined, I already know that there

11  is an application fee for conforming loans.

12    Q.  Other than Mr. Wong, have other loan officers

13  waived application fees at different times?

14      MR. McCABE:  Well, objection.  I'll object to

15  the reference to Mr. Wong as lacking foundation.

16      MR. SCHWARTZ:  Q.  To your knowledge?

17      THE WITNESS:  So I should exclude Mr. Wong and

18  think of other loan officer, if there is --

19    Q.  Well, you know, Mr. Wong has waived

20  applications fees and had to repay the company,

21  correct?

22    A.  Yes.

23    Q.  Other than Mr. Wong, have other loan officers

24  had the same kind of thing happen?

25    A.  Maybe once or twice incident for other loan

00190

1  officer, if they decided to do so.

2    Q.  Which other loan officers have had to repay

3  the company application fees from a failed loan?

4    A.  As I recall Abby Ho.

5    Q.  Any others?

6    A.  No.

7    Q.  To the best of your knowledge, is the $325

8  application fee, is that a nationwide -- is that the

9  same standard?

10    A.  To the best of my knowledge, yes.

11    Q.  And to the best of your knowledge, nationwide,

12  if a loan officer waives an application fee and the

13  loan fails, is the policy that they have to pay the

14  company back?

15      MR. McCABE:  Objection; lacks foundation.

16      THE WITNESS:  To the best of my knowledge,

17  yes.

18      MR. SCHWARTZ:  Now about Fred Chaussy.  Before

19  his -- well, you knew -- well, I'll just show you the

20  document.  Exhibit 13 to the deposition, NKA 1910.

21      [Whereupon, Deposition Exhibit 13, an

22      E-mail dated 2/3/2007, was marked for

23      identification.]

24      THE WITNESS:  Thank you.

25      MR. SCHWARTZ:  Q.  Ms. Ku, you recall you were

00220

CERTIFICATE OF REPORTER

1

2

3     I, SHAARON M. SHIGIO, a Certified Shorthand

4 Reporter, hereby certify that the witness in the

5 foregoing deposition was by me duly sworn to tell the

6 truth, the whole truth and nothing but the truth in the

7 within-entitled cause;

8     That said deposition was taken down in shorthand

9 by me, a disinterested person, at the time and place

10 therein stated, and that the testimony of the said

11 witness was thereafter reduced to typewriting, by

12 computer, under my direction and supervision;

13     That before completion of the deposition, review

14 of the transcript {X} was { } was not requested.  If

15 requested, any changes made by the deponent (and

16 provided to the reporter) during that period allowed

17 are appended hereto.

18     I further certify that I am not of counsel or

19 attorney for either or any of the parties to the said

20 deposition, nor in any way interested in the events of

21 this cause, and that I am not related to any of the

22 parties thereto.

23     DATED:

24

25     Shaaron M. Shigio, CSR #12286