# Exhibit 6

```
00001
 1           IN THE UNITED STATES DISTRICT COURT

 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3              UNLIMITED JURISDICTION

 4

 5              ---o0o---

 6

 7  PHILIP WONG and FREDERIC CHAUSSY, )
    individually, on behalf of others )
 8  similarly situated, and on behalf )
    of the general public,            )
 9                                    )
            Plaintiff(s),              )
10                                    )
        vs.             )CASE: 07-cv-2446 MMC
11                                    )
    HSBC Mortgage Corporation (USA);  )
12  HSBC Bank USA, N.A.; HSBC         )
    Holdings, Inc.; and DOES 1        )
13  through 50, inclusive,            )
                                      )
14          Defendant(s).             )
                                      )
15                                    )

16

17              DEPOSITION OF

18              JEFFREY NEEDHAM

19         _____

20              June 5, 2008

21

22

23  REPORTER:  SHAARON M. SHIGIO, CSR # 12286 JOB 6911

24

25
```

00088
```
 1     You, Jeffrey Needham, are not personally in a
 2  position to testify as to where physically your loan
 3  officers are conducting their business?
 4     A.  I think they're conducting their business at
 5  all the places I mentioned above and others.
 6     Q.  You are not in a position to testify as to how
 7  many hours loan officers spend at any given place doing
 8  business, correct?
 9         MR. TICHY:  I believe he's already answered
10  your question, but --
11         MR. SCHWARTZ:  He hasn't.
12         MR. TICHY:  Okay.
13         THE WITNESS:  My expectations for loan
14  officers is that they are originating and closing
15  loans.  That's what the expectation is.
16         MR. SCHWARTZ:  I understand, but I'm asking
17  you to answer --
18         THE WITNESS:  Well, let me finish.
19     Q.  -- a question straightforwardly.  That's
20  nonresponsive to my question.  You need to answer my
21  question.
22     A.  Okay.
23     Q.  My question is:  Are you, Jeffrey Needham, in
24  a position to state how many hours loan officers are
25  spending in any particular location doing their
```

00089
1  business?

2      MR. TICHY: Okay. Now, again, it's asked and
3  answered, but go ahead and respond as best you can.

4      THE WITNESS: Again, I know for a fact that
5  loan officers are conducting business in all those
6  places that I mentioned, as well as others. That's
7  what I know, Jeffrey Needham.

8      MR. SCHWARTZ: Q. But, yourself, you don't
9  know how much time they're spending at any particular
10 location?

11     THE WITNESS: I don't know how much time
12 they're spending at Starbucks versus meeting consumers
13 versus the Coldwell Banker office that they have a
14 relationship with versus their attorney's office who is
15 introducing them to clients versus the borrower's home.
16 Again, they're spending time at all those locations and
17 others getting introduced to and meeting customers.

18   Q. So you don't know how much time any particular
19 loan officer spends at a HSBC branch versus any of the
20 locations you mentioned versus in their home office,
21 correct?

22   A. At any given time, I don't know where a -- any
23 specific loan officer is conducting their business.

24   Q. So if we wanted to know where, physically,
25 loan officers are spending their time, how many hours

00090
 1  they're spending in different areas, we'd have to talk
 2  to the loan officers?
 3     A.  I would say that the -- the -- the management
 4  level above the loan officers should have some idea as
 5  to where the loan officer is in regards to originating
 6  their transactions and the types of referral sources
 7  that they're using and the time that they're spending
 8  with those.
 9         So in a general sense, I would say that
10  individual loan officer's manager should have some
11  idea, yes.
12     Q.  Okay.  But you, personally, you are not in a
13  position to testify as to how much time loan officers
14  are spending at any of the different locations, from
15  HSBC facilities to home offices to outside areas; is
16  that right?
17     A.  Me, personally?  Do I know where the loan
18  officers are at any given day, conducting their
19  business, whether they're working from 8:00 to 5:00 or
20  from 12:00 to six or -- and at what specific locations,
21  I do not know.
22     Q.  And you can't testify as to, you know, across
23  all the loan officers under your supervision, how much
24  time they spend working at HSBC facilities versus
25  working at their home office versus working at some

**Needham, Jeffrey - 06/05/2008**                                    **Page 90**

00091
1  other location?
2       MR. TICHY:  Again, are you talking about the
3  mortgage company?
4       MR. SCHWARTZ:  No, I'm not.
5       MR. TICHY:  What are you talking about?
6       MR. SCHWARTZ:  I'm talking about HSBC
7  facilities.
8       MR. TICHY:  If you're able to answer that
9  question, please do but --
10           (Record read.)
11      MR. TICHY:  Again, asked and answered.
12      THE WITNESS:  Again, my expectations of loan
13  officer is they're out originating loans.  They're
14  outside salespeople originating sale transactions, and
15  whether they're spending their time at an HSBC loan
16  production -- Mortgage Corp. loan production office or
17  a Coldwell Banker officer or they happen to be spending
18  some time at an HSBC Bank branch facility, I cannot
19  attest to any specific knowledge of exact time for
20  those outside salespeople as to where they are at any
21  given time and/or what they're, you know -- what
22  referral sources they're visiting and/or consumers
23  they're visiting.
24      MR. SCHWARTZ:  Q.  Okay.  I'm not asking for
25  an exact figure, but your -- my understanding from your

00092
1  testimony, correct or incorrect -- I'm asking you, true
2  or false, loan officers -- you cannot testify as to,
3  generally, across all of the loan officers you
4  supervise, what percentage of the time they're spending
5  working for a home office or from a HSBC facility of
6  any kind or from some outside customer site?
7      MR. TICHY: Objection; asked and answered.
8      MR. SCHWARTZ: Not answered.
9      MR. TICHY: Excuse me.
10     MR. SCHWARTZ: His answer was nonresponsive.
11     MR. TICHY: Excuse me. Excuse me. It is
12 answered. I'm advising you not to respond further.
13 Move on.
14     MR. SCHWARTZ: Q. Okay. What percentage of
15 the time do loan officers that you supervise spend
16 working from their home offices?
17     MR. TICHY: Again, I believe he's answered
18 but, you know, that is a different question, and I will
19 let you respond whatever way you want.
20     THE WITNESS: You know, any individual loan
21 officer, again, as I've stated is sourcing their
22 business based on their business plan, based on where
23 they can generate new leads, close transactions.
24     MR. SCHWARTZ: I need you to answer my
25 question. I'm not asking about sources of business.

00093

1    THE WITNESS: If you could --

2    MR. SCHWARTZ: No, I need you to answer my
3 question.

4    MR. TICHY: Excuse me. Let him finish.

5    MR. SCHWARTZ: I do not need to let him finish
6 if he's not being responsive.

7    MR. TICHY: Excuse me. You do.

8    MR. SCHWARTZ: I most certainly do not.

9    MR. TICHY: Okay. Excuse me. Are you
10 finished with your answer?

11    THE WITNESS: I was not.

12    MR. TICHY: Okay. Then finish it.

13    MR. SCHWARTZ: Okay. No, I'm going to ask you
14 the question --

15    MR. TICHY: Are you withdrawing your question?

16    MR. SCHWARTZ: I'm going to re-ask my question
17 and anticipate an answer that's responsive.

18    MR. TICHY: Okay. So you're withdrawing and
19 asking a new question.

20    MR. SCHWARTZ: Q. My question is the same,
21 which is: What percentage of time is a loan officer
22 spending physically, all the loan officers under your
23 supervision, are they spending physically working from
24 home offices?

25    MR. TICHY: Okay. Now I have the same

00094
1  objections, but you are free to answer this yet again.
2  If -- and if you're able to answer this specific
3  question differently, please do.
4      THE WITNESS: Any individual loan officer
5  is -- is a -- has a specific situation as to their
6  business that they're conducting. So whether they're
7  in California or New York or Florida or within
8  California itself, again, they can be spending time at
9  a Realtor's office, at an HSBC Bank branch, at a
10 Mortgage Corporation loan production office, at their
11 home office and their car on the phone as outside
12 salespeople.
13      I don't know how much time they're spending at
14 any given location, and it's going to be different for
15 any individual loan officer.
16  Q. Okay. So your answer is: You don't know how
17 much time a loan officer is spending at any given
18 location.
19      Is there any evidence that you're aware of
20 that would document how much time loan officers are
21 spending at any given location?
22  A. There's no evidence, necessarily, that I'm
23 aware of, you know, I do know that, you know, in
24 certain markets, in certain regions, say, in -- in the
25 Bay Area specifically, there's, you know, schedules or

00095
1  calendars that are produced to provide Mortgage
2  Corporation loan officers with, you know -- you know,
3  some indication as to where they will be or won't be
4  for any given point in time for that individual
5  manager.
6      And I've seen individual loan officers provide
7  schedules throughout the day that, you know, I'm
8  meeting with a Realtor in Marin County. I'm meeting
9  with a CPA for lunch in San Francisco, and you can call
10 me on my cell phone if you need me.
11   Q. So the best way to learn where the loan
12 officers are spending their time, on any given day,
13 would be to review their e-mail records; is that true?
14     MR. TICHY: Objection; that calls for a
15 conclusion. It's also argumentative.
16     THE WITNESS: Yeah, and I don't know if I --
17 while that may apply to one particular loan officer, it
18 may not apply to all particular loan officers, so I
19 wouldn't say that that would be the best indication if
20 you're using it in the broad sense. That might provide
21 an indication for one particular loan officer, but not
22 necessarily for all loan officers.
23     MR. SCHWARTZ: Q. Which particular loan
24 officer?
25     THE WITNESS: I'm not speaking of any specific

00096
1  loan officer per se. Just, in general, a certain loan
2  officer may document where they are with an e-mail.
3  They may have it on a calendar. I don't know.
4    Q.  So we would have to review the e-mail records
5  of the loan officers to see if there are any e-mails to
6  document where they spend their time on any particular
7  day; is that true?
8       MR. TICHY: Again, that calls for a
9  conclusion. Again, that's argumentative. If you're
10 able to answer, you can answer.
11      THE WITNESS: I don't know the answer to that.
12      MR. SCHWARTZ: Q. Well, you suggested it. I
13 mean, you suggested looking at the e-mails, that might
14 indicate where loan officers are.
15      THE WITNESS: No. All I suggested is that
16 a -- a -- a -- a particular loan officer may document
17 to their manager where they are via e-mail. They may
18 simply leave a voice mail message as well as to where
19 they are. They may have a calendar that they keep as
20 to where they are, so that's all I suggested.
21   Q.  So other than looking at e-mails and calendars
22 and talking to the loan officers and their direct
23 managers, are you aware of any other way to ascertain
24 what percentage of the time loan officers spend working
25 in -- at their home office or an HSBC office or

00112
1  The time is 1:59. Please begin.

2      MR. SCHWARTZ: Q. Are you aware of any

3  training that's been provided to loan officers on the

4  difference between outside sales and inside sales?

5      MR. TICHY: Read the question back, please.

6      MR. SCHWARTZ: Are you aware of any training

7  that's been provided to the loan officers on the

8  difference between outside sales and inside sales?

9      THE WITNESS: All of our sales staff goes

10 through high trust sales training, and a focus on high

11 trust sales training is partnership building,

12 relationship building.

13     You know, can I say that there is a specific

14 difference between inside and outside training that

15 anybody's gone through? I don't know if that's the

16 case, but, again, I think it's -- it's common

17 knowledge, generally speaking, that, you know -- that

18 people know the difference between outside and inside

19 sales.

20 Q. What's the basis of your statement that it's

21 common knowledge that people know the difference

22 between outside and inside sales?

23 A. Standard intelligence.

24 Q. Other than standard intelligence, do you have

25 any other indication that it's common knowledge the

00113
1   difference between outside and inside sales?
2       MR. TICHY: Again -- okay. Go ahead.
3       THE WITNESS: Yeah, I -- other than common
4   knowledge, the -- an expectation that someone would
5   understand what outside and inside would mean or that
6   they can decipher as to what the requirements of their
7   position are and what it takes to accomplish, you know,
8   those requirements and goals.
9       Again, I think it's reasonable to assume that
10  most people know the difference between inside and
11  outside.
12      MR. SCHWARTZ: Q. Have you been engaged in
13  any discussion at HSBC with any HSBC employee, of any
14  of the HSBC entities, about the difference between
15  inside and outside sales?
16      MR. TICHY: Objection; hearsay. May be
17  attorney-client privilege. Frankly, it seems like it's
18  outside the scope of the complaint, but....
19      THE WITNESS: Engaged in any discussions with
20  anybody anywhere at any time regarding the difference
21  between inside and outside sales?
22      MR. SCHWARTZ: Yeah, any HSBC employee; that's
23  right.
24      THE WITNESS: You know, I -- I -- I don't
25  recall any specific discussions, but that's not to say

```
00196
 1  any other desk space that you rent for your loan
 2  officers in Fremont?
 3     A.  I don't know if they did at some point in the
 4  past.  Since I've taken over, I don't believe so, no.
 5         MR. SCHWARTZ:  Take a look at Exhibit Number 9
 6  of the deposition pages NKA 2522 and 2523.  It's an
 7  e-mail from Amy Ku of September 11th, 2006 which
 8  mentioned Mr. Needham.
 9         [Whereupon, Deposition Exhibit 9, an
10         E-mail dated 9/11/2006, was marked for
11         identification.]
12         MR. SCHWARTZ:  Q.  Mr. Needham, looking at the
13  bottom of this e-mail where it talks about the process
14  flow for pricing exceptions and the process for product
15  and pricing exceptions, do you see that?
16         THE WITNESS:  I do.
17     Q.  Okay.  It also mentions your name above that
18  in the summary of domestic private banking initiative
19  in California.  Do you see that?
20     A.  I do.
21     Q.  Now a loan officer working under Amy Ku, if
22  they wanted to give a pricing exception, they needed to
23  go through yourself and Brian Gregson, correct?
24     A.  When you say pricing exception, that's a very
25  broad term.  Are you speaking specifically to this
```

00197
1  domestic private bank initiative in California?
2    Q.  I'm referring to the circumstances described
3  here in this document, "Process Flow For Pricing
4  Exceptions."
5    A.  Specifically to this document?
6    Q.  Well, is there some different process flow for
7  some other kind of pricing exception?
8    A.  Yeah, there may very well be.
9    Q.  May very well be.  I'm asking you about
10 reality, not hypothetical.  Is there any process flow
11 other than the process flow described here in this --
12 in this document that relates to pricing exceptions?
13   A.  This process flow is specifically describing
14 the domestic private bank initiative for California and
15 that only.
16   Q.  I see.  And just -- in layman's terms, what
17 was the domestic private banking initiative in
18 California?
19   A.  The initiative was to take the bank -- HSBC
20 Bank USA from a referral perspective and try to use
21 that referral source to grow mortgage production.
22   Q.  And how was that to be done?
23   A.  The mortgage company set aside this program
24 specific to California to try to capture that referral
25 business.

00198
1  Q.  And if -- so if somebody -- if a loan officer
2  wanted to make a pricing exception for a loan that they
3  originated through the bank in California, and you've
4  already testified that the bank was your primary
5  referral source in California since you became division
6  manager, they needed to obtain -- the loan officer
7  needed to obtain approval from -- well, they had to go
8  to the regional manager, and then she had to obtain
9  approval for that exception both from yourself and from
10 the bank district manager; is that right?
11      MR. TICHY:  Objection; the record of this
12 deposition will speak for itself as to what he
13 testified.  I believe there is a question, however,
14 which is specific and you can answer that.
15      THE WITNESS:  The -- the process, as
16 defined -- what this program was trying to do, again,
17 was to capture those transactions coming from the HSBC
18 Bank USA to HSBC Mortgage Corp. (USA) from a referral
19 perspective to try to capture those transactions by
20 Mortgage Corp.
21      So in order to identify, to ensure we were
22 giving a pricing exception to the -- to those referred
23 transactions, they needed to be authorized by myself
24 and Brian Gregson.
25  Q.  Right.  So if -- if a loan officer wanted to

00199
1  do anything different in the standard policy in terms
2  of the pricing of a loan that they wanted to sell to
3  any referral from the bank, they had to go through both
4  you and the regional manager of the bank, correct?
5    A.  I'm not sure his title is regional manager.
6    Q.  Mr. Gregson?
7    A.  Yes, there had to be an authorization from
8  Brian Gregson and myself.
9    Q.  I believe according, to Exhibit 2,
10 Mr. Gregson's title is actually Senior Vice President,
11 District Executive California Region.
12      Does the district executive have to approve
13 other -- for the HSBC Bank USA, N.A. have to approve
14 other transactions by your loan officers?
15   A.  That's a very broad question. The -- again,
16 this process was specific to this initiative. So
17 generally speaking, outside of this initiative, no.
18   Q.  So this is the only initiative, domestic
19 private banking initiative in California, is the only
20 initiative in which HSBC Bank USA, N.A. managers need
21 to approve any -- any work done by your loan officers?
22   A.  Again, I don't know what you mean by "work
23 done." As far as pricing exceptions, as related to
24 mortgage transactions, yes, this was a specific
25 initiative that required both my approval and Brian's

**Needham, Jeffrey - 06/05/2008**                                    **Page 199**

00045
1     MR. TICHY: If you know a range, you're free
2  to give it to him. If you don't know a range --
3     THE WITNESS: I would say the range is between
4  $500,000 and a million dollars on a monthly basis.
5     MR. SCHWARTZ: Q. That's your minimum
6  production threshold for 2008 for loan officers?
7     THE WITNESS: Yes.
8   Q. And what was your minimum production threshold
9  for 2007 for loan officer?
10   A. I would say it was within that same range.
11   Q. What was your minimum production threshold for
12  2006 for loan officers?
13   A. Again, I would say it was probably in that
14  same range.
15   Q. And does Mr. Gates set goals nationwide as to
16  minimum production thresholds that he expects from his
17  division managers like you?
18   A. The minimum production thresholds are really
19  developed through the Mortgage Corporation's accounting
20  and finance group based on expenses within a division
21  and/or region relative to production and product type.
22     So there's a number of variables that go into
23  making that minimum production threshold. You know,
24  basically, it's based on the number of employees within
25  the division as well.

00046
1    So, I mean, to give you an example, I'm sure
2  you have a dollar amount that you're supposed to
3  generate as an attorney within this firm in order for
4  the firm to be profitable. So we've got the same type
5  of experience where it could vary by division.
6    I'm not sure if Mr. Gates specifically sets
7  that himself. I believe, again, it's developed through
8  the finance group of Mortgage Corporation relative to
9  the expenses within any individual division or region.
10   Q.  Where is the financial group of Mortgage
11 Corporation?
12   A.  It's based at the Mortgage Corporation's
13 headquarter in Depew, New York.
14   Q.  And who, specifically, if you know within
15 Mortgage Corporation's finance operations sets the --
16 the productivity goals nationwide?
17      MR. TICHY: Objection. Again, that's vague.
18 If you're asking for 2008, there's a person, maybe you
19 can identify it if you can. Vague.
20      THE WITNESS: Again, there's a number of
21 people that work within Mortgage Corporation's finance
22 and accounting group. I don't know, specifically, who
23 generates the report to come up with the number. I
24 can't give you a name for that. I don't know.
25      MR. SCHWARTZ: Q. Who is the manager of that

```
00271
 1              CERTIFICATE OF REPORTER
 2
 3       I, SHAARON M. SHIGIO, a Certified Shorthand
 4  Reporter, hereby certify that the witness in the
 5  foregoing deposition was by me duly sworn to tell the
 6  truth, the whole truth and nothing but the truth in the
 7  within-entitled cause;
 8       That said deposition was taken down in shorthand
 9  by me, a disinterested person, at the time and place
10  therein stated, and that the testimony of the said
11  witness was thereafter reduced to typewriting, by
12  computer, under my direction and supervision;
13       That before completion of the deposition, review
14  of the transcript {X} was { } was not requested.  If
15  requested, any changes made by the deponent (and
16  provided to the reporter) during that period allowed
17  are appended hereto.
18       I further certify that I am not of counsel or
19  attorney for either or any of the parties to the said
20  deposition, nor in any way interested in the events of
21  this cause, and that I am not related to any of the
22  parties thereto.
23       DATED:
24
25           Shaaron M. Shigio, CSR #12286
```