```
00001
 1            UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5  PHILIP WONG and FREDERIC CHAUSSY,
    individually, on behalf of others
 6  similarly situated, and on behalf
    of the general public,
 7
              Plaintiffs,
 8
        vs.                    No. 07-CV-2446-MMC
 9
    HSBC MORTGAGE CORPORATION (USA);
10  HSBC BANK USA, N.A.; et al.,

11            Defendants.

12

13

14

15

16

17                 DEPOSITION OF

18              AMY ELIZABETH YOUNG

19            Los Angeles, California

20            Thursday, June 12, 2008

21

22

23  REPORTED BY:
    Xavier Mireles,
24  CSR No. 5001

25
```

```
00002
 1       Deposition of AMY ELIZABETH YOUNG, taken on
 2   behalf of Plaintiffs, at 2049 Century Park East,
 3   Suite 500, Los Angeles, California, commencing at
 4   10:03 a.m., on Thursday, JUNE 12, 2008, before Xavier
 5   Mireles, CSR No. 5001.
 6
 7            A P P E A R A N C E S
 8
 9   For Plaintiffs:
10       NICHOLS KASTER & ANDERSON
11       BY:  BRYAN J. SCHWARTZ, ESQ.
12       One Embarcadero Center, Suite 720
13       San Francisco, California 94111
14       (415) 277-7235
15
16   For Defendants:
17       LITTLER MENDELSON
18       BY:  MICHAEL F. McCABE, ESQ.
19       650 California Street, 20th Floor
20       San Francisco, California 94108
21       (415) 433-1940
22
23   Videographer:
24       LUCAS CHEADLE
25
```

00173
1  terms of their performance?
2      A.   I am concerned with how they work with
3  the team. I am concerned about how their attitude is
4  with operations. I am concerned about how well they
5  understand the guidelines, how clean their packages
6  are, how they speak to clients, how they billed
7  referral with outside referral sources.
8           I am concerned on how well they work
9  with myself, with any of our managers, co-workers,
10 and how their customer service skills are with their
11 clients.
12          So I can't say the only thing I do is
13 just production. There is a long list of things I --
14 I look for in a loan officer.
15     Q.   Has any loan officer been disciplined
16 or terminated since you have been a manager there in
17 your region for anything other than low production?
18     A.   Can you say the first part of the
19 question.
20     Q.   If any loan officer in your region has
21 been disciplined or terminated for anything other
22 than low production.
23     A.   No.
24     Q.   Do your loan officers who work at --
25 whether the branches that they are assigned to, that

00086
1    A.    Well, the two meetings that I had this
2  year, one was because of a soft-market policy change.
3  And I wanted to make sure they didn't have any
4  questions on that.
5          The one before I held because
6  operations -- because I just wanted to give them an
7  update on the operations' capacity and discuss that.
8    Q.    What does that mean, "soft-market
9  policy change"?
10   A.    There is a soft-market policy change
11 that indicates really 5 percent -- we'll say Los
12 Angeles County is in a soft market, so if the
13 guideline says it's 80 percent, then we can only lend
14 up to 75 percent.
15   Q.    Is that -- and that's a change -- a
16 policy change that you've been -- you received from
17 the HSBC mortgage underwriting department?
18   A.    Yes.
19   Q.    Have you discussed other underwriting
20 -- HSBC mortgage underwriting policy changes in some
21 of the other conference calls you've had over -- over
22 the years with your staff?
23   A.    Yes.
24   Q.    And when you gave the example of
25 operations' capacity that you discussed at your other

00087
```
 1  conference call in 2008, what were -- what did that
 2  mean?  What were you talking about?
 3      A.   I was referring to the turn time and
 4  the capacity of our operations team and how much they
 5  can handle.
 6      Q.   So the -- the operations -- the turn
 7  time changes and things of that nature, is that also
 8  a subject that, in terms of the -- the information
 9  that you have gotten from the operations folks in
10  Depew, New York, is that another subject frequently
11  of your staff meetings?
12      MR. McCABE:  Objection; vague and ambiguous.
13      THE WITNESS:  Can you clarify the question.
14      MR. SCHWARTZ:  Yes.
15      Q.   The changes made by your operations
16  staff in Depew, New York, is that another regular
17  subject of your conference call, your -- your staff
18  meetings?
19      MR. McCABE:  I am going to object to the use
20  of the term "your" in that question.  It changed
21  twice.
22          May I have the question reread,
23  please.
24      MR. SCHWARTZ:  I will just ask the question
25  again.
```

00088
1    Q.    The operations changes made by the
2  operations people in Depew, New York for HSBC
3  Mortgage, is that a typical subject of your
4  conference calls that you have with your staff
5  members?
6    A.    Yes.
7    MR. McCABE:  Again, you are going to have to
8  wait until he finishes before you answer.
9  BY MR. SCHWARTZ:
10    Q.    Other than changes in underwriting
11  guidelines from the HSBC Mortgage underwriting
12  department and changes in operations' capacity or
13  issues of that nature from HSBC Mortgage operations
14  department, are there other types of issues that you
15  discuss in your -- that you have discussed in your
16  conference calls with your staff, that you can
17  recall?
18    MR. McCABE:  Objection; asked and answered.
19    THE WITNESS:  No.
20  BY MR. SCHWARTZ:
21    Q.    Those are the only ones that you can
22  remember?
23    MR. McCABE:  Well, she already testified that
24  people raise questions, so that would be a topic.
25    DEPOSITION OFFICER:  I'm sorry.  "She already"

00126
1  loan officers, how many conversations they should be
2  having, other mortgage-related conversations as part
3  of their duties as loan officer on a daily basis?
4      A.   They tell me; I don't tell them.
5      Q.   The company has minimum production
6  goals for the loan officers, doesn't it?
7      A.   Correct.
8      Q.   So you discuss with the loan officers
9  the minimum production requirements that the company
10 has of them, don't you?
11     A.   Yes.
12     Q.   And what is the current minimum
13 production requirement the company has for loan
14 officers?
15     MR. McCABE:  Objection; vague and ambiguous,
16 overbroad as to geographical scope.  You mean for the
17 L.A. region?
18     THE WITNESS:  Will you clarify the question?
19 BY MR. SCHWARTZ:
20     Q.   Yeah.
21          What is the current minimum production
22 requirement that the company has for loan officers?
23     MR. McCABE:  Again, overbroad as to time,
24 scope, geography.
25     THE WITNESS:  Today for my loan officers in

00127
1  Southern California, their minimum production goal is
2  600,000.
3  BY MR. SCHWARTZ:
4     Q.   600,000 per what time period?
5     A.   Funded volume per month.
6     Q.   And is that the nationwide target
7  right now, 600,000 per loan officer per month?
8     A.   I don't know.
9     Q.   Where did you get that target from?
10    A.   My management. My manager, Jeff
11 Needham.
12    Q.   And you don't know where -- beyond
13 Mr. Needham where that target came from, the 600,000?
14    A.   No.
15    MR. McCABE: Objection; assumes facts not in
16 evidence.
17 BY MR. SCHWARTZ:
18    Q.   And the -- how long has 600,000 been
19 the target for your loan officers, 600,000 funded
20 loans per month?
21    MR. McCABE: Objection. That mischaracterizes
22 her testimony. She said that was the minimum of the
23 target.
24    THE WITNESS: Can you repeat the question.
25 BY MR. SCHWARTZ:

00128
1    Q.    Yeah.
2          How long has the minimum target for
3  your loan officers been 600,000 funded per month?
4    A.    Since I can remember, it's always been
5  the target I gave my loan officers.
6    Q.    And how do you communicate that target
7  to your loan officers?
8    A.    Verbal conversation.
9    Q.    Is that a target that you discuss in
10 your staff meetings with your loan officers that all
11 loan officers are required to produce a minimum
12 600,000 funded loans per month?
13   A.    Well, the 600,000 is the minimum you
14 need and we do not discuss it on the conference
15 calls.
16   Q.    So when you say you discuss it
17 verbally, do you -- how do you -- you mean in
18 individual conversations with each loan officer?
19   A.    Yes.
20   Q.    What -- what type of conversation
21 would it be where you would be discussing the --
22 their minimum funding requirements?
23   A.    Sorry. Can you repeat it.
24   Q.    Yeah.
25         What is that? Is that like an annual

00172
1    A.    No.

2    Q.    Have you ever disciplined -- by

3  "discipline," I mean any kind of corrective action or

4  termination, anything like that, a loan officer for

5  working too much of the time at an HSBC Bank branch?

6    A.    No.

7    Q.    Have you ever disciplined a loan

8  officer, again, by discipline, I mean corrective

9  action, termination, anything of that nature, for

10 working too much of their time from home?

11   A.    No.

12   Q.    The only criterion you are concerned

13 with as to your loan officers' performance, assuming

14 that they are ethical and so forth, is how much they

15 are selling; correct?

16   A.    Can you repeat the first part of the

17 question.

18   Q.    The only criterion that you are

19 concerned with is -- in terms of your loan officers'

20 performance, assuming that they are not breaking any

21 laws or anything, is that they're -- how much they

22 are selling?

23   A.    No.

24   Q.    No?

25        What else are you concerned about in

```
00241
  1
  2
  3           I, the undersigned, a Certified
  4  Shorthand Reporter of the State of California do
  5  hereby certify:
  6           That the foregoing proceedings were
  7  taken before me at the time and place herein set
  8  forth; that any witnesses in the foregoing
  9  proceedings, prior to testifying, were placed under
 10  oath; that a verbatim record of the proceedings was
 11  made by me using machine shorthand which was
 12  thereafter transcribed under my direction; further,
 13  that the foregoing is an accurate transcription
 14  thereof.
 15           I further certify that I am neither
 16  financially interested in the action nor a relative
 17  or employee of any attorney of any of the parties.
 18           IN WITNESS WHEREOF, I have this date
 19  subscribed my name.
 20  Dated:
 21
 22
 23           XAVIER MIRELES, CSR
 24           Certificate No.  5001
 25
```