# Exhibit 13

00001

1  35674/S53972

2

IN THE UNITED STATES DISTRICT COURT

3        NORTHERN DISTRICT OF CALIFORNIA

4

5     PHILIP WONG, FREDERIC      )
CHAUSSY, and LESLIE MARIE   )
6     SHEARN, individually, on   )
behalf of all others       )
7     similarly situated, and    )
on behalf of the general    )
8     public,                    )
)
9        Plaintiffs,        )
)
10    vs.                 )No. 3:07-cv-2446 MMC
)
11    HSBC MORTGAGE CORPORATION   )
(USA); HSBC BANK USA,      )
12    N.A.; and DOES 1 through    )
50, inclusive,             )
13                            )
Defendants.       )
14

15        30(b)(6) VIDEOTAPED DEPOSITION OF
JEANETTE JENNINGS

16

Taken December 19, 2007
17        Commencing at 9:08 a.m.

18

19

20

21  REPORTED BY:  MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CSR
PARADIGM REPORTING & CAPTIONING INC.
22        1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
23    MINNEAPOLIS, MINNESOTA  55402-1331
612-339-0545 * 800-545-9668 * Fax 612-337-5575
24

25

00002

1          30(b)(6) videotaped deposition of

2  JEANETTE JENNINGS taken on December 19, 2007,

3  commencing at 9:08 a.m., at the law firm of Littler

4  Mendelson, P.C., Suite 2900, 200 North LaSalle

5  Street, before Melanie L. Humphrey-Sonntag,

6  Registered Diplomate Reporter, Certified Realtime

7  Reporter, and Notary Public of and for the State of

8  Illinois.

9
                  **********
10
                  APPEARANCES
11

12  On Behalf of the Plaintiffs:

13      Mr. Bryan J. Schwartz
         Nichols, Kaster & Anderson, LLP
14      Suite 720
         One Embarcadero Center
15      San Francisco, California 94111
         (415) 277-7235
16

17  On Behalf of the Defendants:

18      Ms. Michelle R. Barrett
         Littler Mendelson, P.C.
19      20th Floor
         650 California Street
20      San Francisco, California 94108-2693
         (415) 433-1940
21
    Also Present:  Mr. Bruce Witty, Videographer
22

23

24      NOTE:  The original transcript will be filed
     with Mr. Schwartz, pursuant to the applicable Rules
25  of Civil Procedure.

00142

1    Q. It's never been distributed in any way to

2  the loan officers that you know of?

3    A. No, because we tell people that it's --

4  where it's available and where they can look.  So it

5  isn't anything that's necessary to hand out.

6    Q. Regardless of what the job description

7  says --

8    A. Excuse me.

9    Q. -- you don't know actually how much time

10  loan officers are spending outside of HSBC

11  facilities in their home offices; isn't that right?

12    A. No, I don't know -- I can't say exactly.  I

13  just know that the majority of their time should be

14  spent outside, obtaining business.

15    Q. Well, you're saying "should be spent," and

16  I'm asking you in terms of actually what happens

17  with actual loan officers' work.

18      You don't know if any loan officer actually

19  spends a majority of his or her time outside of an

20  HSBC facility or a home office?

21    A. No.  You have to understand there's

22  200-some-odd loan officers, so I -- I don't track

23  their daily comings and goings, no.

24      MR. SCHWARTZ:  Can we go off the

25  record.

**Jennings, Jeanette 12.19.2007.TXT**        **Page 142**

00113

1    Q.  You don't --

2    A.  But they always receive their -- their

3  biweekly draw.

4    Q.  You don't have a -- a different minimum draw

5  for employees in New York or California or other

6  states; is that right?

7    A.  No.  The minimum is the minimum is the

8  minimum.

9    Q.  And are you aware that loan officers are

10  required to reimburse the company for application

11  fees where a loan application fails?

12    A.  That's a broad statement.  They don't have

13  to pay it back if the loan is declined unless they

14  never collected the fee and we've incurred the

15  expenses, and that's actually in -- in the actual

16  incentive plan.

17      So, for example, if I've taken a loan

18  application but I did not collect the fee from the

19  customer and it's gone through the processing, at

20  the end of the processing that customer is then

21  declined but I still have not collected that fee

22  from the customer, I can -- I can get -- I can get

23  that deducted, yes.

24      If it's because it's a regular decline, no,

25  and I've done everything right, but that's under

00114
1  errors and omissions and, I think, exclusions, that,

2  if they fail to collect the necessary fees or if

3  it's through their own negligence, fraudulent --

4  whatever it might be -- then they could be -- have

5  those -- those fees deducted from commissions, yes.

6      Q.  Do you know to what extent loan officers are

7  encouraged not to collect application fees by their

8  supervisors in order to close more deals?

9      A.  They shouldn't be encouraged to do that at

10  all.  I'm not familiar with that practice at all.

11  That would go against -- because we're incurring

12  expenses for the appraisals and what needs to be

13  done, so I would find that hard to believe that

14  they're encouraged to not collect the fees.

15      That doesn't make sense.

16      Q.  Okay.  Well, we have sworn testimony that

17  that's exactly what's happening, so --

18      A.  Oh.

19      Q.  -- and documentation of that happening, so

20  I'm wondering -- and so -- but it's your testimony

21  that you're not aware of that happening?

22      A.  Absolutely not.  No.

23      Q.  And do you have something -- a published

24  policy -- that is specifically contrary to that

25  practice of supervisors encouraging or requiring

00115
1 their loan officers not to collect application fees?

2    A.  That would be a business policy.  It would

3 be a policy that's directed by HR, so I couldn't

4 comment to that.  If they've published anything,

5 I -- I don't know.

6        But the plan itself speaks to it, that, if

7 they don't collect the fees, they will be charged.

8    Q.  Where is that?  The plan that --

9    A.  Probably under --

10   Q.  -- in Exhibit 3?

11   A.  And, again, if it is not in this one, it is

12 in the newest versions.

13       Could be under "Exclusions."  It could be

14 under the -- it's under the new plans most

15 definitely, but I need to -- I need to look at that.

16       I don't see it in this particular plan.

17   Q.  But you believe that it's in a new plan?

18   A.  Absolutely.

19   Q.  So is it your testimony that -- that all

20 loan officers nationwide earn $23,660 or more every

21 year that they're employed?

22   A.  Whatever the Federal minimum is, and I think

23 that -- it changed this year if -- it was 23.

24 Previously it was just 23,000.

25       I would say that that would be at least that

**Jennings, Jeanette 12.19.2007.TXT**        **Page 115**

00128

1    Q. What evidence exists that supports the

2    notion that loan officers are receiving -- that it's

3    clearly reiterated to loan officers a number of

4    times that they're an outside sales force?

5    A. Through their management -- as far as

6    documentation, I don't have documentation. I can

7    only say from my own verbal conversations that I've

8    had with a few of them, that they've had in meetings

9    and through their training, that, with high-trust

10   selling, that they are to be entrepreneurs, they

11   should be out and about.

12       And, in following the high-trust selling

13   philosophies of what they need to do to build their

14   business, their management -- that -- that this is

15   common knowledge. It isn't anything that should be

16   a surprise to anyone.

17   Q. Do you have any evidence that establishes

18   that loan officers work -- spend more than

19   50 percent of their time working outside of HSBC

20   facilities at any time?

21   A. I wouldn't say any -- anything other than

22   their business plan, that they should be spending

23   more than 50 percent of the time outside of it.

24   Q. What --

25   A. Their business plans also speak to them

00129

1  making business calls, working out and about, and

2  working their business.  They're a commissioned

3  sales force, so . . .

4      Q.  Where does a business plan state that they

5  are to spend more than 50 percent of their time

6  outside of HSBC office facilities?

7      A.  I didn't say that it would state it was to

8  spend 50 percent or more time.  I said it would

9  indicate that they need to spend 50 percent or more

10  time --

11      Q.  It would indicate --

12      A.  -- that they should not be --

13      Q.  How would it indicate that?

14      A.  I think in -- if you read on the business

15  plan, in their business plans and what's expected of

16  them and through their training, that their time

17  should be spent in the field getting business and

18  meeting with clients.

19         For it to say "You are going to spend more

20  than 50 percent --" no, you're not going to find

21  that.

22         But, again, they are commissioned

23  salespeople.  They're hired to sell and are hired as

24  salespeople.  Anyone in the commissioned sales

25  field, in any commissioned sales field, know that

00130

1  they're not going to get their business by sitting

2  in an office. It's going to be outside sales.

3    Q. Okay. And what I'm asking you is, does the

4  company, HSBC -- that you're speaking for,

5  HSBC Bank -- possess any evidence that establishes

6  that -- that any loan officer spends more than

7  50 percent of his or her time outside of HSBC

8  facilities or the home office that they have?

9    A. I don't know --

10    MS. BARRETT: Objection; calls for a

11  legal analysis and conclusion.

12    A. (Continuing.) I don't know.

13  BY MR. SCHWARTZ:

14    Q. You're not aware of any such evidence?

15    A. I said I don't know. I'm not aware if

16  compensation has it -- I don't know if -- in part of

17  their testing. I don't know. I can only say what

18  we verbally have trained them, what we have verbally

19  indicated to them of what they needed to be doing to

20  be out and about getting business. If they're going

21  to be successful, it is not sitting in an office.

22    Q. Okay. You mentioned three types of ways

23  that -- that it was clearly reiterated to loan

24  officers that they're, quote, an outside sales

25  force. You mentioned first that you've participated

00131

1  in conversation where that was emphasized.

2      What conversations did you participate in

3  where that was emphasized to loan officers?

4      A.  That might have been individual

5  conversations, if someone was struggling and

6  reiterating what the expectations of the role are,

7  listening in conversations with managers, at sales

8  management meetings that they may have had.  They

9  have regular sales management meetings about what

10  they're doing to go out and get business.

11      And a lot of it is implied.  It isn't just

12  stated that you're not going to be getting business

13  by sitting in the office.  What are you doing to go

14  out and drum up business?  Are you following your

15  high-trust selling training that you've received?

16  Are you using the tools?  Are you meeting with

17  clients?  Are you meeting with your centers of

18  influence to grow your business?

19      Q.  Okay.  I was asking more specifically, what

20  particular -- which particular people did you

21  participate in conversations with in which the

22  phrase "outside sales force" was emphasized to any

23  loan officer?

24      A.  I don't want to say -- again, "outside

25  sales," I'm not going to limit it to just "outside

00132

1  sales." It's that they need to be out and about

2  getting business.  They aren't supposed to be just

3  stuck in -- just remain in the branch.  They

4  aren't -- that isn't their role.

5        Their role and their expectations -- that is

6  what is reiterated, not that you're supposed to be

7  out of the branch 50 percent the time.  That's what

8  I said.  We imply that.  It isn't said, "You're

9  supposed to be an outside salesperson and you're

10  supposed to be out 50 percent of the time."

11  Q.  Okay.  So --

12  A.  That isn't what I said.

13  Q.  Okay.  So you're not aware of any

14  conversation or training that -- that specifically

15  notifies loan officers that they are outside

16  salespeople who are supposed to be out of the

17  branches 50 percent of the time?

18    A.  If you're asking the question does the

19  training say that, the training doesn't say, "You're

20  an outside salesperson supposed to be 50 percent of

21  the time."  I've already indicated that.

22        If it's indicated that they are -- they are

23  outside salespeople just by virtue of the training

24  itself and the expectations of the role, then yes.

25  It's all implied and it's reiterated in sales

00133
1  meetings; it's reiterated in their business plan.

2  They're not going to make a business plan from

3  sitting in the branch, by making calls and not

4  visiting.

5      So it's all implied within what they need to

6  do on a day-to-day basis in following the training.

7      Q.  Okay.  What . . . so if I understand you

8  correctly, you have not seen any training or

9  participated in any conversation in which the -- the

10  phrase "outside sales" was specifically used to a

11  loan officer?

12      MS. BARRETT:  Objection; misstates

13  testimony.

14      A.  That if "outside sales" was used -- it may

15  have been.  I've used it myself but . . . to say

16  that they had to be in the office or out of the

17  office a certain percentage of the time, no.

18      They're commissioned salespeople, so they

19  can work -- if they want to work until midnight,

20  they can work until midnight because they want to

21  take care of their kids during the day.  Their

22  schedules -- they have that freedom.

23      They can schedule their time when they need

24  to meet with their clients.  If it's a Saturday,

25  fine; if they're taking a day off during the week,

00134

1   that's fine. It's -- they are entrepreneurs and

2   we -- we emphasize all the time that they're

3   entrepreneurs. That is a common language.

4   BY MR. SCHWARTZ:

5       Q. And where -- where is the -- you said

6   that --

7       A. Nothing is written.

8       Q. Okay. You -- so you're not aware of any

9   written document that describes the loan officers

10   as, quote, entrepreneurs?

11      A. I might have listed it in memos to -- to a

12   few loan officers. It may be in their high-trust

13   selling training documents. I would have to refer

14   to their high-trust selling training.

15          But the high-trust selling training is all

16   about mortgage sales specific and being commissioned

17   employees and . . . getting out there and building

18   their book of business.

19      Q. You also said that you -- okay. Well,

20   first, as to those memos indicating that -- to loan

21   officers -- that you feel that they're

22   entrepreneurs, to whom did you send such a memo?

23      A. I . . . I don't know if that is privileged

24   because these people are not involved. I have to

25   confer. I don't know if that's privileged

00135

1   information because that might have been HR employee

2   confidentiality. I don't know.

3   Q. There's no such privilege --

4       THE WITNESS: Am I able to say?

5   BY MR. SCHWARTZ:

6   Q. -- in this context with an HR employee.

7       THE WITNESS: Am I able to give that

8   information? Sorry.

9       MS. BARRETT: Sure.

10      THE WITNESS: I just wanted to confirm

11  I was able to give this information.

12      MR. SCHWARTZ: Sure.

13  A. (Continuing.) A few individuals that come

14  to mind -- and it -- if it wasn't from myself, it

15  was from people on my staff.

16      One of them was with Frederic Chaussy.

17  Another was with Philip Wong, and another was with

18  who's called Baijnath Agiwal and -- B A I J N A T H --

19  I'm guessing at the first name -- Agiwal, A G I W A L.

20  Those are the most recent that come to mind.

21      And the other two, Frederic and Philip, only

22  because of this particular case. And, if it wasn't

23  myself, then it was a member of my staff, Willie

24  Daniel, who had those same conversations, including

25  the conversations during the discussion with the

00136

1  labor board of California, with Frederic.

2  BY MR. SCHWARTZ:

3    Q. And the . . . so you -- you were aware of

4  Mr. Chaussy -- when you say "Frederic," you're

5  speaking of Mr. Chaussy -- you were aware of his

6  labor board complaint before he was terminated?

7    A. Yeah.

8    Q. And the conversations -- so it's your

9  testimony that you had conversations with

10  Mr. Chaussy and Mr. Agiwal and Mr. Wong in which you

11  informed each of them that you felt that they were,

12  quote, entrepreneurs?

13    A. Again, if it wasn't myself, it was a member

14  of my staff, Willie Daniel, that would have had

15  those conversations, yes.

16    Q. And which --

17    A. That they would -- I'm sorry.

18    Q. Go ahead.

19    A. And what the expectations of the role were,

20  and the expectations of the role were they should be

21  out and about, they should be getting business, they

22  should not be sitting in the branch -- it goes

23  against -- and that's why they weren't being

24  successful.

25    Q. So it's your testimony that -- that they

00137

1  were -- but it's not your testimony they were told

2  that they should be spending more than 50 percent of

3  their time outside of the branch?

4      A.  As I stated before, we don't say how much

5  percentage that they should be out; they should not

6  be tied to the branch.

7      Q.  Okay.

8      A.  The expectation is they don't have to be

9  there and shouldn't be there eight hours a day every

10  day.  That is just one referral source.

11     Q.  Do you know to what extent, if any, loan

12  officers are told that their primary responsibility

13  is to the branch?

14     A.  I -- I couldn't comment to that.  Sales

15  managers -- it depends upon the territory.

16     Q.  And the . . . the term "outside sales," what

17  conversations did you use that term in with -- you

18  said you -- you've used that in conversations with

19  the loan officers.

20     A.  It . . . just reclarifying that you're

21  outside salespeople.  You're entrepreneurs, you're

22  commissioned a sales force, and again, hence,

23  that -- it's implied just by the term of

24  "commissioned sales force" and how they're paid.

25        What -- when and how I used it -- I use it

00138

1  as -- it's a common vernacular, so I can't identify

2  each and every time I've used it. I know that I've

3  used it.

4     Q. You know that you've used it, but you can't

5  identify -- can you identify one person that you

6  have -- one loan officer whom you have told that

7  they -- that he or she is an outside sales employee?

8     A. Again, not saying whether they said "outside

9  sales" -- whether I used those exact terms -- it's

10  that they're entrepreneurs, and that, itself,

11  implies that it is outside sales.

12        The job, the role, the expectations also say

13  "For external sources," so they know that they're

14  outside sales.

15     Q. Um --

16     A. That's the only way they'll be successful as

17  a commissioned salesperson, is not by sitting in a

18  branch, not by sitting in an office. They have to

19  go outside to get the sales.

20        So, again, the role itself implies that it's

21  outside sales.

22     Q. And you've testified repeatedly that -- that

23  it's implied or implicit in the position of loan

24  officer that they are outside sales and -- or that

25  it's common knowledge.

00139

1     What -- what's the basis of that statement?

2  Where -- where -- where is that established for the

3  loan officers that they would be aware of?

4     A.  Within the job interviews, during the

5  screening, the training, everything that I've just

6  indicated.

7     Q.  So it's your testimony that, in the job

8  interviews, in screening, and in training, that the

9  loan officers -- or prospective loan officers -- are

10  told that they're going to be outside salespeople?

11     A.  Again, we don't just say "outside sales."

12  We say, "This is a commissioned sales position.  You

13  know what you need to do, you know that we're

14  looking for people to be entrepreneurs, meaning

15  you're -- you're surrounding yourself with the

16  centers of influence --" another common term that we

17  use, whether it be Realtors, accountants "-- you're

18  out and about, doing what you need to do, and we

19  give you the freedom to do that."

20     We talk about scheduling; we talk about all

21  of that.

22     And, again, I'm speaking for my -- myself

23  specifically, and I've heard my staff also describe

24  the position.  Whether the managers describe the

25  position -- they should be because that's also part

00140

1  of their training -- as this is a day in the life of

2  and it's giving an example of being a day in the

3  life of where they follow other loan officers

4  around, sometimes even before they are hired so they

5  can see a real job preview, if you will, of --

6  they're outside sales. They're not just stuck. So

7  they're out and about.

8      For us to say -- again, do we say "You're an

9  outside salesperson"? We don't just say that. It's

10  all within the context of the job and the role

11  itself.

12    Q.  Okay. Apart from the implicit or context or

13  common knowledge, do you have any evidence at all

14  that would suggest that any loan officer was aware

15  that he or she was an outside salesperson?

16    A.  I'd have to read to see if it's within the

17  plan itself or how much it's in the job description.

18  To say that there isn't any I can't say.

19    Q.  What plan?

20    A.  The incentive plan. I'm sorry.

21    Q.  Well, you have an incentive plan in front of

22  you, Exhibit 3. (Indicating.)

23      Does it say anywhere --

24    A.  But again, it also doesn't indicate as far

25  as some of the new language that I'd indicated

00108

1  skills, their experience in the industry, what they

2  can bring forward to us as -- as additional

3  guaranteed loans, but that is rare, and it's

4  considered an exception if it's beyond the six

5  months.

6      There would have to be a case-by-case

7  scenario on each one.

8  Q. The typical six-month nonrecoverable draw,

9  you said it's not a salary. What difference, if

10  any, is there between a salary and the

11  nonrecoverable draw?

12      MS. BARRETT: Objection; calls for a

13  legal analysis and conclusion.

14      MR. SCHWARTZ: Go ahead.

15  A. I -- I just don't -- they're not salaried

16  employees, which would possibly put them in a

17  different class. They're a commissioned employee,

18  so they would, in other words, receive commissions

19  on top of that draw while it's forgiven for the

20  first six months or whatever that time period is.

21  BY MR. SCHWARTZ:

22  Q. Okay. But they get a -- for -- typically

23  for the first six months, sometimes longer in

24  special cases, they get a base -- they get a base

25  pay -- if you want to call it a salary or

00147

1  facing-type roles, so that, in itself -- you know,

2  by FLSA, as far as what those jobs are -- excuse

3  me -- would identify it as a nonexempt position.

4      On sales, because it's a commissioned sales

5  and it being outside sales, predominantly for

6  external, client-favoring external.  That's why --

7  one of the reasons that it's for an exempt position.

8      But, again, the exact methodology of what

9  finance is using I can't comment to.

10     Excuse me.  Compensation, not finance.

11  Q.  You said one of the reasons --

12  A.  Excuse me.

13  Q.  -- one of the reasons that the loan officers

14  are exempt is that you perceive that they are

15  outside sales employees.

16     Where . . . how were you informed that that

17  was the rationale for their classification?

18     MS. BARRETT:  Object; misstates

19  testimony.

20  A.  That is just based upon my own knowledge of

21  FLSA and my own assumption because it is an outside

22  sales position.

23     It's a commissioned position.

24  BY MR. SCHWARTZ:

25  Q.  Is it your understanding that all employees

**Jennings, Jeanette 12.19.2007.TXT**          **Page 147**

00148

1  who earn commissions are classified as exempt under

2  the FLSA?

3      A.  I wouldn't say that -- all positions.  That

4  may not be the case.  I'm just describing what our

5  positions are for -- for the loan officers, same

6  positions that we have for the brokerage side.

7  They're also commissioned; they're also exempt, same

8  type of status and responsibilities.

9      Q.  Are you aware of any other reason why you

10  believe the -- the loan officers are classified as

11  exempt employees?

12     A.  No.  I -- I just described to you what my

13  own assumption and knowledge was based on.  Anything

14  else, you'd have to reach out to compensation.

15     Q.  Have you read the compensation audit that

16  was described of 2006 related to the loan officers?

17     A.  I'm sorry?  Compensation audit?  I don't

18  think I mentioned anything about a compensation

19  audit.

20        Do you mean the study?

21     Q.  Study.  Thank you.

22     A.  Yeah.  No.  As far as the study, not in the

23  greatest detail, only into the positions that we

24  have and how their market and -- that the

25  classification remains the same.

00165

1 BY MR. SCHWARTZ:

2    Q.  Okay.  So I have an example here of an

3 employee handbook -- and I understand that this is

4 outdated because it's now online -- it's a binder.

5 (Indicating.)

6    A.  Right.  Right.

7    Q.  And this actually was provided to me by one

8 of our clients, not by the company.

9        But the . . . it's your -- the -- the

10 current iteration of the performance management

11 process that's available on the intranet specifies

12 this -- these different levels of progressive

13 discipline for, say, ordinary offenses or for

14 nonperformance?

15    A.  Right.  That these steps may or may not be

16 taken, based upon what the infraction is.

17    Q.  Okay.  Well, assuming it's not

18 defalcation --

19    A.  Yeah.  Do you like that word?

20    Q.  -- or some sort of felony generally but it

21 just has to do with low sales or something of that

22 nature, this -- every manager at -- in -- at HSBC

23 North America -- because I understand this is one of

24 those policy issues --

25    A.  Yes.

**Jennings, Jeanette 12.19.2007.TXT**          **Page 165**

00166

1    Q. -- would follow the same performance

2  management process?

3    A. They should be, yes.

4    Q. Okay. And that process requires ongoing

5  coaching or mentoring, first of all; right?

6    A. It -- it's recommended for the ongoing

7  coaching and mentoring, yes. That should be at

8  least a monthly review -- it's also in their

9  business plan, a monthly review with the manager.

10    Q. And -- and then the -- the first step of

11  progressive discipline would be a -- a verbal

12  warning?

13    A. Right.

14    Q. Followed by a -- either a first written

15  warning or a final written warning; right?

16    A. Right, either one.

17    Q. And then how long after that written

18  warning -- again, assuming this has to do with

19  inadequate sales or kind of a run-of-the-mill

20  performance issue -- how long before the

21  termination -- the employee could be terminated?

22    A. It would depend upon that individual's

23  performance and what is a reasonable amount of time

24  for us to see has there been any improvement.

25      Typically speaking, we're looking for the

00167

1  30 days; however, if it's within the first 2 weeks,

2  2 1/2 weeks that there isn't one application, they

3  haven't done anything further on the call

4  monitoring, they're not doing any of the things they

5  need to do to improve, it can be sooner.

6      But, typically, we would want to see a

7  reasonable amount of time, and that's typically

8  30 days, you know.  We want to see at least that.

9  But it's dependent upon the individual and their own

10  performance.

11     Q.  And is that 30-day norm set forth in your

12  online -- in your performance management process?

13     A.  We don't specify time frames.  We specify

14  reasonable amounts of time to pass in order for you

15  to reasonably assess that individual's performance

16  for their improvement or that it hasn't improved

17  and -- in order to take the necessary steps.

18     You have managers that may give longer than

19  that.  It all depends upon, you know, the

20  performance of the person.

21     Are they truly trying to do the right things

22  and you can see that they're trying to do the right

23  things?  That makes a difference.  If someone has

24  shut down and isn't doing anything -- not reporting,

25  not responding or whatever the case might be -- it

00168

1  could be sooner than that, so it's really a

2  case-by-case scenario.

3      But in answer to your question, it doesn't

4  specify an exact time frame.

5  Q.  But you train managers that the norm of a

6  reasonable time would be about 30 days?

7      MS. BARRETT:  Objection; assumes facts

8  not in evidence.

9      MR. SCHWARTZ:  Go ahead.

10  A.  We recommend to our managers what is

11  reasonable.  Thirty days is normally reasonable, and

12  we explain the same thing -- just as I said to

13  you -- "But if you don't see any performance, please

14  contact us."  If we have to take that time -- we

15  have to up that time frame, it has to be sooner.

16  BY MR. SCHWARTZ:

17  Q.  Okay.  And . . . as a manager goes through a

18  progressive discipline policy, through this

19  progressive discipline policy or this -- I guess

20  you're calling it performance management process --

21  are they required to interact with HR, with your

22  team for the mortgage division folks -- are they

23  required to interact with you about meeting each of

24  these steps?

25  A.  Not about meeting each of these steps.

00195

1  STATE OF ILLINOIS )
                 ) SS.
2  COUNTY OF DU PAGE )

3

4        I, Melanie L. Humphrey-Sonntag,

5  Certified Shorthand Reporter No. 084-004299, CSR,

6  RDR, CRR, FAPR, and a Notary Public in and for the

7  County of DuPage, State of Illinois, do hereby

8  certify that previous to the commencement of the

9  examination, said witness was duly sworn by me to

10  testify the truth; that the said deposition was

11  taken at the time and place aforesaid; that the

12  testimony given by said witness was reduced to

13  writing by means of shorthand and thereafter

14  transcribed into typewritten form; and that the

15  foregoing is a true, correct, and complete

16  transcript of my shorthand notes so taken as

17  aforesaid.

18        I further certify that there were present at

19  the taking of the said deposition the persons and

20  parties as indicated on the appearance page made a

21  part of this deposition.

22        I further certify that I am not counsel for

23  nor in any way related to any of the parties to this

24  suit, nor am I in any way interested in the outcome

25  thereof.

00196

1       IN TESTIMONY WHEREOF I have hereunto set my

2   hand and affixed my Notarial Seal this 28th day of

3   December, A.D. 2007.

4

5

   _____

6               Certified Shorthand Reporter
                Registered Diplomate Reporter
7               Certified Realtime Reporter
                Fellow of the Academy of
8                  Professional Reporters

9

10  My commission expires
    February 17, 2010

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25