1   GEORGE J. TICHY II, Bar No. 041146
    MICHAEL F. MCCABE, Bar No. 111151
2   MICHELLE R. BARRETT, Bar No. 197280
    KIMBERLY L. OWENS, Bar No. 233185
3   LITTLER MENDELSON
    A Professional Corporation
4   650 California Street, 20th Floor
    San Francisco, California  94108
5   Telephone:    (415) 433-1940
    Facsimile:    (415) 399-8490
6   E-mail: gtichy@littler.com, mmccabe@littler.com,
    mbarrett@littler.com, kowens@littler.com
7
8   Attorneys for Defendants
    HSBC MORTGAGE CORPORATION (USA) and
9   HSBC BANK USA, N.A.

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
    Philip Wong, Frederic Chaussy, and Leslie      Case No. C 07 2446 MMC [ECF]
14  Marie Shearn, individually, on behalf of all
    others similarly situated, and on behalf of    APPENDIX OF NON-JURISDICTIONAL
15  the general public,                            AUTHORITIES IN SUPPORT OF
                                                   DEFENDANTS' OPPOSITION TO
16              Plaintiffs,                         PLAINTIFFS' MOTION FOR CLASS
                                                   CERTIFICATION UNDER
17      v.                                         FED. R. CIV. P. 23

18  HSBC Mortgage Corporation (USA);              Hearing Date:    October 10, 2008
    HSBC Bank USA, N.A.; and DOES 1               Time:            9:00 A.M.
19  through 50, inclusive,                        Courtroom:       7 (19th Floor)

20              Defendants.                        Complaint Filed:  May 7, 2007

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415 433 1940

NON-JURISDICTIONAL AUTH. ISO DEFS'
OPPOSITION TO RULE 23 CERT MOTION                          Case No. C 07-2446 MMC [ECF]

CASES

1. Brinker Restaurant Corporation v. Superior Court, 165 Cal. App. 4th 25 (2008)

2. Donnachie v. East Bay Regional Park District, 217 Cal. App. 2d 172 (1963)

3. Marx v. Friendly Ice Cream Corp., 380 N.J. Super. 302  (2005)

4. Nordquist v. McGraw Hill Broadcasting Co., 32 Cal. App. 4th 555 (1995)

5. Ramirez v. Yosemite Water Co., Inc., 20 Cal. 4th 785 (1999)

STATUTES

6. Cal. Labor Code § 1171

REGULATIONS

7. 12 N.Y.C.C.R. 142-2.2

8. 8 Cal. Code. Regs. § 11040

9. N.J. Admin. Code 12:56-7.2

10. N.J. Admin. Code 12:56-7.4

Dated:   September 19, 2008

/s/ Michelle R. Barrett<br>
MICHELLE R. BARRETT<br>
GEORGE J. TICHY II<br>
MICHAEL F. MCCCABE<br>
KIMBERLY L. OWENS<br>
LITTLER MENDELSON<br>
A Professional Corporation<br>
Attorneys for Defendants<br>
HSBC MORTGAGE CORPORATION (USA) and<br>
HSBC BANK USA, N.A.

Firmwide:86712325.1 023404.1043

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

# TAB 1

165 Cal.App.4th 25                                                                                    Page 1
165 Cal.App.4th 25, 80 Cal.Rptr.3d 781, 156 Lab.Cas. P 60,647, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal
D.A.R. 11,267

**H**

Brinker Restaurant Corp. v. Superior Court
Cal.App. 4 Dist.,2008.

Court of Appeal, Fourth District, Division 1, California.
BRINKER RESTAURANT CORPORATION et al.,
Petitioners,
v.
The SUPERIOR COURT of San Diego County, Respondent;
Adam Hohnbaum et al., Real Parties in Interest.
No. D049331.

July 22, 2008.

**Background:** Employees filed complaint against
employer, asserting that employer violated wage
and hour laws. Thereafter, employees filed motion
for class certification. The Superior Court, San
Diego County, No. GIC834348,Patricia A.Y.
Cowett, J., issued order certifying class. Employer
filed petition for writ of mandate, challenging certi-
fication order.

**Holdings:** Upon transfer from Supreme Court and
vacation of Court of Appeal's original opinion, the
Court of Appeal, Nares, Acting P.J., held that:
(1) failure of trial court to reach issue of what law
applied to employees' claims against employer prior
to certifying class was erroneous;
(2) individualized issues predominated with respect
to employees' claims that employer violated laws
governing rest breaks, and, thus certification of rest
period subclass of employees was not warranted;
(3) individualized issues predominated with respect
to employees' claims that employer violated laws
governing meal breaks, and, thus certification of
meal period subclass of employees was not warran-
ted; and
(4) individualized issues predominated with respect
to employees' claims that employer unlawfully re-
quired its employees to work off the clock during
meal periods and unlawfully altered employees'

time records, and, thus certification of off the clock
subclass was not warranted.

Petition granted.

West Headnotes

**[1] Labor and Employment 231H €═2220(2)**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(B) Minimum Wages and Overtime
Pay
      231HXIII(B)1 In General
       231Hk2215 Constitutional and Stat-
utory Provisions
        231Hk2220 Construction
         231Hk2220(2) k. Strict or Liber-
al Construction. Most Cited Cases

**Labor and Employment 231H €═2497**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(D) Hours of Service
      231Hk2492 Constitutional and Statutory
Provisions
       231Hk2497 k. Construction in Gener-
al. Most Cited Cases

**Labor and Employment 231H €═2554**

231H Labor and Employment
   231HXIV Safety and Health Regulation in Gen-
eral
     231Hk2553 Constitutional and Statutory Pro-
visions
      231Hk2554 k. In General. Most Cited Cases
In light of the remedial nature of the legislative en-
actments authorizing the regulation of wages, hours
and working conditions for the protection and bene-
fit of employees, the statutory provisions are to be
liberally construed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**[2] Appeal and Error 30 ☞1036(1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
            30XVI(J)3 Parties
                30k1036 Parties
                    30k1036(1) k. In General. Most Cited Cases
A class certification order based upon improper criteria or incorrect assumptions calls for reversal even though there may be substantial evidence to support the court's order. West's Ann.Cal.C.C.P. § 382.

**[3] Parties 287 ☞35.5**

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.5 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases
Class actions are authorized when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court. West's Ann.Cal.C.C.P. § 382.

**[4] Parties 287 ☞35.33**

287 Parties
    287III Representative and Class Actions
        287III(B) Proceedings
            287k35.33 k. Evidence; Pleadings and Supplementary Material. Most Cited Cases
Party seeking class certification has the burden to establish: (1) a sufficiently numerous, ascertainable class, (2) a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods. West's Ann.Cal.C.C.P. § 382.

**[5] Parties 287 ☞35.13**

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.13 k. Representation of Class; Typicality. Most Cited Cases

**Parties 287 ☞35.17**

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.17 k. Community of Interest; Commonality. Most Cited Cases
The "community of interest" requirement for class certification embodies three factors: (1) predominant common questions of law or fact, (2) class representatives with claims or defenses typical of the class, and (3) class representatives who can adequately represent the class. West's Ann.Cal.C.C.P. § 382.

**[6] Parties 287 ☞35.37**

287 Parties
    287III Representative and Class Actions
        287III(B) Proceedings
            287k35.37 k. Consideration of Merits. Most Cited Cases
Whether certification of a class is appropriate is essentially a procedural question that does not ask whether an action is legally or factually meritorious. West's Ann.Cal.C.C.P. § 382.

**[7] Parties 287 ☞35.5**

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.5 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases
A trial court ruling on a class certification motion determines whether the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants. West's Ann.Cal.C.C.P. § 382.

**[8] Parties 287 ☞35.5**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.5 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases
A critical inquiry on a class certification motion is whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. West's Ann.Cal.C.C.P. § 382.

**[9] Parties 287 ☞35.17**

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.17 k. Community of Interest; Commonality. Most Cited Cases
To determine whether common questions of law or fact predominate, as element for class certification, the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged. West's Ann.Cal.C.C.P. § 382.

**[10] Parties 287 ☞35.75**

287 Parties
    287III Representative and Class Actions
        287III(C) Particular Classes Represented
            287k35.75 k. Employees. Most Cited Cases
Failure of trial court to reach issue of what law applied to employees' claims against employer asserting violations of wage and hour laws prior to certifying class was erroneous, as court could not determine whether individual or common issues predominated, which was necessary prerequisite to class certification. West's Ann.Cal.C.C.P. § 382.
*See Annot., Comment Note. Identity or community of interests essential to class or representative suit (1941) 132 A.L.R. 749;Cal. Jur. 3d, Parties, §§ 42, 52; Cal. Civil Practice (Thomson/West 2007) Procedure, § 3:51; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2007) ¶ 14:11.5 (CACIVP Ch. 14-B); 4 Witkin, Cal. Procedure (2007 supp.) Pleading, §*

*279A.*

**[11] Parties 287 ☞35.41**

287 Parties
    287III Representative and Class Actions
        287III(B) Proceedings
            287k35.41 k. Identification of Class; Subclasses. Most Cited Cases

**Parties 287 ☞35.75**

287 Parties
    287III Representative and Class Actions
        287III(C) Particular Classes Represented
            287k35.75 k. Employees. Most Cited Cases
Individualized issues predominated with respect to employees' claims that employer violated laws governing rest breaks, and thus certification of subclass of employees who worked one or more work periods in excess of three-and-a-half hours without receiving a paid ten minute break during which employee was relieved of all duties was not warranted, in employees' action against employer, alleging violation of wage and hour laws; trier of fact could not determine on class-wide basis whether members of proposed subclass missed rest breaks as result of supervisor's coercion, or employee's uncoerced choice to waive such breaks and continue working, and individual questions also predominated as to whether employees received a full ten-minute rest period, or whether period was interrupted. West's Ann.Cal.Labor Code § 226.7(a); 8 CCR § 11050(12)(A); West's Ann.Cal.C.C.P. § 382.

**[12] Statutes 361 ☞181(1)**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k181 In General
                    361k181(1) k. In General. Most Cited Cases
The objective of statutory construction is to determine the intent of the enacting body so that the law

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

165 Cal.App.4th 25
165 Cal.App.4th 25, 80 Cal.Rptr.3d 781, 13 Wage & Hour Cas.2d (BNA) 1547, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal D.A.R. 11,267

Page 4

Case 3:07-cv-02448-MMC  Document 203-2  Filed 09/16/2008  Page 7 of 52

may receive the interpretation that best effectuates that intent.

## [13] Statutes 361 ⇐188

361 Statutes
   361VI Construction and Operation
      361VI(A) General Rules of Construction
         361k187 Meaning of Language
            361k188 k. In General. Most Cited Cases
Court, in construing a statute, first examines the words themselves because the statutory language is generally the most reliable indicator of legislative intent.

## [14] Statutes 361 ⇐188

361 Statutes
   361VI Construction and Operation
      361VI(A) General Rules of Construction
         361k187 Meaning of Language
            361k188 k. In General. Most Cited Cases

## Statutes 361 ⇐208

361 Statutes
   361VI Construction and Operation
      361VI(A) General Rules of Construction
         361k204 Statute as a Whole, and Intrinsic Aids to Construction
            361k208 k. Context and Related Clauses. Most Cited Cases
The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.

## [15] Appeal and Error 30 ⇐893(1)

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most

Cited Cases
The interpretation of a statute presents a question of law subject to de novo appellate review.

## [16] Labor and Employment 231H ⇐2317

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)4 Operation and Effect of Regulations
            231Hk2311 Working Time
               231Hk2317 k. Waiting, Resting, or Sleeping Time. Most Cited Cases
Phrase "major fraction thereof" in regulation requiring employer to permit all employees to take rest periods, with authorized rest period time to be based on the total hours worked daily at rate of ten minutes net rest time per four hours or major fraction thereof means the time period between three and one-half hours and four hours. West's Ann.Cal.Labor Code § 226.7(a); 8 CCR § 11050(12)(A).

## [17] Administrative Law and Procedure 15A ⇐412.1

15A Administrative Law and Procedure
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(C) Rules and Regulations
         15Ak412 Construction
            15Ak412.1 k. In General. Most Cited Cases
Court will not interpret a regulation in a manner that renders an entire sentence meaningless, and in a manner that leads to absurd results.

## [18] Labor and Employment 231H ⇐2317

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)4 Operation and Effect of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Regulations
231Hk2311 Working Time
231Hk2317 k. Waiting, Resting, or Sleeping Time. Most Cited Cases
Regulation requiring employers to authorize all employees to take rest periods which, "insofar as practicable, shall be in the middle of each work period" do not require employers to authorize and permit a first rest break before the first scheduled meal period. West's Ann.Cal.Labor Code § 226.7(a); 8 CCR § 11050(12)(A).

**[19] Parties 287 ⟜35.41**

287 Parties
287III Representative and Class Actions
287III(B) Proceedings
287k35.41 k. Identification of Class; Subclasses. Most Cited Cases

**Parties 287 ⟜35.75**

287 Parties
287III Representative and Class Actions
287III(C) Particular Classes Represented
287k35.75 k. Employees. Most Cited Cases
Trial court, in certifying subclass consisting of employees who worked one or more work periods in excess of five consecutive hours without receiving a 30-minute meal period during which employee was relieved of all duties, relied on erroneous interpretation of statute governing meal periods, and, thus, reversal of order certifying subclass was required, in employees' action against employer, alleging violation of wage and hour laws; statute generally required a first meal period for every "work period of more than five hours per day," and without proper interpretation of statute, trial court could not correctly ascertain legal elements that members of proposed class would have to prove in order to establish their meal period claims, and, thus, could not properly determine whether common issues predominated over issued that affected individual members of the class. West's Ann.Cal.Labor Code § 512(a); 8 CCR §

11050(11)(A); West's Ann.Cal.C.C.P. § 382.

**[20] Mandamus 250 ⟜141**

250 Mandamus
250III Jurisdiction, Proceedings, and Relief
250k141 k. Jurisdiction and Authority. Most Cited Cases
Court of Appeal's denial of employer's first petition for writ of mandate challenging trial court's order ruling that employer had to give employee meal period before employee's work period exceeded five hours on basis that writ relief was not available to challenge an advisory opinion was erroneous, as advisory opinion by trial court was later confirmed by trial court as an official order.

**[21] Labor and Employment 231H ⟜2318**

231H Labor and Employment
231HXIII Wages and Hours
231HXIII(B) Minimum Wages and Overtime Pay
231HXIII(B)4 Operation and Effect of Regulations
231Hk2311 Working Time
231Hk2318 k. Meal or Break Periods. Most Cited Cases
An employer has a statutory duty to make a first 30-minute meal period available to an hourly employee who is permitted to work more than five hours per day, unless (1) the employee is permitted to work a "total work period per day" that is six hours or less, and (2) both the employee and the employer agree by "mutual consent" to waive the meal period. West's Ann.Cal.Labor Code § 512(a).

**[22] Statutes 361 ⟜212.6**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k212 Presumptions to Aid Construction
361k212.6 k. Words Used. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Courts, in construing a statute, presume that every word, phrase, and provision of a statute was intended to have some meaning and perform some useful function.

**[23] Labor and Employment 231H ☜⟹2318**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)4 Operation and Effect of Regulations
                231Hk2311 Working Time
                    231Hk2318 k. Meal or Break Periods. Most Cited Cases

**Labor and Employment 231H ☜⟹2350(2)**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)5 Administrative Powers and Proceedings
                231Hk2344 Proceedings
                231Hk2350 Orders
                    231Hk2350(2) k. Requisites and Validity. Most Cited Cases
To the extent that Industrial Welfare Commission (IWC) wage order stating that a meal period of 30 minutes per five hours of work is generally required was inconsistent with statute generally requiring a first meal period be provided to employee for every work period of more than five hours per day, the IWC wage order was invalid. West's Ann.Cal.Labor Code §§ 512(a), 516.

**[24] Statutes 361 ☜⟹188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
                361k188 k. In General. Most Cited Cases

For purposes of statutory interpretation, to ascertain the common meaning of a word, a court typically looks to dictionaries.

**[25] Labor and Employment 231H ☜⟹2318**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)4 Operation and Effect of Regulations
                231Hk2311 Working Time
                    231Hk2318 k. Meal or Break Periods. Most Cited Cases
Statute requiring an employer to provide employees with a meal period requires only that employers make a meal period available to employees and does not obligate employers to ensure that employees take their meal periods. West's Ann.Cal.Labor Code § 512(a).

**[26] Parties 287 ☜⟹35.41**

287 Parties
    287III Representative and Class Actions
        287III(B) Proceedings
            287k35.41 k. Identification of Class; Subclasses. Most Cited Cases

**Parties 287 ☜⟹35.75**

287 Parties
    287III Representative and Class Actions
        287III(C) Particular Classes Represented
            287k35.75 k. Employees. Most Cited Cases
Individualized issues predominated with respect to employees' claims that employer violated laws governing meal breaks, and, thus certification of subclass consisting of employees who worked one or more work periods in excess of five consecutive hours without receiving a 30-minute meal period during which employee was relieved of all duties, was not warranted, in employees' action against employer, alleging violation of wage and hour

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

laws; under statute governing meal breaks, such breaks only had to be made available to employees by employer, not ensured, and, thus, the reason meal breaks were not taken could only be decided on a case-by-case basis. West's Ann.Cal.Labor Code § 512(a); 8 CCR § 11050(11)(A); West's Ann.Cal.C.C.P. § 382.

**[27] Parties 287 ☞35.17**

287 Parties
    287III Representative and Class Actions
        287III(A) In General
            287k35.17 k. Community of Interest; Commonality. Most Cited Cases
A defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that issues presented by that defense predominate over common issues. West's Ann.Cal.C.C.P. § 382.

**[28] Parties 287 ☞35.41**

287 Parties
    287III Representative and Class Actions
        287III(B) Proceedings
            287k35.41 k. Identification of Class; Subclasses. Most Cited Cases

**Parties 287 ☞35.75**

287 Parties
    287III Representative and Class Actions
        287III(C) Particular Classes Represented
            287k35.75 k. Employees. Most Cited Cases
Individualized issues predominated with respect to employees' claims that employer unlawfully required its employees to work off the clock during meal periods and unlawfully altered employees' time records, and, thus certification of subclass consisting of employees who worked "off the clock" or without pay was not warranted, in employees' action against employer, alleging violation of wage and hour laws; employers could only be held liable for off the clock claims if employer knew or should have known employee was working off the clock, and, thus, resolution of claims required individual inquiries as to whether any employee actually worked off the clock, whether managers had actual or constructive knowledge of such work, and whether managers coerced or encouraged such work, and it had to be determined on individual basis whether any particular time card was adjusted and whether justification given was legitimate. West's Ann.Cal.C.C.P. § 382.

**\*\*785** Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Johanna R. Shargel, Los Angeles; Morrison & Foerster and Karen J. Kubin, San Francisco, for Petitioner.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Los Angeles, Julie A. Dunne, San Diego, and Guylyn R. Cummins, Del Mar Heights, for California Restaurant Association, Employers Group, California Hospital Association, California Retailers Association, National Council of Chain Restaurants and National Retail Federation as Amici Curiae on behalf of Petitioner.

William B. Sailer, San Diego, for California Employment Law Council as Amicus Curiae on behalf of Petitioner.

Greenberg Traurig, Gregory F. Hurley and Stacey Herter, Irvine, for National Association of Theatre Owners of California/Nevada, Inc., as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Lorens & Associates, L. Tracee Lorens, Robert D. Wilson III, Wayne A. Hughes, San Diego; Cohelan & Khoury, Timothy D. Cohelan, Michael D. Singer, Christopher A. Olsen, San Diego; The Turley Law Firm, William Turley, San Diego; Furth, Lehmann & Grant, The Furth Firm, Frederick P. Furth, Jessica L. Grant, San Francisco; Schubert & Reed, Schubert Jonckheer Kolbe & Kralowec, Robert C. Schubert and Kimberly A. Kralowec, San Francisco, for Real Parties in Interest.

Weinberg, Roger & Rosenfeld, David A. Rosenfeld, William A. Sokol, Theodore Franklin, Patricia M. Gates, Alameda; and Miles E. Locker, San Francisco, for Alameda County Central Labor

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

165 Cal.App.4th 25
165 Cal.App.4th 25, 80 Cal.Rptr.3d 781, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal
D.A.R. 11,267

Page 8

Council, Contra Costa County Central Labor Council, Northern California Carpenters Regional Council, SEIU United Healthcare Workers-West and South Bay Central Labor Council as Amici Curiae on behalf of Real Parties in Interest.
Cynthia L. Rice and Jennifer Ambacher, Sacramento, for California Rural Legal Assistance Foundation as Amicus Curiae on behalf of Real Parties in Interest.

NARES, Acting P.J.
*30 In this action involving alleged violations of laws governing rest and meal breaks, **786 we are presented with the following question: Did the trial court err in certifying this matter as a class action without first determining the elements of plaintiffs and real parties in interest Adam Hohnbaum, Illya Haase, Romeo Osorio, Amanda June Rader and Santana Alvarado's (collectively plaintiffs) claims against defendants Brinker Restaurant Corporation, Brinker International, Inc., and Brinker International Payroll Company, LP (collectively Brinker)?

[1] Reconsidering the matter following a transfer from the California Supreme Court and our vacating of the original opinion in this matter, we first recognize that "in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed." *31(Industrial Welfare Com. v. Superior Court (1980) 27 Cal.3d 690, 702, 166 Cal.Rptr. 331, 613 P.2d 579.) FN1 We also recognize that mandatory rest and meal breaks have "have long been viewed as part of the remedial worker protection framework" designed to protect workers' health and safety. (Murphy v. Kenneth Cole Productions, Inc. (2007) 40 Cal.4th 1094, 1105, 1113, 56 Cal.Rptr.3d 880, 155 P.3d 284(Murphy ).) In addition, we note that in construing the applicable statutes and regulations, we look to the plain language of the laws and interpret them in a manner consistent with the Legislature's intent. (Fitch v. Select Products Co. (2005) 36 Cal.4th 812, 818, 31 Cal.Rptr.3d 591, 115 P.3d 1233.)

FN1. This matter is before us for a second time after the California Supreme Court, upon our request, granted review and then transferred the matter back to us with directions that we "vacate the opinion and reconsider the matter as [we] see fit." (Order of Oct. 31, 2007, S157479.)

With these principles in mind, we conclude the class certification order is erroneous and must be vacated because the court failed to properly consider the elements of plaintiffs' claims in determining if they were susceptible to class treatment. Specifically, we conclude that (1) while employers cannot impede, discourage or dissuade employees from taking rest periods, they need only provide, not ensure, rest periods are taken; (2) employers need only authorize and permit rest periods every four hours or major fraction thereof and they need not, where impracticable, be in the middle of each work period; (3) employers are not required to provide a meal period for every five consecutive hours worked; (4) while employers cannot impede, discourage or dissuade employees from taking meal periods, they need only provide them and not ensure they are taken; and (5) while employers cannot coerce, require or compel employees to work off the clock, they can only be held liable for employees working off the clock if they knew or should have known they were doing so. We further conclude that because the rest and meal breaks need only be "made available" and not "ensured," individual issues predominate and, based upon the evidence presented to the trial court, they are not amenable to class treatment. Finally, we conclude the off-the-clock claims are also not amenable to class treatment as individual issues predominate on the issue of whether Brinker forced employees to work off the clock, whether Brinker changed time records, and whether Brinker knew or should have known employees were working off the clock. Accordingly, we grant the petition and order the superior court to vacate its order granting class certification and enter **787 a new order denying certification of plaintiffs' proposed class.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*32 FACTUAL AND PROCEDURAL BACK-GROUND**

A. *Brinker and Its Written Policies*

Brinker operates 137 restaurants in California, including Chili's Grill & Bar, Romano's Macaroni Grill, and Maggiano's Little Italy. Brinker previously owned the Cozymel's and Corner Bakery Café chains, but sold the former in late 2003 and the latter in early 2006.

1. *Rest break and meal period policy*

Brinker's written policy, titled "Break and Meal Period Policy for Employees in the State of California," provides with regard to meal breaks, in a form to be signed by the employee, "I am entitled to a 30-minute meal period when I work a shift that is over five hours." The form also provides, as to rest breaks, "If I work over 3.5 hours during my shift, I understand that I am eligible for one [10-]minute rest break for each four hours that I work." The policy also provides that an employee's failure to follow the foregoing policies "may result in disciplinary action up to and including termination."

2. *Working off the clock policy*

With respect to the issue of working off the clock, Brinker's "Hourly Employee Handbook" states in part: "It is your responsibility to clock in and clock out for every shift you work.... [Y]ou may not begin working until you have clocked in. Working 'off the clock' for any reason is considered a violation of Company policy." Brinker's handbook also states, "If you forget to clock in or out, or if you believe your time records are not recorded accurately, you must notify a Manager immediately, so the time can be accurately recorded for payroll purposes."

B. *2002 Settlement of Regulatory Action Against Brinker Restaurant Corporation*

The California Division of Labor Standards Enforcement (the DLSE) [FN2] investigated Brinker Restaurant Corporation's compensation practices from October 1, 1999 to December 31, 2001, regarding its hourly restaurant employees in California. Among other things, the DLSE investigated Brinker's alleged failure to (1) provide unpaid meal periods as required by law, and, starting on October 1, 2000, pay premium wages to employees who were not provided \*33 with meal periods as required under Labor Code [FN3] section 226.7 and a specified Industrial Welfare Commission (IWC) FN4 wage order; and (2) provide paid 10-minute rest breaks as required by law, and, starting on October 1, 2000, pay premium wages to employees who were not \*\*788 provided with such rest breaks as required under section 226.7 and the specified IWC wage order.

> FN2. "The DLSE 'is the state agency empowered to enforce California's labor laws, including IWC wage orders.' [Citation.]" (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581, 94 Cal.Rptr.2d 3, 995 P.2d 139.)

> FN3. All further statutory references are to the Labor Code unless otherwise specified.

> FN4. The IWC is the state agency in the Department of Industrial Relations " 'empowered to formulate regulations (known as wage orders) governing employment in the State of California.' " (*Morillion v. Royal Packing Co., supra,* 22 Cal.4th at p. 581, 94 Cal.Rptr.2d 3, 995 P.2d 139.) "It is the continuing duty of the [IWC] ... to ascertain the wages paid to all employees in this state, to ascertain the hours and conditions of labor and employment in the various occupations, trades, and industries in which employees are employed in this state, and to investigate the health, safety, and welfare of those employees."(§ 1173.) The IWC is comprised of five members appointed by the Gov-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ernor. (§ 70.) "Although the IWC was de-funded by the Legislature effective July 1, 2004, its wage orders remain in effect. [Citation.]" (*Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 434, fn. 2, 41 Cal.Rptr.3d 482(*Bearden*).)

In 2002 the DLSE filed suit against Brinker in the Los Angeles County Superior Court (the DLSE lawsuit).[FN5] Before the DLSE completed its investigation and thus before it reached any final conclusions as to liability and damages, Brinker Restaurant Corporation and the DLSE entered into a settlement and release agreement (the DLSE settlement) under which Brinker Restaurant Corporation (1) paid $10 million to settle the DLSE lawsuit, and (2) agreed to a court-ordered injunction to ensure its compliance with California meal period and rest break laws until September 2006.

> FN5. *Division of Labor Standards Enforcement v. Brinker Restaurant Corporation* (Super. Ct. Los Angeles County, 2002, No. BC279138).

## C. *Plaintiffs' Complaint*

Plaintiffs' first amended complaint (hereafter the complaint) alleges three types of wage and hour violations that are pertinent to the issues raised in this petition:

### 1. *Alleged rest break violations*

In their first cause of action, plaintiffs allege Brinker willfully violated section 226.7 and IWC Wage Orders Nos. 5-1998, 5-2000 and 5-2001 (hereafter collectively referred to as IWC Wage Order No. 5) by "fail[ing] to provide rest periods for every four hours or major fraction thereof worked per day to non-exempt employees, and failing to provide compensation for such unprovided rest periods." Plaintiffs also allege that as a result of these alleged unlawful acts, they and the members of the proposed class are entitled to recover premium wages and other relief under sections 226, 226.7 and IWC

Wage Order No. 5.

### *34 2. *Alleged meal period and "early lunching" violations*

In their second cause of action, plaintiffs allege Brinker violated sections 226.7 and 512, and IWC Wage Order No. 5, by failing to "provide meal periods for days on which non-exempt employees work(ed) in excess of five hours, or by failing to provide meal periods [altogether], or to provide second meal periods for days employees worked in excess of [10] hours, and failing to provide compensation for such unprovided or improperly provided meal periods." Plaintiffs claim that Brinker engages in unlawful "early lunching" by requiring its employees to take their meal periods soon after they arrive for their shifts, usually within the first hour, and then requiring them to work in excess of five hours, and sometimes more than nine hours straight, without an additional meal period. Plaintiffs also allege that as a result of these alleged unlawful acts, they and the members of the proposed class are entitled to recover premium wages and other relief under sections 226 and 226.7, and IWC Wage Order No. 5.

### 3. *Alleged off-the-clock/time shaving violations*

In their third claim, plaintiffs allege Brinker unlawfully required its employees **789 to work off the clock during meal periods. Although this claim is not expressly set forth in the complaint, the court approved a stipulated amendment to the complaint under which (1) that pleading "include[s] allegations that employees worked 'off the clock' without setting forth those allegations with specificity"; and (2) plaintiffs' allegations with respect to off-the-clock work "shall be limited to: (a) time worked during a meal period when an individual was clocked out; and (b) time 'shaving,' which is defined as an unlawful alteration of an employee's time record to reduce the time logged so as to not accurately reflect time worked."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

165 Cal.App.4th 25
16 Cal.App.4th 25, 80 Cal.Rptr.3d 781, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal
D.A.R. 11,267

Page 11
Case 3:07-cv-00446-MMC   Document 203-2   Filed 09/19/2008   Page 14 of 52

D. *Cross-Motions on Plaintiffs' Rolling Five-Hour Meal Period Claim*

In May 2005, pursuant to a court-approved stipulation to aid a mediation session, the parties submitted briefing to the court in the form of cross-motions on plaintiffs' rolling five-hour meal period claim. Specifically, the parties briefed the legal issue of "whether [Brinker] was required to provide a meal period for each five-hour block of time worked by an hourly employee." This statement of the issue followed the stipulation subheading: "*When Must A Meal Period Be Provided?* "

In their motion, plaintiffs asserted that "Brinker's policy of requiring their employees to work for periods of over [five] continuous hours without a meal break violates [IWC Wage Order No. 5], as well as [sections] 512 and 226.7."

In its motion, Brinker argued it was only required to "provide a first meal period to its hourly, non-exempt employees when such employees worked *35 more than five hours and that [it] was required to provide a second meal period to [those] employees only after [they] worked more than [10] hours in a workday."

Plaintiffs asserted in their written opposition to Brinker's motion that while rest breaks "need only be 'authorized and permitted,' ...*the employer must 'ensure' that the employee takes meal periods.*" (Italics added.) Acknowledging that the 10-hour second meal period provision in section 512 was not at issue in this case, plaintiffs also addressed their early lunching claim, asserting that Brinker's payroll records showed that Brinker was "forcing employees to take their meal period right after they report to work," and thus it was "impossible for [Brinker] to comply with the applicable wage orders as [it was] *not providing morning rest periods to [its] employees which precede the meal period.* Instead, they [were] *giving employees their meal periods as soon as they arrive[d] to work and then working them up to [10] additional hours without an additional meal break.*" (Italics added.)

Plaintiffs asked the court to find that "by failing to provide second meal periods to employees required to work in excess of five hours before or after a meal," Brinker was violating IWC Wage Order No. 5, and plaintiffs and the members of the proposed class were entitled to compensation under section 226.7.

1. *July 2005 meal period "advisory opinion" and order*

On July 1, 2005, the court issued a written tentative advisory opinion on the issue of when an employer must provide a meal period to an hourly employee under section 512. The court found that, under that section, a meal period "must be given *before [an] employee's work period exceeds five hours.*" (Italics added.) The court **790 stated that "the DLSE wants employers to provide employees with break periods and meal periods toward the middle of an employee['s] work period in order to break up that employee's 'shift.' " Thereafter, on July 15 of that year, the court issued a minute order (hereafter the July 2005 order) stating the "advisory ruling" was "*confirmed* by the court *as an order.*" (Italics added.)

E. *Brinker's First Writ Petition (Challenging the July 2005 Meal Period Order )*

In November 2005 Brinker filed its first petition for writ of mandate (D047509) in this matter. In the petition, Brinker challenged the court's July 2005 meal period order. Specifically, Brinker requested a writ directing the trial court to "vacate its earlier order holding that: (1) a non-exempt employee is entitled to a meal period for each five-hour block of time worked [; and] (2) the premium pay owed for a violation of [section 226.7] is a wage."

In support of its petition, Brinker argued the trial court erred by interpreting section 512 to mean that an hourly employee's entitlement to a meal *36 period is 'rolling,' such that "a separate meal period must be provided for each *five-hour block of*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*time* worked ... regardless of the total hours worked in the day. In other words, the [court] interpreted the law to be that ... [o]nce a meal period concludes, the proverbial clock starts ticking again, and if the employee works five hours more, a second meal period must be provided."

Brinker also argued that although an employee working more than five hours and less than 10 hours is entitled under section 512 to a 30-minute meal period at some point during the workday, "nothing in [s]ection 512 ... requires a second meal period be provided solely because [the] employee works five hours after the end of the first meal period, where the total time worked is less than [10] hours." Brinker further asserted that IWC Wage Order No. 5 also "does not dictate the anomalous result that meal periods must be provided every five hours" because, like section 512, it requires only that an employee working more than five hours "gets a meal period *at some point* during the workday." Brinker complained that the court's meal period ruling "requires servers to sit down, unpaid, during the most lucrative part of their working day."

By order dated January 20, 2006, this court denied Brinker's first petition on the ground writ relief was not available to challenge an advisory opinion.

F. *Plaintiffs' Motion for Class Certification*

In April 2006 plaintiffs moved to certify a class of "[a]ll present and former employees of [Brinker] who worked at a Brinker[-]owned restaurant in California, holding a non-exempt position, from and after August 16, 2000 ('Class Members').'" In their moving papers, plaintiffs alternatively defined the class as "all hourly employees of restaurants owned by [Brinker] in California who have not been provided with meal and rest breaks in accordance with California law and who have not been compensated for those missed meal and rest breaks." In a footnote, plaintiffs stated that the compensation they had not received for the "missed

meal and rest breaks" included " 'off-the-clock' work as [Brinker] engage[s] in several practices to avoid providing meal breaks known as, 'time shaving;' inserting meal periods into payroll records when they were not provided;**791 and forcing employees to work 'off-the-clock' during meal breaks." The class in question is estimated to consist of more than 59,000 Brinker employees.

Plaintiffs' motion also sought certification of six subclasses, three of which are pertinent to this appeal: (1) a "Rest Period Subclass," consisting of "Class Members who worked one or more work periods in excess of three and a half (3.5) hours without receiving a paid 10 minute break during which the Class Member was relieved of all duties, from and after October 1, 2000"; (2) a *37 "Meal Period Subclass," consisting of "Class Members who worked one or more work periods in excess of five (5) consecutive hours, without receiving a thirty (30) minute meal period during which the Class Member was relieved of all duties, from and after October 1, 2000"; and (3) an "Off-The-Clock Subclass," consisting of "Class Members who worked 'off-the-clock' or without pay from and after August 16, 2000."

Plaintiffs asserted that "[Brinker's] corporate policies of improper early meals, time shaving, failure to provide meal periods altogether or for less than [30] minutes, failure to provide rest periods, and forcing 'off-the-clock' work, are centralized and common to the Class." They stated that "[u]tilization of the class action vehicle is the superior method of trying this case, due to the fact that [Brinker] maintain[s] data and reports in 'searchable' format ... that specifically identify the number of employees who are not receiving meal breaks for every [five] hours worked, not receiving meal periods at all, and the instances where time cards have been manipulated, known at Brinker as 'time-shaving.' " Plaintiff further stated that "[t]his case can be easily tried as a class action with the use of statistical evidence to prove the effects of company-wide policies and practices on the Class

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case App.4th 25, 2d 446 R, 781, DSE 2008 647, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal

Members."

In support of their contention that common issues predominated, plaintiffs submitted evidence that Brinker used a centralized computer system that could generate reports showing class-wide meal and rest break violations. Specifically, plaintiffs assert the computer records could be used to show all "employee shifts that lasted over five hours with breaks that were less than 30 minutes;" a "five hour short report" showing "employees that worked more than five hours in a day, but their time was changed to reflect less than five hours" to reveal "time shaving" done to conceal meal period violations; and run a "time card maintenance report" that identifies all changes made to original records. Plaintiffs also submitted detailed declarations from 33 current and former hourly employees. Some stated they were denied rest breaks but said nothing about whether they were denied meal breaks, or what time in their shift meal breaks were taken. Others stated they were not provided rest or meal breaks. Some of the declarants stated they were given meal breaks, but were required to take them within the first hour of working and were not given another meal break after working five hours. Some, but not all, stated they were required to work when they were clocked out for lunch or after their shift ended. Some stated they did not "waive" their breaks, but instead were not relieved of work duties so they could take their breaks.

Plaintiffs also submitted statistical and survey evidence that allegedly showed that even after its settlement with the DLSE, Brinker continued to *38 prevent its employees from taking meal and rest periods. **792 This evidence purported to show rest periods were not given, meal periods were not provided for every five hours worked, meal periods were taken for a period of less than 30 minutes, and second meal periods were not provided where employees worked more than five hours after the first meal period.

In its opposition, Brinker argued that a rest break class should not be certified because (1) under IWC Wage Order No. 5, paid rest breaks need only be permitted, not necessarily taken; (2) Brinker permitted its employees to take rest breaks; (3) whether individual employees took the rest breaks that Brinker provided required a "hopelessly individualized" inquiry; and (4) individual issues thus predominated.

Brinker next argued that a meal period class should not be certified because (1) under sections 512 and 226.7, unpaid meal periods need only be provided, not necessarily taken; (2) plaintiffs' "rolling, five-hour approach to meal periods," which "would call for a second meal period for work days with *fewer than* 10 hours unless the first meal is taken exactly mid-shift" (original italics), was wrong because "[u]nder the plain language of [s]ection 512, an employee working more than five hours, but fewer than 10, is entitled to one 30-minute meal period at some point during the work day," and "[s]ection 512 on its face calls for a second meal period only when more than 10 hours are worked"; (3) Brinker provided all required meal periods to its employees; (4) whether each employee was provided with meal periods as required by law "var[ied] person-by-person, shift-by-shift, and day-by-day," and "involve[d] hundreds of individualized inquiries"; and (5) individual issues thus predominated.

Brinker also argued that plaintiffs' off-the-clock claim should not be certified as a class action claim because (1) plaintiffs had not cited any Brinker policy to alter time records or permit off-the-clock work, and Brinker has a policy expressly prohibiting such work; (2) plaintiffs had no proof of "class-wide off-the-clock work"; (3) even if off-the-clock work occurred, Brinker could not be held liable unless it "suffered or permitted the work"; and (4) any off-the-clock work would have to be individually proven.

In support of its opposition to the class certification motion, Brinker submitted more than 600 declarations from hourly workers and almost 30 declarations from managers. Brinker submitted declarations from managers who stated they permitted

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

their employees to take rest and meal breaks. The managers explained in detail their compliance with rest and meal break laws. They also explained that there was no uniform practice for meal breaks because it was different for servers, host and bartenders than for dishwashers and cooks, and it differed for lunch shifts versus dinner shifts. They explained **\*39** that Brinker allowed restaurant managers to handle meal and rest breaks compliance locally, without a system wide standard practice. For example, one manager explained lunch servers rarely worked shifts long enough to take lunch breaks, dishwashers and cooks at lunch would take lunch as a group, dinner servers had a "rolling" meal break policy, and dinner cooks and dishwashers took turns taking meal breaks. Every 15 minutes or so, one employee would clock out for a 30-minute meal break. Another manager stated that he came up with an Excel spreadsheet called a "Meal Compliance Log," which was attached as an exhibit to his declaration. According to that manager, it was not used by other restaurants and easily allowed him to determine from **\*\*793** time cards which employees were violating meal break policies and to give the employees written warnings about the violations. That manager also used a "Pasta Pal" system for meal and rest breaks, where opening shift servers and closing shift servers were paired up to assist each other in meal and rest breaks. Another manager stated that management at his restaurant had a written schedule to ensure meal breaks, which, at the request of employees, were often taken an hour after coming to work to ensure they could maximize their tips during peak business hours. They explained they allowed rest breaks and sometimes employees took more rest breaks than required by law. The manager declarations also explained how they would sometimes need to make changes in an employee's time card to accurately reflect hours worked because the employee would not clock out before beginning their meal period or would return from a meal period without clocking back in. Some restaurants had "meal compliance officers," whose entire shift was devoted to relieving other employees so they could take breaks. A man-

ager of one of the named plaintiffs provided a declaration and supporting documentation challenging that plaintiff's claim he was not given rest and meal breaks and also stated he periodically gave that plaintiff and other employees free meals as a way of thanking them for their hard work.

Brinker submitted declarations from 283 employees who stated they were allowed rest breaks while employed by Brinker. With regard to meal breaks, 336 employees declared they were regularly provided 30-minute meal breaks. Brinker also submitted 433 statements obtained by the DLSE that indicated meal breaks were made available to Brinker employees.

In their reply brief, plaintiffs elaborated on their meal period, rest break, and off-the-clock claims.

With respect to their meal period claims, plaintiffs asserted in their reply papers that under the court's July 2005 order Brinker was required to provide its employees with a meal period for every five hours worked, and common issues predominated on plaintiffs' rolling five-hour meal period claim.

**\*40** Plaintiffs maintained that common issues predominate on their claims for "missed or inadequate meal periods." Citing *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962-963, 35 Cal.Rptr.3d 243(*Cicairos* ), plaintiffs asserted that employers have an affirmative duty to ensure employees receive meal periods, and the waiver provisions of section 512"cannot rationally be interpreted to mean the 'mutual consent' of employer and employee required to waive meal periods is relaxed to a *lesser* standard permitting employees to 'informally decline' (without obtaining the employer's consent)" because such an interpretation "flies in the face of the *affirmative obligation* placed upon the employer to relieve employees for meal periods enunciated in *Cicairos*."

Plaintiffs also stated that "[Brinker's claims that] it can meet its legal obligation to 'provide' meal periods by 'making them available,' and that employees

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

may 'informally decline' them" was erroneous, be-
cause *Cicairos, supra,* 133 Cal.App.4th 949, 35
Cal.Rptr.3d 243"confirm[s] that *meal periods may
not be waived (or 'informally declined* ')." (Italics
added.)

Plaintiffs asserted that common issues predominate
on their rest break claims because they "presented
corporate policy evidence of a pattern and practice
by Brinker of failing to provide a rest period prior
to employees' meal period as a result of its practice
of scheduling meals early." **794 Specifically,
plaintiffs argued that "Brinker maintains company-
wide policies discouraging rest periods, including
requiring servers to give up tables and tips if they
want a break and failing to provide rest periods *pri-
or* to scheduled early meals."

Last, claiming that common issues also predomin-
ate on their "off-the-clock" meal period claims,
plaintiffs stated, "Plaintiffs' submissions ... provide
evidence employees were asked to work while
clocked out for meals." Noting they had limited
their off-the-clock claims "to those relating to meal
periods," plaintiffs also asserted that "Brinker's cor-
porate records prove their 'time-shaving' claim.
When entries are manipulated to delete time from
an employee's shift to bring it under five hours, re-
cords reflect that change."

### G. Order Granting Class Certification

Following issuance of a tentative ruling on
plaintiffs' class certification motion, and after a
hearing thereon, the court took the matter under
submission. On July 6, 2006, the court issued its or-
der granting the motion and certifying the proposed
class (class certification order), · finding that
"common issues predominate over individual is-
sues." The court specifically found that "*common
questions regarding the meal and rest period
breaks* are sufficiently pervasive to permit adjudic-
ation in this one class action. [¶] [Brinker's] *41 ar-
guments regarding the necessity of making employ-
ees take meal and rest periods actually points to a

*common legal issue* of *what* [Brinker ] *must do to
comply with the Labor Code.* Although a determin-
ation that [Brinker] need not *force employees to
take breaks* may require some individualized dis-
covery, the common alleged issues of meal and rest
violations predominate." (Italics added.)

Brinker's writ petition followed.

### DISCUSSION

### I. *LAW GOVERNING CLASS CERTIFICATION
MOTIONS*

[2] The California Supreme Court has explained
that "[t]he decision to certify a class rests squarely
within the discretion of the trial court, and we af-
ford that decision great deference on appeal, revers-
ing only for a manifest abuse of discretion:
'Because trial courts are ideally situated to evaluate
the efficiencies and practicalities of permitting
group action, they are afforded great discretion in
granting or denying certification.' [Citation.] A
certification order generally will not be disturbed
unless (1) it is unsupported by substantial evidence,
(2) it rests on *improper criteria,* or (3) it rests on
*erroneous legal assumptions.* [Citations.]"
(*Fireside Bank v. Superior Court* (2007) 40 Cal.4th
1069, 1089, 56 Cal.Rptr.3d 861, 155 P.3d
268(*Fireside Bank* ), italics added.) A class certific-
ation order "based upon *improper criteria or incor-
rect assumptions* calls for reversal ' "even though
there may be substantial evidence to support the
court's order." ' [Citations.]" (*Linder v. Thrifty Oil
Co.* (2000) 23 Cal.4th 429, 436, 97 Cal.Rptr.2d
179, 2 P.3d 27(*Linder* ), italics added.)

[3][4][5] The standards for class certification in
California are well established. "Code of Civil Pro-
cedure section 382 authorizes class actions 'when
the question is one of a common or general interest,
of many persons, or when the parties are numerous,
and it is impracticable to bring them all before the
court.' " (*Sav-On Drug Stores, Inc. v. Superior

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Court* (2004) 34 Cal.4th 319, 326, 17 Cal.Rptr.3d 906, 96 P.3d 194(*Sav-On* ).) The party seeking class certification has the burden to establish**795 "(1) ... a sufficiently numerous, ascertainable class, (2) ... a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods." (*Fireside Bank, supra,* 40 Cal.4th at p. 1089, 56 Cal.Rptr.3d 861, 155 P.3d 268; *Sav-On, supra,* 34 Cal.4th at p. 326, 17 Cal.Rptr.3d 906, 96 P.3d 194.) In turn, "the 'community of interest requirement embodies three factors: (1) *predominant common questions of law or fact;* (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.]" (*Fireside Bank, supra,* 40 Cal.4th at p. 1089, 56 Cal.Rptr.3d 861, 155 P.3d 268,*42 italics added; *Sav-On, supra,* 34 Cal.4th at p. 326, 17 Cal.Rptr.3d 906, 96 P.3d 194.) Here, the parties to this writ proceeding contest only the first factor of predominance.

[6][7] Whether certification of a class is appropriate is "essentially a procedural [question] that does not ask whether an action is legally or factually meritorious." (*Linder, supra,* 23 Cal.4th at pp. 439-440, 97 Cal.Rptr.2d 179, 2 P.3d 27.) "A trial court ruling on a certification motion determines 'whether ... the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Sav-On, supra,* 34 Cal.4th at p. 326, 17 Cal.Rptr.3d 906, 96 P.3d 194.)

[8][9] A critical inquiry on a class certification motion is whether "the *theory of recovery* advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On, supra,* 34 Cal.4th at p. 327, 17 Cal.Rptr.3d 906, 96 P.3d 194, italics added.) In order to determine whether common questions of law or fact predominate, "the trial court *must* examine

the issues framed by the pleadings and the law applicable to the causes of action alleged." (*Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 916, 107 Cal.Rptr.2d 761(*Hicks* ), italics added, fn. omitted, citing *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 810-811, 94 Cal.Rptr. 796, 484 P.2d 964.)

## II. *ANALYSIS*

### A. *Failure To Determine Elements of Plaintiffs' Claims*

[10] As we explained in part I, *ante,* in order to determine if common questions of fact predominated, the trial court was required to "examine the issues framed by the pleadings and the law applicable to the causes of action alleged." (*Hicks, supra,* 89 Cal.App.4th at p. 916, 107 Cal.Rptr.2d 761, fn. omitted.) More specifically, in a wage and hour case such as this, the court was required to determine the elements of plaintiffs' claims.

For example, in *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 103 Cal.Rptr.2d 320, 15 P.3d 1071, the trial court certified a nationwide class without first deciding what law applied to the class members' claims. The Court of Appeal denied the defendant's petition for writ of mandate, and the California Supreme Court reversed. In doing so the high court held "the decision in this case to order certification of a nationwide class was premised upon the faulty legal assumption that [the applicable law] need not be resolved as part of the certification **796 process." (*Id.* at p. 927, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) "[A] trial court cannot reach an informed decision on predominance and manageability"(*ibid.*) without first "determining the applicable law or delving into manageability issues." (*Id.* at p. 926, 103 Cal.Rptr.2d 320, 15 P.3d 1071.)

*43 Here, it is undisputed that the court did not reach the issue of what law applied to plaintiffs' claims. Rather, the court expressly held, as did the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

court in *Washington Mutual,* that the applicable law "need not be resolved as part of the certification process." (*Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 927, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The court erred in so finding because it could not determine whether individual or common issues predominate in this case, and thus whether a class action was proper, without first determining this threshold issue. Further, as we explain in greater detail, *post,* had the court correctly decided the elements of plaintiffs' rest, meal break and off-the-clock claims, it could have only concluded liability could only be established by making individual inquiry into each plaintiff's claims, and they thus are not amenable to class treatment.

### B. *Rest Break Claims*

[11] Section 226.7, subdivision (a) provides: "No employer shall require any employee to work during any meal or *rest period mandated by an applicable order of the [IWC* ]." (Italics added.) For purposes of section 226.7, IWC Wage Order No. 5-2001, which became operative on January 1, 2001, and governs an employer's obligations with respect to rest breaks, is the current IWC wage order at issue in this writ proceeding.[FN6] The pertinent provisions of IWC Wage Order No. 5-2001 are codified in California Code of Regulations, title 8, section 11050, subdivision 12(A) (hereafter Regulation 11050(12)(A)), which provides: "Every employer shall authorize and permit all employees to take rest periods, which *insofar as practicable shall be in the middle of each work period.* The authorized rest period time shall be based on *the total hours worked daily* at the rate of ten (10) minutes net rest time *per four (4 ) hours or major fraction thereof.* However, a rest period need not be authorized for employees *whose total daily work time is less than three and one-half (3 1/2 ) hours.* Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." (Italics added.)

FN6. With exceptions not applicable here,

IWC Wage Order No. 5-2001 applies to "all persons employed in the public housekeeping industry, whether paid on a time, piece rate, commission, or other basis." (Cal.Code Regs., tit. 8, § 11050, subd. 1.) It defines "public housekeeping industry" to mean "*any industry, business, or establishment which provides meals,* housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the [IWC], *and includes,* but is not limited to the following: [¶] (1) *Restaurants,* night clubs, taverns, bars, cocktail lounges, lunch counters, cafeterias, boarding houses, clubs, *and all similar establishments where food in either solid or liquid form is prepared and served to be consumed on the premises.*" (*Id.,* § 11050, subd. 2(P)(1), italics added.)

[12][13][14][15] In order to properly interpret Regulation 11050(12)(A), we apply the following principles of statutory interpretation: "The objective of statutory construction is to determine the intent of the enacting body so that the law *44 may receive the interpretation that best effectuates that intent. [Citation.] 'We first examine the words themselves because the statutory language is generally the most **797 reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.]" (*Fitch v. Select Products Co., supra,* 36 Cal.4th at p. 818, 31 Cal.Rptr.3d 591, 115 P.3d 1233.) The interpretation of a statute presents a question of law subject to de novo appellate review. (*CBS Broadcasting, Inc. v. Superior Court* (2001) 91 Cal.App.4th 892, 906, 110 Cal.Rptr.2d 889.)

[16] The phrase "per four (4) hours or major fraction thereof" does not mean that a rest period must be given every three and one-half hours. Regulation 11050(12)(A) states that calculation of the appro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

priate number of rest breaks must "be based on the total hours worked daily." Thus, for example, if one has a work period of seven hours, the employee is entitled to a rest period after four hours of work because he or she has worked a full four hours, not a "major fraction thereof." It is only when an employee is scheduled for a shift that is more than three and one-half hours, but less than four hours, that he or she is entitled to a rest break before the four hour mark.

Moreover, because the sentence following the "four (4) hours or major fraction thereof" limits required rest breaks to employees who work at least three and one-half hours in one work day, the term "major fraction thereof" can only be interpreted as meaning the time period between three and one-half hours and four hours. Apparently this portion of the wage order was intended to prevent employers from avoiding rest breaks by scheduling work periods slightly less that four hours, but at the same time made three and one-half hours the cut-off period for work periods below which no rest period need be provided.

In supplemental briefing following transfer plaintiffs for the first time rely upon a February 16, 1999 DLSE opinion letter in support of their position that rest breaks must be provided every three and one-half hours. Specifically, that letter, responding to a query from an attorney in Camarillo, California, attempted to "clarify the meaning of 'or major fraction thereof' " in Regulation 11050(12)(A). Jose Millan, the Chief Deputy Labor Commissioner, concluded that this phrase meant that "an employer must provide its employees with a 10-minute rest period when the employees work *any* time over the midpoint of each four hour block of time...." The DLSE elaborated, quoting a 1948 opinion from the chief of the Division of Industrial Welfare (the predecessor to the DLSE) (1948 Chief's Decision):

" 'Rest Periods-in the Orders shall be construed to mean that for each four hours (or majority fraction thereof) worked in a day the employee

has earned the right to 10 minutes' rest time. That is, if the (employee) works more than 2 and up to 6 hours in a day, (the employee) is entitled to 10 minutes; if (the employee) **45** works more than 6 and up to 10 hours in a day (the employee) is entitled to 20 minutes; if (the employee) works more than 10 and up to 14 hours in the day, (the employee) is entitled to 30 minutes, etc.' " (Feb. 16, 1999 DLSE Opn. Letter, quoting Chief's Decisions, Section 1101: Rest Periods, *General Interpretation and Enforcement Procedure of the Orders and the Labor Code Sections,* Manual of Procedure, Division of Industrial Welfare, Department of Industrial Relations (1948).)

[17] Thus, the DLSE interpreted the term "major fraction thereof" to mean any time over 50 percent of a four-hour work **798** period. However, this interpretation is incorrect as it renders the current version of Regulation 11050(12)(A) internally inconsistent. An employee cannot, as the 1948 Chief's Decision says, be entitled to a 10-minute break if she or she "works more than 2 ... hours in a day," if the employee is not entitled to a 10-minute break if he or she works "less than three and one-half" hours in a day. We will not interpret Regulation 11050(12)(A) in a manner that renders an entire sentence meaningless, and in a manner that leads to absurd results. (*Reno v. Baird* (1998) 18 Cal.4th 640, 658, 76 Cal.Rptr.2d 499, 957 P.2d 1333; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76-77, 124 Cal.Rptr.2d 519, 52 P.3d 695.) Further, we need not accept as precedent a DLSE letter that is contrary to law. (See *Murphy, supra,* 40 Cal.4th at p. 1105, fn. 7, 56 Cal.Rptr.3d 880, 155 P.3d 284.)

There is a rational explanation why the 1948 Chief's Decision, upon which the February 16, 1999 DLSE opinion letter is based, interpreted the then-existing version of Regulation 11050(12)(A) to provide a rest break every two hours. In 1948, the rest break regulation was found in title 8 of the California Administrative Code, [FN7] section 11390 (Regulation 11390), and provided:

FN7. Effective January 1, 1988, the Legis-

lature adopted a new designation for this code, i.e., the California Code of Regulations.

"Every employer shall authorize all employees to take rest periods which, insofar as practicable, shall be in the middle of each work period. Rest periods shall be computed on the basis of 10 minutes for four hours working time, or *majority* fraction thereof. No wage deduction shall be made for such rest periods." (Italics added.)

As can be seen from the text of Regulation 11390, it did not contain the sentence providing "a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours." Thus, it would not make Regulation 11390 internally inconsistent to interpret it to mean that for a work shift of more than two hours, a 10-minute rest break must be provided.

Moreover, Regulation 11390 used the term "majority," while Regulation 11050(12)(A) uses the term "major." The term majority is defined *46 as: " The greater number. The number greater than half of any total." (Black's Law Dict. (6th ed.1990) p. 955, col. 1.) That definition comports with the IWC's interpretation of former Regulation 11390 to mean if an employee works "more than 2 and up to 6 hours in a day, (the employee) is entitled to 10 minutes" in rest break. However, when Regulation 11390 was revised and renumbered as Regulation 11380 in 1952, at which time the sentence stating that no rest period need be given to workers who worked a daily work time of less than three and one-half hours was added, the term "majority" was changed to "major." (Cal.Code Regs., tit. 8, § 11380, subd. (12).) It is readily apparent this change was made as use of the term "majority," and the interpretation given that term by the 1948 Chief's Decision, would conflict with the three and one-half hour cut off for provision of rest periods.

Plaintiffs also cite a wage and hour treatise in support of its position. However, the cited portion of the treatise, Simmons, *Wage and Hour Manual for*

*California Employers* (12th ed.2007) at page 173, **799 merely states that "the California Wage Orders require employers to 'authorize and permit' rest periods for nonexempt employees whose total daily work time is at least 3-1/2 hours." This phrase is consistent with an interpretation that rest breaks must be given if an employee works between three and one-half hour and four hours, but if four or more hours are worked, it need be given only every four hours, not every three and one-half hours.

In supplemental briefing, plaintiffs have expanded their argument and now contend that employees are entitled to a second rest period after working six hours, and a third rest period after working 10 hours. This contention is unavailing.

This argument ignores the plain text of Regulation 11050(12)(A). If the IWC had intended that employers needed to provide a second rest period at the six-hour mark, and a third rest period at the 10-hour mark, it would have stated so in Regulation 11050(12)(A).

[18] Furthermore, contrary to plaintiffs' assertion, the provisions of Regulation 11050(12)(A) do not require employers to authorize and permit a first rest break *before* the first scheduled meal period. Rather, the applicable language of Regulation 11050(12)(A) states only that rest breaks "insofar as *practicable* shall be in the middle of each work period." (Italics added.) Regulation 11050(12)(A) is silent on the question of whether an employer must permit an hourly employee to take a 10-minute rest break before the first meal period is provided. As Brinker points out, an employee who takes a meal period one hour into an eight-hour shift could still take a post-meal period rest break "in the middle" of the first four-hour work period, in full compliance with the applicable provisions of IWC Wage Order No. 5-2001.

*47 Moreover, the language of Regulation 11050(12)(A) is clearly intended to provide employers with some discretion to not have rest peri-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ods in the middle of a work period if, because of the nature of the work or the circumstances of a particular employee, it is not "practicable." This discretion is of particular importance for jobs, such as in the restaurant industry, that require flexibility in scheduling breaks because the middle of a work period is often during a mealtime rush, when an employee might not want to take a rest break in order to maximize tips and provide optimum service to restaurant patrons. As long as employers make rest breaks available to employees, and strive, where practicable, to schedule them in the middle of the first four-hour work period, employers are in compliance with that portion of Regulation 11050(12)(A).

In support of their argument that employers must provide a rest period before the first meal period, plaintiffs cite a September 17, 2001 DLSE opinion letter. The 2001 DLSE opinion letter, which interpreted IWC Wage Order No. 16-2001, stated that "[i]f an employer *regularly requires employees to work five hours prior to their 30[-]minute lunch break* " (italics added), as a general matter under IWC Wage Order No. 16-2001"the first rest period should come sometime before the meal break." (Sept. 17, 2001 DLSE Opn. Letter re: IWC Order 16-2001 Rest Period Provisions, p. 4.) However, that letter stated that its findings applied only to "persons employed in the on-site occupations of construction, drilling, logging, and mining"(*id.* at p. 1) and is thus inapplicable to this case. Moreover, plaintiffs do not contend that Brinker "regularly re-quires**800 employees to work five hours prior to their 30[-]minute lunch break." On the contrary, plaintiffs complain that Brinker regularly engages in unlawful early lunching by requiring its employ-ees to take their meal periods soon after they arrive for their shifts, usually within the first hour.

Brinker asserts the court failed to address the issue of whether employers must "force" employees to take rest breaks and, had it correctly ascertained that Brinker was not responsible for requiring its employees to take rest breaks, "it necessarily would

have concluded that liability could only be estab-lished on an individual basis and that plaintiffs' claims were not amenable to class treatment." In their return to the petition, plaintiffs respond they never disputed that rest breaks can be waived, and thus the court did not have to consider or decide that legal question.

Although plaintiffs acknowledge that employees can waive their right to take rest breaks that their employers authorize and permit as required by law, the court's class certification order is silent with re-spect to both the elements plaintiffs must prove to establish their rest break claims and the critical leg-al issue of whether employees may waive their right to take such breaks. In basing its predomin-ance finding on the "common legal issue" of "what *48 [Brinker] must do to comply with the Labor Code," the court assumed it Was not required to de-termine the elements of plaintiffs' rest break claims before it certified the proposed class of Brinker's hourly employees. However, on the alleged facts of this purported class action, the court's assumption was incorrect, thus requiring reversal of the class certification order. (See *Linder, supra,* 23 Cal.4th at p. 436, 97 Cal.Rptr.2d 179, 2 P.3d 27). Because the applicable provisions of Regulation 11050(12)(A) provide only that rest periods should be scheduled in the middle of each work period "insofar as prac-ticable," the propriety of permitting a rest break near the end of a typical four-hour work period de-pends on whether the scheduling of such a rest break was practicable in a given instance, and thus cannot be litigated on a class basis.

Furthermore, because (as the parties acknowledge) Brinker's hourly employees may waive their rest breaks, and thus Brinker is not obligated to ensure that its employees take those breaks, any showing on a class basis that plaintiffs or other members of the proposed class missed rest breaks or took shortened rest breaks would not necessarily estab-lish, without further individualized proof, that Brinker violated the provisions of section 226.7, subdivision (a) and Regulation 11050(12)(A) as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

165 Cal.App.4th 25
165 Cal.App.4th 25, 84 Cal.Rptr.3d 781, 08 Cal. Daily Op. Serv. 10,647, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal
D.A.R. 11,267

Page 21

plaintiffs allege in their complaint.

Had the court properly determined that (1) employees need be afforded only one 10-minute rest break every four hours "or major fraction thereof" (Reg. 11050(12)(A)), (2) rest breaks need be afforded in the middle of that four-hour period only when "practicable," and (3) employers are not required to ensure that employees take the rest breaks properly provided to them in accordance with the provisions of IWC Wage Order No. 5, only individual questions would have remained, and the court in the proper exercise of its legal discretion would have denied class certification with respect to plaintiffs' rest break claims because the trier of fact cannot determine on a class-wide basis whether members of the proposed class of Brinker employees missed rest breaks as a result of a supervisor's coercion or the **801 employee's uncoerced choice to waive such breaks and continue working. Individual questions would also predominate as to whether employees received a full 10-minute rest period, or whether the period was interrupted. The issue of whether rest periods are prohibited or voluntarily declined is by its nature an individual inquiry.

Plaintiffs assert that even if the court erred in failing to define the elements of plaintiffs' rest period claims prior to certifying the class we must remand this matter to allow the court to determine if their "expert statistical and survey evidence" makes their rest break claims amenable to class treatment. However, while it is clear that courts may use such evidence in determining if a claim is amenable to class treatment (see *49 *Sav-On, supra,* 34 Cal.4th at p. 333, 17 Cal.Rptr.3d 906, 96 P.3d 194), that evidence does not change the individualized inquiry in determining if Brinker allowed rest periods, or forbid employees from taking them. As summarized in the factual background, *ante,* in addition to being based upon faulty legal principles, that evidence only purported to show when rest breaks were taken, or not. It did not show *why* rest breaks were not taken. It could also not show *why* breaks of less than 10 uninterrupted minutes were taken. Plaintiffs

claim they were forced to forgo rest breaks, while Brinker submitted evidence from management and employees that rest breaks were made available but on occasion waived by the employees. The question of whether employees were forced to forgo rest breaks or voluntarily chose not to take them is a highly individualized inquiry that would result in thousands of mini-trials to determine as to each employee if a particular manager prohibited a full, timely break or if the employee waived it or voluntarily cut it short. (*Brown v. Federal Express Corp.* (C.D.Cal.2008) 249 F.R.D. 580, 587(*Brown* ) [meal period violations claim not amenable to class treatment as court would be "mired in over 5000 mini-trials" to determine if such breaks were provided].) This individualized proof makes plaintiffs' rest break claims not amenable to class treatment.

Further, contrary to plaintiffs' suggestion in their supplemental briefing, our conclusion that individual issues predominate does not dictate that claims asserting violations of rest break laws can never be certified as a matter of law. Rather, we are only concluding that under the facts presented to the trial court in this case, and the manner in which plaintiffs' claims are defined, the claims in this case are not suitable for class treatment. Moreover, we are not, as plaintiffs claim, improperly determining the merits of their claims. (See *Lewis v. Robinson Ford Sales, Inc.* (2007) 156 Cal.App.4th 359, 367, 67 Cal.Rptr.3d 347 ["in determining class certification questions, the courts do not decide the merits of the case"].) Rather, as explained, *ante,* we are only determining the law applicable to their claims.

For all of the foregoing reasons, we conclude that the class certification order rests on improper criteria and incorrect assumptions with respect to the rest break claims, and thus the court abused its discretion in finding that those claims are amenable to class treatment. Accordingly, the portion of the class certification order certifying the rest break subclass must be vacated. (*Fireside Bank, supra,* 40 Cal.4th at p. 1089, 56 Cal.Rptr.3d 861, 155 P.3d 268.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## C. Meal Period Claims

Plaintiffs also assert two principal claims regarding missed or inadequate meal periods.**802 First, plaintiffs assert a rolling five-hour meal period claim, alleging Brinker's uniform meal period policy violates sections 512 and 226.7, and IWC Wage Order No. 5, by failing to provide or make available to *50 Brinker's hourly employees a 30-minute uninterrupted meal period for every five *consecutive* hours of work. Related to this claim is plaintiffs' assertion that Brinker's "most egregious meal period violations" stem from its practice of early lunching, under which Brinker allegedly requires its hourly employees to take their meal periods soon after they arrive for their shifts, usually within the first hour, and then requires them to work in excess of five hours, and sometimes more than nine hours straight, without an additional meal period.

Second, plaintiffs claim that employers have an affirmative duty under IWC Wage Order No. 5 to ensure that hourly employees are relieved of all duty during meal periods, and Brinker's uniform meal period policy violates sections 512 and 226.7, and IWC Wage Order No. 5, by failing to ensure that its hourly employees "receive" or "take" their meal periods.

We conclude the court (1) abused its discretion in concluding that plaintiffs' rolling five-hour and early lunching meal period claims are amenable to class treatment because it was based upon incorrect legal assumptions and (2) incorrectly assumed that, in order to render an informed certification decision, it did not have to resolve the issue of whether Brinker had a duty to ensure that its employees take their meal periods. We further conclude that employers need only make meal breaks available, not "ensure" they are taken, and, for the same reasons expressed in our discussion regarding rest breaks, the meal break claims are not amenable to class treatment.

### 1. *Rolling five-hour meal period claim*

[19][20] As discussed, *ante,* the court found, in what it initially termed an "advisory" opinion, a meal period "must be given *before* [*an*] *employee's work period exceeds five hours.*" (Italics added.) The court also stated that "the DLSE wants employers to provide employees with break periods and *meal periods toward the middle of an employee*[']*s work period* in order to break up that employee's 'shift.' " (Italics added.) The court further stated that Brinker "appears to be in violation of [section] 512 by not providing a 'meal period' *per every five hours of work.*" (Italics added.) Two weeks later, at an ex parte hearing, the court issued a minute order (the July 2005 order) stating the "advisory ruling" was "*confirmed* by the court *as an order.*" (Italics added.) [FN8]

> FN8. This court's order denying Brinker's first writ petition stated in part: "The review of an advisory opinion would result in an advisory opinion. California courts generally have no power to render an advisory opinion. [Citation.] The petition is denied." Upon further review, that order was erroneous as the "advisory" opinion by the trial court was later confirmed by the court as an official order.

*51 We conclude that the court's rolling five-hour meal period ruling in its July 2005 order was erroneous, and thus the class certification order rests on improper criteria with respect to the plaintiffs' rolling five-hour meal period claim and cannot stand to the extent it was based on that ruling. (See *Fireside Bank, supra,* 40 Cal.4th at p. 1089, 56 Cal.Rptr.3d 861, 155 P.3d 268.)

Section 512, subdivision (a) (hereafter section 512(a)), which governs an employer's**803 obligations with respect to the "providing" of meal periods to its hourly employees, provides:

> "An employer may not employ an employee for a work period of more than five hours *per day*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

without *providing* the employee with a meal period of not less than 30 minutes, except that if the *total work period per day* of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours *per day* without *providing* the employee with a second meal period of not less than 30 minutes, except that if the *total hours worked* is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." (Italics added.)

[21] Section 512(a) thus plainly provides that an employer in California has a statutory duty to make a first 30-minute meal period available to an hourly employee who is permitted to work more than five hours *per day,* unless (1) the employee is permitted to work a "total work period per day" that is six hours or less, and (2) both the employee and the employer agree by "mutual consent" to waive the meal period.

This interpretation of section 512(a), regarding an employer's duty to provide a first meal period, is consistent with the plain language set forth in IWC Wage Order No. 5-2001, which provides in part: "No employer shall employ any person for a *work period of more than five (5) hours* without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee." (Cal.Code Regs., tit. 8, § 11050, subd. 11(A), italics added.) Although that subdivision of the wage order refers to "work period of more than five (5) hours" rather than to "work period of more than five (5) hours *per day,*" the Legislature used the term "work period of more than five hours *per day* " (italics added) in section 512(a), and we presume the Legislature intended the provisions of IWC Wage Order No. 5-2001 and section 512(a) to be given a consistent interpretation. "[S]ection 516,

as amended in 2000, does not authorize the IWC to enact wage orders inconsistent with the language of section 512." (*Bearden, supra,* 138 Cal.App.4th at p. 438, 41 Cal.Rptr.3d 482.)

**\*52** With respect to the issue of *when* an employer must make a first 30-minute meal period available to an hourly employee, Brinker's uniform meal period policy (titled "Break and Meal Period Policy for Employees in the State of California") comports with the foregoing interpretation of section 512(a) and IWC Wage Order No. 5-2001. It provides that employees are " entitled to a 30-minute meal period" when they "work a shift that is over five hours."

Section 512(a) also plainly provides that an employer in California has a statutory duty to make a second 30-minute meal period available to an hourly employee who has a "work period of more than 10 hours *per day* " (italics added) unless (1) the "total hours" the employee is permitted to work per day is 12 hours or less, (2) both the employee and the employer agree by "mutual consent" to waive the second meal period, and (3) the first meal period "was not waived."

Plaintiffs contend, and the trial court ruled in its July 2005 order, that Brinker's **804** written meal policy violates section 512(a) and IWC Wage Order No. 5 (specifically, Cal.Code Regs., tit. 8, § 11050, subd. 11(A)) because it allows the practice of early lunching and fails to make a 30-minute meal period available to an hourly employee for every five consecutive hours of work. Plaintiffs contend that hourly employees are entitled to a second meal period five hours after they return to work from the first meal period.

Under this interpretation, however, the term "per day" in the first sentence of section 512(a) would be rendered surplusage, as would the phrase "[a]n employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes" in the second sentence

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

165 Cal.App.4th 25
165 Cal.App.4th 25, 80 Cal.Rptr.3d 781, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal
D.A.R. 11,267

Page 24

of that subdivision.

[22] "It is a well established principle of statutory construction that '[t]he courts presume that every word, phrase, and provision of a statute was intended to have some meaning and perform some useful function....' [Citation.]" (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 698-699, 188 Cal.Rptr. 233.) "Interpretations that lead to absurd results or render words surplusage are to be avoided. [Citation.]" (*Woods v. Young* (1991) 53 Cal.3d 315, 323, 279 Cal.Rptr. 613, 807 P.2d 455.)

Here, the interpretation of section 512(a) given by plaintiffs and the court is erroneous as a matter of law, and thus must be avoided because it renders surplusage the provisions of that subdivision governing the question of when an employer must provide meal periods to an hourly employee. (See *Woods v. Young, supra,* 53 Cal.3d at p. 323, 279 Cal.Rptr. 613, 807 P.2d 455.)

[23] Citing *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 157 Cal.Rptr. 840, 599 P.2d 31, the court stated in its order that **\*53** "[t]he California Supreme Court has interpreted wage orders to require a meal period for each five-hour period an employee works," and "[a] meal period of [30] minutes per five hours of work is generally required." That case, however, is distinguishable as it involved an IWC wage order (No. 5-76) that is not involved in the present case. (*California Hotel & Motel Assn., supra,* 25 Cal.3d at p. 205, fn. 7, 157 Cal.Rptr. 840, 599 P.2d 31.) As summarized by the Supreme Court, the pertinent provision of that wage order provided that "[a] meal period of 30 minutes per *5 hours of work* is generally required." (*Ibid.,* italics added.) As already discussed, however, section 512(a), which governs here, provides in part: "An employer may not employ an employee for a *work period of more than five hours per day* without providing the employee with a meal period of not less than 30 minutes." (Italics added.) The distinction between the two provisions is of critical importance. Where-

as IWC wage order No. 5-76 generally required a meal period for every "5 hours of work," section 512(a) generally requires a first meal period for every "work period of more than five hours *per day.*" (Italics added.)

Moreover, *California Hotel & Motel Assn. v. Industrial Welfare Com., supra,* 25 Cal.3d 200, 157 Cal.Rptr. 840, 599 P.2d 31 was decided before section 516 was amended in 2000, which amendment forbids wage orders inconsistent with section 512. (*Bearden, supra,* 138 Cal.App.4th at p. 438, 41 Cal.Rptr.3d 482 [section 516 provides IWC orders "must be consistent with the specific provisions of [section 512]"].) Indeed, the legislative history of the 2000 amendment to section 516 declares**\*805** its intent was to "prohibit the [IWC] from adopting a working condition order that conflicts with [section 512(a)'s] 30-minute meal period requirements...." (Legis. Counsel's Dig., Sen. Bill No. 88 (1999-2000 Reg. Sess.), Stats.2000, ch. 492.) The Senate third reading analysis for Senate Bill No. 88, which amended section 516 in 2000, states: "This bill clarifies two provisions of the Labor Code enacted in Chapter 134. Labor Code Section 512 codifies the duty of an employer to provide employees with meal periods. Labor Code Section 516 establishes the authority of IWC to adopt or amend working condition orders with respect to break periods, meal periods, and days of rest. *This bill provides that IWC's authority to adopt or amend orders under Section 516 must be consistent with the specific provisions of Labor Code Section 512.*" (Italics added.) Thus, to the extent IWC wage order No. 5-76 is inconsistent with section 512, it is invalid. (*Bearden, supra,* 138 Cal.App.4th at pp. 438-44, 41 Cal.Rptr.3d 482.)

In support of their claim that lunch breaks must be provided in the middle of a shift, plaintiffs also rely upon a June 14, 2002 DLSE opinion letter. However, that opinion letter has since been withdrawn and therefore cannot be relied upon to support plaintiffs' claims. (Acting Deputy Chief Gregory L. Rupp, mem. to all DLSE staff, Dec. 20,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2004.) Plaintiffs' reliance on the September 17, 2001 DLSE opinion letter is also misplaced as that letter *54 concerned the timing of rest periods, not meal breaks. As discussed, *ante,* the wage order pertaining to rest breaks provides that, to the extent practicable, rest periods should be scheduled in the middle of a work period. No such restriction on the timing of meal periods is contained in the wage order concerning meal periods.

We conclude the court abused its discretion in certifying the class in this matter to the extent it relied on an erroneous interpretation of section 512(a). As already discussed, a class certification order based upon improper criteria or incorrect assumptions must be reversed, even though there may be substantial evidence to support it. (*Linder, supra,* 23 Cal.4th at p. 436, 97 Cal.Rptr.2d 179, 2 P.3d 27.) Here, the court's order certifying the meal period subclass class was based upon both improper criteria regarding the elements of the rolling five-hour meal period claim and an incorrect assumption about when an employer must provide a meal period under the provisions of section 512(a). Without a proper interpretation of section 512(a), the court could not correctly ascertain the legal elements that members of the proposed class would have to prove in order to establish their meal period claims, and thus could not properly determine whether common issues predominate over issues that affect individual members of the class.

### 2. *Brinker's alleged failure to ensure employees take meal periods*

Plaintiffs also claim that Brinker's uniform meal period policy violates sections 512 and 226.7, as well as IWC Wage Order No. 5, by failing to *ensure* that its hourly employees take their meal periods.[FN9] Plaintiffs initially opposed this court deciding **806 this issue, arguing the trial court had already done so, and, even if it had not, the issue should be remanded to the trial court to decide it in the first instance. However, in supplemental briefing following transfer from the California Supreme

Court, plaintiffs join Brinker in requesting that we decide the legal question of whether employers must "ensure" meal periods are taken or whether they must only be made "available." In order to promote judicial economy and because this is a purely legal issue that we may decide in the first instance, we will address this issue on the merits.

> FN9. Amici curiae Employers Group, California Restaurant Association, National Council of Chain Restaurants, National Retail Federation, California Hospital Association, and The California Retailers Association frame the issue as follows: "Whether California's Labor Code imposes on employers a duty to not only *provide* uninterrupted meal periods, but to further *force* employees to take their meal periods and to *police* their compliance-regardless of the reason proffered by the employee for not wanting a meal period and even against the employee's will." Amici curiae California Employment Law Council and National Association of Theatre Owners of California/Nevada, Inc. raise a similar issue: "[W]hether employers must force their employees to take meal ... breaks or whether they must simply provide the opportunity for such breaks."

**55 We conclude that California law provides that Brinker need only provide meal periods, and, as a result, as with the rest period claims, plaintiffs' meal period claims are not amenable to class treatment.

As already discussed, the critical inquiry on a class certification motion is whether the theory of recovery advanced by the certification proponents is likely to prove amenable to class treatment (*Sav-On, supra,* 34 Cal.4th at p. 326, 17 Cal.Rptr.3d 906, 96 P.3d 194), and, in order to determine whether common questions of law or fact predominate, the trial court must examine the issues framed by the pleadings and the law applicable to the alleged causes of action (*Hicks, supra,* 89 Cal.App.4th at p.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

916, 107 Cal.Rptr.2d 761).

As stated, *ante*, section 512(a) provides that an employer "may not employ an employee for a work period of more than five hours per day without *providing* the employee with a meal period of not less than 30 minutes" (italics added) and, if the employee's work period is less than six hours, "*the meal period may be waived* " (italics added).

[24][25] " 'To ascertain the common meaning of a word, "a court typically looks to dictionaries." ' " (*Arocho v. California Fair Plan Ins. Co.* (2005) 134 Cal.App.4th 461, 466, 36 Cal.Rptr.3d 200, fn. omitted.) The term "provide" is defined in Merriam-Webster's Collegiate Dictionary (11th ed.2006) at page 1001 as "to supply or *make available*." (Italics added.) Thus, from the plain language of section 512(a), meal periods need only be made available, not ensured, as plaintiffs claim. Moreover, plaintiffs' interpretation of section 512(a) is inconsistent with the language allowing employees to waive their meal breaks for shifts of less than five hours.

In *White v. Starbucks Corp.* (N.D.Cal.2007) 497 F.Supp.2d 1080(*Starbucks* ), the United States District Court for the Northern District of California rejected the notion that employers must ensure their employees take meal breaks: "The interpretation that White advances-making employers ensurers of meal breaks-would be impossible to implement for significant sectors of the mercantile industry (and other industries) in which large employers may have hundreds or thousands of employees working multiple shifts. Accordingly, the court concludes that the California Supreme Court, if faced with this issue, would require only that an employer *offer* meal breaks, without forcing employers actively to ensure that workers are taking these breaks. In short, the employee must show that he was *forced to* **807 *forego* [*sic* ] his meal breaks as opposed to merely showing that he did not take them regardless of the reason." (*Starbucks, supra,* 497 F.Supp.2d at pp. 1088-1089.)

More recently in *Brown, supra,* 249 F.R.D. 580, the United States District Court for the Central District of California considered a motion to certify a **56 class of former and current Federal Express drivers who allegedly had been deprived of rest and meal periods in violation of sections 512 and 226.7. In analyzing the motion the district court first noted that " '[t]o determine whether common issues predominate, this Court must first examine the substantive issues raised by Plaintiffs and second inquire into the proof relevant to each issue.' [Citation.]" (*Brown, supra,* 249 F.R.D. at 584.)

As in this case, the plaintiffs in *Brown* asserted that "California law requires employers to ensure that meal breaks are actually taken." (*Brown, supra,* 249 F.R.D. at 584.) The district court rejected this argument, holding that section 512 and the applicable wage order did not support plaintiff's position. (*Brown, supra,* at 585.)The court explained that section 512's statement that employer must "provide" meal periods "does not suggest any obligation to ensure that employees take advantage of what is made available to them." (*Brown, supra,* 249 F.R.D. at 585.) The court also noted that the California Supreme Court "in characterizing violations of California's meal period obligations ... repeatedly described it as an obligation not to force employees to work through breaks." (*Ibid.,* fn. omitted.) The court also noted that "[r]equiring enforcement of meal breaks would place an undue burden on employers whose employees are numerous.... It would also create perverse incentives, encouraging employees to violate company meal break policy in order to receive extra compensation under California wage and hour laws." (*Id.* at 585.)

We find the reasoning in *Starbucks* and *Brown* persuasive and conclude that employers need not ensure meal breaks are actually taken, but need only make them available.

Plaintiffs assert that *Cicairos, supra,* 133 Cal.App.4th 949, 35 Cal.Rptr.3d 243 and *Perez v. Safety-Kleen Systems* (N.D.Cal.2007) 2007 WL 1848037(*Perez* ) hold that meal breaks, unlike rest

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

breaks, must be ensured, not merely made available. This contention is unavailing.

In *Cicairos, supra,* 133 Cal.App.4th 949, 35 Cal.Rptr.3d 243, truck drivers brought an action against their former employer that included a claim for violation of section 512 and an IWC wage order applicable to the transportation industry. The court in *Cicairos* held that, based on the facts presented there, the defendant's obligation to provide the plaintiffs with an adequate meal period was not satisfied "by assuming that the meal periods were taken." (*Cicairos, supra,* 133 Cal.App.4th at p. 962, 35 Cal.Rptr.3d 243.) "[E]mployers have 'an affirmative obligation to ensure that workers are actually relieved of all duty.' " (*Ibid.*)

Plaintiffs assert this language means employers must "ensure" meal breaks are taken. The plaintiff in *Starbucks* made the same argument, and the *57 Northern District rejected it, distinguishing *Cicairos* on its facts: "*Cicairos* should be read under the facts presented by that case. There, the defendant employer had a computerized system on each truck that allowed defendant to keep track of the drivers' activities, such as speed, starts and stops, **808 and time. [Citation.] Furthermore, drivers had to input certain activities manually, such as road construction and heavy traffic. [Citation.] Although the defendant was required to record employee meal periods under Wage Order No. 9 and although a collective bargaining agreement required the company to schedule lunch periods, the employer did not schedule meal periods, did not include an activity code for them and did not monitor compliance. [Citation.] Finally, evidence showed that the defendant's management pressured drivers to make more than one trip daily, making it harder to stop for lunch. [Citation.] Under those facts, the court found that defendant failed to establish that it 'provided' plaintiffs with their required meal periods. [Citation.] White harps on one sentence in the case stating that 'employers have "an affirmative obligation to ensure that workers are actually relieved of all duty." ' [Citation.] That language is

consistent, however, with a rule requiring an employer to *offer* or *provide* or *authorize and permit* a meal break, i.e., the interpretation that Starbucks endorses. The defendant in *Cicairos* knew that employees were driving while eating and did not take steps to address the situation. This, in combination with management policies, effectively deprived the drivers of their breaks." (*Starbucks, supra,* 497 F.Supp.2d at p. 1089; accord, *Brown, supra,* 249 F.R.D. at 586.)

The court in *Starbucks* also rejected such an interpretation of *Cicairos* on policy grounds: "Under White's reading of *Cicairos,* an employer with no reason to suspect that employees were missing breaks would have to find a way to force employees to take breaks or would have to pay an additional hour of pay every time an employee voluntarily chose to forego [sic] a break. This suggests a situation in which a company punishes an employee who foregoes [sic] a break only to be punished itself by having to pay the employee. In effect, employees would be able to manipulate the process and manufacture claims by skipping breaks or taking breaks of fewer than 30 minutes, entitling them to compensation of one hour of pay for each violation. This cannot have been the intent of the California Legislature, and the court declines to find a rule that would create such perverse and incoherent incentives." (*Starbucks, supra,* 497 F.Supp.2d at p. 1089.)

*Perez* also does not support plaintiffs' position that meal breaks must be "ensured" as opposed to "made available." In *Perez, supra,* 2007 WL 1848037 at *1, the court denied a summary judgment motion brought by the employer as to employees' claim the employer had "fail[ed] to provide meal and rest breaks." In denying summary judgment on the meal break claim, the Northern District held there was an issue of fact as to whether the defendant "provided" (*id.* at *6) meal periods, given "the lack of a policy for meal *58 breaks"(*id.* at *7), the fact plaintiffs "were on call at all times and were required to carry a company cell phone to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

maintain constant contact with the branch"(*id.* at *6) and that they "were required to complete a detailed log each day which specifically stated they were on duty from the time they arrived at the branch until going home at the end of the day." (*Ibid.*) Because there was evidence the employer had failed to *provide* meal periods, the court declined to decide whether employers also had the duty to ensure meal periods were taken: "[T]he court need not resolve plaintiffs' argument that California law 'does not permit an employee ... to decide to take a break or not take a **809 break.' " (*Id.* at *7.) Relying on *Cicairos*, the court simply held "an employer must do something affirmative to *provide* a meal period." (*Perez, supra,* 2007 WL 1848037 at *7, italics added.)

We also conclude *Cicairos* and *Perez* are distinguishable on their facts. In *Cicairos* and *Perez* the courts only decided meal breaks must be provided, not ensured. Indeed, as noted above, the court in *Perez* expressly declined to consider whether meal breaks need be ensured. We further agree with *Starbucks* that public policy does not support the notion that meal breaks must be ensured. If this were the case, employers would be forced to police their employees and force them to take meal breaks. With thousands of employees working multiple shifts, this would be an impossible task. If they were unable to do so, employers would have to pay an extra hour of pay any time an employee voluntarily chose not to take a meal period, or to take a shortened one.

*3. Amenability of plaintiffs'. meal break claims to class treatment*

[26] Further, we conclude, as we did with regard to rest breaks, that because meal breaks need only be made available, not ensured, individual issues predominate in this case and the meal break claim is not amenable class treatment. The reason meal breaks were not taken can only be decided on a case-by-case basis. It would need to be determined as to each employee whether a missed or shortened

meal period was the result of an employee's personal choice, a manager's coercion, or, as plaintiffs argue, because the restaurants were so inadequately staffed that employees could not actually take permitted meal breaks. As we discussed, *ante*, with regard to rest breaks, plaintiffs' computer and statistical evidence submitted in support of their class certification motion was not only based upon faulty legal assumptions, it also could only show the fact that meal breaks were not taken, or were shortened, not why. It will require an individual inquiry as to all Brinker employees to determine if this was because Brinker failed to make them available, or employees chose not to take them.

In the recent case *Brown, supra,* 249 F.R.D. 580, once the district court concluded that meal periods need only be provided, not ensured, it also held **59 that individual issues would predominate over common ones at a trial on the meal period claims and the motion to certify a class as to those claims was denied. (*Id.* at 586.) The district court held that use of time sheets was not a viable method of proving the meal break claims on a class-wide basis as they would not provide the "reason for missed breaks." (*Id.* at 587.) The court further held that class treatment was not a superior means of adjudicating the meal break claims because "[i]n order to prevail, each will have to demonstrate that he or she was not able to take breaks required by California law. [¶] Without a viable method of common proof for evaluating the ability of 5,500 class members to take breaks as required by law, the Court will be mired in over 5000 mini-trials regarding individual job duties and expectations. The difficulties in managing such a wide-ranging factual inquiry persuade the Court that class treatment is not a superior method for resolution of the class members' potential claims. Moreover, because class treatment here would nonetheless require individual class members to establish the reason for their missed breaks, class members would face many of the same difficulties in motivation and expenditure of resources that they would encounter in **810 separate actions. In addition to this, they would face the inevit-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

able delay imposed by waiting for the resolution of thousands of individual factual claims in the class action. Class treatment is not a superior means of adjudicating this controversy." (*Id.* at 587-588.)

Likewise in our case, the evidence does not show that Brinker had a class-wide policy that prohibited meal breaks. The evidence in this case indicated that some employees took meal breaks and others did not. For those who did not, the reasons they declined to take a meal period requires individualized adjudication. Further, plaintiffs' statistical and survey evidence does not render the meal break claims one in which common issues predominate. While time cards might show when meal breaks were taken and when there were not, they cannot show *why*. Indeed, even plaintiffs' employee declarations show no class-wide practice regarding meal breaks. Some employees only claimed to have been refused rest breaks and said nothing about being denied meal breaks or that they were forced to take meal breaks at a certain time. As Brinkers' manager declarations also show, individual restaurants were given discretion to, and did, implement individualized practices to ensure compliance with meal break policies.

We also reject plaintiffs' claim the absence of written waivers signals that missed meal periods necessarily resulted from management coercion. There is no statutory requirement under section 512(a) that the "mutual consent" necessary to a waiver must be in writing. Had the Legislature intended such a requirement, they could have, and would have, placed such a requirement in the statute.

[27] *60 Plaintiffs assert the affirmative defense of waiver cannot defeat class certification. This contention is unavailing as "a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that issues presented by that defense predominate over common issues." (*Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450, 56 Cal.Rptr.3d 534.)

Further, it matters not that Brinker bears the burden of proof on an affirmative defense. "The question before us ... is not whether [Brinker] proved its defense, but whether it presented evidence from which the trial court could reasonably conclude that the adjudication of the defense would turn more on individualized questions than on common questions." (*Walsh v. IKON Office Solutions, Inc., supra,* 148 Cal.App.4th at p. 1453, fn. 8, 56 Cal.Rptr.3d 534.)

## D. *Off-The-Clock Claims*

[28] Brinker asserts the court erred by certifying plaintiffs' off-the-clock claims for class treatment "without identifying any common questions or common proof with respect to those claims or, for that matter, even mentioning them." Brinker asserts the resolution of plaintiffs' off-the-clock claims would require individual inquiries into whether a given employee actually performed off-the-clock work and whether the employee's manager had actual or constructive knowledge of such work. Citing the declarations of two class members (Jerry Gallon and Will Gordon) who stated that they often performed job duties while clocked out for meal periods or for the day, Brinker argues the declarations failed to indicate whether these employees were required to work off the clock or did so by their own choice, and also failed to indicate whether their supervisors knew they were **811 performing off-the-clock work in violation of Brinker policy. Had the court examined the elements of plaintiffs' off-the-clock claims, Brinker asserts, the court "never could have certified them."

We conclude that, as with plaintiffs' rest and meal break claims, their off-the-clock claims are not amenable to class treatment because, once the elements of those claims are considered, individual issues predominate.

Plaintiffs do not dispute that employers can only be held liable for off-the-clock claims if the employer knows or should have known the employee was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

working off the clock. (*Morillion v. Royal Packing Co., supra,* 22 Cal.4th at p. 585, 94 Cal.Rptr.2d 3, 995 P.2d 139.) Nor do they dispute that Brinker has a written corporate policy prohibiting off-the-clock work.

Because of these facts, plaintiffs' off-the-clock claims are not amenable to class treatment. Plaintiffs propose to prove class-wide violations by Brinker *61 by submitting declarations, statistical evidence and survey evidence showing the number of times employees worked during a meal period and the number of times changes were made to time cards. However, they do not submit evidence showing, on a class-wide basis, the reason *why* they worked off the clock. Indeed, as Brinker points out, two employees that declared they "often performed job duties while clocked out for meal breaks or for the day" did not indicate whether they were required to do so or did so by their own choice, nor whether their supervisors had knowledge of such activities. Thus, resolution of these claims would require individual inquiries in to whether any employee actually worked off the clock, whether managers had actual or constructive knowledge of such work and whether managers coerced or encouraged such work. Indeed, not all the employee declarations alleged they were forced to work off the clock, demonstrating there was no class-wide policy forcing employees to do so.

Similarly, plaintiffs' claim that managers adjusted time cards, i.e., conducted "time-shaving," would also necessitate an individualized inquiry. As stated, *ante,* Brinker managers are authorized to adjust time cards if notified an employee's time was not accurately recorded. It would therefore have to be determined on an individual basis why a particular time card was adjusted and whether the justification given was legitimate.

Brinker "has the right to inquire into the validity of each claim with regard to the authority of the manager to instruct the employee to work off-the-clock, store management's knowledge of the employee's having performed work off-the-clock, whether the employee, in fact, performed any work off-the-clock, [and] the reason the employee did not submit a time adjustment request form." (*Wal-Mart Stores, Inc. v. Lopez* (Tex.Ct.App.2002) 93 S.W.3d 548, 558 [reversing class certification of off-the-clock claim]; see also *Basco v. Wal-Mart Stores, Inc.* (E.D.La.2002) 216 F.Supp.2d 592, 603 [individual issues arising from the "myriad possibilities that could be offered to explain why any one of the plaintiffs worked off the clock" would predominate over common issues]; *Petty v. Wal-Mart Stores, Inc.* (2002) 148 Ohio App.3d 348, 773 N.E.2d 576, 582 [finding issues were individual as to each plaintiff because of various circumstances under which employees worked off-the-clock and questions of management's knowledge of, and condoning, plaintiffs' working off-the-**812 clock].) FN10

> FN10. Although these out-of-state cases are not binding authority in California, we find their reasoning persuasive and consistent with our analysis of plaintiffs' off-the-clock claims.

Accordingly, we conclude the court erred in certifying as a class action plaintiffs' off-the-clock claims.

## *62 DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its July 6, 2006 class certification order and enter a new order denying with prejudice certification of plaintiffs' rest, meal period, and off-the-clock subclasses. The stay issued on December 7, 2006, is vacated. Costs are awarded to Brinker.

WE CONCUR: HALLER and O'ROURKE, JJ.
Cal.App. 4 Dist.,2008.
Brinker Restaurant Corp. v. Superior Court
165 Cal.App.4th 25, 80 Cal.Rptr.3d 781, 156 Lab.Cas. P 60,647, 08 Cal. Daily Op. Serv. 9347, 2008 Daily Journal D.A.R. 11,267

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 2

217 Cal.App.2d 172
217 Cal.App.2d 172, 31 Cal.Rptr. 611

▷
Donnachie v. East Bay Regional Park Dist.
Cal.App.1.Dist.
  PAUL ANDREW DONNACHIE, a Minor, etc., et
    al., Plaintiffs and Appellants,
                    v.
  EAST BAY REGIONAL PARK DISTRICT et al.,
         Defendants and Respondents.
  PAUL ANDREW DONNACHIE, a Minor, etc., et
    al., Plaintiffs and Appellants,
                    v.
  CITY OF PIEDMONT, Defendant and Respondent.
            (Consolidated Cases.)
         **Civ. No. 20640., Civ. No. 20671.**

   District Court of Appeal, First District, California.
                June 13, 1963.

                  HEADNOTES

(1) State of California § 57--Liability.
In a personal injury action against a park district,
the trial court erred in granting defendant's motion
for summary judgment and judgment on the plead-
ings on the ground that Civ. Code, § 22.3 (Stats.
1961, ch. 1404, § 1), granted it immunity from tort
liability, and was empowered to do no more than
continue the actual trial of the cause until the date
specified in Stats. 1961, ch. 1404, § 4.

(2a, 2b) Judgments § 8a(9)(e)--Summary Judg-
ments--Affidavits--Sufficiency.
In a personal injury action against several municip-
alities, based on negligent maintenance of facilities
in a regional park, where defendants moved for
summary judgment on the ground that none of de-
fendants had any authority or control over the park,
plaintiffs' declarations in opposition, which relied
solely on hearsay statements in an anonymous
pamphlet, could not be deemed sufficient to over-
come defendant's direct averments that they did not
own, maintain, or control the park.

(3)  Judgments  §  8a(8)(e)--Summary Judgments-
-Affidavits--Sufficiency.
On motion for summary judgment, an affidavit or
declaration that is based on hearsay or conclusions
and that contains no competent averments made by
one having personal knowledge of the facts is of no
value in determining whether there is a triable issue
of fact.
See **Cal.Jur.2d**, Judgments, § 40.

                   SUMMARY

APPEALS from judgments of the Superior Court of
Alameda County. Folger Emerson, Judge. Judg-
ment for one defendant reversed with directions;
judgments for other defendants affirmed.

Action for personal injuries sustained by a child
when he was kicked by a horse while hiking in a
park. Summary judgment for defendant park district
reversed with directions; summary judgments for
defendant cities affirmed.

                   COUNSEL
Thompson, Sherbourne & Oppen, Belli, Ashe &
Gerry and James Oppen for Plaintiffs and Appel-
lants.
Berry, Davis, Channell & McNamara, Hilton J.
Melby, City Attorney (Oakland), Edward A. Gog-
gin, Assistant City Attorney, Carroll, Davis,
Burdick & McDonough, Worthington, Fields &
Worthington, Gilbert Eisenberg, R. W. Fields and
Richard G. Logan for Defendants and Respondents.

SHOEMAKER, J.
Plaintiffs Paul Andrew Donnachie, Joan M. Don-
nachie and Robert P. Donnachie, appeal from sep-
arate judgments entered in favor of defendants East
Bay Regional Park District, City of Oakland, City
of Berkeley, and City of Piedmont.

Plaintiff Paul Donnachie, a minor, brought this ac-
tion through his guardian *ad litem,* Joan Donnachie,
to recover damages for personal injuries sustained
when he was kicked by a horse. The accident oc-
curred on May 7, 1960, in Redwood Regional Park,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

where the plaintiff, then 4 years old, was hiking with others, supervised by Gerald and Marian Springman. Walking along a hiking trail, they met a horseback rider using the same trail, and plaintiff was kicked in the head and body by the horse. The complaint alleged that at the time of the accident, defendants City of Oakland, City of Berkeley, and City of Piedmont, managed, controlled, maintained, directed and operated defendant East Bay Regional Park District and the Redwood Regional Park; that defendants had negligently failed to provide adequate signs showing that the hiking trail was also used as a bridle path; that each of the defendants knew or ought to have known of the danger to hikers inherent in the presence of horseback riders upon the same trail; that plaintiff's injuries were a direct and proximate result of defendants' negligence.

Defendant East Bay Regional Park District moved for summary judgment or judgment on the pleadings upon the ground that the enactment of Civil Code, section 22.3, had rendered it immune from tort liability.

Defendants City of Oakland and City of Berkeley moved for summary judgment upon the ground that no triable issue *174 of fact existed since neither defendant had any authority, control, or responsibility for the Redwood Regional Park, which was owned and controlled solely by defendant East Bay Regional Park District.

Defendant City of Piedmont also moved for summary judgment, relying upon both of the grounds raised by the other defendants.

The trial court granted the motion of defendant East Bay Regional Park District for judgment on the pleadings and for summary judgment. Summary judgments were also granted in favor of defendants City of Oakland, City of Berkeley, and City of Piedmont.

(1) Turning first to the judgment in favor of respondent East Bay Regional Park District, based

solely on the ground that newly enacted section 22.3 of the Civil Code had rendered it immune from tort liability (said section being section 1 of chapter 1404, Statutes 1961), this contention was rejected in the recent case of *Corning Hospital Dist. v. Superior Court* (1962) 57 Cal.2d 488 [20 Cal.Rptr. 621, 370 P.2d 325], wherein the Supreme Court held that the effect of the statute was merely to suspend the effect of *Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], until the end of the period referred to in section 4 of chapter 1404.

In the light of this decision, the trial court erred in granting respondent district's motions for summary judgment and judgment on the pleadings. Under the rule of the *Corning Hospital* case, the court was empowered to do no more than to continue the actual trial of the cause until the 1963 date specified in section 4, chapter 1404.

(2a) Turning next to the judgments in favor of respondents City of Oakland, City of Berkeley, and City of Piedmont, based on the common ground that no triable issue of fact existed for the reason that none of these respondents had any authority or control over the Redwood Regional Park, in support of their respective motions each respondent filed a declaration under penalty of perjury by its city manager or administrator, averring that the city did not at the time of the accident or thereafter, own, manage, control, maintain, direct, or operate the East Bay Regional Park District or the Redwood Regional Park, but that on the contrary, the ownership and control over the Redwood Regional Park was vested solely in the East Bay Regional Park District, a separate public *175 entity which had been formed in 1934 pursuant to the Public Resources Code.

In opposition to each of these motions for summary judgment, appellants filed a substantially identical declaration averring that appellants had evidence of respondents' ownership and control over the Redwood Regional Park in the form of a pamphlet distributed by the East Bay Regional Park District and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the City of Oakland. This pamphlet, which was appended to appellants' declaration, bore the heading "East Bay Regional Park District." Under the subheading "History," the pamphlet stated that the Redwood Regional Park had been purchased by the Regional Park District in 1951, and that the district directors had planned the park as a place where large groups of people might enjoy the highest type of recreation. The remainder of the pamphlet contained a map of the area and information concerning the park facilities, and the manner in which picnic tables might be reserved. On the last page of the pamphlet, the following statement appeared: "The East Bay Park District is owned and operated by seven cities of the East Bay: Oakland, Berkeley, Alameda, Albany, San Leandro, Emeryville, and Piedmont." Appellants' opposition to the motions for summary judgment was based solely upon this pamphlet.

The question squarely presented is whether the statements contained in the pamphlet were sufficient to overcome respondents' declarations that they did not own, maintain, or otherwise exercise any control over the Redwood Regional Park. (3) In resolving this question, the rule is that an affidavit or declaration which is based upon hearsay or conclusions and which contains no competent averments made by one having personal knowledge of the facts is of no value in determining whether there is a triable issue of fact. (*Bennett v. Hibernia Bank* (1960) 186 Cal.App.2d 748, 753-754 [9 Cal.Rptr. 896]; *Whaley v. Fowler* (1957) 152 Cal.App.2d 379, 382-383 [313 P.2d 97]; *Maltby v. Shook* (1955) 131 Cal.App.2d 349, 354 [280 P.2d 541].) (2b) In the present case, appellants' declarations are devoid of any direct averment that respondents did in fact own or otherwise exercise control over the Redwood Regional Park or the East Bay Regional Park District. Appellants merely direct the court's attention to a pamphlet which contains the statement that respondents did own the East Bay Regional Park District. Appellants' declarations contain no clue as to the author of the pamphlet. *176 It is apparent that this attempt to avoid competent averments of fact and to rely solely upon an anonymous pamphlet, which is the grossest form of hearsay evidence, cannot be deemed sufficient to overcome respondents' direct averments that they did not own, maintain or control the Redwood Regional Park or the East Bay Regional Park District. Since appellants did not allege any cause of action other than negligent maintenance of the park facilities against respondents City of Oakland, City of Berkeley, and City of Piedmont, the trial court properly granted summary judgments in their favor.

For the reasons above stated, the judgment in favor of the East Bay Regional Park District is reversed with directions to the trial court to continue the trial of that action until the expiration of the period specified in section 4 of chapter 1404, 1961 Statutes. The judgments in favor of the City of Oakland, the City of Berkeley, and the City of Piedmont, are affirmed.

Kaufman, P. J., and Agee, J., concurred.
Appellants' petition for a hearing by the Supreme Court was denied August 7, 1963.

Cal.App.1.Dist.
Donnachie v. East Bay Regional Park Dist.
217 Cal.App.2d 172, 31 Cal.Rptr. 611

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 3

882 A.2d 374

Page 1

380 N.J.Super. 302, 882 A.2d 374, 10 Wage & Hour Cas.2d (BNA) 1564

**C**

Marx v. Friendly Ice Cream Corp.
N.J.Super.A.D.,2005.

Superior Court of New Jersey,Appellate Division.
Ronald MARX, Iyad Khawaja, Samer Abualouf,
Ibrahim Abushawar, Joseph C. Limoli and James
Morrissey, Plaintiffs-Appellants,
v.
FRIENDLY ICE CREAM CORPORATION, Defendant-Respondent.
Submitted March 15, 2005.
Decided Aug. 31, 2005.

**Background:** General managers of chain restaurant sued employer seeking overtime. Employer answered claiming managers were exempt from overtime law as "executives." The Superior Court, Law Division, Bergen County, ruled the managers were employed in an "executive" position and not eligible for overtime. Managers appealed.

**Holdings:** The Superior Court, Appellate Division, Grall, J.A.D., held that:
(1) evidence was sufficient to support finding that management was managers' primary duty;
(2) evidence was sufficient to support finding that managers were not required to perform non-exempt work 80% of the time; and
(3) failure to accept non-contingent offer of settlement warranted award of attorney fees.

Affirmed.

West Headnotes

**[1] Labor and Employment 231H ⬤⟿2251**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(B) Minimum Wages and Overtime
Pay
       231HXIII(B)3 Exemptions
        231Hk2251 k. Strict or Liberal Construction of Exemptions. Most Cited Cases

All exemptions to overtime pay requirements of the Minimum Wage Law should be construed narrowly and the employer has the obligation to prove that an employee meets the criteria for exemption. N.J.S.A. 34:11-56a4.

**[2] Labor and Employment 231H ⬤⟿2262**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(B) Minimum Wages and Overtime
Pay
       231HXIII(B)3 Exemptions
        231Hk2253 Executive and Administrative Employees
         231Hk2262 k. Managers, Supervisors, Etc. Most Cited Cases
Restaurant chain's evidence was sufficient to support finding that store general managers "primary duty" was management, as required element for exemption from overtime requirements of the Minimum Wage Law for executives; general managers were "in charge" of restaurant and operated them without day-to-day supervision, they scheduled employee hours, determine food quantities, and move employees from one task to another throughout the day, they exercised discretion in hiring and firing, and their salaries were higher than those of employees they supervised. N.J.A.C. 12:56-7.1(a); 29 C.F.R. §§ 541.1, 541.102 (2004).

**[3] Labor and Employment 231H ⬤⟿2262**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(B) Minimum Wages and Overtime
Pay
       231HXIII(B)3 Exemptions
        231Hk2253 Executive and Administrative Employees
         231Hk2262 k. Managers, Supervisors, Etc. Most Cited Cases
Evidence was sufficient to support holding that restaurant chain general managers were not required

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

by policy or actual duties to spend more than 40% of their time on work normally performed by non-exempt employees, in determining whether employees were "executives" who were exempt for over-time requirements in the Minimum Wage Law (MWL); restaurant chain utilized software program to determine staffing based on need, and if managers actually spent 80% of their time on non-exempt work it was due to their failure to delegate. N.J.A.C. 12:56-7.1; 29 C.F.R. §§ 541.111, 541.112, 541.115 (2004).

**[4] Labor and Employment 231H ⬦2250**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)3 Exemptions
                231Hk2250 k. In General. Most Cited Cases
The remedial purpose of the Minimum Wage Law (MWL) requires appellate court to construe the changes from the federal Fair Labor Standards Act (FLSA) as an effort to exclude employees from the exemption and afford protection greater than the regulations implementing the FLSA. N.J.A.C. 12:56-7.1; 29 C.F.R. § 541.1 (2004).

**[5] Costs 102 ⬦194.50**

102 Costs
    102VIII Attorney Fees
        102k194.50 k. Effect of Offer of Judgment or Pretrial Deposit or Tender. Most Cited Cases
Offers of settlement made by restaurant chain to assistant manager to resolve suit for overtime wages was made to manager individually and was not contingent on acceptance by other plaintiffs in suit, and thus, award of counsel fees, under rule authorizing award for failure to settle, to restaurant chain was warranted. R. 4:58-1, 4:58-3.

**375 Aslan T. Soobzokov, Paterson, attorney for appellants Iyad Khawaja, Samer Abualouf, Ibrahim Abushawar and Joseph C. Limoli.

Littler Mendelson, attorneys for respondent (Eric A. Savage, of counsel; Jessica S. Boar, New York, NY, on the brief).

Before Judges SKILLMAN, GRALL and GILROY.

*304 The opinion of the court was delivered by GRALL, J.A.D.
Plaintiffs appeal following a non-jury trial in this action to recover overtime pay pursuant to N.J.S.A. 34:11-56a4 and N.J.S.A. 34:11-56a25.[FN1] Employers are not obligated to pay overtime to workers who serve in an "executive capacity," N.J.S.A. 34:11-56a4, and this case requires us to consider the scope of the exemption for "executives" that is defined and delimited in N.J.A.C. 12:56-7.1. We conclude that the trial court's decision is supported by adequate evidence and consistent with N.J.A.C. 12:56-7.1.

> FN1. The complaint included additional counts that are not at issue on this appeal. Plaintiffs also alleged breach of contract, breach of a covenant of good faith and fair dealing, fraud, deceit, and negligent misrepresentation. With the exception of the count alleging negligent misrepresentation, which plaintiffs dismissed voluntarily, the counts were dismissed with prejudice by agreement. Plaintiff Samer Abualouf also alleged wrongful termination, but he dismissed that count of the complaint.

Plaintiffs Iyad Khawaja, Samer Abualouf and Joseph C. Limoli are general managers of restaurants owned by defendant Friendly Ice Cream Corporation (FICC).[FN2] **376 They claim that the trial court *305 erred in concluding that they are ineligible for overtime because they are employed in an "executive capacity," within the meaning of N.J.S.A. 34:56a4 and N.J.A.C. 12:56-7.1.

> FN2. Plaintiffs James Morrissey and Ronald Marx do not appeal. Morrissey's claims were dismissed by the trial court with dir-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ection to arbitrate pursuant to a written agreement. Neither party has provided that order. After trial, Marx stipulated to dismissal of his claim with prejudice and without costs, and he has withdrawn his appeal.

Plaintiff Ibrahim Abushawar is an assistant manager employed by FICC. The issue he raises on appeal is unrelated to the issue raised by the other plaintiffs. Abushawar's claim for overtime was dismissed on FICC's motion for summary judgment, and he does not challenge that ruling. Abushawar appeals from an order granting FICC's motion for costs and fees pursuant to *R.* 4:58-3. We affirm that order.

In parts I-IV of this decision, we address the evidence and law relevant to the overtime claim raised by the plaintiffs who are general managers.[FN3] We address Abushawar's distinct claim in part V of this decision.

> FN3. There is a preliminary issue relevant to our jurisdiction. The trial judge's order requiring Abushawar to pay fees and costs pursuant to *R.* 4:58-3 left open the amount to be paid, and, as a result, the orders were not appealable as of right when the notices of appeal were filed. *See Kattoura v. Patel,* 262 *N.J.Super.* 34, 40, 619 *A.2d* 1031 (App.Div.1993); *McGowan v. Barry,* 210 *N.J.Super.* 469, 472 n. 2, 510 *A.2d* 95 (App.Div.1986); *R.* 2:2-3(a)(1). Defendant's brief asserts that the fees and costs were set on September 8, 2004, but no order was provided. Because this appeal is fully briefed and FICC has not claimed prejudice, we grant leave to appeal nunc pro tunc and address the merits. *R.* 2:4-4(b)(2); *R.* 2:5-6(a); *McGowan, supra.*

## I.

FICC owns and franchises the restaurants known as "Friendly's." Each restaurant does three types of business—sale of prepackaged ice cream products, take-out service, and restaurant service. Uniform quality of products and service and profitability throughout the chain of restaurants are important to FICC. The corporate goal is to develop consistency to the point that customers expect that they will get specific food, prepared and served in *306 a specific way whenever they go to a Friendly's restaurant. To that end, FICC sets menus, prices, and specific procedures designed to ensure courteous and prompt service of quality food and prevent waste through spoilage, oversized-portions and theft. To promote uniformity, FICC has developed manuals and check lists for daily, weekly and monthly tasks in its restaurants. Every Friendly's restaurant has one general manager who has overall responsibility for management of the facility, supervision of the staff and implementation of all FICC policies and procedures.

Abualouf was the general manager of defendant's Ramsey restaurant from 1999 to 2001, and Limoli managed the Bloomfield restaurant between March 2001 and May 2002. Khawaja was promoted to the position of general manager in 1996, and at the time of trial he was working as the general manager of the Bloomfield restaurant. All three plaintiffs had a minimum of eighteen employees on staff at all relevant times. FICC policies require a minimum of three employees in attendance during hours of operation.

The starting salary for a general manager is $40,000 per year and the maximum salary is $65,000. A fifty-hour workweek is expected, and bonuses are available based upon the performance of staff and profitability of the restaurant. When the general manager is not present, either the assistant manager or guest service supervisor assumes the role of the general manager, but the general manager retains responsibility for the correct and profitable operation of the restaurant, and the general**377 manager is expected to review the management work done in his or her absence.

FICC pays its assistant managers at an hourly rate

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of $13.39 per hour, and they receive overtime pay for any hours over forty per week. Guest service supervisors, cooks, and servers are paid less than assistant managers and are also eligible for overtime. Each general manager reports to a district manager who visits the district's restaurants at his or her discretion and when needed.

*307 General managers hire, train, supervise, evaluate and schedule hours for members of the restaurant staff. They have the authority to fire staff members in accordance with FICC's progressive discipline policy. Approval of the district manager is required for termination of an assistant manager or guest services supervisor, but the general manager's recommendation is generally followed.

General managers are also responsible for ordering the food and supplies, determining the quantity of perishable food to ready in advance of each shift, and ensuring that the various stations in the restaurants are properly equipped before each shift. They pay the restaurant's bills, analyze profit and loss statements and prepare or oversee the preparation of payroll.

The general manager must enforce FICC's waste and theft prevention procedures by: locking the kitchen door at all times; checking discarded containers to avoid waste; monitoring portion size; auditing customer checks to ensure proper charging; counseling servers when a customer leaves without paying; and charging employees for food they consume.

Oversight of maintenance of the restaurant facility is left to the general managers. Parking lots, tables and work stations must be kept clean. Appliances must be clean and operable.

The general managers must ensure the quality of food and service. They are expected to prevent service of food that does not meet standards of quality and appearance. Meals or desserts that are substandard are to be discarded and reported as waste. Food supplies must be dated to avoid service of

spoiled food. There are time goals for serving customers, and general managers are expected to "lend a hand" if necessary to relieve a "bottleneck" during peak hours.

General managers are also responsible for sales promotion within the restaurant. They are required to train servers to promote sales by using techniques such as asking customers if they would like to add toppings to ice cream and suggesting purchase of a larger portion or a side dish. FICC sends "mystery *308 guests" to its restaurants: they report to FICC on service and food quality, and FICC uses the reports to identify problems and develop the performance ratings which are used in awarding bonuses.

While plaintiffs describe the general manager's job as one involving constant supervision of staff, they claim that FICC's mandatory menus, prices, detailed procedures and check lists leave no room for their meaningful exercise of discretion. Plaintiffs testified that they work as many as sixty to seventy hours per week and devote only fifteen to twenty percent of that time to managerial responsibilities. On a regular basis, they clean bathrooms and tables, vacuum and mop, defrost, unload food supplies, police the parking lot, and cook and serve food. As plaintiffs see it, they are required to devote their time to work that should be done by their staff because FICC sets the labor component of their budget at an amount too low to permit them to schedule enough workers to get the job done.

**378 Michael Maglioli, former vice president of restaurant operations for FICC, explained the relationship between a restaurant's labor budget and staffing decisions. FICC utilizes a computer program that projects staffing levels based on recent sales. The program is sensitive to the type of sales-prepackaged, take-out or restaurant service-because the labor required varies depending upon the nature as well as the volume of sales. Maglioli explained that general managers are expected to schedule in accordance with the computer's projection of needs and to exercise their discretion to adjust for extern-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

al factors the program does not consider-for example, school holidays that tend to bring increased business. A general manager has the discretion to exceed the labor budget. The budget represents the target for expenditures on labor costs not a ceiling. The budget is a planning tool designed to maintain a positive ratio between costs and profits. Maglioli did not know of one case in which a general manager had been terminated on account of exceeding the projected labor budget and noted that FICC as a whole generally exceeds the labor component of the *309 budget. A general manager's failure to meet the labor budget is not determinative of his or her bonus, but labor costs are relevant to the restaurant's profitability, which is taken into consideration in determining eligibility for bonus.

FICC considers its general managers to be "executives" who are not entitled to overtime pursuant to *N.J.S.A.* 34:11-56a4. Plaintiffs have not been paid overtime for any of their work as general managers.

On the basis of the foregoing evidence the trial court concluded that plaintiffs were employed in an "executive capacity" and ineligible to claim entitlement to overtime compensation under *N.J.S.A.* 34:11-56a4 and *N.J.A.C.* 12:56-7.1.

## II.

An employer's obligation to pay overtime wages is a component of New Jersey's minimum wage law (MWL), *N.J.S.A.* 34:11-56a to -56a30. The MWL was enacted "to establish a minimum wage level for workers in order to safeguard their health, efficiency, and general well-being...."*N.J.S.A.* 34:11-56a. It is patterned on the federal Fair Labor Standards Act (FLSA), 29 *U.S.C.A.* §§ 201-219. Both the FLSA and the MWL require an employer to pay an employee who works more than forty hours per week at a rate of one-and-one half times the employee's regular hourly rate for every hour after the fortieth, unless the employer establishes the right to an exemption from the "overtime" ob-

ligation based upon the employee's salary, duties and work. *N.J.S.A.* 34:11-56a4; *N.J.A.C.* 12:56-7.1 to -7.6; 29 *U.S.C.A.* § 207; 29 *U.S.C.A.* § 217; 29 *C.F.R.* §§ 541.0-541.602 (2004). Both laws provide an exception for any employee who works in a "bona fide executive capacity." *N.J.S.A.* 34:11-56a4; 29 *U.S.C.A.* § 213(a)(1).

[1] State minimum wage laws that are more protective of workers than federal law are authorized by the FLSA. 29 *U.S.C.A.* § 218(a). On that basis, this court has held that the FLSA does not preclude states from extending its protection to a greater *310 number of employees by narrowing the group of employees excluded from the law. *Yellow Cab Co. of Camden v. State, Dir. of Wage & Hour Bureau,* 126 *N.J.Super.* 81, 91-92, 312 *A.2d* 870 (App.Div.1973), *certif. denied,*64 *N.J.* 498, 317 *A.2d* 711 (1974). Based upon the Legislature's remedial purpose in enacting a minimum wage law, we have held that all exemptions to *N.J.S.A.* 34:11-56a4 should be construed narrowly and that the employer has the obligation to prove that **379 an employee meets the criteria for exemption. *Id.* at 86,312 *A.2d* 870.

Under both the FLSA and MWL, the criteria for exempting an employer from the obligation to pay overtime to an employee who serves in a "bona fide executive capacity" is set forth in regulations promulgated by the head of the Department of Labor. *N.J.A.C.* 12:56-7.1; 29 *C.F.R.* § 541.1. *N.J.S.A.* 34:11-56a5 provides the Commissioner with the authority to promulgate regulations that are "appropriate to carry out the purposes" or "necessary to prevent the circumvention or evasion" of the MWL. *See*29 *U.S.C.A.* § 213(a)(1) (authorization for FLSA regulations).

Although *N.J.A.C.* 12:56-7.1 has not been applied by a court of this State in a published decision,[FN4] we have guidance. *N.J.A.C.* 12:56-7.1 is modeled upon and in many instances identical to the FLSA regulation defining the "executive" exemption, 29 *C.F.R.* § 541.1.[FN5]Thus, we may rely upon judicial decisions construing the FLSA regulation and upon

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the interpretations of the FLSA regulation by the Secretary of the Department of Labor, which *311 are published with the regulation in the Code of Federal Regulations. *See State v. Chew,* 150 *N.J.* 30, 695 *A.*2d 1301 (1997), *cert. denied,*528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999).

> FN4. Two decisions of our trial courts address overtime claims under the FLSA, 29 *U.S.C.A.* §§ 201-219. *Cf. Dimiro v. Township of Montclair,* 290 *N.J.Super.* 708, 676 *A.*2d 627 (Law Div.1996) (federal law); *Fox v. Armour & Co.,* 21 *N.J. Misc.* 262, 33 *A.*2d 582 (Dist.Ct.1943) (same).

> FN5. Amendments to 29 *C.F.R.* § 541.1, effective August 23, 2004, have substantially revised the federal regulation. *See*69 *Fed.Reg.* 22260 (Apr. 23, 2004). As of August 16, 2005, the Commissioner of the Department of Labor has not proposed revisions to *N.J.A.C.* 12:56-7.1. Because the New Jersey regulation is modeled upon and informed by the regulations in effect prior to August 23, 2004, our references to the Code of Federal Regulations are to sections pertinent to the former regulation, except as otherwise noted.

### III.

In order to invoke the "executive" exemption an employer must establish the employee's eligibility under six standards that, stated generally, relate to the following: compensation, managerial responsibility, authority to direct staff, authority to select and retain staff, authority to exercise discretion, and percentage of actual work devoted to management. *N.J.A.C.* 12:56-7.1. The purpose of this multifaceted test is to prevent invocation of the exemption by an employer who is using an "executive" title to avoid overtime obligations-a "strawboss" supervisor is not exempt. 29 *C.F.R.* § 541.115(b).

*N.J.A.C.* 12:56-7.1 provides:

(a) "Executive" means any employee:

1. Whose primary duty consists of the management of the enterprise in which he or she is employed or of a customarily recognized department or subdivision thereof; and

2. Who customarily and regularly directs the work of two or more other employees therein; and

3. Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion of any other change of status of other employees will be given particular weight; and

4. Who customarily and regularly exercises discretionary powers; and

5. Who devotes less than 20 percent of his or her workweek to non-exempt work or less than 40 percent if employed by a retail or service establishment, provided**380 that in either case he or she retains his or her role as manager and supervises two or more full time employees; and

6. Who is compensated for his or her services on a salary basis exclusive of gratuities, board, lodging or other facilities, at a rate of not less than $300.00 per week effective November 5, 1990, $350.00 per week effective April 1, 1991, and $400.00 per week effective April 1, 1992.

(b) "Executive" shall also include employees owning a bona fide equity in the enterprise of 20 percent or more.

(c) "Executive" shall not include employees training to become executives and not actually performing the duties of an executive.

### *312 IV.

We begin our discussion of the discrete requirements with subsection (a)6 because it establishes a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

straightforward threshold requirement based upon compensation. An employer must pay an employee $400 per week or more to claim an exemption based upon the employee's "executive" capacity. There is no question that FICC pays compensation that is adequate under this standard. The lowest salary for a general manager, exclusive of bonus, is $40,000 per year, $769 per week.

The remaining standards are not as easily understood or applied. We consider those standards in the order in which they appear in the regulation.

The focus of subsection (a)1 is on the adequacy of the employee's responsibility for management. *N.J.A.C.* 12:56-7.1(a)1. This subsection is identical to 29 *C.F.R.* § 541.1(a). It requires the employer to establish that the employee has management of a distinct unit as his or her "primary duty."

The purpose in requiring a distinct unit (in the terms of the regulation, "the enterprise ... or of a customarily recognized department or subdivision" of the enterprise) is "to distinguish between a mere collection of [workers] assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 *C.F.R.* § 541.101. Subsection (a)1 prevents an employer from basing a claim of executive status on periodic or temporary assignment of managerial duties.

The evidence of FICC's eligibility with respect to distinct units is undisputed. Each restaurant has a separate location, payroll, deposit account, staff, budget and profitability rating. *N.J.A.C.* 12:56-7.1(a)1.

The Secretary of Labor identifies the following as management duties:

[I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their *313 status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

[29 *C.F.R.* § 541.102.]

FICC's training manuals, procedures and the testimony presented by both plaintiffs**381 and defendant establish that FICC's general managers have many of these "management duties." *See Murray v. Stuckey's Inc.,* 939 *F.*2d 614, 619-20 (8th Cir.1991) (considering nationwide standards adopted by the employer), *cert. denied,*502 *U.S.* 1073, 112 *S.Ct.* 970, 117 *L.Ed.*2d 135 (1992); *Cowan v. Treetop Enters. Inc.,* 120 *F.Supp.*2d 672, 691-92 (M.D.Tenn.1999) (manuals and training materials). They are responsible for interviewing, hiring, evaluating, disciplining, scheduling work hours, and assigning and reassigning staff. They plan for food preparation on a daily basis, order necessary supplies, implement procedures to prevent theft and waste, and analyze profit and loss statements. There is no question that they have management duties.

As is apparently often the case, the "more difficult question" is whether plaintiffs' managerial duties are "primary." For purposes of this regulation, "the meaning of 'primary' is 'principal' or 'chief,' not 'over one half.' " *Donovan v. Burger King Corp.,* 672 *F.*2d 221, 226 (1st Cir.1982)(*Donovan I* ). The determination requires consideration of "all the relevant facts" and a qualitative assessment of the following: the employee's relative freedom from supervision; the frequency of the employee's exercise of discretion; the relative importance of managerial and non-managerial tasks; the time spent on managerial duties; and the employee's salary relative to the wages of workers supervised. *See Donovan v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Burger King Corp.*, 675 *F.*2d 516, 520-21 (2d Cir.1982)(*Donovan II* ); 29 *C.F.R.* § 541.103. No single factor is dispositive. *See Donovan II, supra,* 675 *F.*2d at 521.

*314 [2] FICC's evidence was adequate to support the trial court's conclusion that management is the plaintiffs' "primary duty" under this criteria. Each FICC general manager is "in charge" of the restaurant and operates it without any day-to-day supervision. *Id.* at 522. District managers appear on a discretionary and irregular basis. *See Murray, supra,* 939 *F.*2d at 619 (primary duty of a local store manager is no less managerial because of reporting to a regional manager whose primary duty is management of multiple stores at a higher level within the organization). District managers report on but do not control operations of the individual restaurants on a day-to-day basis.

The general managers regularly make discretionary decisions necessary to the day-to-day operation of the restaurant. The obligation to complete forms and follow FICC procedures channels but does not eliminate the general manager's exercise of discretion. *See Donovan II, supra,* 675 *F.*2d at 521-22. General managers must schedule employee hours, determine the quantities of food to order and prepare, select and correct employees, and move employees from one assignment to another as needs fluctuate throughout the day. These discretionary, managerial duties are performed on a regular basis throughout the day. 29 *C.F.R.* § 541.102; 29 *C.F.R.* § 541.107.

Plaintiffs' managerial duties are their "chief" duties in the sense that the managerial duties have greater importance to their role in the organization than does their performance of "fill-in" tasks when the demand for service is high or staff levels are low. They acknowledge that their obligation to supervise, correct, and discipline the restaurant workers is continual and a critical component of the job. Proper supervision is essential to the quality control and prevention of waste and theft that FICC requires. *Cowan, supra,* 120 *F.Supp.*2d at 691 (where

training materials demonstrate that a manager's "critical" function is cooking, the exemption is not available).

**382 FICC trains and expects its general managers to step-in when there is a "bottleneck," and plaintiffs' testimony was that low *315 staffing levels often require them to spend as much as eighty percent of their day lending a hand. The trial court did not credit that testimony. But, even if the trial court had found plaintiffs credible, relative allocation of time is only one factor that is not determinative of "primary" duty. *See* 29 *C.F.R.* § 541.103; *see also Baldwin v. Trailer Inns, Inc.,* 266 *F.*3d 1104, 1113, 1115-16 (9th Cir.2001) (managers of recreational vehicle park spent ninety percent of time on nonexempt duties); *Murray, supra,* 939 *F.*2d at 618-20 (manager of a Stuckey's, one of a chain of combination gasoline stations, convenience stores, and restaurants, claimed to spend sixty-five to ninety percent of time on non-managerial tasks); *Kastor v. Sam's Wholesale Club,* 131 *F.Supp.*2d 862, 866-67 (N.D.Tex.2001) (manager of bakery department spent ninety percent of his time performing non-managerial tasks).

The time plaintiffs spend cooking, serving food or clearing and wiping tables does not preclude simultaneous performance of their supervisory duties. Cooking, serving and clearing tables is not necessarily inconsistent with effective supervision. It can permit a general manager to teach techniques that improve performance and efficiency, monitor the portions and quality of food and review the accuracy of guest checks.

In analyzing the various duties and tasks of managers and assistant managers employed in Burger King restaurants, two federal Courts of Appeal have concluded that their duties are primarily managerial within the meaning of the federal regulation. *Donovan II, supra,* 675 *F.*2d at 520-22; *Donovan I, supra,* 672 *F.*2d at 225-27. The courts concluded, as we do, that non-exempt tasks such as cooking and serving permit and are not inconsistent with simultaneous supervision. *Ibid.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Finally, the salary of FICC's general managers compares favorably with wages paid to other employees. An assistant manager working forty hours per week would earn less than $28,900. The minimum salary for a general manager is $40,000. The difference becomes more dramatic when the managers' salaries and the salaries of employees other than the assistant managers are **\*316** compared. Servers earn under $3.00 per hour plus tips. *See Moore v. Tractor Supply Co.,* 352 F.Supp.2d 1268, 1276-78 (S.D.Fla.2004) (noting that courts have not developed a particular measure and discussing cases), *aff'd,* No. 05-10189DC, 2005 *WL* 1625237 (11th Cir. July 12, 2005).

The trial court's conclusion that plaintiffs each have the primary duty of managing a "customarily recognized ... subdivision" of the FICC under the qualitative, multi-factored standard incorporated in 29 *C.F.R.* § 541.1(a) and adopted in *N.J.A.C.* 12:56-7.1(a)1 is supported by this record.

The evidence also supports the conclusion that plaintiffs' supervisory obligations are sufficient to meet the requirements of subsection (a)2, which limits the "executive" exemption to employees who "customarily and regularly direct the work of two or more other employees." Plaintiffs direct the work of all employees of the restaurant and FICC's regulations require the presence of a minimum of three employees. *See*29 *C.F.R.* § 541.1(b) (identical requirement).

FICC also established that its general managers have the authority to hire and fire required by subsection (a)3. *See*29 *C.F.R.* § 541.1(c) (identical requirement). FICC's evidence demonstrated that plaintiffs hire, schedule work hours, evaluate, discipline and, at a minimum, make recommendations as to firing which are routinely **\*\*383** accepted if policies for progressive discipline have been followed. *N.J.A.C.* 12:56-7.1(a)3.

Plaintiffs also exercise sufficient discretion to meet the requirements of subsection (a)4, which limits the "executive" exemption (again in the words

identical to those employed in the federal regulation) to employees who "customarily and regularly exercise[ ] discretionary powers." *N.J.A.C.* 12:56-7.1(a)4; 29 *C.F.R.* § 541.1(d). The preceding discussion of the general managers' "primary duty" includes an analysis of the general managers' duties that require daily and continuing exercise of discretion that is not eliminated by FICC's procedures and guidelines. There is **\*317** no evidence that would permit the conclusion that plaintiffs lack the degree of discretion required by subsection (a)4.

[3] A brief explanation of the relationship between subsection (a)1 and subsections (a)2-5 is necessary. On the facts of this case, it appears that subsections (a)2-4 require a duplication of discrete aspects of the analysis of "primary duty" under subsection (a)1. The Secretary's interpretations of the regulation explain the significance of the discrete standards in the course of discussing 29 *C.F.R.* § 541.1(c), which requires exercise of discretion. The purpose of the separate standard is to exclude "[a] person whose work is so completely routinized that he has no discretion" even if that factor was not sufficiently weighty to require exclusion under the multi-factored analysis of "primary duty." 29 *C.F.R.* § 541.107. Thus, the subsections that appear repetitive in this case have significance because no single factor is determinative under the test of subsection (a)1. The separate subsections serve to exclude employees who lack one of the essential components included in subsections (a)2, (a)3, and (a)4 even though the employees have management as their primary duty within the meaning of subsection (a)1.

[4] Subsection (a)5 poses difficult questions of interpretation and application. It excludes a claim of executive status based upon time devoted to "non-exempt work." In the context of the restaurant business, a "service establishment," eligibility requires the employer to demonstrate that the manager "devotes" "less than forty percent" "of his or her workweek" "to non-exempt work." *N.J.A.C.* 12:56-7.1(a)5. Here, New Jersey's regulation devi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ates from the federal model, and we must consider the differences in language as reflecting an intention to depart from the federal standard. *Airwork Serv. Div. v. Dir., Div. of Taxation,* 2 *N.J.Tax* 329 (Tax 1981), *aff'd o.b.,* 4 *N.J.Tax* 532 (App.Div.1982), *aff'd,* 97 *N.J.* 290, 294, 478 *A.2d* 729 (1984), *cert. denied,* 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985). The remedial purpose of the law requires us to construe the changes as an effort to exclude employees from the exemption and afford protection **\*318** greater than the regulations implementing the FLSA. Where "the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced." *Ramirez v. Yosemite Water Co.,* 20 *Cal.*4th 785, 85 *Cal.Rptr.*2d 844, 978 *P.2d* 2, 10 (1999).

We consider the differences to determine the purpose of the deviation. The comparable provision of the federal regulation has limited application; it is relevant only in cases involving employees who earn less than $250 per week. 29 *C.F.R.* § 541.1(e).FN6 Under the FLSA, an employer**\*\*384** who pays at a rate of $250 per week or more may establish the employee's "executive" status under a less stringent "short test" that does include this quantitative analysis of tasks performed on a weekly basis: the "short test" does not require a determination of the percentage of the employee's workweek devoted to non-exempt work. *See Donovan II, supra,* 675 *F.*2d at 518-21; *Donovan I, supra,* 672 *F.*2d at 223-24. Where the "short test" applies, the employer need establish only three elements: the employee's compensation is fixed at $250 per week or more; the employee's "primary duty consists of the management of the enterprise ... or of a customarily recognized department"; and involves "customary and regular direction of the work of two or more other employees...."29 *C.F.R.* § 541.1(f).FN7

FN6. 29 *C.F.R.* § 541.1(e) provides:

(e) ... [I]n the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not *directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section:* Provided, That this paragraph *shall not apply* in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed....

FN7. 29 *C.F.R.* § 541.1(f) provides:

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week ...: Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week ..., and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

**\*319** Subsection (a)5 serves the same function as subsections (a)2, (a)3, and (a)4 discussed above. While relative time spent on managerial duties is one of several factors considered in determining "primary duty" under (a)1, under (a)5 time spent on non-exempt duties provides an independent basis for excluding an employee from the "executive" exemption solely on the basis of a quantitative review of time spent on non-exempt work.

The term "non-exempt work" is not defined in *N.J.A.C.* 12:56-7.1. Interpretative statements explaining this component of the federal "long test" use the terms "exempt" and "non-exempt" to describe the tasks that are counted in favor of and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

against "executive" status. *See* 29 *C.F.R.* § 541.112. The reasonable conclusion is that the intent here is to incorporate the descriptions included in the interpretative statements and simplify the language of the regulation. The phrasing of the federal standard is awkward, "work not directly and closely related to the performance of the work described in paragraphs (a) through (d)." Use of the terms exempt and non-exempt, made familiar by the Secretary's interpretations, serves as shorthand. On that basis, we conclude that non-exempt means work "not directly and closely related to qualifying managerial duties."

The interpretative statement explains: "Nonexempt work is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the 'executive.' " 29 *C.F.R.* § 541.111(b). The primary purpose of the exclusionary language placing a limitation on the amount of non-exempt work is to distinguish between the bona fide executive and the 'working' foreman or 'working' supervisor who regularly performs ... work which is unrelated or only remotely related to his supervisory activities." 29 *C.F.R.* **385 § 541.115(a). Thus, the *320 explanation recognizes a distinction between a supervisor who does the same tasks side-by-side with the workers, and a supervisor who does the work to demonstrate or teach. *Ibid.* (using an example from the garment production industry). In that manner, it distinguishes "fill-in tasks," which are assigned because the supervisory and managerial duties do not take full time, from those tasks that are done in furtherance of the supervisory role. Another example distinguishes general record keeping from keeping records for performance evaluations. 29 *C.F.R.* § 541.115(b).[FN8]

> FN8. It is not surprising that the Secretary's illustrations do not include examples from the restaurant industry. The federal regulation's percentage requirement does not apply to "an employee who is in sole charge of an independent establishment or a physically separated branch establishment." 29 *C.F.R.* § 541.1(e). That exception to this component of the long test, which would encompass FICC's general managers, is not a component of *N.J.A.C.* 12:56-7.1(a)5.

The federal regulations were recently amended, and the amended regulations no longer require a time-percentage analysis of non-exempt activities for any employee. 29 *C.F.R.* § 541.1 (as amended effective Aug. 23, 2004). The Department of Labor explained that the requirement had fallen into disuse because of the outdated wage level that limited its application to low wage earners. *See* 69 *Fed.Reg.* 22122, 22126. The Department concluded that reactivation of the test, with its "moment-by-moment examination of an exempt employee's specific duties," would impose new monitoring requirements, recordkeeping burdens, and require employers to conduct a detailed analysis of the substance of each particular employee's daily and weekly tasks. *Id.* at 22126 to -27. Referencing judicial decisions that recognize an employee's ability to perform his or her primary duties while performing non-exempt tasks, and reporting complaints from department investigators and employers who found the distinction involved "a subjective and difficult evaluative task that prompted contentious disputes," the agency dispensed with the standard. *See id.* at 22127 (referencing *Donovan I, supra* ). To date, no conforming amendments have been proposed in New Jersey.

*321 The question we must confront is the proof an employer must adduce to establish eligibility under the percentage standard. The issue has not been expressly addressed in a federal decision disclosed by our review of the cases. In both *Burger King* cases discussed above, the Courts of Appeal affirmed the trial judge's factual determination that the employer had not established the percentage requirement for lower paid assistant managers "as not clearly erroneous," without discussion of proofs that would have sufficed. *Donovan II, supra,* 675 *F.*2d at 517;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Donovan I, supra,* 672 *F.*2d at 227. In other cases courts have found it unnecessary to reach the percentage requirement because of the employer's failure to establish "primary duty." *See, e.g., Cowan, supra.*

We cannot conclude that the Commissioner intended to require an employer to establish proof in the form of a moment-to-moment analysis of an employee's workweek. That interpretation would necessarily require detailed records of tasks performed at work, and the New Jersey regulations do not call for maintenance of such records. *Cf. N.J.S.A.* 34:56a20. The absence of a regulation requiring what would be needed suggests that there was no intention to demand proof of that sort to establish eligibility under subsection (a)5.

**386** Like New Jersey, California has a test based on a quantitative assessment of time spent on tasks. *Ramirez, supra,* 85 *Cal.Rptr.*2d 844, 978 *P.*2d at 10 & n. 4. The Supreme Court of California has described the questions and problems inherent in a "quantitative" review of exempt and non-exempt work as follows:

Is the number of hours worked ... to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee should be working [on exempt work], or should it be determined by the actual average hours the employee spent on [such] activity? The logic inherent in the [regulation's] quantitative definition ... dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on [exempt work] were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in [exempt] activities during most of his working hours and falls below the ... mark due to his own substandard performance [or affirmative choice] should not thereby be able to evade a valid ex-

emption.

*\*322 [Ramirez, supra,* 85 *Cal.Rptr.*2d 844, 978 *P.*2d at 13.]

The *Ramirez* court directed a solution that allows trial courts to "steer clear of [the] two pitfalls" it identified. *Ramirez, supra,* 85 *Cal.Rptr.*2d 844, 978 *P.*2d at 13. The court held that a trial court should: "inquir[e] into the realistic requirements of the job," giving consideration to "how the employee actually spends his or her time," but also "consider[ing] whether the employee's practice diverges from the employer's realistic expectations...."*Ibid.*

The approach adopted in *Ramirez* is properly protective of the employee without being unfair to the employer. The benefits of the *Ramirez* approach are particularly apparent in this case involving managers who schedule the hours of the non-exempt staff. On the one hand, there is a concern that the employer may provide an unreasonable labor budget which requires the managers to take on non-exempt work to succeed. On the other hand, there is a concern that the managers may schedule their staff time poorly, through inexperience, incompetence or design, thereby creating the necessity that justifies their own performance of non-exempt work and receipt of overtime pay.[FN9] By considering both the realistic basis for the employer's job description and the employees' fulfillment of the employer's reasonable expectations, the *Ramirez* test measures percentage of exempt and non-exempt work by a standard that is not only more practical but also more meaningful than a moment-to-moment analysis.

> FN9. The complexity of the analysis most likely explains why the FLSA regulation never applied to an employee who is "in sole charge" of the unit he or she manages. *Cf.*29 *C.F.R.* § 541.1(e). New Jersey's regulation does not include that exemption.

The trial court in this case took an approach that is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

consistent with the *Ramirez* standard, and we hold that it is the appropriate approach. The trial court reviewed the FICC's evidence about the responsibilities of its general managers, the testimony about the computer program that general managers are directed to use in order to determine the staffing levels, which is based upon the need for staff, and the plaintiffs' testimony that they spend only **\*323** twenty percent of their time on exempt work. The trial court concluded:

**\*\*387** [If it] is, in fact, the case, [that plaintiffs spend only twenty percent of their time on managerial tasks] they are not performing their function as managers. Their testimony was to the effect that they had to clean-up parking lots, do the cooking, handle the fountain service and, at times, they had to wash dishes themselves. To believe this testimony [about the eighty percent time commitment] would mean that the plaintiffs failed to delegate responsibility.

Thus, the trial court reviewed the evidence of FICC's reasonable expectations, determined that FICC's staffing levels are realistic because they are based upon need, and considered plaintiffs' testimony about how they spend their time during the workweek. The court did not credit plaintiffs' testimony, and the court implicitly recognized that under the circumstances if the general managers were spending as much as eighty percent of their job on non-exempt work, then they were not meeting FICC's reasonable expectations.

We hold that FICC's evidence was adequate to meet the employer's burden to establish that its general managers are expected to devote less than forty percent of their workweek to non-exempt work and that the expectation is reasonable in light of the staffing permitted. *N.J.A.C.* 12:56-7.1(a)5. FICC established that the significant managerial responsibilities were sufficient to occupy the workweek. Proof of that sort negates any inference that non-exempt work is used as a prohibited "fill-in," as it is with "strawboss" supervisors. 29 *C.F.R.* § 541.115. FICC presented evidence that it employed

computerized staffing models based upon criteria related to the demand for labor. That proof negates any inference that FICC either arbitrarily restricted staffing or did so in a bad faith effort to require its general managers to do non-exempt work for substandard pay. *Cf. Donovan II, supra,* 675 *F.*2d at 519 (because the evidence that employer's ideal ratio of staff to production was inconsistent with actual staffing and tolerated by the employer who had knowledge of the inadequacy, the trial judge's conclusion that Burger King failed to qualify its lower-paid, long test, assistant managers was not clearly erroneous).

**\*324** We hold that an employer may establish compliance with *N.J.A.C.* 12:56-7.1(a)5 by evidence that demonstrates that: proper performance of expected managerial duties reasonably requires devotion of more than sixty percent of the employee's workweek; and the staffing levels in the unit are based on criteria adequate to meet the demands without assistance of the exempt managerial employees that takes more than forty percent of their time. Employees may rebut the evidence with proof of actual tasks performed. The ultimate burden of proof remains with the employer.

The decision of the trial court is supported by the evidence and consistent with controlling legal principles, and we defer to the judge's conclusions on the credibility of plaintiffs' rebuttal evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974); *Maggio v. Pruzansky,* 222 *N.J.Super.* 567, 537 *A.*2d 756 (App.Div.1988). We affirm the order dismissing plaintiffs' complaint with prejudice.

### V.

[5] We also affirm the trial court's decision awarding counsel fees pursuant to *Rule* 4:58-1 and *Rule* 4:58-3. Abushawar raises only one narrow factual issue on this appeal, which does not have sufficient support in the record to warrant discussion in a written opinion. *R.* 2:11-3(e)(1)(E). He argues that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

he should not be required to pay the fees as directed because "the offer[s] of settlement were **388 contingent upon" acceptance of offers by all plaintiffs. That is the only argument he raises, and it is not supported by the record. The offer of judgment is included in FICC's appendix on this appeal. The offer was made to "plaintiff Ibrahim Abushawar."

On its face, the offer of judgment is not contingent upon acceptance by any other plaintiff, and we decline to consider contradictory certifications about the plaintiffs' collective misunderstandings that were executed after the date of the trial judge's order.

The orders are affirmed.

N.J.Super.A.D.,2005.
Marx v. Friendly Ice Cream Corp.
380 N.J.Super. 302, 882 A.2d 374, 10 Wage & Hour Cas.2d (BNA) 1564

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.