# TAB 4

32 Cal.App.4th 555                                                                    Page 1
32 Cal.App.4th 555, 38 Cal.Rptr.2d 221, 2 Wage & Hour Cas.2d (BNA) 1027

▷
Nordquist v. McGraw-Hill Broadcasting Co., Inc.
Cal.App.5.Dist.
BRIAN E. NORDQUIST, Plaintiff and Respondent,
v.
McGRAW-HILL BROADCASTING COMPANY,
INC., Defendant and Appellant.
No. F020310.

Court of Appeal, Fifth District, California.
Feb 17, 1995.

[Opinion certified for partial publication.† FN† ]

FN† Pursuant to California Rules of Court,
rule 976.1, this opinion is certified for pub-
lication with the exception of part 2 of Dis-
cussion.

SUMMARY

The trial court entered a judgment that a television
station sports director/newscast anchor was entitled
to overtime compensation under Industrial Welfare
Commission Order No. 11-80, because he was not
exempt as a professional or administrative employ-
ee "engaged in work which is primarily intellectual,
managerial, or creative, and which requires exercise
of discretion and independent judgment." (Cal.
Code Regs., tit. 8, § 11110.) (Superior Court of
Kern County, No. 203210, Henry E. Bianchi FN†
and John I. Kelly, Judges. FN* )

FN† Retired judge of the Kern Superior
Court sitting under assignment by the
Chairperson of the Judicial Council.

FN* *Judge Bianchi heard the trial regard-
ing compensation; Judge Kelly heard the
trial regarding prejudgment interest.

The Court of Appeal, for reasons stated in an un-
published portion of the opinion, reversed the judg-
ment insofar as it applied the incorrect period of
limitations, affirmed in all other respects, and re-
manded with directions. The court held that the em-
ployer did not establish as a matter of law that the
employee fell within the professional exemption
contained in Cal. Code Regs., tit. 8, § 11110. He
had no advanced degree or even a high school edu-
cation, and the skill and expertise he developed
over the years came from on-the-job training. He
was directed to simply report the facts and was pre-
cluded from providing commentary on stories he
reported. That portion of his work that did involve
creativity and discretion did not consume the re-
quired 50 percent of his work time. Neither was the
employee exempt as an administrative employee as
his duties did not involve the "discretion and inde-
pendent judgment" contemplated by that exemp-
tion. Moreover, the employee was categorized by
the employer as a nonexempt employee on its per-
sonnel records for five years, and he was required
to fill in time sheets, which the employee handbook
indicated made him a nonexempt employee. The
court further held that the employee was entitled to
prejudgment interest under Civ. Code, § 3287
(award of interest on damages), even though Lab.
Code, § 98.1, subd. (c), provides for interest on
awards granted by the Labor Commissioner, and
the employee did not prevail in his administrative
proceeding. There is no legislative intent that in-
terest awarded under Civ. Code, § 3287, is not
available to claimants who are unsuccessful in an
administrative proceeding but who prevail on ap-
peal in a judicial trial de novo. (Opinion by Thax-
ter, J., with Stone (W. A.), Acting P. J., and Di-
biaso, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Labor § 12--Regulation of Working Conditions-
-Labor Commissioner and Other Actions--Judicial
Review.
Under Lab. Code, § 98.2, providing for a de novo
trial in superior court on appeal from an order by

the Labor Commissioner, on appeal from the judgment of the superior court, the findings of the labor commissioner are entitled to no weight, and review is of the facts presented to the trial court. Factual issues are reviewed under the substantial evidence rule. When the evidence conflicts, the appellate court will not disturb the findings of the trial court, and must consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment.

**(2) Labor § 12--Regulation of Working Conditions--Hours--Overtime--Exempt and Nonexempt Employees--Television Sports Director.**
Substantial evidence supported the trial court's decision that a television station sports director/ newscast anchor was entitled to overtime compensation under Industrial Welfare Commission Order No. 11-80, because he was not exempt as a professional or administrative employee "engaged in work which is primarily intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment" (Cal. Code Regs., tit. 8, § 11110). The employer did not establish as a matter of law that the employee fell within the professional exemption. He had no advanced degree or even a high school education, and the skill and expertise he developed over the years came from on-the-job training. He was directed to simply report the facts and was precluded from providing commentary on stories he reported. That portion of his work that did involve creativity and discretion did not consume the required 50 percent of his work time. Neither was the employee exempt as an administrative employee as his duties did not involve the "discretion and independent judgment" contemplated by that exemption. Moreover, the employee was categorized by the employer as a nonexempt employee on its personnel records for five years, and he was required to fill in time sheets, which the employee handbook indicated made him a nonexempt employee.
[See 2 **Witkin**, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 330.]

**(3) Interest § 4--Prejudgment Interest--After Denial of Award by Labor Commissioner.**
A television station sports director who recovered a judgment for overtime compensation, based on the finding that he was a nonexempt employee, was entitled to prejudgment interest under Civ. Code, § 3287 (award of interest on damages), even though Lab. Code, § 98.1, subd. (c), provides for interest on awards granted by the labor commissioner, and the employee did not prevail in the administrative proceeding before the commissioner. There is no legislative intent that interest awarded under Civ. Code, § 3287, is not available to claimants who are unsuccessful in an administrative proceeding but who prevail on appeal in a judicial trial de novo.

COUNSEL
Payne & Fears, James L. Payne and Valerie L. McNamara for Defendant and Appellant.
Werdel & Shea and Edwin T. Shea for Plaintiff and Respondent.

**THAXTER, J.**
In the published portion of this opinion we will uphold the trial court's decisions on two novel issues: (1) that plaintiff and respondent Brian E. Nordquist, a television station sports director/newscast anchor, is entitled to overtime compensation under subdivision 3 of Industrial Welfare Commission Order No. 11-80 (IWC Order No. 11-80) because he was not exempt as a professional or administrative employee, "engaged in work which is primarily intellectual, managerial, or creative," and "which requires **\*558** exercise of discretion and independent judgment" (Cal. Code Regs., tit. 8, § 11110); and (2) that Nordquist was entitled to prejudgment interest following his successful appeal to the superior court following an order by the Labor Commissioner rejecting his compensation claim.

In the unpublished portion of the opinion we will hold that the trial court erred by applying the four-year limitations period of Code of Civil Procedure section 337, subdivision 1 rather than the three-year period of section 338, subdivision (a) to Nordquist's claim. We will remand with directions to apply the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

correct statute of limitations and to recalculate the amount of overtime compensation and interest payable to Nordquist.

## Facts and Procedural History

Appellant McGraw-Hill Broadcasting Company, Inc., doing business as KERO-TV23 (KERO), hired Nordquist as a sportscaster/reporter on May 24, 1982. On August 5, 1982, Nordquist signed a written employment contract with KERO and his employment continued pursuant to successive written employment contracts until he resigned in 1987. His job responsibilities were the same before and after he signed the contract.

The three letter contracts contained similar terms, including compensation by salary and integration clauses. The contract in effect when Nordquist resigned provided:

"4. Your basic work week will consist of five days. It is understood that from time to time you may be required to work additional days or extended work-shifts.

"5. In consideration of your duties hereunder we shall pay you, less only those deductions required by law or mutually agreed upon, a weekly gross compensation based on the following annual rates:

"(i) From 12/30/85 through 12/28/86, $30,000 per year.

"(ii) From 12/29/86 through 12/27/87, $33,000 per year.

"6. Except as superseded by the terms of this agreement, you are subject to, and agree to be bound by, all of the personnel policies and benefits as outlined in the KERO-TV handbook for employees, 'McGraw-Hill Broadcasting Company and You,' and all other KERO-TV policies and procedures."

The employee handbook incorporated into the contract states a normal workweek is 40 hours and con-

sists of five 8-hour days; payment is made for *559 overtime work in excess of 40 hours per week and, in California, for hours worked in excess of 8 hours per day. The handbook also states in answer to the question, "[a]re you 'exempt' or 'nonexempt'?": "... If you are exempt, ... [y]ou do not record your hours worked on a time-card. [¶] If you are nonexempt, ... you record your hours worked on a time-card" and must be paid "time and one-half your regular rate for hours worked in excess of 40 hours per week." The handbook also discusses a manager's discretion to grant compensatory time off in lieu of overtime pay.

KERO required Nordquist to keep daily and biweekly time sheets, which were approved by his supervisor, in order to receive his paycheck. According to KERO, the purpose for the time sheets for on-air employees, including Nordquist, was to keep track of vacation and sick leave days. KERO's nonexempt employees punched a time card; exempt employees used the time sheets. Since on-air employees were required to work some holidays and extra days to broadcast the daily news, KERO established an informal compensatory time-off policy. Under the policy, exempt employees were permitted to take one day off for each extra day worked, when the needs of the station would allow. The policy was discretionary with the station management, however, and frequently Nordquist was not permitted to take the promised time off.

When Nordquist was hired, he was assigned a grade level of 4009, which reflects an unclassified employee category signifying (1) Nordquist was an "on-air" employee under a "talent contract," as opposed to a staff employee; and (2) Nordquist's salary increases would not be limited by a set pay range. However, Nordquist was listed as N-E, meaning nonexempt, for Fair Labor Standards Act (FLSA) purposes on the KERO "Personnel Change Notice" form which is generated by the corporate office in New York when an employee is hired. Raymond Schiffhauer, KERO's director of business affairs, testified Nordquist's nonexempt classifica-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion resulted from a clerical error which was perpetuated by computer until he caught it in March 1987 when he was conducting a periodic review of personnel records. He admitted, however, he was aware at that time that the station manager was not entirely happy with Nordquist's performance.

In September 1983, KERO promoted Nordquist to the position of sports director/anchor. In this position, Nordquist was responsible for producing and anchoring three sports segments of KERO's live nightly newscasts, two during the hour-long 6 p.m. newscast, and one at 11 p.m., Monday through Friday. The KERO sports department had two regular employees, Nordquist and Pete Cirivilleri, the weekend news anchor. Nordquist remained the sports director/anchor until he resigned on September 4, 1987. *560

According to Nordquist, the sports director/anchor position involved primarily mundane and unimaginative duties and responsibilities. He gathered sports news throughout the day which he summarized, scripted, and read on-air during the sports segment of the nightly newscasts. His script was essentially a rewrite of material from wire services, satellite feeds, print media, press releases, phone calls and local interviews. Broadcast content was dictated by the sports events of the day and was prepared according to station guidelines and standard formats in the industry. On the other hand, according to KERO's news director, Walt Brown, Nordquist's duties as sports director/anchor required him to exercise discretion, judgment and creativity. Further, Nordquist's successful exercise of those traits led to his being the most watched sports anchor in the broadcast area.

On December 1, 1987, after he had resigned, Nordquist filed a claim for overtime compensation with the California Labor Commissioner pursuant to Labor Code section 98 et seq. Following an evidentiary hearing, the commissioner ruled that Nordquist was an exempt employee under IWC Order No. 11-80, and thus not entitled to overtime compensation. Nordquist sought a trial de novo in

superior court. The parties stipulated to bifurcate the issues of liability and damages for trial. The trial court concluded Nordquist was a nonexempt employee entitled to overtime compensation, and the four-year statute of limitations for obligations arising from a written contract applied rather than the three-year statute of limitations for obligations arising from statute. Thus, Nordquist was entitled to overtime pay for the four-year period prior to December 1, 1987.

The parties stipulated, based on the court's ruling, that Nordquist was entitled to $102,956.14 in overtime compensation and proceeded to trial on the issue of his entitlement to prejudgment interest. The court held Nordquist was not entitled to interest under Labor Code section 98.1, subdivision (c) but was entitled to it under Civil Code section 3287. The parties then agreed Nordquist was due $60,598 in prejudgment interest and $2,512 ($31.40/day from Mar. 23, 1993, through date of judgment on June 11, 1993) in postjudgment interest. The court awarded Nordquist his costs and entered judgment accordingly. KERO's timely appeal followed.


Discussion


1. *Substantial evidence supports the finding that Nordquist was a nonexempt employee.*


*Standard of Review*


(1) Labor Code section 98.2 provides for a de novo trial in superior court on appeal from an order by the Labor Commissioner. On appeal from *561 the judgment of the superior court, the findings of the Labor Commissioner are entitled to no weight, and review is of the facts presented to the trial court. (*Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721, 725 [245 Cal.Rptr. 36].)

Whether Nordquist was exempt from the overtime provisions of IWC Order No. 11-80 is a factual is-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sue which this court reviews under the substantial evidence rule. (*Cardenas v. Mission Industries* (1991) 226 Cal.App.3d 952, 958 [277 Cal.Rptr. 247].) Thus, our authority begins and ends with a determination whether, on the entire record, there is any substantial evidence-that is, of " 'ponderable legal significance,' " reasonable, credible and of solid value-contradicted or uncontradicted, which will support the judgment. As long as there is such evidence, we must affirm. (*Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 507 [286 Cal.Rptr. 714].) Moreover, when, as in this case, the evidence is in conflict, the appellate court will not disturb the findings of the trial court. The court must consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619].)

### The Applicable Law

The California Industrial Welfare Commission (IWC) is authorized to promulgate orders regulating wages, hours, and conditions of employment for employees throughout the state. (*Ghory v. Al-Lahham* (1989) 209 Cal.App.3d 1487, 1490 [257 Cal.Rptr. 924].) IWC Order No. 11-80 is the wage and hour order applicable to the broadcasting industry. The order provides, in substance, that no employee shall be employed more than eight hours in any workday or more than forty hours in any work week unless the employee receives premium pay varying from time and a half to double time, depending on the number of hours and/or days worked in excess of the stated maximums. The order applies to:

"all persons employed in the broadcasting industry whether paid on a time, piece rate, commission, or other basis, except that:

"(A) [The overtime provisions] shall not apply to persons employed in administrative, executive, or professional capacities. No person shall be considered to be employed in an administrative, executive or professional capacity unless one of the following conditions prevails:

"(1) The employee is engaged in work which is *primarily* intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment, and for which the remuneration is not less than $900.00 per month; or **\*562**

"(2) The employee is licensed or certified by the State of California and is engaged in the practice of one of the following recognized professions: law, medicine, dentistry, pharmacy, optometry, architecture, teaching, or accounting.

"(B) The provisions of this Order shall not apply to professional actors of either sex." (Cal. Code Regs., tit. 8, § 11110, subds. 1(A) and (B), italics added.)

Under the wage orders, an employee is "primarily" engaged in intellectual, managerial, or creative work if more than half of his or her work time is devoted to such duties. (Cal. Code Regs., tit. 8, § 11110, subd. 2(K).)

If an employee is entitled to overtime pay under California law, the employer may not abrogate its obligation to pay such compensation by written agreement. (Lab. Code, § 219.)Further, absent an explicit wage agreement, a fixed salary does not serve to compensate an employee for statutory overtime worked. (*Hernandez v. Mendoza, supra,* 199 Cal.App.3d at p. 725.)

Because the California wage and hour laws are modeled to some extent on federal laws, federal cases may provide persuasive guidance. (*Alcala v. Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 550 [227 Cal.Rptr. 453].) However, California's professional employee exemption is narrower than that in the FLSA, and the administrative employee exemption is somewhat different. (2 Division of Labor Standards Enforcement, Operations and Procedures Manual (1989) §§ 10.63, 10.62

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(DLSE Manual).) [FN1] The employer bears the burden of proving an employee is exempt. (*Corning Glass Works v. Brennan* (1974) 417 U.S. 188, 196-197 [41 L.Ed.2d 1, 10-11, 94 S.Ct. 2223].) Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms. (*Dalheim v. KDFW-TV* (5th Cir. 1990) 918 F.2d 1220, 1224.)

> FN1 KERO submits the DLSE Manual cites should be disregarded because the sections cited are from the 1989 version, after Nordquist's employment with KERO ended. Not so; unless the manual reflects standards which changed from the time of Nordquist's employment (KERO makes no such claim), its provisions are relevant because they explain standards applicable to Nordquist's employment.

Regarding the artistic professional exemption, the DLSE Manual provides: "Relatively few individuals qualify for exemption as members of artistic professions in California, since most of those who have sufficient control over the nature [of] their own work and over their work hours are self-employed. Academic degrees are not required, but a specialized course of study of at least four years is generally one element involved in establishing a professional standing in the fine arts. This by itself is not enough, *563 however. A composer or vocal or instrumental soloist may be exempted because of the individual's wide-ranging discretionary powers, including control over his or her working conditions, but a member of the orchestra will not be, no matter how professional a musician he or she may be. A few writers employed in the motion picture or broadcast industries have sufficient discretionary powers to be exempt, but most do not, even when they work at home, because of time limits, restricting outlines or other constraints on the creative aspects of their work. A newspaper columnist required only to furnish, for example, five columns per week, regardless of subject, time of preparation,

etc., could be exempted from Order 4, but reporters, editors and advertising copy writers could not...." (DLSE Manual, § 10.63.)

Regarding the administrative exception, the DLSE Manual states:

" 'Administrative capacity' is defined here and discussed ... in accord with the general principles embodied in federal regulations, with several differences. The proportion of time that must be spent on administrative duties and the related evaluation of routine work is not the same, so employers cannot automatically rely on federal exemptions in California....

"The exempt employee who works in an 'administrative capacity' is one who:

"(a) Customarily and regularly exercises discretion and independent judgment in the performance of 'intellectual' work which, in the context of an administrative function, is office or non-manual work directly related to management policies or the general business operations of the employer or the employer's customers, and

"(b)(1) regularly and directly assists a proprietor or an exempt administrator or

"(2) performs, under only general supervision, work along specialized or technical lines requiring special training, experience or knowledge, or

"(3) executes special assignments and tasks under only general supervision, and

"(c) devotes more than 50 percent of his or her work time to the activities described above ....

. . . . . . . . . . .

"Discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after considering various possibilities. It implies that the employee has the power to make an independent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

choice free from immediate supervision and with respect to matters of significance. The decision may be in the form of a recommendation for action subject to the final authority of a superior, but the employee must have sufficient authority for the recommendations to affect matters of consequence to the business or its customers.

"The most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skills and knowledge. An employee who merely applies his or her knowledge in following prescribed procedures or in determining which procedures to follow, or who determines whether specified standards are met ... is not exercising discretion and judgment of the independent sort associated with administrative work....

. . . . . . . . . . .

"A second cause of the misapplication of the term 'discretion and independent judgment' involves employees who make decisions, but not at a level appropriate to administrative work. In some sense, almost every employee is required to use discretion: the shipping clerk may decide the method of packing, the truck driver decides the route, the bookkeeper decides which ledger to post first, but none of these decisions are important enough to count as part of an administrative function. Matters of consequence are those of real and substantial significance to the policies or general operations of the business of the employer or the employer's customers. This does not mean that exemptions are limited to persons who participate in the formulation of overall policies regarding the operation of the business as a whole-the tasks may be directly related to merely a particular segment of the business, but still must have a substantial effect on the whole business.

. . . . . . . . . . .

"The IWC orders provide that the work of the ex-

empt administrative employee must be 'primarily' intellectual work which requires the exercise of discretion and independent judgment .... The intellectual work may include such activities as gathering and summarizing the information and follow-through activities which, if done separately by a nonexempt employee, might be seen as relatively routine in that it would not be related to the exercise of discretionary powers. Although such work conceivably could *564 be delegated, if it is an integral part of the administrative task, it may be counted as part of the exempt duties...." (DLSE Manual, § 10.62.) The manual adds that persons in charge of a functional department which might even be a one-person department, such as credit managers, personnel directors, buyers, labor relations directors, may be exempt administrative employees. (*Ibid.*)

### Case Law

There is a dearth of case law on the subject. We know of only two cases addressing in detail the issue of whether television network newswriters were exempt employees under the FLSA. Because both cases apply federal law, they are not dispositive. However, what they lack in precedential value, they make up for in the detail of their discussion.

In *Dalheim v. KDFW-TV* (N.D.Tex. 1988) 706 F.Supp. 493, affirmed, 918 F.2d 1220, the plaintiffs were general assignment reporters (including a sportscaster), producers, directors and assignment editors employed by KDFW-TV, a network affiliate television station. The plaintiffs contended they were required to work more than 40 hours per week without overtime pay. The defendant asserted the plaintiffs were employees working in executive, administrative or professional capacities, and therefore exempt from the FLSA provisions. The trial court concluded that KDFW-TV had failed to prove the plaintiffs were exempt. In doing so, it noted that whether an employee is exempt is a factual question, so prior decisions are of limited value because employees with the same job titles may be either

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

exempt or nonexempt depending on their job functions. (706 F.Supp. at p. 496.)

The court set forth in detail the plaintiffs' duties at KDFW-TV. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at pp. 496-501.)It then rejected KDFW-TV's contention that the reporter, producer and director plaintiffs were exempt as "learned" or "artistic" professionals. The court found that the station did not require plaintiffs to possess a college degree. Further, the plaintiffs tended to follow a path of starting in small markets and advancing to larger ones; their performance was enhanced by work experience which was more akin to an apprenticeship and training rather than intellectual instruction and study.(*Id.* at p. 502.)

The court acknowledged that general assignment reporters can be artistic professionals because significant technological advances in how broadcast news is gathered and presented to the viewer have required that reporters produce work that is original and creative in character and which depends primarily on the invention, imagination, or talent of the employee. (*Dalheim*\*565 v. *KDFW-TV, supra,*706 F.Supp. at p. 503.)The court concluded, however, KDFW-TV had failed to prove that the work of its reporters was "primarily" inventive or routinely original and creative. The reporters used primarily intelligence, diligence and accuracy, rather than creativity, to report facts. They were told which stories to cover and informed of the focus or angle of the story before they covered it. Occasionally, they were told who to interview. They used essentially a standard format of pictures and sound to cover most stories and attempted to obtain both sides of the story. (*Id.* at p. 505.)

The reporters were not the equivalent of a newscast announcer. KDFW-TV rarely promoted its reporters, and the evidence did not convince the court that individual reporters drew viewers in measurable numbers. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at p. 505.)The court noted that with respect to television announcers, the determination of exempt and nonexempt status is difficult because of

the merging artistic aspects of the job with the commercial. The differences that dictate whether one is a "name" announcer or a "staff" announcer are found in the announcer's personality, voice and manner and in some inherent special ability or talent which, while difficult to define, is nevertheless real. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at p. 504.)Announcer duties which are considered exempt under federal law include: functioning as a master of ceremonies; playing parts in a program; conducting farm, fashion and home economics programs; covering public events such as sports programs, in which the announcer may be required to ad-lib and describe changing events; and acting as a narrator and commentator. Nonexempt work includes giving station identification and time signals, announcing the names of programs, and similar routine work. The determination whether a particular announcer is exempt thus is based upon his individual duties and the amount of exempt and nonexempt work performed. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at p. 504.)

The court found the KDFW-TV producers were not artistic professionals because their work was akin to that of the "rewrite man." They usually revised work prepared by reporters, wire services, or earlier broadcast news stories. Thus, their work was not creative or original. Further, in formatting a newscast, the producers followed accepted conventions in selecting lead stories, grouping related stories, pacing the broadcast, avoiding monotony in sequencing forms of stories, and in incorporating stories that could be added or dropped as time dictated. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at p. 506.)

In the same vein, the directors were not artistic professionals because they operated principally within accepted guidelines rather than relying on invention, imagination or talent in performing their job. Many of their decisions *566 were obvious because station management had prescribed the "look" of the newscast in much detail. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at p. 506.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The *Dalheim* court also concluded the producers, directors and assignment editors did not qualify as exempt administrative employees. They did not perform work related to administration as distinguished from production. In addition, the producers used techniques, procedures, repetitious experiences and specific standards to carry out their work. The length of their stories was dictated by station management and the relative importance of the story. Industry standards dictated how to lead a newscast, group and bridge stories, and when and how to cut stories. Producers merely utilized their knowledge in following these prescribed procedures. (*Dalheim v. KDFW-TV, supra,*706 F.Supp. at pp. 507-508.)Likewise, the directors merely employed skill in applying techniques and procedures to their tasks; they did not employ discretion and independent judgment. (*Id.* at p. 508.)

Several years later, another group of television network newscast employees brought suit for overtime compensation in *Freeman v. National Broadcasting Co., Inc.* (S.D.N.Y. 1993) 846 F.Supp. 1109 with similar results. There, the newswriter for "NBC Nightly News," the news producer for NBC's "Today" show and "Weekend Nightly News," and a field producer/newswriter sought overtime pay from their employer, NBC. The trial court, in a 51-page opinion, concluded plaintiffs were not administrative or artistic professional employees under the FLSA.

The plaintiffs' work related essentially to producing the primary product of a broadcast news organization-a news program-rather than to defendant's administrative operations. Plaintiffs' duties and responsibilities did not include administrative tasks such as setting business policy, planning the news division's long-range objectives, promoting the newscast, or negotiating salary or benefits with other personnel. (*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1153.)

Further, the NBC employees were not exempt artistic professionals. The court concluded that the reporting of news, the rewriting of stories received from various sources, and the routine editorial work of a reporter was not predominantly original and creative in character. Under the federal guidelines, only analytical, interpretative or highly individualized writing is considered creative. Thus, collecting facts about news events by investigation, interview or personal observation and then writing stories for publication about these events was nonexempt work. (*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1156.)*567

The court rejected NBC's argument that plaintiffs' primary duty was to develop and create engaging and interesting news stories, which require judgment, selectivity, creativity and a high degree of talent. NBC had argued that the employees must analyze substantial amounts of complex information received from a variety of sources, including original sources; each must interpret that material to give it meaning for NBC viewers; each is compelled to make a number of difficult choices about what to include and how to express it in the most engaging manner possible; and each must individualize his treatment of such material in the course of creating a visual news story expected to have flair, vitality and distinctiveness. (*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1156.)The court noted all nonfiction writing requires the writer to select and impose a structure on facts. Moreover, virtually all journalistic writing is designed to some extent to interest, engage and entertain, as well as to inform the reader or viewer. The question, therefore, was whether the character of plaintiffs' work as a whole was defined to the same extent by invention, imagination and talent, as those employees generally defined as exempt by the federal regulations: editorial writers, columnists, critics, and "top flight" writers of analytical and interpretive articles.(*Id.* at pp. 1156-1157.)

The *Freeman* court concluded the plaintiffs were "talented" in the sense that they had a native and superior ability in their fields. On occasion, their work was inventive and imaginative and rose to the level of artistry. In some respects, their work was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

also analytical. However, their work was predominantly functional in nature, in that it depended on acquired skill and experience. It did not depend to a sufficient extent on invention, imagination or talent to qualify for the artistic professional exemption. (*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1157.)

The court was not convinced that the added element in television journalism of combining words and pictures required a significantly greater amount of invention, imagination, or talent. There was an element of creativity involved in integrating words and pictures, just as there was an element of creativity in choosing the words and structure of a written script. However, the evidence disclosed that editing words and pictures or "writing to picture" was largely an acquired skill. Finally, the time constraints under which plaintiffs worked frequently served to limit opportunities for creativity and invention.(*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1157.)

Other factors that influenced the court's decision included that plaintiffs' writing was fundamentally objective reporting of the news, and they relied *568 primarily on their intelligence and the skills derived from many years of experience in the field and not imagination or sheer talent. (*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1158.)Further, like all reporters, they made decisions and judgment in the field regarding what to film and whom to interview. The decisions, however, were frequently dictated by the nature of the assignment and a standard format for pictures and sound.(*Id.* at p. 1159.)

The court held, although plaintiffs performed work that was at times original, creative, or analytic, their usual daily tasks involved acquired skill and experience rather than invention, imagination or sheer talent. Thus, they were nonexempt employees entitled to overtime compensation. (*Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1159.)

A third case cited by KERO, *Mandelaris v. Mc-Graw-Hill Broadcasting Co.* (E.D.Cal. 1992), involves a claim for overtime compensation by Nordquist's successor at KERO. In the unpublished opinion that includes only findings of fact and conclusions of law, the court held that Mandelaris, as KERO's sports director/anchor, was an exempt artistic professional and administrative employee within the meaning of IWC Order No. 11-80.The conclusion was based on findings that: Mandelaris had discretion to decide whether he or Pete Cirivilleri, the weekend sports anchor, covered selected sporting events; when and if a story should be abandoned; the order of presentation of stories on a newscast and the tone of the story aired. In addition, Mandelaris was his own editor and he ad-libbed as necessary and demonstrated talent in being able to perform on television and at public events extemporaneously. Further, Mandelaris spent more than 50 percent of his working time performing tasks which required the exercise of discretion and independent judgment; he engaged in work which was primarily intellectual and creative; there were no evident constraints on the creative aspects of his work and he performed his duties under only general supervision. (*Ibid.*)

*Mandelaris* is not dispositive here because the decision is fact specific. Even if the evidence in the two cases were identical, the decision by one fact finder does not preclude a contrary finding by another fact finder.

### Nordquist's Job Responsibilities

### Testimony of KERO's Walt Brown

Walt Brown, KERO's news director and Nordquist's supervisor, described Nordquist's job responsibilities as sports director and nightly sports anchor. *569 Nordquist gathered information, served as assignment editor for the sports department, and was writer, editor and producer of his sports newscast. He supervised or shot his own video and designed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

graphics for his segments within format guidelines. Nordquist determined the content for each newscast and was only required to clear stories with potential legal consequences. According to Brown, the greatest bulk of Nordquist's time was spent in absorbing the great body of sports material that is available on any given day and collating it in order to write the newscast.

Nordquist determined which of the myriad sporting events that day would be included in the sports segment and had complete discretion as to who to interview for a story. Brown indicated Nordquist's discretion was somewhat limited by a station policy to lead with local sports whenever feasible. Nordquist was a talented and creative video editor whose skills in this regard kept the viewers entertained. The pacing of Nordquist's sportscasts distinguished him from other sports anchors. In addition, Nordquist possessed a special quality or charisma that drew people to him, which KERO looked for in its on-air personnel. He was able to ad-lib when necessary.

Nordquist set himself apart from other local sportscasters by his prime time specials, such as "Grow for the Gold." Nordquist displayed originality, creativity, discretion and judgment in these programs, which appealed to a wider audience than the usual nightly sports news. In preparing these programs, Nordquist would gather information, "negotiate" a photographer, coordinate interviews, film, "write to the video," determine whether to use archive materials, and edit the program to ensure good pacing and that it fit the time framework.

Brown testified he provided "light" supervision for Nordquist. The guidelines he provided were ad hoc rather than from a prepared list. He gave the sports reporters autonomy to schedule themselves so long as they got the job done. He made content suggestions to Nordquist every two or three weeks.

*Nordquist's Testimony*

Nordquist has a ninth grade education and his only formal training in the broadcasting industry was two months at the National Institute of Broadcasting School, which provided voice training. He had 10 years of experience in radio sports before coming to KERO.

As anchor for the sports segment of the weekday nightly newscasts, Nordquist was on-air for approximately 10 minutes total. The station ran two three-and-one-third-minute sports segments at the hourlong 6 p.m. program **570** and one three-and-one-third-minute segment during the half-hour 11 p.m. newscast. Nordquist wrote his own scripts. The sports stories of the day dictated the content of the scripts. When Nordquist arrived at KERO each morning, he gathered sports information from various sources: the Associated Press wire copy; satellite feeds; national, state and local newspapers; sports magazines; press releases and information he received over the telephone. He prioritized content with the aid of the wire service that stacked stories by priority. He also relied on station guidelines or requirements of the news director that his segments lead with a local story and the story with the most recent video.

Nordquist decided which stories to cover each day and how to present them pursuant to the guidelines of his news director. The guidelines included format standards, e.g., sound bites should be no longer than 45 to 50 seconds and should be run with action video rather than a tape of the person interviewed to avoid "talking heads." Whom he interviewed was determined by certain sports industry standards: unbeaten teams, higher ranked teams, geographically proximate teams, etc. Nordquist was directed to report the facts; it was contrary to KERO's policy for him to editorialize.

Nordquist tended to "lift" stories word-for-word from the wire service. The great majority of the material in his scripts came from another written source. In addition, he edited satellite feed tapes for video to accompany his scripts. The editing techniques he utilized were common industry-wide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rather than unique to him. In addition, Brown required he use certain formats, such as always displaying the home team on the bottom of the scoreboard screen regardless of which team won. Nordquist seldom deviated from the script which he simply read from the TelePrompTer. Occasionally, he ad-libbed coming on or off his segment or when directed to "stretch" his segment by the producer. However, he and his co-anchor usually agreed on the transitional ad libs before the broadcast. During his broadcast segment, the director instructed him through an earpiece he wore.

Although no one edited Nordquist's scripts, Nordquist discussed the content of his segments with Walt Brown almost daily. Brown provided almost daily critique and made frequent content suggestions. Brown suggested the story line for many of Nordquist's specials and series. For example, for the award winning "Grow for the Gold" series, Brown asked Nordquist to do a four-part series on anabolic steroids, particularly the human growth hormone, with a local angle. Brown directed Nordquist to include basic information, controversies, expert commentary and interviews with local bodybuilders. Nordquist testified these specials generally required about two and a half to three days to prepare. **571

KERO required Nordquist to attend promotional events and make personal appearances for the station 10 to 12 times a year. Personal appearance requests usually came through the news director or the station manager. KERO promoted Nordquist and the other news anchors through the print media. While Nordquist was the weekday sports anchor, KERO news and its news team was rated number one in the Bakersfield market. Nordquist won numerous awards for his sports broadcasts.

### Testimony of Pete Cirivilleri

Walt Brown hired Cirivilleri as weekend sports anchor in 1983. Nordquist was not involved in the hiring interview. Cirivilleri viewed Nordquist as an as-

sociate rather than a supervisor. He saw the sports department as a two-man team.

When Nordquist left KERO, Cirivilleri became the sports director/weekday news anchor. As sports director, he took it upon himself to do a little more organization of the stories. He had daily or weekly supervision from Brown.

*There was substantial evidence Nordquist was not required to perform work which was primarily intellectual and creative and which required the exercise of discretion and independent judgment.*

(2) On our review of the entire record we conclude there is substantial evidence supporting the trial court's conclusion that Nordquist was a nonexempt employee.

KERO did not establish as a matter of law that Nordquist fell within the artistic professional exemption. First, Nordquist had no advanced degree or even a high school education. The skill and expertise he developed over the years came from on-the-job training. Although as a successful sports anchor he displayed a certain amount of originality and creativity in his ability to present the sports news, the majority of his job responsibilities were more mundane and routine, like those of the plaintiffs in *Dalheim* and *Freeman*. He gathered sports information from various sources-written and video-and generated some local stories himself. However, he was directed to simply report the facts and was precluded from providing commentary on stories he reported. Nordquist summarized, prioritized and produced the reports largely within station and industry formats. During the approximately 10 to 11 minutes he was on the air each weekday, he read from a TelePrompTer and seldom deviated from the prepared script. This evidence supports the trial court's conclusion that Nordquist's job responsibilities **572 were not primarily intellectual or creative within the meaning of IWC Order No. 11-80.

About four times a year, Nordquist prepared sports

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

related specials or series which displayed original-ity and creativity and involved independent judg-ment. However, Nordquist testified these specials required only two and a half to three days each to prepare. [FN2] Thus, even if they did involve the cre-ativity and discretion necessary to make those tasks exempt, they did not consume 50 percent of his work time.

> FN2 Although KERO argues that Nordquist's testimony regarding the amount of time involved in preparation of the specials is inherently improbable, without expert testimony on the subject we are in no position to discount his testi- mony.

Substantial evidence also supports the court's con-clusion Nordquist was not exempt as an adminis-trative employee. As pertinent to the facts of this case, the DLSE Manual section 10.62 provides that the exempt employee who works in an administrat-ive capacity is one who (1) regularly exercises dis-cretion and independent judgment in the perform-ance of "intellectual" work which is directly related to management policies or the general business op-erations of the employer, and (2) performs work, under only general supervision, along specialized or technical lines requiring special training, experi-ence or knowledge.

"Discretion and independent judgment" within the meaning of IWC Order No. 11-80 involves the comparison of possible courses of conduct, and act-ing after considering various possibilities. It implies that the employee has the power to make an inde-pendent choice free from immediate supervision and with respect to matters of significance. The de-cisions must be at a level appropriate to adminis-trative work. Matters of consequence are those of substantial significance to the policies or general operations of the business of the employer. (DLSE Manual, § 10.62.)

We need not determine whether decisions regarding the content and presentation of the nightly sports

newscast constitute matters of significance to the business of KERO, because the evidence supports the conclusion that Nordquist's duties did not in-volve the "discretion and independent judgment" contemplated by the administrative employee ex-emption. The DLSE Manual provides that the use of "discretion and independent judgment" are dis-tinguishable from the use of skills and knowledge. An employee who merely applies his knowledge in following prescribed procedures is not exercising discretion and judgment of the independent sort as-sociated with administrative work. (DLSE Manual, § 10.62.) *573

The *Freeman* court focused on this difference in concluding that, although talented, the news report-ers, producers and editors were not exempt employ-ees because they generated work which depended primarily on skill and experience rather than cre-ativity or sheer talent. (*Freeman v. National Broad-casting Co., Inc., supra,* 846 F.Supp. at p. 1157.)Likewise, Nordquist's "talent" for putting to-gether an entertaining sports newscast came from his skillful application of station guidelines and various techniques which were standard in the in-dustry.

Accordingly, substantial evidence supports the trial court's finding that Nordquist was not an exempt employee within the meaning of IWC Order No. 11-80.The court's conclusion is bolstered by the fact that KERO categorized Nordquist as a nonex-empt employee on its personnel records between 1982 and 1987 and required him to fill in time sheets, which the employee handbook indicated made him a nonexempt employee. While KERO claimed that Nordquist's original classification res-ulted from a clerical error, and the purpose of the time sheet was merely to track sick leave and vaca-tion time, the fact finder was free to draw contrary inferences.

> 2. *The court erred in applying the four-year limita-tions period of Code of Civil Procedure section 337, subdivision 1 rather than the three-year period*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*of Code of Civil Procedure section 338, subdivision (a).* FN* *

FN* See footnote, *ante*, page 555.

. . . . . . . . . . .

3. *The trial court properly awarded Nordquist pre-judgment interest pursuant to Civil Code section 3287.*

(3) The trial court concluded Nordquist was not entitled to prejudgment interest under Labor Code section 98.1, subdivision (c) (hereafter § 98.1(c)), which provides for interest on awards granted by the Labor Commissioner, but it awarded interest pursuant to Civil Code section 3287, which provides generally for the award of interest on damages. KERO contends Nordquist is not entitled to any prejudgment interest because he did not prevail in the administrative proceeding. KERO reasons that because Nordquist is not entitled to interest under the statute that specifically governs his claim, he should not be entitled to interest under Civil Code section 3287's general grant of interest.

Section 98.1(c) provides, "All awards granted pursuant to a hearing under this chapter [the administrative proceeding before the Labor Commissioner] *574 shall accrue interest on all due and unpaid wages at the adjusted annual rate established pursuant to Section 19269 [now section 19521] of the Revenue and Taxation Code. The interest shall run until the wages are paid from the date that the wages were due and payable ...." There is no dispute that Nordquist was not awarded compensation in the administrative proceeding, so is not entitled to interest under section 98.1(c).

The question remains whether the court should infer from section 98.1(c) a legislative intent or determination that interest awardable under Civil Code section 3287 is not available to claimants who are unsuccessful in the administrative proceeding

but who prevail on appeal in a judicial trial de novo.

Nordquist relies on a line of cases holding that the Legislature's failure to expressly provide for interest on retroactive government benefit awards did not prevent the recipient from recovering interest under Civil Code section 3287, subdivision (a). FN3 (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 681 [131 Cal.Rptr. 789, 552 P.2d 749] [welfare benefits]; *Austin v. Board of Retirement* (1989) 209 Cal.App.3d 1528, 1532-1534 [258 Cal.Rptr. 106] [disability retirement benefits]; *Aguilar v. Unemployment Ins. Appeals Bd.* (1990) 223 Cal.App.3d 239, 245 [272 Cal.Rptr. 696] [unemployment benefits].) In each of these cases, the court found nothing in the statutory scheme governing the particular benefit which suggested a legislative intent to preclude recovery of interest on damages awarded as prejudgment benefits from the date such benefits became due. (See *id.* at pp. 243, 245.)

> FN3 Civil Code section 3287, subdivision (a) authorizes the recovery of interest on damages which are certain or capable of being made certain by calculation, if the right to recover has vested on a particular day.

In this case, the statutory scheme governing employee compensation claims expressly awards prejudgment interest to claimants who prevail in the administrative proceeding. The purpose of Labor Code section 98 et seq. is to afford a speedy method by which wage earners may determine their right to wages, while at the same time affording due process to employers and a procedure for appeal. (*Dawson v. Westerly Investigations, Inc.* (1988) 204 Cal.App.3d Supp. 20, 24 [251 Cal.Rptr. 633].) As a corollary to this purpose, the Legislature provided disincentives to discourage meritless and unwarranted appeals. For example, Labor Code section 98.2, subdivision (b) makes unsuccessful appellants liable for costs and attorney fees but does not award costs and fees to successful appellants. (*Henry v. Amrol, Inc.* (1990) 222 Cal.App.3d Supp. 1, 7-8

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

272 Cal.Rptr. 134].) According to KERO, the same purpose is served by subjecting an unsuccessful employer-appellant to **575** an assessment of pre-judgment interest, but relieving the employer from an interest award when the commissioner accepted the employer's justification for denying the employee's claim. In other words, KERO contends the Legislature sought to discourage appeals by employees by denying interest even if the appeal has merit.

KERO's argument fails to acknowledge the difference in the rate of interest under each statute. It appears that section 98.1(c)'s "adjusted annual rate," is substantially more generous than the fixed rate provided by Civil Code section 3287. The parties stipulated that if the court awarded Nordquist interest pursuant to section 98.1(c), the amount of such interest through December 1992 was $113,070.41. If the court awarded interest pursuant to Civil Code section 3287, the amount of interest through March 23, 1993, was only $60,598. Because the interest rates vary substantially, application of the pertinent interest statute in the applicable case both (1) effectuates the legislative purpose of discouraging meritless appeals (the employer who appeals an administrative award to the employee would pay the higher interest rate) and (2) protects the right of the damaged, but originally unsuccessful, employee to fully recoup his losses from the employer's erroneous denial of wages.

KERO makes two additional arguments to support its position. First, it asserts section 98.1(c) is rendered a nullity if every wage claimant who prevails in court is entitled to interest under Civil Code section 3287, subdivision (a), regardless of his or her success before the commissioner. KERO relies on the rule of statutory construction that an interpretation which would render terms surplusage should be avoided. (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) However, as discussed above, an award of interest under Civil Code section 3287 when the originally unsuccessful employee prevails on appeal does not render section

98.1(c) without effect. That section provides a more generous award to the employee who also prevails in the administrative proceeding.

Finally, KERO cites the rule that a specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the particular provision relates. (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 214 [285 Cal.Rptr. 717]; Code Civ. Proc., § 1859.) KERO contends section 98.1(c) is the specific provision governing the award of interest on employee wage claim awards and as such, it prevails over the general provision for interest in Civil Code section 3287. **576**

The rule upon which KERO relies, however, applies only when the two statutes conflict. (*State Farm Mut. Auto. Ins. Co. v. Haight* (1988) 205 Cal.App.3d 223, 239 [252 Cal.Rptr. 162].) Here, although both statutes address prejudgment interest, they are not mutually exclusive. Section 98.1(c) can be applied to cases in which the employee prevails both before the commissioner and in the de novo judicial proceeding, while Civil Code section 3287 can be applied to cases in which the employee prevails only in court. Such interpretation is not unreasonable and does not violate the express provisions of either statute.

KERO also argues that Nordquist was responsible for the prejudgment delay so interest should not be awarded. That argument was made and rejected in the trial court. KERO has not shown any error or abuse of discretion in the court's ruling. Accordingly, the award of interest under Civil Code section 3287 should be affirmed.

Disposition

The judgment is reversed insofar as it applies the four-year period of limitations under Code of Civil Procedure section 337, subdivision 1, and is af-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

firmed in all other respects. The matter is remanded with directions to apply the three-year period of limitations of Code of Civil Procedure section 338, subdivision (a), and to conduct such further proceedings as may be necessary to redetermine the amounts of overtime compensation and prejudgment interest payable to respondent.

Each party shall bear its own costs on appeal.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.
Appellant's petition for review by the Supreme Court was denied May 11, 1995. **578

Cal.App.5.Dist.
Nordquist v. McGraw-Hill Broadcasting Co.
32 Cal.App.4th 555, 38 Cal.Rptr.2d 221, 2 Wage & Hour Cas.2d (BNA) 1027

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 5

978 P.2d 2                                                                    Page 1
20 Cal.4th 785, 978 P.2d 2, 85 Cal.Rptr.2d 844, 138 Lab.Cas. P 58,648, 6 Wage & Hour Cas.2d (BNA) 35, 99 Cal.
Daily Op. Serv. 5203, 99 Cal. Daily Op. Serv. 4725, 1999 Daily Journal D.A.R. 6065

▷

PETER RAMIREZ, Plaintiff and Appellant, v.
YOSEMITE WATER COMPANY, INC., Defend-
ant and Respondent.
Cal. 1999.
    PETER RAMIREZ, Plaintiff and Appellant,
                    v.
YOSEMITE WATER COMPANY, INC., Defend-
        ant and Respondent.
               No. S070114.

        Supreme Court of California
             June 17, 1999.

                  SUMMARY

A bottled water route sales representative brought
an action against his former employer for unpaid
overtime pay. The trial court concluded that
plaintiff was exempt from overtime pay because he
was an outside salesperson (Lab. Code, § 1171) un-
der a California Industrial Welfare Commission
(IWC) wage order defining an outside salesperson
as one who regularly works more than half the
working time engaged in sales activities outside the
workplace. The trial court also found that plaintiff
was exempt from the overtime laws under another
wage order because he earned over 50 percent of
his salary from commissions. (Superior Court of
Los Angeles County, No. BC080284, Ruth Essegi-
an, Judge. FN* ) The Court of Appeal, Second
Dist., Div. Three, No. B097099, affirmed, relying
on federal regulations and criteria to find that
plaintiff was an outside salesperson. It did not reach
the question of whether plaintiff was also exempt
from overtime laws as a commissioned employee.

        FN* Judge of the Municipal Court for the
        Los Angeles Judicial District, assigned by
        the Chief Justice pursuant to article VI,
        section 6 of the California Constitution.
The Supreme Court reversed the judgment of the
Court of Appeal and remanded for further proceed-
ings. Where the language or intent of state and fed-

eral labor laws substantially differs, reliance on
federal regulations or interpretations to construe
state regulations is misplaced. The court held that
the wage order defining an outside salesperson con-
stituted a reasonable and valid interpretation by the
IWC, notwithstanding that it incorporated a quantit-
ative method that differed in some respects from
the qualitative method employed under federal law.
The court also held that it was necessary to remand
the matter to resolve factual discrepancies and to
properly apply the wage order. The number of
hours worked in sales-related activities should be
determined by inquiring into the realistic require-
ments of the job, considering how the employee ac-
tually spends his or her time, as well as whether
the employee's practice diverges from the employer's
realistic expectations, whether there was any con-
crete expression of employer displeasure over an
employee's substandard performance, and whether
these expressions were themselves realistic. In the
present case, the trial court's review of the evidence
was tainted by an interpretation of the regulation
that was overly favorable to finding the exemption.
With respect to whether plaintiff was also exempt
from overtime pay as a commissioned employee,
the court held that it was necessary to remand the
matter to determine if plaintiff was involved prin-
cipally in selling a product or service. (Opinion by
Mosk, J., expressing the unanimous view of the
court.)

                  HEADNOTES

        Classified to California Digest of Official Reports


(1) Appellate Review § 144--Scope of Review-
-Questions of Law.
An appellate court independently reviews the lower
court's judgment on questions of law.

(2) Labor § 6--Regulation of Working Conditions-
-Statutory Provisions-- Construction.
In light of the remedial nature of the legislative en-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

actments authorizing the regulation of wages, hours, and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection. Thus, under California law, exemptions from statutory mandatory overtime provisions are narrowly construed. Moreover, the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption.

**(3a, 3b, 3c, 3d)** Labor § 11--Regulation--Wages--Overtime Pay-- Exemption for Outside Salesperson--Validity of State Administrative Regulation.

A California Industrial Welfare Commission (IWC) wage order that, for purposes of an exemption from overtime pay under Lab. Code, § 1171, defined an outside salesperson as someone who regularly works more than half the working time engaged in sales activities outside the workplace, constituted a reasonable and valid interpretation by the IWC, notwithstanding that it incorporated a quantitative method that differed in some respects from the qualitative method employed under federal law. Where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced. Considered as a quasi-legislative regulation, the wage order was valid since it was within the scope of the IWC's authority and was reasonably necessary to effectuate the purpose of Lab. Code, § 1171. It was necessary to establish a working definition of outside salesperson that took into account the fact that some employees work in both sales and nonsales capacities, and it was reasonable to take a quantitative approach. Even when the wage order was considered to be purely an interpretive regulation, the agency's interpretation deserved considerable judicial deference since the interpretation was contained in a regulation formally adopted pursuant to the Administrative Procedure Act, and the regulation embodied a statutory interpretation that the administrative

agency had applied consistently and which was long-standing.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 330.]

**(4)** Administrative Law § 35--Effect and Validity of Rules and Regulations-- Construction and Interpretation--Quasi-legislative and Interpretive Rules.

With regard to administrative regulations, there is a dichotomy between quasi-legislative and interpretive rules. Quasi-legislative regulations are those adopted by an agency to which the Legislature has confided the power to make law, and such rules have the dignity of statutes. On the other hand, interpretive regulations are those that involve an agency's interpretation of a statute or regulation, and they are given variable deference according to a number of factors. Administrative rules do not always fall neatly into one category or the other; the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature. Regulations that fall somewhere in the continuum may have both quasi-legislative and interpretive characteristics, as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms.

**(5)** Administrative Law § 35--Effect and Validity of Rules and Regulations-- Construction and Interpretation--Judicial Function.

In reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is within the scope of the authority conferred and (2) is reasonably necessary to effectuate the purpose of the statute.

**(6)** Administrative Law § 35--Effect and Validity of Rules and Regulations-- Construction and Interpretation--Rules Interpreting Statute--Judicial Deference.

An interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of judicial deference than one contained in an advice letter prepared by a single staff

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

978 P.2d 2
20 Cal. 4th 1, 978 P.2d 2, 83 Cal.Rptr.2d 548, 139 Lab.Cas. P 58,648, 5 Wage & Hour Cas.2d (BNA) 55, 99 Cal.
Daily Op. Serv. 5203, 99 Cal. Daily Op. Serv. 4725, 1999 Daily Journal D.A.R. 6065

Page 3

member.

**(7) Labor § 11--Regulation--Wages--Overtime Pay--Exemption for Outside Salesperson--Determination of Hours Worked in Sales-related Activities.**

On appeal from a bottled water route sales representative's action against his former employer for unpaid overtime pay, in which the trial court and Court of Appeal concluded plaintiff was exempt from overtime pay because he was an outside salesperson (Lab. Code, § 1171) under a California Industrial Welfare Commission wage order defining an outside salesperson is one who regularly works more than half the working time engaged in sales activities outside the workplace, it was necessary to remand the matter to resolve factual discrepancies and to properly apply the wage order. The number of hours worked in sales-related activities should not be determined by the number of hours the employer claims the employee should be working in sales, nor should it be determined by the actual average hours the employee spent on sales activity, which may fall below the 50 percent mark due to substandard performance. Rather, the court must inquire into the realistic requirements of the job, considering how the employee actually spends his or her time, as well as whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic. In the present case, the trial court's review of the evidence was tainted by an interpretation of the regulation that was overly favorable to finding the exemption.

**(8) Labor § 11--Regulation--Wages--Overtime Pay--Exemption for Commissioned Employees.**

On appeal from a bottled water route sales representative's action against his former employer for unpaid overtime pay, in which the trial court found that plaintiff was exempt from overtime pay under a California Industrial Welfare Commission wage order because he earned over 50 percent of his

salary from commissions, it was necessary to remand the matter to determine if plaintiff was involved principally in selling a product or service. Commission wages, as defined in Lab. Code, § 204.1, are compensation paid to any person for services rendered in the sale of the employer's property or services and based proportionately upon the amount or value thereof. Lab. Code, § 204.1, sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute commission wages. First, the employees must be involved principally in selling a product or service, not making the product or rendering the service. Second, the amount of their compensation must be a percent of the price of the product or service. In the present case, it was not clear that the first condition was met. Whether plaintiff was an outside salesperson who worked more than half the working time engaged in sales activities outside the workplace was to be resolved on remand, and since the determination of whether plaintiff was a commissioned employee depended partly on that issue, both questions were best resolved on remand.

COUNSEL

Dennis F. Moss for Plaintiff and Appellant.

Sonnenschein, Nath & Rosenthal, Lee T. Paterson and Weston A. Edwards for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons and Kelly L. Hensley for the Employers Group as Amicus Curiae on behalf of Defendant and Respondent.

**MOSK, J.**

Generally, employees in the State of California who work more than 40 hours per week and 8 hours per day (at least, in the latter case, up until January 1, 1998) have had the right to receive premium pay for the hours worked over this limit. (See 1 Wilcox, Cal. Employment Law (rev. Mar. 1998) § 3.04, pp. 3-21 to 3-28.) Labor Code section 1171 [FN1] expressly excludes from the overtime laws employees who are "outside salespersons," [FN2] and the California Industrial Welfare Commission (IWC), the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

agency charged with implementing section 1171, defined the term "outside salesperson" in Wage Order No. 7-80, as someone who "regularly works more than half the working time" engaged in sales activities outside the workplace. (Cal. Code Regs., tit. 8, § 11070, subd. 2(I) (hereinafter Wage Order No. 7-80, 2(I)).) [FN3] In this case we are called on to decide whether an employee who performs a mixture of sales and nonsales duties is an "outside salesperson" within the meaning of section 1171. The trial court and the Court of Appeal came to the conclusion that the employee, who delivered bottled *790 water and was also expected to sell the water service to new customers, was an outside salesperson for purposes of section 1171. Their conclusion was based on a reading of federal regulations that differ substantially from the state regulations applicable in this case: the former regulations define the term by determining the employees' "primary purpose," rather than by calculating how they spend their time.

FN1 All statutory citations are to this code unless otherwise specified.

FN2 The statute actually uses the term "outside salesman," as does the applicable federal regulation, but the regulation that is the primary focus of this opinion uses the term "outside salesperson." For the sake of consistency, we will use the term "outside salesperson."

FN3 Wage Order No. 7-80 was superseded in 1998 by Wage Order No. 7-98, set forth at California Code of Regulations, title 8, section 11070. The present Wage Order does not change Wage Order No. 7-80 in any respect pertinent to the issues discussed herein. The definition of "outside salesperson" is unchanged.

We conclude these courts may have erred in determining that the employee in this case was an outside salesperson because they incorrectly relied on the federal regulation and interpretation of that reg-

ulation when construing this state's distinct definition of "outside salesperson." Accordingly, we reverse the Court of Appeal's judgment and remand for further proceedings.

I. *Factual and Procedural Background*

Yosemite Water Company, Inc. (Yosemite) is in the business of selling bottled water and other products incidental to the bottled water business, such as cups, coffee, and other ingredients, and of renting water coolers. By 1995, the company had grown from 70 to 150 routes. A route is a defined territory over which a "route sales representative" is responsible for all delivery and sales activity.

Plaintiff Peter Ramirez was employed by Yosemite as a route sales representative between April 1989 and November 1992. From November 1992 to March 3, 1993, when he left the company, Ramirez served as a relief route sales representative.

After he left the company, Ramirez filed a complaint against Yosemite for unpaid overtime wages, unlawful wage deductions and employee charges, and unpaid wages. The company cross-complained against him for damages for interference with contractual relations and interference with prospective economic advantage as the result of his alleged attempt to solicit Yosemite's customers when he left the company. At a subsequent bench trial, much of the evidence presented concerned the matter of how Ramirez spent his average workday. Because the question whether Ramirez was an "outside salesperson," as we will see, turns on a detailed, fact-specific determination of this matter, we shall recount that evidence at some length.

Ramirez spent a substantial portion of his workday delivering bottled water to business and residential customers. Each five-gallon bottle of water Ramirez delivered weighed forty pounds. On an average business stop, Ramirez would deliver six to seven bottles; an average residential customer purchased one to two bottles. About 70 percent of his

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

customers were *791 residential. When he began on route No. 15, it was an 800-bottle route serving about 400 customers. The route grew so that, at its height, he had 550 customers and averaged 1,500-1,900 bottles delivered in a 10-day cycle, or an average of between 150 and 190 bottles per day. He averaged six delivery stops per hour, delivering one to two bottles on average to residential customers and six to seven bottles for commercial ones. For established customers, he would carry the bottles into a business or place of residence, exchange full for empty bottles, and refill and replace other stock and supplies. He would also rotate bottles on his truck, check the bottles for leaks and foreign objects, and carry the bottles to the customer's house. For some customers, he would also rotate the spare water bottles, wipe off the tops and place the bottles in the coolers. He would also do minor service on the coolers.

According to Ramirez's testimony, he engaged in very little solicitation of regular customers to persuade them to increase their service. He testified that once customers commenced service their purchasing habits became stable, and he generally did not "push" established customers into buying more or different products for fear of offending them. Moreover, he had little direct contact with residential customers, who were frequently not home when he delivered the water. He saw a customer only about 5 to 7 percent of the time, usually at the customer's request. He did not engage in selling to customers he did not see. Customers would communicate by leaving notes or calling, and he would leave bills and reminders of overdue payments under the bottles.

Yosemite employed several full-time employees as solicitors, whose principal task was to sign up new customers. Ramirez was also expected to engage in solicitation of new customers. He testified that he was expected to obtain at least 1 new customer per workday, and to do so, he made on average 10 contacts per day on his route, which took him a total of approximately 30 minutes. He was also generally responsible for "setting up" the new customers. Between once a month and once every two months, he spent six hours on Saturday with other route sales representatives going door-to-door soliciting new customers. He also attended sales meetings designed to improve sales techniques approximately twice a month. In a five-day workweek, he estimated he would spend about three to three and one-half hours trying to sell his service to potential new customers. Occasionally, he would pass out to old and new customers a list of the company's products.

If a potential customer called Yosemite to initiate service, Ramirez would receive a note to call that person back and set up a time to begin service. At *792 the time he set up a new customer, if he met the customer face-to-face, he would explain the service rules and minimum purchases, and describe the additional products the company had to offer.

From the time Ramirez left the plant around 8 a.m., until he returned in the evening, he testified he worked anywhere from seven to nine hours *not* counting the time he spent soliciting new customers. His average day lasted 11 hours and sometimes longer, such as when he had difficulty balancing his accounts. He worked Monday through Friday, more than 40 hours in a week, in addition to the occasional Saturday noted above. He was not paid for any overtime hours worked.

When he was a route sales representative, Ramirez was paid a minimum of $1,200-$1,400 per month, which Yosemite considered a "guaranteed draw" against future bottle sales. He would also receive an additional 22 percent per bottle and 10 percent for cups, tea, coffee and cooler rentals he delivered once he had exceeded the guaranteed draw. He was paid according to the number of bottles he delivered, whether or not he had originally solicited the customers to whom they were delivered. Thus, if a company solicitor sold water to a new resident located on route No. 15, Ramirez would deliver the water and get the credit for the bottles delivered even though he did not do the soliciting. In addition to his usual compensation, he received a small com-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mission for each new customer he signed: He was paid nothing for the first 10 customers he signed, $5 per new customer for the 11th through 15th customers, $10 per customer for the next 10, and $20 for each new customer over 25.

Maya Soderstrom, Yosemite's president, testified that when a route sales representative made a delivery, he or she was expected to engage in selling activity. As Soderstrom explained, selling "is the main job of our route salespeople," who are in the field selling "constantly." The company's expectation is that the route sales representatives are selling 90 percent or more of their workday, although she later clarified that she was counting the time spent delivering bottles of water to the customer as part of the selling activity. She also explained that the route sales representatives are the primary contact between the company and the customer. Daniel Ledbetter, Ramirez's route supervisor, also testified that over 80 percent of Ramirez's time at work was spent away from the Yosemite plant and over 90 percent of his working day was spent in selling activities, although it is unclear whether or not he had a similarly broad definition as Soderstrom of the term "sales." Ledbetter also confirmed that Ramirez was expected to obtain the equivalent of 1 new customer per day worked and to speak to 10-15 people a day to accomplish this goal. *793

Claude I. Niesen, special projects manager and a sales training manager at Yosemite, offered an opinion of the time Ramirez took to do various tasks. He purported to base his opinion on his long-time experience in the bottled water industry at Yosemite and other companies, on Ramirez's sales record and deposition, and discussions with Ledbetter and other supervisory personnel at Yosemite. He opined that Ramirez spent 90 percent of his workweek in sales activity and that over 80 percent of his workweek was spent away from the company's premises. Niesen also opined that Ramirez must have spent 850 minutes a week engaged in face-to-face solicitation of prospective customers.

At the conclusion of the trial, the court found in favor of Yosemite that Ramirez was an "outside salesperson." In order to understand the basis of the trial court's decision, it is important to appreciate that there was a fundamental conflict between Ramirez's and Yosemite's interpretations of the meaning of the term "outside salesperson." As noted, IWC provides that an employee be considered an outside salesperson if he or she works more than half the working time away from the employer's place of business selling items or obtaining orders. (Wage Order No. 7-80, 2(I).) Ramirez claimed that the IWC wage order requires the court to tally the amount of time spent engaged in actual sales outside the workplace, as opposed to the time spent delivering products or performing services such as cooler maintenance. He claimed the evidence showed plainly that he spent more time delivering products and providing services than selling, and that therefore he was not an outside salesperson.

Yosemite contended, on the other hand, that the court should look to federal law. When a sales/delivery person is performing a dual function, the court must ascertain "the primary function" of the employee as determined by various factors discussed below. Yosemite argued that Ramirez's primary function was sales and therefore he was an outside salesperson. Yosemite also argued that inasmuch as Wage Order No. 7-80, 2(I) could be construed to conflict with federal law, the IWC must have exceeded its authority, because Labor Code section 1171 intended to fully incorporate the federal definition of outside salesperson. The trial court appeared to agree with Yosemite both that the "primary function" analysis was applicable and that Ramirez was an outside salesperson.

The trial court also found that Ramirez was exempt from the overtime laws under another section of Wage Order No. 7-80 because he earned over 50 percent of his salary from commissions. (See Wage Order No. 7-80, subd. 3(c); see now Wage Order No. 7-98, set out at Cal. Code Regs., tit. 8, § 11070,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

subd. 3(B).) *794

The Court of Appeal affirmed, also accepting the federal "primary function" analysis. Although it acknowledged that the language of the IWC regulation defining outside salesperson differed from federal regulations, it nonetheless looked to the federal regulations "for guidance." After reviewing the pertinent federal regulations, which will be discussed more fully below, the court concluded that Ramirez's "prime function" was selling bottles of water and additional products, and that he therefore fit within the definition of "outside salesperson." It did not reach the question whether Ramirez was also exempt from the overtime laws as a commissioned employee.

We granted review to determine the proper meaning of the term "outside salesperson."

## II. Discussion

### A. Standard of Review

The question whether Ramirez was an outside salesperson within the meaning of applicable statutes and regulations is, like other questions involving the application of legal categories, a mixed question of law and fact. (See, e.g., *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) (1) In the present case, although there was some controversy as to the facts-i.e., as to what Ramirez did as an employee for Yosemite-the predominant controversy is the precise meaning of the term "outside salesperson," a question of law. It was this question on which we granted review. As such, we will review the Court of Appeal's and the trial court's judgment independently on the question of this term's meaning in this context. (*Ibid.*)

### B. The Outside Salesperson Exemption

(2) In interpreting the scope of an exemption from the state's overtime laws, we begin by reviewing certain basic principles. First, "past decisions ... teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection." (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579].) Thus, under California law, exemptions from statutory mandatory overtime provisions are narrowly construed. (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221]; see also *Phillips Co. v. Walling* (1945) 324 U.S. 490, 493 [65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876].) Moreover, the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the *795 employee's exemption.(*Nordquist, supra,*32 Cal.App.4th at p. 562; *Corning Glass Works v. Brennan* (1974) 417 U.S. 188, 196-197 [94 S.Ct. 2223, 2229, 41 L.Ed.2d 1].)

The IWC is the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in the State of California. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561 [59 Cal.Rptr.2d 186, 927 P.2d 296].) The IWC's wage orders, although at times patterned after federal regulations, also sometimes provide greater protection than is provided under federal law in the Fair Labor Standards Act (FLSA) and accompanying federal regulations. (See, e.g., *Tidewater, supra,*14 Cal.4th at pp. 566-567 [seamen entitled to overtime under wage order despite exemption from FLSA]; *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 33-34 [285 Cal.Rptr. 515] [employees working shifts of less than 24 hours entitled to be paid for sleep time, notwithstanding contrary federal rule]; *Skyline Homes,Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239, 247 [211 Cal.Rptr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

792],disapproved on other grounds in *Tidewater, supra,*14 Cal.4th at p. 574 [regular rate of pay for overtime purposes calculated by dividing salary by no more than 40 hours, notwithstanding federal rule authorizing use of fluctuating workweek].) The FLSA explicitly permits greater employee protection under state law. "The FLSA has a 'savings clause,' which provides: 'No provision of this chapter or of any order thereunder shall excuse noncompliance with any ... State law or municipal ordinance establishing ... a maximum workweek lower than the maximum workweek established [hereunder] ....' (29 U.S.C. § 218(a).) The federal courts that have addressed this question have interpreted this savings clause as expressly permitting states to regulate overtime wages. (See, e.g., ... *Pacific Merchant Shipping Ass'n v. Aubry* [(1990)] 918 F.2d [1409,] 1422 ['Congress has specifically allowed states to enforce overtime laws more generous than the FLSA,' citing the savings clause] ....)." (*Tidewater, supra,*14 Cal.4th at p. 567.)

(3a) At issue in this case is an interpretation of section 1171 and Wage Order No. 7-80, 2(I).Section 1171, found in the chapter of the Labor Code pertaining to minimum wage, maximum hour, and overtime laws, states: "The provisions of this chapter shall apply to and include men, women and minors employed in any occupation, trade, or industry, whether compensation is measured by time, piece, or otherwise, but *shall not include any individual employed as an outside salesman.*" (Italics added.) Wage Order No. 7-80, 2(I), implementing section 1171, in turn defined "outside salesperson" as follows: "[A]ny person, 18 years of age or over, who customarily and regularly works *more than half the working time* away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." (Italics added.) ***796**

The Court of Appeal, finding no case law or other elucidation of this part of the IWC wage order, turned, as noted, to federal regulations. These regulations explicate the meaning of the term "outside

salesperson" in those employment situations in which the employee performs a mixture of delivery and sales work. The Court of Appeal purported to "synthesiz[e] the guidelines in federal regulations together with [Wage Order No. 7-80" to arrive at the proper ruling in this case.

Those federal regulations to which the Court of Appeal looked for guidance differ substantially from the wage order. Section 541.5 of title 29 of the Code of Federal Regulations (1998) defines the term "outside salesman" as an "employee: [ ] (a) [w]ho is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in: [ ] (1) [m]aking sales within the meaning of section 3(k) of the Act; or [ ] (2) [o]btaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and [ ] (b) [w]hose hours of work of a nature other than that described in paragraph (a) (1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: *Provided,* [t]hat work performed *incidental to and in conjunction* with the employee's own outside sales or solicitations, *including incidental deliveries and collections,* shall not be regarded as nonexempt work." (First italics in original, other italics added.)

The operative effect of the federal exemption is concisely summarized at section 541.505(a) of title 29 of the Code of Federal Regulations (1998): "[I]n the case of outside salesmen ..., the employee's chief duty or *primary function* must be the making of sales or the taking of orders if he is to qualify under the definition in § 541.5. He must be a sales[person] by occupation. If he is, all work that he performs which is actually incidental to and in conjunction with his own sales effort is exempt work. All other work of such an employee is nonexempt work.... All of the duties performed by an employee must be considered. The time devoted to the various duties is an important, but not necessarily controlling, element." (Italics added.) In determin-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ing whether an employee's "primary function" is as a salesperson, such factors to be considered are the "presence or absence of customary or contractual prearrangements concerning amounts of products to be delivered; description of the employee's occupation in union contracts; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; proportion of earn-ings directly attributable to sales effort; and other factors that may have a bearing on the relationship to sales of the employee's work." (29 C.F.R. § 541.505(e) (1998).)*797

Furthermore, 29 Code of Federal Regulations section 541.505(b) (1998), which appears to have the most direct bearing on the present case, states: "[T]here is little question that a routeman who provides the only sales contact between the employer and the customers, who calls on customers and takes orders for products which he delivers from stock in his vehicle or procures and delivers to the customer on a later trip, and who receives compensation commensurate with a volume of products sold, is employed for the purpose of making sales."

Thus, the federal exemption focuses on defining the employee's "primary function," not on how much work time is spent selling. Although the federal exemption does place a 20 percent cap on nonexempt (i.e., nonsales) work, that cap does not apply to any nonsales activities that are "incidental to" outside sales, including the making of deliveries. In other words, so long as it can be shown that the individual's chief duty or primary function is making sales, then every activity in any way incidental to sales may be funneled into the exempt category and excluded from the 20 percent cap on nonexempt work.

Wage Order No. 7-80, on the other hand, makes no mention of the primary function for which the person is employed. Rather, the state regulation takes a purely quantitative approach, focusing exclusively on whether the individual "works more than half the working time ... selling ... or obtaining orders or contracts." (Wage Order No. 7-80, 2(I).) State law

also differs from the federal regulation in that it does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is *incidental to* sales. The language of the state exemption only encompasses work directly involved in "selling ... items or obtaining orders or contracts." (*Ibid.*)

By choosing not to track the language of the federal exemption and instead adopting its own distinct definition of "outside salespersons," the IWC evidently intended to depart from federal law and to provide, at least in some cases, greater protection for employees. Under the Court of Appeal's interpretation, on the other hand, a California employee is accorded significantly *less*, not more, protection than under the federal standard. This is so because the Court of Appeal imported the laxer federal criteria regarding what constitutes an exemption into a state standard that requires only more than 50 percent in exempt activities in order to qualify as an outside salesperson, as opposed to 80 percent under federal law. The Court of Appeal failed to recognize that the two numbers referred to two different types of classifications, with the former number measuring activities directly related to sales, and the latter, larger number measuring both those activities *798 and activities "incidental to" sales, as that term has come to be broadly defined under federal regulations. (See 29 C.F.R. § 541.505(b), (e) (1998).) In confounding federal and state labor law, and thereby providing less protection to state employees, the Court of Appeal and the trial court departed from the teaching that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced. (See *Aguilar v. Association for Retarded Citizens, supra,*234 Cal.App.4th 21, 34-35; *Skyline Homes, Inc. v. Department of Industrial Relations, supra,*165 Cal.App.3d at pp. 247-249.) [FN4]

> FN4 The IWC's distinct approach to defining categorical overtime exemptions can also be illustrated in its treatment of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

exemption for administrative, executive, and professional employees. (Cal. Code Regs., tit. 8, § 11070, subd. 1(A).) The federal exemption for this category of employees adopts a core test which focuses on the employee's "primary duty"; if the "primary duty" test is met, then he or she is deemed exempt regardless of how much time the individual actually spends performing the primary duty. (29 C.F.R. §§ 541.1(f), 541.2(e)(2), and 541.3(e) (1998).) By contrast, the state law exemption, as in the case of "outside salespersons," adopts the requirement that the employee must be "engaged ... primarily" in exempt work (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)); the term "primarily" is defined as "more than one-half the employee's work time." (Id., § 11070, subd. 2(J).)

In sum, Wage Order No 7-80, 2(I) incorporates a quantitative method for determining whether an employee is an outside salesperson that differs in some respect from the qualitative method employed under federal law. The Court of Appeal and the trial court employed the federal method, or an improper hybrid of the state and federal methods, not fully acknowledging the differences between the two schemes and the consequently problematic nature of using interpretations of the federal regulation as a key to understanding the state regulation. These courts therefore erred in that respect.

Yosemite argues the IWC exceeded its regulatory authority in adopting a definition of "outside salesperson" at variance with the federal definition. Yosemite points to the fact that at the time the outside salesperson exemption contained in section 1171 was adopted in 1972 (Stats. 1972, ch. 1122, § 2, p. 2153), the FLSA had already adopted the definition of that term and accompanying regulations reviewed above. Because the term "outside salesperson" was used nowhere else in California law, Yosemite argues that it is logical to infer that the Legislature intended to fully incorporate the

federal definition. Yosemite therefore concludes that the IWC exceeded its legislative mandate by adopting a regulation that is narrower than the federal one.

(4) In assessing Yosemite's claim, we first consider the general framework of judicial review of administrative regulations. In Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1 [*799978 Cal.Rptr.2d 1, 960 P.2d 1031](Yamaha), we posited a dichotomy between "quasi-legislative" and "interpretive" rules. Quasi-legislative regulations are those "adopted by an agency to which the Legislature has confided the power to 'make law'" (id. at p. 7), and such rules "have the dignity of statutes" (id. at p. 10). On the other hand, interpretive regulations are those which involve "an agency's interpretation of a statute or regulation ..." (id. at p. 7, italics omitted), and are given variable deference according to a number of factors (id. at p. 12). As we acknowledged, "administrative rules do not always fall neatly into one category or the other; the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature." (Id. at p. 6, fn. 3.)

Regulations that fall somewhere in the continuum may have both quasi-legislative and interpretive characteristics, as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms. In Moore v. California State Bd. of Accountancy (1992) 2 Cal.4th 999 [9 Cal.Rptr.2d 358, 831 P.2d 798](Moore), for example, we reviewed a regulation by the Board of Accountancy, the agency statutorily chartered to regulate the accounting profession in this state, providing that those unlicensed by that board could not use the title "accountant." The agency was interpreting a statute, Business and Professions Code section 5058, that forbids use of titles " 'likely to be confused with' " the titles of " ' "certified public accountant" ' " and " ' "public accountant." ' " (2 Cal.4th at p. 1011.)As we stated: "Inasmuch as enforcement of the provisions of the Accountancy

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Act, including section 5058, is entrusted to the *Board,* it seems apparent that the Legislature delegated to the Board the authority to determine whether a title or designation not identified in the statute is likely to confuse or mislead the public. Since the Board was also authorized to seek an injunction against the use of such terms, its authority to 'adopt, repeal, or amend such regulations as may be reasonably necessary and expedient for the ... administration of [the Accountancy Act]' (§ 5010) includes the power to identify by regulation those terms which it finds are 'likely to be confused with "certified public accountant" or "public accountant," ' the use of which may be enjoined under the broad prohibition of section 5058. To conclude otherwise would contravene the intent and purpose behind the statute. " (2 Cal.4th at pp. 1013-1014, italics added; see also *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 362 [185 Cal.Rptr. 453, 650 P.2d 328] [administrative agency with rulemaking power is authorized to "fill up the details" of a statutory scheme].)

(3b) The regulation at issue in the present case, as in *Moore,* has both quasi-legislative and interpretive characteristics. The Legislature has expressly delegated to the IWC the authority to promulgate wage orders setting **\*800** "minimum wages, maximum hours and standard conditions of labor for all employees." (§ 1185.) "Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion. [Citations.] [ ] Because of the quasi-legislative nature of the IWC's authority, the judiciary has recognized that its review of the commission's wage orders is properly circumscribed." (*Industrial Welfare Com. v. Superior Court, supra,*27 Cal.3d at p. 702.)As in *Moore,* this delegation of legislative authority includes the power to elaborate the meaning of key statutory terms. On the other hand, since the IWC is engaged in construing the meaning of a portion of section 1171, its regulation

is in some sense interpretive.

If Wage Order No. 7-80, 2(I) is considered quasi-legislative regulation, it is certainly valid. (5) " ' "[I]n reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is 'within the scope of the authority conferred' [citation] and (2) is 'reasonably necessary to effectuate the purpose of the statute' [citation]." ' " (*Yamaha, supra,*19 Cal.4th at p. 11.)

(3c) We conclude, first of all, that Wage Order No. 7-80, 2(I) is within the scope of the IWC's authority. Although the Legislature in 1972 adopted the outside salesperson exemption already found in federal law, nothing in either the language or the legislative history of the statute suggests that the Legislature thereby intended to incorporate, down to the last detail, all the federal regulations pertaining to that exemption. The only mention of the outside salesperson exemption we can uncover is a sentence in a Senate committee analysis noting that "opposition has also been expressed by the Vacuum Cleaner Manufacturers Association, who wish to examine the impact of outdoor salesman who work on a commission." (Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 30 (1971 Reg. Sess.) as amended Apr. 1, 1971, p. 1.) The next time the bill was amended, the outside salesperson exemption in its present form appeared for the first time. (Sen. Amend. to Assem. Bill No. 30 (1971 Reg. Sess.) July 27, 1971.) In the absence of statutory language or legislative history to the contrary, we have no reason to presume that the Legislature, in delegating broad regulatory authority to the IWC, obliged the agency to follow in each particular a federal regulatory agency's interpretation of a common term. And indeed, as cited above, and as the Legislature was presumably aware, there are numerous instances in which the IWC has chosen different methods of implementing laws pertaining to wages and hours. We therefore conclude that the IWC, **\*801** in formulating a definition of "outside salesperson" that diverged from the federal defini-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion, did not thereby exceed its statutory authority.

We also conclude that Wage Order No. 7-80, 2(I), was reasonably necessary to effectuate the purpose of section 1171. It was necessary for the IWC to establish some working definition of "outside salesperson" that takes into account the fact that some employees work in both sales and nonsales capacities. It was reasonable for the IWC, in formulating its definition, to take a quantitative approach, looking to the actual hours spent on sales activity to determine if an employee is primarily a salesperson. Thus, we conclude that adoption of the IWC's definition of outside salesperson was not arbitrary or capricious, nor did it exceed the scope of the IWC's statutory mandate.

On the other hand, even if we considered Wage Order No. 7-80, 2(I) a purely interpretive regulation, it has two attributes which weigh in favor of considerable judicial deference to the agency's interpretation. First, the interpretation is contained in a regulation formally adopted pursuant to the Administrative Procedure Act. (6) " '[A]n interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference than [one] contained in an advice letter prepared by a single staff member.' " (*Yamaha, supra,* 19 Cal.4th at p. 13.)(3d) Second, the regulation is entitled to greater deference because it embodies a statutory interpretation that the administrative agency " 'has consistently maintained' " and " 'is [of] long-standing' " (*ibid.*), i.e., for almost 20 years. For these reasons, the IWC's definition is entitled to deference regardless of whether it is deemed a quasi-legislative or interpretive regulation. We conclude that the IWC's interpretation of the term "outside salesperson" is reasonable and should not be invalidated.

Yosemite contends that the pertinent language of Wage Order No. 7-80, 2(I), strictly construed, will lead to an absurd result inasmuch as even those employed full time as salespeople often do not spend more than half of their time directly selling to customers, but engage in other related activities such as preparation, travel time, and paperwork. There is, however, no need to interpret the wage order so strictly. If a salesperson must travel one hour to destination A in order to attempt a sale, then surely the most reasonable interpretation of the wage order is to count the hour of travel time as time spent "selling." But if, as in the present case, an employee travels to a destination to engage in both sales and nonsales activities, the travel time must be apportioned among the two types of activities for purposes of determining the total amount of time spent doing sales and nonsales work.

(7) Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties that caused some confusion in **\*802** the trial court and the Court of Appeal: Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee *should* be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 JA2457 97th 9U4485CMMR.2e844uBenant283-3 FS8e643i8Wage &Hour&a8.2d01BN8)35, 99 Cal.
Daily Op. Serv. 5203, 99 Cal. Daily Op. Serv. 4725, 1999 Daily Journal D.A.R. 6065

realistic expectations, whether there was any con-crete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

In the present case, the evidence is uncontroverted that Ramirez performed both sales and delivery functions for Yosemite. Delivery of preordered wa-ter bottles or the restocking of "empties" is not a sales activity in the conventional meaning of the word-one who *only* performed these delivery tasks could not be considered a salesperson. It is true, as Yosemite points out, that failure to properly deliver the product would lead to loss of the customer, but that does not make such delivery a sales activity, any more than an attorney's preparation of a legal brief in order to satisfy and thereby retain a client is a sales activity.

Although appellate courts normally defer to trial courts' resolution of conflicting evidence when there is substantial evidence to support the trial court's decision (see *Gray v. Don Miller & Asso-ciates Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763]), in the present case the record indicates that the trial court's review of the evidence of whether Ramirez was an outside salesperson was tainted by an inter-pretation of the term that was overly favorable to finding the exemption. In other words, the record suggests that the trial court would have found Ramirez to be an outside salesperson even if it be-lieved all of Ramirez's testimony as to how he spent his time on the job to be true, whereas a plain *803 reading of that testimony in light of Wage Order No. 7-80, 2(I) would yield the contrary conclusion. Thus, it is unclear from the record that the court ever saw the need to resolve inconsistent testimony presented at trial. (See *Engalla v. Permanente Med-ical Group, Inc.* (1997) 15 Cal.4th 951, 972-973 [64 Cal.Rptr.2d 843, 938 P.2d 903] [when trial court applies incorrect standard that keeps it from resolving factual disputes, remand for further fact-finding appropriate]; see also *Webster v. Trustees of*

*Cal. State University* (1993) 19 Cal.App.4th 1456, 1462-1463 [24 Cal.Rptr.2d 150] [when trial court in administrative writ proceedings employs substantial evidence standard that makes resolution of conflict-ing evidence unnecessary, instead of the correct in-dependent judgment test, remand is appropriate].) We therefore conclude that remand to the trial court is the most appropriate disposition. On remand the trial court may have to resolve significant factual discrepancies-for example, Ramirez's claim that he spent only 150 minutes a week on direct door-to-door sales versus Yosemite's claim that he spent 850 minutes a week. [FN5]

> FN5 On remand, the trial court should, as Ramirez requested, itemize the types of activities that it considers to be sales re-lated, and the approximate average times that it finds the employee spent on each of these activities. Because the question whether a particular activity is sales related is a mixed one of law and fact, this itemiz-ation will enable an appellate court to re-view whether the trial court's legal classi-fications are correct, and whether its factu-al findings are supported by substantial evidence.

### C. *Ramirez as a Commissioned Employee*

(8) Wage Order No. 7-80, subdivision 3(e) and its successor, Wage Order No. 7-98, subdivision 3(B), state that "[p]rovisions of [overtime compensation] shall not apply to any employee whose earnings ex-ceed one and one-half (11/2) times the minimum wage, if more than half (1/2) of that employee's compensation represents commissions." As dis-cussed above, the trial court found not only that Ramirez was an outside salesperson but also that he was compensated primarily through commissions within the meaning of this wage order. Therefore, for that independent reason, the court found he should be exempt from the overtime statute. There would be no need to remand this case if we agreed with the trial court that Ramirez was a commis-sioned employee.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

978 P.2d 2

20 Cal.4th 785, 978 P.2d 2, 85 Cal.Rptr.2d 844, 138 Lab.Cas. P 58,648, 6 Wage & Hour Cas.2d (BNA) 35, 99 Cal. Daily Op. Serv. 5203, 99 Cal. Daily Op. Serv. 4725, 1999 Daily Journal D.A.R. 6065

Page 14

The IWC wage order does not define the term "commission," but its meaning is set forth in Labor Code section 204.1 as follows: "Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Although section 204.1 applies specifically to employees of vehicle dealers, both parties contend, and we agree, that the statute's definition of "commission" is more generally applicable. In interpreting this language, the Court of Appeal in *804*Keyes Motors, Inc. v. Division of Labor Standards Enforcement* (1987) 197 Cal.App.3d 557, 563 [242 Cal.Rptr. 873] stated: "We conclude Labor Code section 204.1 sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute 'commission wages.' First, the employees must be involved principally in selling a product or service, not making the product or rendering the service. Second, the amount of their compensation must be a percent of the price of the product or service." (Italics omitted.)

Ramirez was compensated at a flat rate of $1,200-$1,400 per month, plus a percentage of the price of the bottles of water and related products sold when sales exceeded the flat rate. The parties dispute whether or not the $1,200-$1,400 sum represented a "draw" against future bottle sales, or was more in the nature of a salary. But regardless of which it was, and regardless of whether Ramirez's compensation could be characterized as "a percentage of the price of the product or service," it is not at all clear that the first condition set forth by the *Keyes* court was met. As discussed above, it remains to be clarified on remand whether Ramirez was "involved principally in selling the product or service." Because our determination of whether Ramirez was a commissioned employee depends partly on matters to be decided by the trial court on remand, we believe this question is also best resolved on remand.

III. *Disposition*

For all of the foregoing reasons, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred. *805*

Cal. 1999.
Ramirez v. Yosemite Water Co., Inc.
20 Cal.4th 785, 978 P.2d 2, 85 Cal.Rptr.2d 844, 138 Lab.Cas. P 58,648, 6 Wage & Hour Cas.2d (BNA) 35, 99 Cal. Daily Op. Serv. 5203, 99 Cal. Daily Op. Serv. 4725, 1999 Daily Journal D.A.R. 6065

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 6

1171.  The provisions of this chapter shall apply to and include men, women and minors employed in any occupation, trade, or industry, whether compensation is measured by time, piece, or otherwise, but shall not include any individual employed as an outside salesman or any individual participating in a national service program carried out using assistance provided under Section 12571 of Title 42 of the United States Code.

   Any individual participating in a national service program pursuant to Section 12571 of Title 42 of the United States Code shall be informed by the nonprofit, educational institution or other entity using his or her service, prior to the commencement of service of the requirement, if any, to work hours in excess of eight hours per day, or 40 hours per week, or both, and shall have the opportunity to opt out of that national service program at that time.

   Individuals participating in a national service program pursuant to Section 12571 of Title 42 of the United States Code shall not be discriminated against or be denied continued participation in the program for refusing to work overtime for a legitimate reason.

# TAB 7

Welcome to the online source for the
New York Codes, Rules and Regulations

12 NY ADC 142-2.2

12 NYCRR 142-2.2

N.Y. Comp. Codes R. & Regs. tit. 12, 142-2.2

OFFICIAL COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK
TITLE 12. DEPARTMENT OF LABOR
CHAPTER II. DIVISION OF LABOR STANDARDS
SUBCHAPTER B. MINIMUM WAGE ORDERS
PART 142. MISCELLANEOUS INDUSTRIES AND OCCUPATIONS
SUBPART 142-2. PROVISIONS APPLICABLE TO ALL EMPLOYEES SUBJECT TO THIS PART,
EXCEPT EMPLOYEES IN NONPROFITMAKING INSTITUTIONS COVERED BY THE PROVISIONS OF
SUBPART 142-3.
Text is current through February 29, 2008.

Section 142-2.2.Overtime rate.

An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938, as amended; provided, however, that the exemptions set forth in section 13(a)(2) and (4) shall not apply. In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as amended, except employees subject to section 13(a)(2) and (4) of such act, overtime at a wage rate of one and one-half times the basic minimum hourly rate. The Fair Labor Standards Act is published in the United States Code, the official compilation of Federal statutes, by the Government Printing Office, Washington, DC. Copies of the Fair Labor Standards Act are available at the following office:
New York State Department of Labor
Counsel's Office
State Office Building Campus,
Building 12, Room 509
Albany, NY 12240-0005 The applicable overtime rate shall be paid for each workweek:

|  | Non-residential employees | Residential employees |
|---|---|---|
| For working time over | 40 hours | 44 hours |

<General Materials (GM) - References, Annotations, or Tables>

CASE NOTES:

Workers hired by contractor of drugstore corporation to work as on-foot delivery personnel in corporation's stores were "employees'' of contractor for purposes of FLSA and state statutory minimum wage and overtime provisions, rather than merely being "placed'' by contractor, even though workers were relatively transient; contractor paid workers and controlled their hiring, firing, transfer and pay, contractor was not licensed as employment agency, workers had negligible investment in business, little skill or initiative was required for work in question, and workers' services constituted integral part of contractor's business. Ansoumana v. Gristede's Operating Corp., 2003, 255 F.Supp.2d 184, reconsideration denied 255 F.Supp.2d 197

CASE NOTES:

Individual owners/operators of corporate contractor that hired on-foot delivery personnel to work in drugstore corporation's stores qualified as " employers'' for purposes of minimum wage and overtime provisions of FLSA and state statute, just as did contractor, even though owners did not directly control workers; owners exercised operational management of contractor. Ansoumana v. Gristede's Operating Corp., 2003, 255 F.Supp.2d 184, reconsideration denied 255 F.Supp.2d 197

Drugstore corporation in whose stores workers hired by corporate contractor were placed as on-foot delivery personnel was joint employer, jointly liable with contractor for violations of FLSA and state statutory minimum wage and overtime provisions; corporation and contractor had extensive and regular relationship approaching agency, workers performed integral service for stores in which they worked, deliveries were not made via central facility but directly from stores, and corporation exercised control over workers, who worked as individuals rather than as a group, throughout. Ansoumana v. Gristede's Operating Corp., 2003, 255 F.Supp.2d 184, reconsideration denied 255 F.Supp.2d 197

CASE NOTES:

Under New York law, in determining whether live-in domestic service employee received adequate overtime compensation, court was required to add total amount of money and allowances for meals and lodging she received each week from her employers. Almeida v. Aguinaga, 2007, 500 F.Supp.2d 366

CASE NOTES:

Employee bringing minimum wage and overtime claims under FLSA and New York law would be granted opportunity to amend complaint to replead dismissed claims. Zhong v. August August Corp., 2007, 498 F.Supp.2d 625

CASE NOTES:

District court would decline to exercise its supplemental jurisdiction with respect to overtime compensation claim under New York law, where FLSA overtime claim had been dismissed and employee had not sufficiently alleged facts necessary to sustain independent recovery of overtime compensation under state law. Zhong v. August August Corp., 2007, 498 F.Supp.2d 625

CASE NOTES:

Genuine issue of material fact, as to whether employee performed work for which she was inadequately compensated, precluded partial summary judgment for employer on her overtime claims under FLSA and New York law. Rivera v. Ndola Pharmacy Corp., 2007, 497 F.Supp.2d 381

CASE NOTES:

Where employer's wage and hour records are inadequate, employee's estimates may constitute sufficient evidence in action for unpaid overtime, and employer cannot be heard to complain that damages lack exactness and precision of measurement that would be possible had it kept records. Rivera v. Ndola Pharmacy Corp., 2007, 497 F.Supp.2d 381

CASE NOTES:

Records submitted by employer in FLSA overtime action were insufficient evidence of employee's hours or wage rate because they only contained sampling of weeks throughout year, no records were provided for three years during which employee alleged she worked overtime, records were based on time sheets that contained only employee's name and amount paid that week, and letters prepared during her employment list only general hours and weekly pay and thus were not evidence of actual hours worked; records were also insufficient because they contradicted employee's testimony as to hours worked. Rivera v. Ndola Pharmacy Corp., 2007, 497 F.Supp.2d 381

CASE NOTES:

When employer's records are inaccurate or inadequate, employee may meet burden of proving that he performed work for which he was not properly compensated if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show amount and extent of that work as a matter of just and reasonable inference; employee may meet this burden by relying solely on his or her recollection. Rivera v. Ndola Pharmacy Corp., 2007, 497 F.Supp.2d 381

CASE NOTES:

Both FLSA and New York state labor laws entitle employees to time-and-a-half overtime for hours worked in excess

CASE NOTES:

State law overtime claims did not present novel and complex issues of New York law that would make district court decline to exercise supplemental jurisdiction over them. Scholtisek v. Eldre Corp., 2005, 229 F.R.D. 381

CASE NOTES:

Employee was exempt from protection under the FLSA and New York State Labor Law for overtime pay and other compensation, as a learned professional, where employee was certified public accountant, studied accounting in college, was licensed by the state, represented clients before the Internal Revenue Service (IRS), gave clients professional advice regarding tax and accounting matters, prepared tax returns, conducted audits, was paid more than $600 per week in salary. Galasso v. Eisman, Zucker, Klein & Ruttenberg, 2004, 310 F.Supp.2d 569

CASE NOTES:

Genuine issue of material fact existed as to scope of employee's duties, and therefore whether he was exempt from the provisions of federal and state overtime laws, precluding summary judgment in favor of employers on employee's federal and state overtime compensation claims. Noble v. 93 University Place Corp., 2003, 303 F.Supp.2d 365

CASE NOTES:

Fair Labor Standards Act (FLSA) did not preempt domestic employee's claim for overtime compensation under New York law. Manliguez v. Joseph, 2002, 226 F.Supp.2d 377

CASE NOTES:

Continuing violation doctrine did not apply to allow former chauffeur, who alleged that company he worked for misclassified him as an independent contractor to avoid paying him overtime compensation required by FLSA and New York Labor Law, to avoid statute of limitations; each paycheck that failed to compensate chauffeur for overtime was a discrete, individual wrong rather than part of a single course of wrongful conduct. Gustafson v. Bell Atlantic Corp., 2001, 171 F.Supp.2d 311

CASE NOTES:

Doctrine of equitable tolling did not apply to allow former chauffeur, who alleged that company he worked for misclassified him as an independent contractor to avoid paying him overtime compensation required by FLSA and New York Labor Law, to toll statute of limitations, even if company misled chauffeur regarding chauffeur's status; chauffeur knew that he was receiving straight pay for overtime. Gustafson v. Bell Atlantic Corp., 2001, 171 F.Supp.2d 311

CASE NOTES:

Named plaintiff's potential status as exempt employee during portion of his employment did not defeat typicality in class action against employer for violation of state overtime pay requirements; named plaintiff was non-exempt for at least six months, so that allegedly unique defense relating to his exemption could not be characterized as central to the litigation, but potentially only limited his recoverable damages to the initial six-month period. Noble v. 93 University Place Corp., 2004, 224 F.R.D. 330

CASE NOTES:

Common questions of law and fact were sufficient to support class certification in action against employer for violation of state overtime pay requirements; each potential class member was allegedly employed to prepare or sell food, was required to work in excess of forty hours each week, and was not properly compensated for that additional labor. Noble v. 93 University Place Corp., 2004, 224 F.R.D. 330

CASE NOTES:

Proposed class of all non-exempt employees who were not paid overtime compensation for each hour worked in excess of 40 hours per week satisfied ascertainability requirement for class certification in action against employer

for violation of state overtime pay requirements. Noble v. 93 University Place Corp., 2004, 224 F.R.D. 330

CASE NOTES:

New York statute precluding the use of the class action mechanism where the underlying statute provides for a penalty did not bar class certification for employee's state law overtime pay claim against his former employer, where employee had waived his right to recover liquidated damages. Noble v. 93 University Place Corp., 2004, 224 F.R.D. 330

CASE NOTES:

Issue of whether employee was entitled to overtime wages based upon employer's alleged violation of state overtime regulations could not be resolved at motion to dismiss phase because of a factual dispute as to whether employer complied with the federal "fluctuating workweek standard," which if met, would have provided an exception to the general federal requirement that employers pay overtime at one and one-half times the employee's regular wage rate. Anderson v. Ikon Office Solutions, Inc. (1 Dept. 2007) 38 A.D.3d 317, 833 N.Y.S.2d 1

CASE NOTES:

Home health care aide, as provider of companionship services for individuals who were unable to care for themselves, did not have right to overtime compensation at 1 1/2 times her hourly rate under Miscellaneous Wage Order, which was based upon FLSA. Ballard v. Community Home Care Referral Service, Inc. (2 Dept. 1999) 695 N.Y.S.2d 130, 264 A.D.2d 747

12 NY ADC 142-2.2

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

<u>Docs In Sequence</u>

This site is provided by West.
© 2008 West | <u>Privacy</u> | <u>Accessibility</u>



# TAB 8

## Welcome to the online source for the
## California Code of Regulations

8 CA ADC § 11040

8 CCR § 11040

Cal. Admin. Code tit. 8, § 11040

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 8. INDUSTRIAL RELATIONS
DIVISION 1. DEPARTMENT OF INDUSTRIAL RELATIONS
CHAPTER 5. INDUSTRIAL WELFARE COMMISSION
GROUP 2. INDUSTRY AND OCCUPATION ORDERS
ARTICLE 4. PROFESSIONAL, TECHNICAL, CLERICAL, MECHANICAL, AND SIMILAR
OCCUPATIONS
This database is current through 9/5/08, Register 2008, No. 36
§ 11040. Order Regulating Wages, Hours, and Working Conditions in Professional, Technical, Clerical, Mechanical, and Similar Occupations.

1. Applicability of Order This order shall apply to all persons employed in professional, technical, clerical, mechanical, and similar occupations whether paid on a time, piece rate, commission, or other basis, except that:

(A) Provisions of sections 3 through 12 shall not apply to persons employed in administrative, executive, or professional capacities. The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption from those sections:

(1) Executive Exemption A person employed in an executive capacity means any employee:

(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretion and independent judgment; and

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-16. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(2) Administrative Exemption A person employed in an administrative capacity means any employee:

(a) Whose duties and responsibilities involve either:

(I) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers; or

(II) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or

(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

(e) Who executes under only general supervision special assignments and tasks; and

(f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in California Labor Code Section 515(c) as 40 hours per week.

(3) Professional Exemption A person employed in a professional capacity means any employee who meets all of the following requirements:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or

(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:

(i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or

(ii) Work that is original and creative in character (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and

(iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraphs (a) and (b).

(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(e) Subparagraph (b) above is intended to be construed in accordance with the following provisions of federal law as they existed as of the date of this wage order: 29 C.F.R. Sections 541.207, 541.301(a)-(d), 541.302, 541.306, 541.307, 541.308, and 541.310.

(f) Notwithstanding the provisions of this subparagraph, pharmacists employed to engage in the practice of pharmacy, and registered nurses employed to engage in the practice of nursing, shall not be considered exempt professional employees, nor shall they be considered exempt from coverage for the purposes of this subparagraph unless they individually meet the criteria established for exemption as executive or administrative employees.

(g) Subparagraph (f) above shall not apply to the following advanced practice nurses:

(i) Certified nurse midwives who are primarily engaged in performing duties for which certification is required pursuant to Article 2.5 (commencing with Section 2746) of Chapter 6 of Division 2 of the Business and Professions Code.

(ii) Certified nurse anesthetists who are primarily engaged in performing duties for which certification is required pursuant to Article 7 (commencing with Section 2825) of Chapter 6 of Division 2 of the Business and Professions Code.

(iii) Certified nurse practitioners who are primarily engaged in performing duties for which certification is required pursuant to Article 8 (commencing with Section 2834) of Chapter 6 of Division 2 of the Business and Professions Code.

(iv) Nothing in this subparagraph shall exempt the occupations set forth in clauses (i), (ii), and (iii) from meeting the requirements of subsection 1(A)(3)(a)-(d) above.

(h) Except, as provided in subparagraph (i), an employee in the computer software field who is paid on an hourly basis shall be exempt, if all of the following apply:

(i) The employee is primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment.

(ii) The employee is primarily engaged in duties that consist of one or more of the following:

- The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications.

- The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.

- The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.

(iii) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering. A job title shall not be determinative of the applicability of this exemption.

(iv) The employee's hourly rate of pay is not less than forty-two dollars and sixty four cents ($42.64). The Division of Labor Statistics and Research shall adjust this pay rate on October 1 of each year to be effective on January 1 of the following year by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers.

(i) The exemption provided in subparagraph (h) does not apply to an employee if any of the following apply:

(i) The employee is a trainee or employee in an entry-level position who is learning to become proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering.

(ii) The employee is in a computer-related occupation but has not attained the level of skill and expertise necessary to work independently and without close supervision.

(iii) The employee is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment.

(iv) The employee is an engineer, drafter, machinist, or other professional whose work is highly dependent upon or facilitated by the use of computers and computer software programs and who is skilled in computer-aided design software, including CAD/CAM, but who is not in a computer systems analysis or programming occupation.

(v) The employee is a writer engaged in writing material, including box labels, product descriptions, documentation, promotional material, setup and installation instructions, and other similar written information, either for print or for on screen media or who writes or provides content material intended to be read by customers, subscribers, or visitors to computer-related media such as the World Wide Web or CD-ROMs.

(vi) The employee is engaged in any of the activities set forth in subparagraph (h) for the purpose of creating imagery for effects used in the motion picture, television, or theatrical industry.

(B) Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.

(C) The provisions of this order shall not apply to outside salespersons.

(D) The provisions of this order shall not apply to any individual who is the parent, spouse, child, or legally adopted child of the employer.

(E) The provisions of this order shall not apply to any individual participating in a national service program, such as AmeriCorps, carried out using assistance provided under Section 12571 of Title 42 of the United States Code. (See Stats. 2000, ch. 365, amending Labor Code Section 1171.)

2. Definitions

(A) An "alternative workweek schedule" means any regularly scheduled workweek requiring an employee to work more than eight (8) hours in a 24-hour period.

(B) "Commission" means the Industrial Welfare Commission of the State of California.

(C) "Division" means the Division of Labor Standards Enforcement of the State of California.

(D) "Emergency" means an unpredictable or unavoidable occurrence at unscheduled intervals requiring immediate action.

(E) "Employ" means to engage, suffer, or permit to work.

(F) "Employee" means any person employed by an employer.

(G) "Employees in the health care industry" means any of the following:

(1) Employees in the health care industry providing patient care; or

(2) Employees in the health care industry working in a clinical or medical department, including pharmacists dispensing prescriptions in any practice setting; or

(3) Employees in the health care industry working primarily or regularly as a member of a patient care delivery team; or

(4) Licensed veterinarians, registered veterinary technicians and unregistered animal health technicians providing patient care.

(H) "Employer" means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.

(I) "Health care emergency" consists of an unpredictable or unavoidable occurrence at unscheduled intervals relating to healthcare delivery, requiring immediate action.

(J) "Health care industry" is defined as hospitals, skilled nursing facilities, intermediate care and residential care facilities, convalescent care institutions, home health agencies, clinics operating 24 hours per day, and clinics performing surgery, urgent care, radiology, anesthesiology, pathology, neurology or dialysis.

(K) "Hours worked" means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so. Within the health care industry, the term "hours worked" means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the Fair Labor Standards Act.

(L) "Minor" means, for the purpose of this order, any person under the age of 18 years.

(M) "Outside salesperson" means any person, 18 years of age or over, who customarily and regularly works more

than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

(N) "Primarily" as used in Section 1, Applicability, means more than one-half the employee's work time.

(O) "Professional, Technical, Clerical, Mechanical, and Similar Occupations" includes professional, semiprofessional, managerial, supervisorial, laboratory, research, technical, clerical, office work, and mechanical occupations. Said occupations shall include, but not be limited to, the following: accountants; agents; appraisers; artists; attendants; audio-visual technicians; bookkeepers; bundlers; billposters; canvassers; carriers; cashiers; checkers; clerks; collectors; communications and sound technicians; compilers; copy holders; copy readers; copy writers; computer programmers and operators; demonstrators and display representatives; dispatchers; distributors; door-keepers; drafters; elevator operators; estimators; editors; graphic arts technicians; guards; guides; hosts; inspectors; installers; instructors; interviewers; investigators; librarians; laboratory workers; machine operators; mechanics; mailers; messengers; medical and dental technicians and technologists; models; nurses; packagers; photographers; porters and cleaners; process servers; printers; proof readers; salespersons and sales agents; secretaries; sign erectors; sign painters; social workers; solicitors; statisticians; stenographers; teachers; telephone, radio-telephone, telegraph and call-out operators; tellers; ticket agents; tracers; typists; vehicle operators; x-ray technicians; their assistants and other related occupations listed as professional, semiprofessional, technical, clerical, mechanical, and kindred occupations.

(P) "Shift" means designated hours of work by an employee, with a designated beginning time and quitting time.

(Q) "Split shift" means a work schedule, which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods.

(R) "Teaching" means, for the purpose of Section 1 of this order, the profession of teaching under a certificate from the Commission for Teacher Preparation and Licensing or teaching in an accredited college or university.

(S) "Wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.

(T) "Workday" and "day" mean any consecutive 24-hour period beginning at the same time each calendar day.

(U) "Workweek" and "week" mean any seven (7) consecutive days, starting with the same calendar day each week. "Workweek" is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods.

3. Hours and Days of Work

(A) Daily Overtime-General Provisions

(1) The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1 1/2) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

(a) One and one-half (1 1/2) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

(b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

(c) The overtime rate of compensation required to be paid to a nonexempt full-time salaried employee shall be computed by using the employee's regular hourly salary as one-fortieth (1/40) of the employee's weekly salary.

## (B) Alternative Workweek Schedules

(1) No employer shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order, a regularly scheduled alternative workweek schedule of not more than ten (10) hours per day within a 40 hour workweek without the payment of an overtime rate of compensation. All work performed in any workday beyond the schedule established by the agreement up to 12 hours a day or beyond 40 hours per week shall be paid at one and one-half (1 1/2) times the employee's regular rate of pay. All work performed in excess of 12 hours per day and any work in excess of eight (8) hours on those days worked beyond the regularly scheduled number of workdays established by the alternative workweek agreement shall be paid at double the employee's regular rate of pay. Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift. Nothing in this section shall prohibit an employer, at the request of the employee, to substitute one day of work for another day of the same length in the shift provided by the alternative workweek agreement on an occasional basis to meet the personal needs of the employee without the payment of overtime. No hours paid at either one and one-half (1 1/2) or double the regular rate of pay shall be included in determining when 40 hours have been worked for the purpose of computing overtime compensation.

(2) If an employer, whose employees have adopted an alternative workweek agreement permitted by this order requires an employee to work fewer hours than those that are regularly scheduled by the agreement, the employer shall pay the employee overtime compensation at a rate of one and one-half (1 1/2) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours, and double the employee's regular rate of pay for all hours worked in excess of 12 hours for the day the employee is required to work the reduced hours.

(3) An employer shall not reduce an employee's regular rate of hourly pay as a result of the adoption, repeal or nullification of an alternative workweek schedule.

(4) An employer shall explore any available reasonable alternative means of accommodating the religious belief or observance of an affected employee that conflicts with an adopted alternative workweek schedule, in the manner provided by subdivision (j) of Section 12940 of the Government Code.

(5) An employer shall make a reasonable effort to find a work schedule not to exceed eight (8) hours in a workday, in order to accommodate any affected employee who was eligible to vote in an election authorized by this section and who is unable to work the alternative workweek schedule established as the result of that election.

(6) An employer shall be permitted, but not required, to provide a work schedule not to exceed eight (8) hours in a workday to accommodate any employee who is hired after the date of the election and who is unable to work the alternative workweek schedule established by the election.

(7) Arrangements adopted in a secret ballot election held pursuant to this order prior to 1998, or under the rules in effect prior to 1998, and before the performance of the work, shall remain valid after July 1, 2000 provided that the results of the election are reported by the employer to the Division of Labor Statistics and Research by January 1, 2001, in accordance with the requirements of section (C) below (Election Procedures). If an employee was voluntarily working an alternative workweek schedule of not more than ten (10) hours a day as of July 1, 1999, that alternative workweek schedule was based on an individual agreement made after January 1, 1998 between the employee and employer, and the employee submitted, and the employer approved, a written request on or before May 30, 2000 to continue the agreement, the employee may continue to work that alternative workweek schedule without payment of an overtime rate of compensation for the hours provided in the agreement. The employee may revoke his/her voluntary authorization to continue such a schedule with 30 days written notice to the employer. New arrangements can only be entered into pursuant to the provisions of this section. Notwithstanding the foregoing, if a health care industry employer implemented a reduced rate for 12-hour shift employees in the last quarter of 1999 and desires to re-implement a flexible work arrangement that

includes 12-hour shifts at straight time for the same work unit, the employer must pay a base rate to each affected employee in the work unit that is no less than that employee's base rate in 1999 immediately prior to the date of the rate reduction.

(8) Notwithstanding the above provisions regarding alternative workweek schedules, no employer of employees in the health care industry shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order a regularly scheduled alternative workweek schedule that includes work days exceeding ten (10) hours but not more than 12 hours within a 40 hour workweek without the payment of overtime compensation, provided that:

(a) An employee who works beyond 12 hours in a workday shall be compensated at double the employee's regular rate of pay for all hours in excess of 12;

(b) An employee who works in excess of 40 hours in a workweek shall be compensated at one and one-half (1 1/2) times the employee's regular rate of pay for all hours over 40 hours in the workweek;

(c) Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift;

(d) The same overtime standards shall apply to employees who are temporarily assigned to a work unit covered by this subsection;

(e) Any employer who instituted an alternative workweek schedule pursuant to this subsection shall make a reasonable effort to find another work assignment for any employee who participated in a valid election prior to 1998 pursuant to the provisions of Wage Orders 4 and 5 and who is unable to work the alternative workweek schedule established;

(f) An employer engaged in the operation of a licensed hospital or in providing personnel for the operation of a licensed hospital who institutes, pursuant to a valid order of the Commission, a regularly scheduled alternative workweek that includes no more than three (3) 12-hour workdays, shall make a reasonable effort to find another work assignment for any employee who participated in the vote which authorized the schedule and is unable to work the 12-hour shifts. An employer shall not be required to offer a different work assignment to an employee if such a work assignment is not available or if the employee was hired after the adoption of the 12 hour, three (3) day alternative workweek schedule.

(9) No employee assigned to work a 12-hour shift established pursuant to this order shall be required to work more than 12-hours in any 24-hour period unless the Chief Nursing Officer or authorized executive declares that:

(a) A "health care emergency", as defined above, exists in this order; and

(b) All reasonable steps have been taken to provide required staffing; and

(c) Considering overall operational status needs, continued overtime is necessary to provide required staffing.

(10) Provided further that no employee shall be required to work more than 16 hours in a 24 hour period unless by voluntary mutual agreement of the employee and the employer, and no employee shall work more than 24 consecutive hours until said employee receives not less than eight (8) consecutive hours off duty immediately following the twenty-four consecutive hours of work.

(11) Notwithstanding subsection (B)(9) above, an employee may be required to work up to 13 hours in any 24 hour period if the employee scheduled to relieve the subject employee does not report for duty as scheduled and does not inform the employer more than two (2) hours in advance of that scheduled shift that he/she will not be appearing for duty as scheduled.

**(C) Election Procedures**

Election procedures for the adoption and repeal of alternative workweek schedules require the following:

(1) Each proposal for an alternative workweek schedule shall be in the form of a written agreement proposed by the employer. The proposed agreement must designate a regularly scheduled alternative workweek in which the specified number of work days and work hours are regularly recurring. The actual days worked within that alternative workweek schedule need not be specified. The employer may propose a single work schedule that would become the standard schedule for workers in the work unit, or a menu of work schedule options, from which each employee in the unit would be entitled to choose. If the employer proposes a menu of work schedule options, the employee may, with the approval of the employer, move from one menu option to another.

(2) In order to be valid, the proposed alternative workweek schedule must be adopted in a secret ballot election, before the performance of work, by at least a two-thirds (2/3) vote of the affected employees in the work unit. The election shall be held during regular working hours at the employees' work site. For purposes of this subsection, "affected employees in the work unit" may include all employees in a readily identifiable work unit, such as a division, a department, a job classification, a shift, a separate physical location, or a recognized subdivision of any such work unit. A work unit may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection are met.

(3) Prior to the secret ballot vote, any employer who proposed to institute an alternative workweek schedule shall have made a disclosure in writing to the affected employees, including the effects of the proposed arrangement on the employees' wages, hours, and benefits. Such a disclosure shall include meeting(s), duly noticed, held at least 14 days prior to voting, for the specific purpose of discussing the effects of the alternative workweek schedule. An employer shall provide that disclosure in a non-English language, as well as in English, if at least five (5) percent of the affected employees primarily speak that non-English language. The employer shall mail the written disclosure to employees who do not attend the meeting. Failure to comply with this paragraph shall make the election null and void.

(4) Any election to establish or repeal an alternative workweek schedule shall be held at the work site of the affected employees. The employer shall bear the costs of conducting any election held pursuant to this section. Upon a complaint by an affected employee, and after an investigation by the labor commissioner, the labor commissioner may require the employer to select a neutral third party to conduct the election.

(5) Any type of alternative workweek schedule that is authorized by the Labor Code may be repealed by the affected employees. Upon a petition of one-third (1/3) of the affected employees, a new secret ballot election shall be held and a two-thirds (2/3) vote of the affected employees shall be required to reverse the alternative workweek schedule. The election to repeal the alternative workweek schedule shall be held not more than 30 days after the petition is submitted to the employer, except that the election shall be held not less than 12 months after the date that the same group of employees voted in an election held to adopt or repeal an alternative workweek schedule. However, where an alternative workweek schedule was adopted between October 1, 1999 and October 1, 2000, a new secret ballot election to repeal the alternative workweek schedule shall not be subject to the 12 month interval between elections. The election shall take place during regular working hours at the employees' work site. If the alternative workweek schedule is revoked, the employer shall comply within 60 days. Upon proper showing of undue hardship, the Division of Labor Standards Enforcement may grant an extension of time for compliance.

(6) Only secret ballots may be cast by affected employees in the work unit at any election held pursuant to this section. The results of any election conducted pursuant to this section shall be reported by the employer to the Division of Labor Statistics and Research within 30 days after the results are final, and the report of election results shall be a public document. The report shall include the final tally of the vote, the size of the unit, and the nature of the business of the employer.

(7) Employees affected by a change in the work hours resulting from the adoption of an alternative workweek schedule may not be required to work those new work hours for at least 30 days after the announcement of the final results of the election.

(8) Employers shall not intimidate or coerce employees to vote either in support of or in opposition to a proposed alternative workweek. No employees shall be discharged or discriminated against for expressing opinions concerning the alternative workweek election or for opposing or supporting its adoption or repeal. However, nothing in this section shall prohibit an employer from expressing his/her position concerning that alternative workweek to the affected employees. A violation of this paragraph shall be subject to Labor Code Section 98 et seq.

(D) The provisions of subsections (A), (B) and (C) above shall not apply to any employee whose earnings exceed one and one-half (1 1/2) times the minimum wage if more than half of that employee's compensation represents commissions.

(E) One and one-half (1 1/2) times a minor's regular rate of pay shall be paid for all work over 40 hours in any workweek except minors 16 or 17 years old who are not required by law to attend school and may therefore be employed for the same hours as an adult are subject to subsection (A) or (B) and (C) above.

(VIOLATIONS OF CHILD LABOR LAWS are subject to civil penalties of from $500 to $10,000 as well as to criminal penalties. Refer to California Labor Code Sections 1285 to 1312 and 1390 to 1399 for additional restrictions on the employment of minors and for descriptions of criminal and civil penalties for violation of the child labor laws. Employers should ask school districts about any required work permits.)

(F) An employee may be employed on seven (7) workdays in one workweek when the total hours of employment during such workweek do not exceed 30 and the total hours of employment in any one workday thereof do not exceed six (6).

(G) If a meal period occurs on a shift beginning or ending at or between the hours of 10 p.m. and 6 a.m., facilities shall be available for securing hot food and drink or for heating food or drink, and a suitable sheltered place shall be provided in which to consume such food or drink.

(H) The provisions of Labor Code Sections 551 and 552 regarding one (1) day's rest in seven (7) shall not be construed to prevent an accumulation of days of rest when the nature of the employment reasonably requires the employee to work seven (7) or more consecutive days; provided, however, that in each calendar month, the employee shall receive the equivalent of one (1) day's rest in seven (7).

(I) Except as provided in subsections (E), (H) and (L), this section shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

(J) Notwithstanding subsection (I) above, where the employer and a labor organization representing employees of the employer have entered into a valid collective bargaining agreement pertaining to the hours of work of the employees, the requirement regarding the equivalent of one (1) day's rest in seven (7) (see subsection (H) above) shall apply, unless the agreement expressly provides otherwise.

(K) The provisions of this section are not applicable to employees whose hours of service are regulated by:

(1) The United States Department of Transportation Code of Federal Regulations, Title 49, Sections 395.1 to 395.13, Hours of Service of Drivers; or

(2) Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200 and following sections, regulating hours of drivers.

(L) No employee shall be terminated or otherwise disciplined for refusing to work more than 72 hours in any workweek, except in an emergency as defined in Section 2(D).

(M) If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that makeup work time, if performed in the same workweek in which the work time was lost, may not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 11 hours of work in one (1) day or 40 hours of work in one (1) workweek. If an employee knows in advance that he/she will be requesting makeup time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to make up work time for up to four (4) weeks in advance; provided, however, that the makeup work must be performed in the same week that the work time was lost. An employee shall provide a signed written request for each occasion that the employee makes a request to make up work time pursuant to this subsection. While an employer may inform an employee of this makeup time option, the employer is prohibited from encouraging or otherwise soliciting an employee to request the employer's approval to take personal time off and make up the work hours within the same workweek pursuant to this subsection.

4. Minimum Wages

(A) Every employer shall pay to each employee wages not less than six dollars and twenty-five cents ($6.25) per hour for all hours worked, effective January 1, 2001, and not less than six dollars and seventy-five cents ($6.75) per hour for all hours worked, effective January 1, 2002, except:

LEARNERS: Employees during their first one 160 hours of employment in occupations in which they have no previous similar or related experience, may be paid not less than 85 percent of the minimum wage rounded to the nearest nickel.

(B) Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

(C) When an employee works a split shift, one (1) hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment.

(D) The provisions of this section shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

5. Reporting Time Pay

(A) Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

(B) If an employee is required to report for work a second time in any one workday and is furnished less than two (2) hours of work on the second reporting, said employee shall be paid for two (2) hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

(C) The foregoing reporting time pay provisions are not applicable when:

(1) Operations cannot commence or continue due to threats to employees or property; or when recommended by civil authorities; or

(2) Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or

(3) The interruption of work is caused by an Act of God or other cause not within the employer's control.

(D) This section shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time.

6. Licenses for Disabled Workers

(A) A license may be issued by the Division authorizing employment of a person whose earning capacity is impaired by physical disability or mental deficiency at less than the minimum wage. Such licenses shall be granted only upon joint application of employer and employee and employee's representative if any.

(B) A special license may be issued to a nonprofit organization such as a sheltered workshop or rehabilitation facility fixing special minimum rates to enable the employment of such persons without requiring individual licenses of such employees.

(C) All such licenses and special licenses shall be renewed on a yearly basis or more frequently at the discretion of the Division. (See California Labor Code, Sections 1191 and 1191.5)

7. Records

(A) Every employer shall keep accurate information with respect to each employee including the following:

(1) Full name, home address, occupation and social security number.

(2) Birth date, if under 18 years, and designation as a minor.

(3) Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded. Meal periods during which operations cease and authorized rest periods need not be recorded.

(4) Total wages paid each payroll period, including value of board, lodging, or other compensation actually furnished to the employee.

(5) Total hours worked in the payroll period and applicable rates of pay. This information shall be made readily available to the employee upon reasonable request.

(6) When a piece rate or incentive plan is in operation, piece rates or an explanation of the incentive plan formula shall be provided to employees. An accurate production record shall be maintained by the employer.

(B) Every employer shall semimonthly or at the time of each payment of wages furnish each employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately, an itemized statement in writing showing: (1) all deductions; (2) the inclusive dates of the period for which the employee is paid; (3) the name of the employee or the employee's social security number; and (4) the name of the employer, provided all deductions made on written orders of the employee may be aggregated and shown as one item.

(C) All required records shall be in the English language and in ink or other indelible form, properly dated, showing month, day and year, and shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California. An employee's records shall be available for inspection by the employee upon reasonable request.

(D) Clocks shall be provided in all major work areas or within reasonable distance thereto insofar as practicable.

8. Cash Shortage and Breakage

No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

9. Uniforms and Equipment

(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. The term "uniform" includes wearing apparel and accessories of distinctive design or color. NOTE': This section shall not apply to protective apparel regulated by the Occupational Safety and Health Standards Board.

(B) When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards. NOTE': This section shall not apply to protective equipment and safety devices on tools regulated by the Occupational Safety and Health Standards Board.

(C) A reasonable deposit may be required as security for the return of the items furnished by the employer under provisions of subsections (A) and (B) of this section upon issuance of a receipt to the employee for such deposit. Such deposits shall be made pursuant to Section 400 and following of the Labor Code or an employer with the prior written authorization of the employee may deduct from the employee's last check the cost of an item furnished pursuant to (A) and (B) above in the event said item is not returned. No deduction shall be made at any time for normal wear and tear. All items furnished by the employer shall be returned by the employee upon completion of the job.

10. Meals and Lodging

(A) "Meal" means an adequate, well-balanced serving of a variety of wholesome, nutritious foods.

(B) "Lodging" means living accommodations available to the employee for full-time occupancy which are adequate, decent, and sanitary according to usual and customary standards. Employees shall not be required to share a bed.

(C) Meals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee. When credit for meals or lodging is used to meet part of the employer's minimum wage obligation, the amounts so credited may not be more than the following:

| Effective Dates: | January 1, 2001 | January 1, 2002 |
|---|---|---|
| Lodging: | | |
| Room occupied alone | $29.10 per week | $31.75 per week |
| Room shared | $24.25 per week | $26.20 per week |
| Apartment-two thirds (2/3) of the ordinary rental value, and in no event more than | $352.90 per month | $381.20 per month |
| Where a couple are both employed by the employer, two-thirds (2/3) of the ordinary rental value, and in no event more than | $522.10 per month | $563.90 per month |
| Meals: | | |
| Breakfast | $2.25 | $2.45 |
| Lunch | $3.10 | $3.35 |
| Dinner | $4.15 | $4.50 |

(D) Meals evaluated as part of the minimum wage must be bona fide meals consistent with the employee's work shift. Deductions shall not be made for meals not received or lodging not used.

(E) If, as a condition of employment, the employee must live at the place of employment or occupy quarters owned or under the control of the employer, then the employer may not charge rent in excess of the values listed herein.

## 11. Meal Periods

(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

(C) In all places of employment where employees are required to eat on the premises, a suitable place for that purpose shall be designated.

(D) Notwithstanding any other provision of this order, employees in the health care industry who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods. In order to be valid, any such waiver must be documented in a written agreement that is voluntarily signed by both the employee and the employer. The employee may revoke the waiver at any time by providing the employer at least one (1) day's written notice. The employee shall be fully compensated for all working time, including any on-the-job meal period, while such a waiver is in effect.

## 12. Rest Periods

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

## 13. Change Rooms and Resting Facilities

(A) Employers shall provide suitable lockers, closets, or equivalent for the safekeeping of employees' outer clothing during working hours, and when required, for their work clothing during non-working hours. When the occupation requires a change of clothing, change rooms or equivalent space shall be provided in order that employees may change their clothing in reasonable privacy and comfort. These rooms or spaces may be adjacent to but shall be separate from toilet rooms and shall be kept clean. NOTE': This section shall not apply to change rooms and storage facilities regulated by the Occupational Safety and Health Standards Board.

(B) Suitable resting facilities shall be provided in an area separate from the toilet rooms and shall be available to employees during work hours.

## 14. Seats

(A) All working employees shall be provided with suitable seats when the nature of the work reasonably permits the

(B) When employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties.

## 15. Temperature

(A) The temperature maintained in each work area shall provide reasonable comfort consistent with industry-wide standards for the nature of the process and the work performed.

(B) If excessive heat or humidity is created by the work process, the employer shall take all feasible means to reduce such excessive heat or humidity to a degree providing reasonable comfort. Where the nature of the employment requires a temperature of less than 60°F., a heated room shall be provided to which employees may retire for warmth, and such room shall be maintained at not less than 68°.

(C) A temperature of not less than 68° shall be maintained in the toilet rooms, resting rooms, and change rooms during hours of use.

(D) Federal and State energy guidelines shall prevail over any conflicting provision of this section.

## 16. Elevators

Adequate elevator, escalator or similar service consistent with industry-wide standards for the nature of the process and the work performed shall be provided when employees are employed four floors or more above or below ground level.

## 17. Exemptions

If, in the opinion of the Division after due investigation, it is found that the enforcement of any provision contained in Section 7, Records; Section 12, Rest Periods; Section 13, Change Rooms and Resting Facilities; Section 14, Seats; Section 15, Temperature; or Section 16, Elevators, would not materially affect the welfare or comfort of employees and would work an undue hardship on the employer, exemption may be made at the discretion of the Division. Such exemptions shall be in writing to be effective and may be revoked after reasonable notice is given in writing. Application for exemption shall be made by the employer or by the employee and/or the employee's representative to the Division in writing. A copy of the application shall be posted at the place of employment at the time the application is filed with the Division.

## 18. Filing Reports (See California Labor Code, Section 1174(a))

## 19. Inspection (See California Labor Code, Section 1174)

## 20. Penalties (See California Labor Code, Section 1199)

(A) In addition to any other civil penalties provided by law, any employer or any other person acting on behalf of the employer who violates, or causes to be violated, the provisions of this order, shall be subject to the civil penalty of:

(1) Initial Violation - $50. 00 for each underpaid employee for each pay period during which the employee was underpaid in addition to the amount which is sufficient to recover unpaid wages.

(2) Subsequent Violations - $100.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to an amount which is sufficient to recover unpaid wages.

(3) The affected employee shall receive payment of all wages recovered.

(B) The labor commissioner may also issue citations pursuant to California Labor Code Section 1197.1 for non-payment of wages for overtime work in violation of this order.

## 21. Separability

If the application of any provision of this order, or any section, subsection, subdivision, sentence, clause, phrase, word, or portion of this order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein.

## 22. Posting of Order

Every employer shall keep a copy of this order posted in an area frequented by employees where it may be easily read during the workday. Where the location of work or other conditions make this impractical, every employer shall keep a copy of this order and make it available to every employee upon request.

<General Materials (GM) - References, Annotations, or Tables>

Note: Authority cited: Section 1173, Labor Code; and California Constitution, Article XIV, Section 1. Reference: Sections 1182 and 1184, Labor Code.

HISTORY

1. Amendment filed 4-22-88; operative 7-1-88 (Register 88, No. 19.)

2. Repealer of subsection 4(3) filed 1-11-89; operative 1-11-89 (Register 89, No. 4).

3. Amendment of subsections 1 and 3 filed 2-28-89; operative 7-1-89 (Register 89, No. 10).

4. Change without regulatory effect pursuant to section 100, title 1,California Code of Regulations repealing subsection 8 (last sentence only) filed 4-24-89 (Register 89, No. 17).

5. Editorial correction of printing errors (Register 91, No. 32).

6. Amendment of subsections 2.(H) and 2.(K), new subsections 3.(J)-(K) and 11.(C) filed 8-5-93; operative 8-21-93. Submitted to OAL for printing only pursuant to Labor Code section 1185 (Register 93, No. 32).

7. Change without regulatory effect amending subsection 3(J) filed 9-21-93 pursuant to title 1, section 100, California Code of Regulations (Register 93, No. 39).

8. Amendment of subsection 4.(A) filed 9-19-96; operative 10-1-96. Submitted to OAL for printing only (Register 96, No. 38).

9. Amendment of subsection 4.(A) filed 1-14-97; operative 3-1-97. Submitted to OAL for printing only (Register 97, No. 3).

10. Amendment of parenthetical information below article heading and amendment of section filed 7-31-97; operative 1-1-98. Submitted to OAL for printing only pursuant to Labor Code section 1185 (Register 97, No. 31).

11. Repealer and new section filed 2-22-2002; operative 1-1-2001. Supplemental filing providing parenthetical information below article heading filed 4-15-2002. Submitted to OAL for printing only pursuant to Labor Code section 517 (Register 2002, No. 16).

8 CA ADC § 11040

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

<u>Docs In Sequence</u>    <u>Table of Contents</u>



# TAB 9

**§ 12:56-7.2 Definition of administrative**

(a) "Administrative" means any employee:

1. Whose primary duty consists of the performance of office or non-manual work directly related to management policies or general internal business operations; and

2. Who customarily and regularly exercises discretion and independent judgment; and

3. Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity; or who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or who executes under only general supervision special assignments and tasks; and

4. Who devotes less than 20 percent of his or her work to nonexempt work or less than 40 percent if employed by a retail or service establishment; and

5. Who is compensated for his or her services on a salary or fee basis, exclusive of gratuities, board, lodging or other facilities at a rate of not less than $ 300.00 per week effective November 5, 1990, $ 350.00 per week effective April 1, 1991 and $ 400.00 per week effective April 1, 1992.

(b) "Administrative" shall also include an employee whose primary duty consists of sales activity and who receives at least 50 percent of his or her total compensation from commissions and a total compensation of not less than $ 300.00 per week effective November 5, 1990, $ 350.00 per week effective April 1, 1991 and $ 400.00 per week effective April 1, 1992.

HISTORY:

Amended by R.1982 d.468, effective January 3, 1983.

See: 14 New Jersey Register 1145(a), 15 New Jersey Register 36(a).

Amended by R.1990 d.520, effective November 5, 1990.

See: 22 New Jersey Register 2235(a), 22 New Jersey Register 3379(b).

In (a)5 and (b): revised and updated amounts and dates in text.

Amended by R.1995 d.553, effective October 16, 1995.

See: 27 New Jersey Register 2868(a), 27 New Jersey Register 3958(a).

Chapter Notes

# TAB 10

**§ 12:56-7.4 Definition of outside sales person**

(a) "Outside sales person" means any employee:

1. Who is employed for the purpose of and who is customarily and regularly engaged away from his or her employer's place or places of business in:

i. Making sales; or

ii. Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

2. Whose hours of work of a nature other than that described in (a)1 above do not exceed 20 percent of hours worked in the workweek; provided, that work performed incidental to and in conjunction with the outside sales person's own personal sales or solicitations, including incidental deliveries and collection, shall be regarded as exempt work. Employees who basically drive vehicles and who only incidentally or occasionally make sales shall not qualify for this exemption.

HISTORY:

Amended by R.1990 d.520, effective November 5, 1990.

See: 22 New Jersey Register 2235(a), 22 New Jersey Register 3379(b).

Stylistic revisions.

Amended by R.1995 d.553, effective October 16, 1995.

See: 27 New Jersey Register 2868(a), 27 New Jersey Register 3958(a).

Chapter Notes