Case 3:07-cv-02446-MMC    Document 205-39    Filed 09/19/2008    Page 1 of 17
Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

**RECEIVED**

1

JAN 03 2008

LITTLER MENDELSON

COPY

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PHILIP WONG, FREDERIC          )
CHAUSSY, and LESLIE MARIE      )
SHEARN, individually, on       )
behalf of all others           )
similarly situated, and        )
on behalf of the general       )
public,                        )
                               )
          Plaintiffs,          )
                               )
     vs.                       )No. 3:07-cv-2446 MMC
                               )
HSBC MORTGAGE CORPORATION      )
(USA); HSBC BANK USA,          )
N.A.; and DOES 1 through       )
50, inclusive,                 )
                               )
          Defendants.          )

30(b)(6) VIDEOTAPED DEPOSITION OF
JEANETTE JENNINGS

Taken December 19, 2007
Commencing at 9:08 a.m.

REPORTED BY:  MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CSR
          PARADIGM REPORTING & CAPTIONING INC.
                1400 RAND TOWER
             527 MARQUETTE AVENUE SOUTH
          MINNEAPOLIS, MINNESOTA  55402-1331
     612-339-0545 * 800-545-9668 * Fax 612-337-5575

Jeanette Jennings  30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

41

1    one of our colleagues to assist us.  That's rare but

2    it's usually when we have an uptick in hiring, but

3    that is -- that is very rare.  I can't say -- name

4    just anyone because it could be anyone to assist us.

5        Q.  Now, what are you typically looking for in

6    a -- a loan officer that you're seeking to -- a loan

7    officer vacancy that you're seeking to fill?

8        A.  You mean skills?  What exactly -- what do

9    you mean?  I'm looking for them --

10       Q.  What criteria do you have?  Yeah.

11       A.  As far as a loan officer, typically what

12   we're looking for, obviously, is having some

13   industry experience.  It would also depend upon the

14   manager.  The manager may say, "I'm willing to train

15   on that mortgage experience.  I'm looking for

16   someone who has certain behaviors, retail

17   experience, sales experience," that kind of thing.

18       But predominantly, if we're looking at -- on

19   average, it would be someone who has retail-type

20   sales experience, whether in financial services

21   industry or within mortgage industry.

22       And, obviously, appear to have been

23   successful in doing so.

24       Q.  The primary thing that you'd be looking for

25   would be somebody who has demonstrated or who you

Jeanette Jennings  30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

42

1    believe would be a good salesperson?

2        A.   Having a true entrepreneurial spirit, that's

3    right.

4        Q.   Entrepreneurial spirit?

5        A.   Uh-huh.

6        Q.   How do you differentiate that from a good --

7    good sales -- good potential as a salesperson?

8        A.   I would differentiate between the two, as

9    far as being a good salesperson -- one is someone

10   who is able to counsel their employee -- excuse me,

11   their -- their customers, provide the right advice,

12   doing all of the right things in order to make sure

13   the sale is -- is -- is closed and it goes through

14   successfully.

15        As far as an entrepreneurial, having that

16   spirit, is making sure they're surrounding

17   themselves with the right centers of influence,

18   they're seeking out -- in this case of loan

19   consultants, are they visiting the Realtors?  Are

20   they visiting the accountants?  Are they visiting

21   attorneys? anyone who would be able to give them

22   those referrals, as well as visiting the branches,

23   making sure that -- "Hey, you know, I'm referring

24   business to you.  All right.  How can I assist you?"

25   You know, making sure that those relationships are

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

43

1    maintained.

2          So it's -- relationship manager type of

3    entrepreneurial is also what we would -- we would

4    expect because that is the expectation.

5          So that's how I would differentiate between,

6    you know, sales -- you have to have that to be the

7    entrepreneur, but the entrepreneur is also knowing

8    what needs to be done and going out to do that, to

9    build my business.

10         Q.   Now, these employees, the loan officers,

11   would acquire their skill by experience, rather than

12   by some advanced, specialized intellectual or

13   academic instruction; correct?

14         A.   I'm -- I'm not quite -- I'm not quite sure

15   of your question.  Can you clarify?

16         Q.   That the -- that the loan officers would

17   acquire their skill -- they would hone their loan

18   officer abilities by experience, as opposed to by

19   advanced, specialized academic or intellectual

20   instruction?

21         A.   I would disagree.  I would think it would be

22   both.  All right.  Some who have -- if you have

23   the -- the advanced degrees, if you will --

24   obviously, with finance and understanding that --

25   that also -- that's also a help.

107

1  customers, not the loan officers' customers, so they

2  can't sell away, they can't solicit, that kind of

3  thing.

4          As far as -- there's additional information

5  regarding exclusions, such as following our

6  statement of principle and business ethics.  If they

7  aren't -- that they can't accept gifts over a

8  certain dollar amount, according to policies,

9  anything that -- that kind of thing that follows our

10  North American policies that they can't accept.

11          So those are offhand -- and, again, I'm

12  speaking in only general terms because I don't have

13  the newest and latest version with me.

14          But the overall -- if I might add, the

15  overall premise and meat of it as to how they're

16  paid is -- has pretty much remained the same.

17      Q.  How do you decide, for a particular loan

18  officer, how long they are salaried before they go

19  to a recoverable draw system?

20      A.  Well, first, they're not salaried.  All

21  right?  And we have a draw policy, and, typically,

22  it is a six-month time period that is a

23  nonrecoverable draw.  So it's forgiven.

24          If it's anything beyond that, it would

25  depend upon the individual, their knowledge, their

Case 3:07-cv-02446-MMC    Document 205-39    Filed 09/19/2008    Page 6 of 17
Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

108

1  skills, their experience in the industry, what they

2  can bring forward to us as -- as additional

3  guaranteed loans, but that is rare, and it's

4  considered an exception if it's beyond the six

5  months.

6        There would have to be a case-by-case

7  scenario on each one.

8    Q.  The typical six-month nonrecoverable draw,

9  you said it's not a salary.  What difference, if

10  any, is there between a salary and the

11  nonrecoverable draw?

12        MS. BARRETT:  Objection; calls for a

13  legal analysis and conclusion.

14        MR. SCHWARTZ:  Go ahead.

15    A.  I -- I just don't -- they're not salaried

16  employees, which would possibly put them in a

17  different class.  They're a commissioned employee,

18  so they would, in other words, receive commissions

19  on top of that draw while it's forgiven for the

20  first six months or whatever that time period is.

21  BY MR. SCHWARTZ:

22    Q.  Okay.  But they get a -- for -- typically

23  for the first six months, sometimes longer in

24  special cases, they get a base -- they get a base

25  pay -- if you want to call it a salary or

Jeanette Jennings 30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

109

1   nonrecoverable draw or whatever it is, it's a base

2   pay that they're going to get, regardless of what

3   sales they do?

4       A.   That's correct.

5            I do want to clarify that further.  There —

6   that draw continues as a regular biweekly pay, just

7   like any other employee within North America.

8            So, in other words, they're prepaid their

9   commissions.  So if I earn -- as an example, I've —

10  I'm paid 4,000 -- or $2,000 biweekly, but in that

11  month I had 5,000 in commissions, then I am due, at

12  the end of the month, an additional $1,000 for

13  commissions.  All right?

14           On the other hand of that, being a

15  commissioned employee, if I've gone beyond my

16  forgivable -- forgiveness period, if I've earned

17  only 3,000 but I was paid 4,000, then I turn into a

18  deficit, and that deficit would come out of any

19  future commissioned earnings.

20           And they receive monthly statements, you

21  know, from finance detailing all of the commissions

22  paid.

23      Q.   Did there come a time when you changed the

24  commission system -- or commission -- sorry --

25  the -- the base pay system such that the loan

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

110

1   officers are only receiving $23,000 a year as -- as

2   a base?

3       A.   As part of the draw policy, it -- the draw

4   is based upon the individual -- all right? -- and

5   there is a tier based upon loan production.

6           So if I'm earning historically enough

7   fundings that I can have a hundred-thousand-dollar

8   draw, well, then I can have a hundred-thousand-

9   dollar draw.

10          If I'm not and my draw doesn't support that,

11  the minimum draw is the -- the Federal minimum, the

12  23, what, 660?  I can't remember the exact numbers

13  but in the $23,000 annual range.

14          But they're notified in advance that "Your

15  draw can change at the end of the six months,"

16  whatever that period is.

17          And if they aren't meeting the minimum

18  production, their manager should be having

19  conversations with them, and they would know by

20  their own monthly statements that they're not

21  meeting the minimum production standards.

22      Q.   Loan officers, as -- as you said, will be in

23  a deficit situation if they -- after the . . . the

24  first six months typically -- if they don't fund

25  enough loans to pay for the -- the draw.

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

111

1      Do they have -- they then have to pay that

2  money back to the company?

3      A.  Well, as I stated, if they are in a deficit

4  period, it would come out of any future commissions.

5      So the next month I might very well make

6  that up.  I might make -- do that 5,000.

7      So the thousand dollars I was a deficit

8  from, then I've broken even.  I've earned my 4,000

9  because, again, your commissions are being prepaid.

10  We prepay the draw, so that's really what that is.

11      So if I didn't make it and I only made

12  enough to recover 500, well, then, the next month

13  that would carry over; it would come off of those

14  future commissions.

15      Q.  Right.  But the month that you failed to

16  produce enough loans, you could -- you could be paid

17  zero and receive a -- a check that says "Negative a

18  thousand"?

19      A.  No.

20      Q.  No?

21      A.  No.  They receive their biweekly draw.

22  Despite the fact of whatever they -- they've earned,

23  they are going to receive a biweekly draw.

24      Q.  So you're saying, no matter what deficit an

25  employee is carrying, they're receiving their

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

124

1    A.   Uh-huh.

2    Q.   Are you aware that loan officers are -- have

3    required attendance at HSBC facilities?

4    A.   For meetings or -- I'm not sure --

5    Q.   That they're required to report -- that loan

6    officers are required to report to HSBC's facilities

7    on a regular basis.

8    A.   "HSBC's facilities" is pretty broad.  If

9    it's a regular basis for a monthly meeting,

10   quarterly meeting -- I'm not sure -- if it's a

11   day-to-day basis, no, they shouldn't be required to

12   be doing that.

13       Because, again, the branch is only one piece

14   of their referral source.  Do they have to let that

15   branch know where they are so that appointments can

16   be made for them?  Sure.  But for them to be

17   physically at that location, in presence, eight

18   hours a day, no, that is not a requirement.

19       MR. SCHWARTZ:  I'll show you a

20   document, Exhibit 4.  This was previously marked by

21   Defendant MORT 174.

22                    (The document was thereupon

23                     marked Deposition Exhibit

24                     No. 4 for identification as of

25                     December 19, 2007.)

Jeanette Jennings  30(b)(6)  12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

125

1  BY MR. SCHWARTZ:

2    Q.  Have you ever seen this document or a

3  document of this nature before?

4    A.  No.

5    Q.  Okay.

6    A.  Excuse me.  Other than reviewing it in Sue

7  Marczak's deposition.

8    Q.  Okay.

9    A.  But prior to that, no.

10    Q.  You did review it prior to the deposition

11  today, though?

12    A.  Yeah.

13    Q.  Okay.  So you knew that, in fact, loan

14  officers -- and this is just an example -- are

15  required to attend at HSBC Bank branches on a daily

16  basis here, as exhibited here in Exhibit 4?

17          MS. BARRETT:  Objection.  The document

18  speaks for itself.

19    A.  I would say this is -- this would

20  identify -- and in looking at this -- that you have

21  to have coverage for a branch.  Let me explain.

22       Our loan officers -- the bank is the

23  customer of the mortgage corporation.  We're

24  servicing their customers.

25       So if I'm given three branches that are part

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

126

1  of my territory that I'm covering, that would be

2  indicated so that my branches know who to call and

3  when to call.  And, if I'm out of the office -- oh,

4  and there's another loan officer to assist you --

5  that's all this identifies to me.  This is stating

6  that you have to have branch coverage but not that

7  you have to be physically there.

8          I would dispute that.

9          If I can continue to clarify --

10 BY MR. SCHWARTZ:

11     Q.  No.  I don't think there's a question

12 pending.

13         So I -- just to -- the question I have is,

14 so it's your testimony that -- that the managers in

15 the mortgage division do not require their employees

16 to be physically present at the HSBC branches?

17         MS. BARRETT:  Objection; misstates

18 testimony.

19     A.  That the loan officers -- and -- and I can

20 testify that I've also recruited some of these loan

21 officers, not Philip Wong or Frederic by any means.

22 But part of that recruitment process and

23 interviewing process is that they are entrepreneurs,

24 that the branch is just one piece of their referral

25 source.

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

137

1    were -- but it's not your testimony they were told

2    that they should be spending more than 50 percent of

3    their time outside of the branch?

4        A.  As I stated before, we don't say how much

5    percentage that they should be out; they should not

6    be tied to the branch.

7        Q.  Okay.

8        A.  The expectation is they don't have to be

9    there and shouldn't be there eight hours a day every

10   day.  That is just one referral source.

11       Q.  Do you know to what extent, if any, loan

12   officers are told that their primary responsibility

13   is to the branch?

14       A.  I -- I couldn't comment to that.  Sales

15   managers -- it depends upon the territory.

16       Q.  And the . . . the term "outside sales," what

17   conversations did you use that term in with -- you

18   said you -- you've used that in conversations with

19   the loan officers.

20       A.  It . . . just reclarifying that you're

21   outside salespeople.  You're entrepreneurs, you're

22   commissioned a sales force, and again, hence,

23   that -- it's implied just by the term of

24   "commissioned sales force" and how they're paid.

25           What -- when and how I used it -- I use it

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

160

1          And that is then chunked down based upon

2    geographics and regions -- I don't get involved into

3    that process -- and from there, based upon like

4    regions, what are the minimum standards that

5    everyone needs to meet.

6          And, yes, there is a minimum standard that

7    loan officers need to meet.  What that is, I'd have

8    to look back at their annual review because it's

9    inserted into their annual review process --

10         Q.   That would be --

11         A.   -- and as part of their business plan.

12         Q.   Right.

13         A.   Excuse me.

14         Q.   And that would be -- David Gates would --

15    would be the person who would be involved in

16    figuring out what the actual numbers were for --

17         A.   Yes.

18         Q.   -- for -- sorry -- the actual numbers were

19    for sales targets for the loan officers?

20         A.   Yes.

21         Q.   But in terms of the overall structure of the

22    performance accountability and assessment, that

23    would be the same formula for each position

24    nationwide?

25         A.   For the core responsibilities, yes.   If

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

161

1       there's anything beyond that, just as my own

2       position -- my manager and I may set , "Oh, and, by

3       the way, I'm giving you some additional things that

4       I require of you this year --"

5           Q.  Right.

6           A.  "-- in addition to these," so that might be

7       also between manager and the employee, as well.

8           Q.  Right.

9           A.  But the core, yes, they're the same

10      nationwide.

11          Q.  Right.  And then, likewise, there's a . . .

12      there's a national protocol with respect to how

13      employees are disciplined; is that right?

14          A.  We have a performance management process, yeah.

15          Q.  Could you describe your performance

16      management process.

17          A.  Well, the overall performance management

18      process -- there -- there are certain steps.  Now,

19      depending upon what the infraction is that that

20      person's being disciplined, all those steps may or

21      may not have to be followed.

22              So, obviously, if it's a regular performance

23      issue, we would begin with, obviously -- there would

24      be verbal discussions ahead of time.  My manager, if

25      I'm not meeting my goals, would be having a

Jeanette Jennings 30(b)(6) 12/19/2007
Philip Wong, et al. v. HSBC Mortgage Corporation, et al.\

195

1   STATE OF ILLINOIS )

                    ) SS.

2   COUNTY OF DU PAGE )

3

4        I, Melanie L. Humphrey-Sonntag,

5   Certified Shorthand Reporter No. 084-004299, CSR,

6   RDR, CRR, FAPR, and a Notary Public in and for the

7   County of DuPage, State of Illinois, do hereby

8   certify that previous to the commencement of the

9   examination, said witness was duly sworn by me to

10  testify the truth; that the said deposition was

11  taken at the time and place aforesaid; that the

12  testimony given by said witness was reduced to

13  writing by means of shorthand and thereafter

14  transcribed into typewritten form; and that the

15  foregoing is a true, correct, and complete

16  transcript of my shorthand notes so taken as

17  aforesaid.

18       I further certify that there were present at

19  the taking of the said deposition the persons and

20  parties as indicated on the appearance page made a

21  part of this deposition.

22       I further certify that I am not counsel for

23  nor in any way related to any of the parties to this

24  suit, nor am I in any way interested in the outcome

25  thereof.

196

1        IN TESTIMONY WHEREOF I have hereunto set my

2   hand and affixed my Notarial Seal this 28th day of

3   December, A.D. 2007.

4

5

6                              Certified Shorthand Reporter

                               Registered Diplomate Reporter

7                              Certified Realtime Reporter

                               Fellow of the Academy of

8                              Professional Reporters

9

10  My commission expires

    February 17, 2010

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"OFFICIAL SEAL"
M. L. HUMPHREY-SONNTAG
Notary Public, State of Illinois
My Commission Expires 02/17/10