GEORGE J. TICHY, II, Bar No. 041146
MICHAEL F. MCCABE, Bar No. 111151
MICHELLE R. BARRETT, Bar No. 197280
RACHELLE L. WILLS, Bar No. 257471
LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108.2693
Telephone:    415.433.1940
Email: gtichy@littler.com; mmccabe@littler.com;
mbarrett@littler.com; rwills@littler.com

Attorneys for Defendant
HSBC MORTGAGE CORPORATION (USA) AND
HSBC BANK USA, N.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Philip Wong, Frederic Chaussy, Leslie Marie Shearn, and Chad Barbiere, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>                    Plaintiff,<br><br>          v.<br><br>HSBC Mortgage Corporation (USA); HSBC Bank USA, N.A.; and DOES 1 through 50, inclusive,<br><br>                    Defendant. | Case No.  C 07 2446 MMC [ECF]<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DECERTIFY CONDITIONAL FLSA CLASS**<br><br>Hearing Date:      April 23, 2010<br>Time:                   9:00 a.m.<br>Courtroom:         7 (19th Floor)<br><br>Complaint Filed:  May 7, 2007; June 29, 2007 (FAC); August 22, 2008 (SAC) |

## <u>NOTICE OF MOTION</u>

        PLEASE TAKE NOTICE that on Friday, April 23, 2010 at 9:00 a.m. in the courtroom of the Honorable Maxine Chesney of the above-mentioned Court, Defendants HSBC Mortgage Corporation (USA) and HSBC Bank USA, N.A. ("Defendants") will, and hereby do, move for an order to decertify the collective action that was conditionally certified on or about March 19, 2008, in this case pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b).

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF CONDITIONAL CLASS                                              C 07 2446 MMC [ECF]

1  Defendants move at this time for an Order to Decertify the Collective Action that was

2  conditionally certified on the aforementioned date.  The evidence demonstrates that the named and

3  opt-in Plaintiffs are not similarly situated and that the determining facts establish that decertification

4  is warranted and appropriate.

5  This Motion is based upon the Notice of Motion and Motion; the accompanying

6  Memorandum of Points and Authorities; and accompanying deposition testimony, declarations and

7  exhibits.

8  Dated: March 19, 2010

9

10

11  /s/ Michelle R. Barrett
   GEORGE J. TICHY, II

12  MICHAEL F. MCCABE
   MICHELLE R. BARRETT

13  RACHELLE L. WILLS
   LITTLER MENDELSON

14  A Professional Corporation
   Attorneys for Defendant

15  HSBC MORTGAGE CORPORATION (USA)
   AND HSBC BANK USA, N.A.

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                    2.                    C 07 2446 MMC [ECF])

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ...................................................................................................1

II.  FACTS .................................................................................................................1

III. LEGAL ANALYSIS ...........................................................................................2

    A.   Following Extensive Discovery, Plaintiffs Cannot Establish That They Are
        Similarly Situated ........................................................................................2

        1.   Courts Within The Ninth Circuit Have Set A High Bar For
             Adjudicating The Outside Sales Exemption on a Representative Basis .........3

    B.   HMCU Did Not Implement Uniform Policies Or Practices Governing How
        Plaintiffs Performed Their Work ....................................................................6

    C.   The Exemptions At Issue Require Individualized Inquiry Regarding How
        Each Loan Officer Performed His/Her Job ......................................................7

        1.   Overview of Applicable Exemptions ...................................................8

             a.   The Outside Salesperson Exemption.........................................8

             b.   The Highly Compensated Exemption.........................................9

    D.   Widely Varying Factual And Employment Settings Of Individual Plaintiffs
        Warrant Decertification ................................................................................9

        1.   Loan Officers Maintain Independence And Discretion Over How They
             Performed Their Job Duties...........................................................10

        2.   Plaintiffs' Work Experiences Varied Due to A Multitude of Factors
             That Prevents Resolution Of This Case On A Collective Basis.....................13

             a.   Managerial Expectations of Loan Officers Differed .........................14

             b.   Circumstances Unique To Particular Geographic Regions
                 Affected Plaintiffs' Work Activities.........................................16

             c.   Plaintiffs Utilized A Variety Of Methods To Sell Loans .................18

             d.   Plaintiffs Spent Varying Amounts Of Time At Loan Production
                 Offices Or Bank Branches.........................................................19

    E.   Defendants Will Be Required To Present Individualized Rebuttal Evidence
        For Each Plaintiff.........................................................................................20

        1.   Application Of The Outside Salesperson Exemption  Requires An
             Analysis of Each Loan Officer's Job Duties .....................................21

        2.   Application Of The Highly Compensated Exemption Criterion Also
             Requires An Individual Analysis......................................................21

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

i.

C 07 2446 MMC [ECF])

# TABLE OF CONTENTS
## (CONTINUED)

PAGE

3. Damage Calculations Will Be Highly Individualized ....................................22

    a. The Trier of Fact May Be Required To Determine Which Periods Of Time Each Individual Plaintiff Met The Requirements Of The Outside Salesperson and/or Highly compensated Exemptions ................................................................22

    b. Plaintiffs' Positions During The Relevant Statutory Time Period Also Impacts Their Damages ...................................................23

    c. Plaintiffs' Work Hours Also Affect Any Determination Of Damages ...................................................................................................23

F. Fairness And Procedural Considerations Strongly Support Decertification .............24

IV. CONCLUSION ......................................................................................................25

Firmwide:94692214.3 023404.1043

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

ii.

C 07 2446 MMC [ECF])

# TABLE OF AUTHORITIES

PAGE

## CASES

Campbell v. PricewaterhouseCoopers, LLP, 253 F.R.D. 586 (E.D. Cal. 2008) ...................................4

Castle v. Wells Fargo Fin., Inc., 2008 U.S. Dist. LEXIS 106703 (N.D. Cal. Feb. 20, 2008)...........................................................................................................................................2, 21

Colson v. Avnet, Inc., 2010 U.S. Dist. LEXIS 12620 at *33-34 (D. Ariz. Jan. 27, 2010)...........................................................................................................................................3, 4

Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165 (1989)..........................................................24

In re Wells Fargo Home Mort. Overtime Pay Litig., 571 F.3d 953 (9th Cir. 2009) ...................3, 4

Johnson v. TGF Precision Haircutters, Inc., 2005 U.S. Dist. LEXIS 44259 (S.D. Tex. Aug. 17, 2005) ........................................................................................................................24

Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493 (D. N.J. 2000)..................................3

Oetinger v. First Residential Mortg. Network, Inc., 2009 U.S. Dist. LEXIS 61877 (W.D. Ky. July 15, 2009) ..............................................................................5, 8, 9, 21, 24

Olivo v. GMAC Mortg, Corp., 374 F. Supp. 2d 545 (E.D. Mich. 2004) .......................................8

Pfohl v. Farmers Ins. Group, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004)...................3, 5

Reed v. County of Orange, 2010 U.S. Dist. LEXIS 6157 (C.D. Cal. Jan. 8, 2010)...2, 3, 5, 14, 24, 25

Reyes v. Texas Ezpawn L.P., 2007 U.S. Dist. LEXIS 1461 (S.D. Tex. Jan. 8, 2007).......................25

Rutlin v. Prime Succession, Inc., 220 F.3d 737 (6th Cir. 2000)..................................................23

Smith v. T-Mobile USA, Inc., 2007 U.S. Dist. LEXIS 60729 (C.D. Cal. Aug. 15, 2007)...........................................................................................................................3, 6, 25

Thiessen v. General Electric Capital Corp., 267 F.3d 1095 (10th Cir. 2001) ..............................3

Vinole v. Countrywide, 571 F.3d 935 (9th Cir. 2009) ....................................3, 4, 5, 7, 8, 21

Wynn v. Broadcasting Co., 234 F.Supp.2d 1067 (C.D. Cal. 2002) ..............................................3

## STATUTES

29 U.S.C. § 13(k).............................................................................................................21

29 U.S.C. §216(b)...............................................................................................................9

## OTHER AUTHORITIES

29 C.F.R. § 541.201(a) .......................................................................................................9

29 C.F.R. § 541.203(b) ........................................................................................................9

29 C.F.R. § 541.500..........................................................................................................8, 21

29 C.F.R. § 541.503...............................................................................................................8

29 C.F.R. § 541.601..........................................................................................................9, 23

29 C.F.R. § 541.601(3)..........................................................................................................9

29 C.F.R. § 541.601(b)(3) ......................................................................................................9

29 C.F.R. § 541.700...............................................................................................................8

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFT.'S MOT. FOR DECERTIFICATION OF
COLLECTIVE CLASS AND MPA I/SO (NO.
C 07 2446 MMC [ECF])

iii.

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

29 C.F.R. § 541.700(b) ............................................................................................22

29 C.F.R. § 541.701 ..................................................................................................8

DOL Op Letter, FLSA 2006-11 (Sept. 8, 2006) .......................................................9

DOL Op. Letter, FLSA 2006-11 (Mar. 31, 2006) ....................................................8

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFT.'S MOT. FOR DECERTIFICATION OF
COLLECTIVE CLASS AND MPA I/SO (NO.
C 07 2446 MMC [ECF])

iv.

1     **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3         HSBC Mortgage Corporation (USA) and HSBC Bank USA, N.A. (referred to as "HMCU"

4 and "HBUS," or collectively as "Defendants") respectfully submit the following Motion to Decertify

5 the Collective Class composed of Senior Retail Mortgage Loan Consultants, Retail Mortgage Loan

6 Consultants and Premier Mortgage Sales Officers (hereinafter "loan officers").[1]  Having completed

7 the non-expert discovery in this case, Defendants have developed a factual record that establishes

8 beyond dispute that the claims raised in this case cannot be resolved on a representative basis.  As

9 such, decertification is warranted.  The uncontradicted evidence shows there is no common policy,

10 plan, or directive dictating how loan officers were required to generate their mortgage loan sales.

11 Consequently, virtually every loan officer performed their jobs differently.  In order to determine if

12 each Plaintiff and opt-in Plaintiff was entitled to overtime, a fact finder will need to receive evidence

13 regarding how each and every loan officer actually spent his/her work time to determine the

14 applicability of the outside sales and/or highly compensated exemptions.  The need to examine

15 evidence from every loan officer defeats the purpose and benefits of a collective action.

16         As set forth in detail below, loan officers' job duties varied depending on a number of factors

17 including where they worked, local and national economic conditions, prior experience in the

18 industry, manager expectations, types of loan products sold, and sales approach adopted.  Further

19 complicating the analysis, the way loan officers performed their jobs changed over time.  In light of

20 the diverse evidence before the Court affecting the application of exemptions to the claims asserted,

21 the Court should decertify the collective action and dismiss the opt-in Plaintiffs from the lawsuit.

22 **II.    FACTS**

23         Plaintiffs initiated this action in May 2007 alleging that Defendants misclassified loan

24 officers as exempt employees under federal and state law.[2]  On January 21, 2009, the Court granted

---

25 [1] HMCU, not HBUS, employed the loan officers involved in this case.  *See* Declaration of David
26 Gates ("Gates Decl.") ¶3, which is attached as an exhibit to the Declaration of Michelle R. Barrett
("Barrett Decl. ¶_") in support of Defendants' Motion.  By jointly submitting or referring
27 collectively to Defendants, Defendants in no way intend to waive their position that HMCU, not
HBUS, is the loan officers' employer and that HBUS is improperly included in this suit.
28 [2] Plaintiffs also allege that Defendants had unlawfully required non-exempt sales assistants to work
off the clock and miss meal and rest periods.  *See* U.S. Dist. Ct. for the No. Dist. of Calif., Case No.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

C 07 2446 MMC [ECF])

1  Defendants' Motion for Judgment on the Pleadings and eliminated the state law claims.

2        Named Plaintiffs moved early on for conditional certification of a collective class under 29

3  U.S.C. § 216(b).  *See* U.S. District Court for the Northern District of California Case No. 07-CV-

4  2446 at Docket #69 (hereinafter "Dkt. #_").  They contended that loan officers were similarly

5  situated based on HMCU's uniform treatment of loan officers as exempt.

6        The Court ordered fact discovery be completed by February 5, 2010.  Dkt. #254.  Although

7  Defendants requested more, they deposed a total of 24 Plaintiffs and opt-ins, whose deposition

8  testimony showed widely varied methods of doing the loan officer job.[3]  Barrett Decl. ¶2.

9  Meanwhile, Plaintiffs scheduled and deposed 11 loan officer managers.  *Id.*  Defendants provided

10  Plaintiffs with over 30,000 pages of documents, and have answered 46 interrogatories.  *Id.* ¶3.

11  ## III.   LEGAL ANALYSIS

12      **A.   Following Extensive Discovery, Plaintiffs Cannot Establish That They Are**
13           **Similarly Situated.**

14        To justify proceeding through a collective action, "[i]t is not sufficient for the plaintiffs'

15  evidence to merely 'successfully engage' the competing evidence offered by the defendant."  *Reed v.*

16  *County of Orange*, 2010 U.S. Dist. LEXIS 6157 at *18 (C.D. Cal. Jan. 8, 2010) (quoting *Castle v.*

17  *Wells Fargo Fin., Inc.*, 2008 U.S. Dist. LEXIS 106703 at *2 (N.D. Cal. Feb. 20, 2008)).  Rather,

18  Plaintiffs have the burden to "to provide *substantial* evidence to demonstrate" that they are

19  "similarly situated."  *Reed,* 2010 U.S. Dist. LEXIS 6157 at *18 (emphasis. added).  At the second

20  stage of the collective action certification process following the close of discovery, courts use a

21  strict, heightened standard of review to determine whether plaintiffs are in fact similarly situated

22  such that judicial economy can be achieved by trying the case on a collective basis.  In making this

23  determination, courts weigh various factors, including: (1) the disparate factual and employment

24  settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear

25  to be individual to each plaintiff; and, (3) fairness and procedural considerations.[4]  *Reed*, 2010 U.S.

---

26  07-CV-2446 at Dkt. #15 and 183.  Plaintiffs never sought certification, conditional or otherwise, of
these claims, and the Court's order granting conditional certification was limited to loan officers.
27  [3] Reference to "Plaintiffs" includes both named Plaintiffs and opt-in Plaintiffs.
[4] At least one district court has further refined the second stage analysis and has articulated
28  additional factors to consider, including: (1) whether plaintiffs held the same job titles; (2) whether
plaintiffs worked in the same level of the organization; (3) whether plaintiffs worked in different

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS
2.
C 07 2446 MMC [ECF])

Dist. LEXIS 6157 at *18. *See also Smith v. T-Mobile USA, Inc.*, 2007 U.S. Dist. LEXIS 60729 at *10 (C.D. Cal. Aug. 15, 2007); *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447 at *8-9 (C.D. Cal. Mar. 1, 2004) (citing *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). Each of these factors weigh heavily in favor of decertification.

### 1. Courts Within The Ninth Circuit Have Set A High Bar For Adjudicating The Outside Sales Exemption on a Representative Basis.

In addressing two Rule 23 class actions involving mortgage loan officers, the Ninth Circuit recognized that the outside sales exemption in particular requires a fact intensive analysis of the specific job duties of putative class members which militates against class certification.[5] *See In re Wells Fargo Home Mort. Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009); *Vinole v. Countrywide*, 571 F.3d 935 (9th Cir. 2009). The same rationale that the Ninth Circuit used when rejecting Rule 23 class certification of loan officers in *Vinole* and *Wells Fargo* applies equally to FLSA collective actions concerning loan officers. Namely, analysis of the outside sales and the highly compensated exemptions requires a highly individualized inquiry concerning each loan officer's work activities. In *Pfohl*, the court declined to certify a collective class composed of employees, who alleged that they were uniformly misclassified as exempt, aptly noting that "the issue[] of the...administrative exemption tests of the FLSA require such individualized inquiries....'[T]he focus [in FLSA cases] is not on [the employer's] action, but instead on the nature of the employee's job duties in the context of the relevant exemption criteria.'" *Pfohl*, 2004 U.S. Dist. LEXIS 6447 *29 (quoting *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D. N.J. 2000)). By parity of analysis, the Ninth Circuit's analysis virtually requires decertification here.[6]

---

divisions; (4) the extent to which the alleged violation occurred during different time periods; (5) the extent to which the alleged violation was committed by different decision-makers; and, (6) the extent to which plaintiffs rely on common evidence to prove the alleged violation. *Wynn v. Broadcasting Co.*, 234 F.Supp.2d 1067, 1083 (C.D. Cal. 2002).
[5] The Ninth Circuit issued these opinions after this Court's grant of conditional certification in this matter.
[6] In fact, in *Colson v. Avnet, Inc.*, 2010 U.S. Dist. LEXIS 12620 at *33-34 (D. Ariz. Jan. 27, 2010), the court, relying in part on *In re Wells Fargo*, 571 F.3d 953, declined to order even initial conditional certification of a class of sales and marketing representatives based solely on the fact that these representatives had all been classified by their employer as exempt. The court reasoned "[a]s a matter of both sound public policy and basic common sense, the mere classification of a group of employees - - even a large or nationwide group - - as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for 216(b) purposes." *Colson*, 2010 U.S. Dist. LEXIS

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

In *Wells Fargo*, the Ninth Circuit held that the district court had abused its discretion by granting class certification of Wells Fargo's mortgage loan officers who, like Plaintiffs, argued that they had been misclassified. 571 F.3d at 959. Like Defendants in this case, Wells Fargo argued that several exemptions applied, including the outside sales and highly compensated exemptions. *Id.* at 956. The Ninth Circuit criticized the district court's heavy reliance on Wells Fargo's uniform policy of classifying all of its mortgage loan officers as exempt. *Id.* at 958. The Ninth Circuit recognized that Wells Fargo's "blanket exemption policy," while relevant, did not address the highly-individualized issues presented by the overtime exemptions, including outside sales:

> [The outside sales] exemption applies where, among other things, the employee is "customarily and regularly away from the employer's place of . . . business . . ." [citation omitted]. Often, this exemption will militate against certification because, the district court noted, it requires '<u>a fact-intensive inquiry into each potential plaintiff's employment situation</u>....' E.R. 11....Whether [a uniform exemption policy] is in place or not, courts must still ask where the individual employees actually spend their time.

*Id.* at 959 (emphasis added) (citing *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 603 (E.D. Cal. 2008)).

In *Vinole*, the Ninth Circuit considered whether the district court had properly denied certification of a class composed of Countrywide mortgage loan officers who also had been uniformly classified as exempt. 571 F.3d at 937. The district court had denied class certification because "analysis [of the outside salesperson exemption] would require an individualized inquiry into the manner in which each [mortgage loan officer] carried out his or her work." *Id.* at 944. The Ninth Circuit agreed that the district court had properly declined to certify the class based solely on Countrywide's uniform exemption policy, noting "[i]nstead of adopting what would essentially be a bright-line presumption in favor of class certification, we favor an approach that takes into consideration all factors that militate in favor of, or against, class certification." *Id.* at 946.

In *Vinole*, the appellate court did not adopt a *per se* exclusion of representative actions involving exemption defenses, but limited their use to situations that involve truly common issues:

> Our approach is consistent with that taken by several district courts with respect

at *32-33.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

to evaluating class certification in the wage exemption context. These courts acknowledged the employer's uniform application of an exemption to employees, but focused on whether the employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs and other factors susceptible to common proof.

*Id.* at 946 (footnote omitted). In upholding the district court's denial of class certification, the appellate court found the lack of corporate control compelling:

Plaintiff's claims will require inquiries into how much time each individual [loan officer] spent in or out of the office and how the [loan officer] performed his or her job; all of this where the [loan officer] was granted almost unfettered autonomy to do his or her job. This must be considered along with the lack of issues subject to common proof that would actually ameliorate the need to hold several hundred mini-trials with respect to each [loan officer's] actual work performance.

*Id.* at 947.

District courts within and outside this Circuit impose an equally intensive analysis when examining certification of collective classes under the more rigorous second step for collective certification. For example, in *Oetinger v. First Residential Mortg. Network, Inc.*, 2009 U.S. Dist. LEXIS 61877, *11-12 (W.D. Ky. July 15, 2009), a district court granted the defendant's motion to decertify a collective class of mortgage loan bankers. Like the Plaintiffs here, the *Oetinger* plaintiffs argued that they had met their collective certification burden because the defendant classified all of its mortgage loan bankers as exempt employees. *Id.* at *7-8. The court rejected the plaintiffs' argument, reasoning that "[the defendant] has no company-wide plan strictly governing the particular duties of every mortgage banker," and an "employer's classification means little compared to the employee's actual job duties and circumstances." *Id.* at *8-9.

Similarly, in *Pfohl*, the district court declined to certify a collective class of employees who had been classified as exempt. In applying the second step of review, the court held that the plaintiff had failed to demonstrate that the putative class was similarly situated "in regard to the form or method of wages paid [to the putative class members], and that he has not shown that the job duties of the putative collective group are sufficiently similar to his." 2004 U.S. Dist. LEXIS 6447 at *21; *see also Reed,* 2010 U.S. Dist. LEXIS 6157 at *58 (decertifying a collective class of plaintiffs alleging various off-the-clock violations, reasoning that plaintiffs' experiences varied "*from*

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

5.

C 07 2446 MMC [ECF])

1   assignment to assignment, from supervisor to supervisor, and from individual to individual"

2   (emphasis added)); *Smith*, 2007 U.S. Dist. LEXIS 50729 at *14-18 (denying certification at the

3   second step of review because plaintiffs' overtime claims arose "out of different fact patterns").

**B.   HMCU Did Not Implement Uniform Policies Or Practices Governing How Plaintiffs Performed Their Work.**

Like the defendant in *Vinole*, HMCU did not direct how loan officers were required to

perform their job duties. Since approximately May 2005, HMCU's retail mortgage sales group has

been divided into four geographic regions, with each division headed by a Divisional Manager.

Gates Decl. ¶4.[7] Each division is composed of geographical regions headed by either a Regional

Retail Mortgage Lending Manager or a Senior Retail Mortgage Lending Manager. *Id.*[8] During the

relevant time period, there were approximately 13 to 14 Regional or Senior Regional Manager

positions. *Id.* Within most regions, there are also Sales Managers who have direct responsibility

over loan officers in a smaller geographic region. *Id.* Multiple Sales Managers report directly to a

Regional or Senior Regional Manager. *Id.* In some areas, HMCU also employs Retail Mortgage

Lending Team Leaders. Team Leaders report up to Sales Managers and help a team of loan officers

in a particular geographic area to achieve sales goals.[9] *Id.* Gates 19:14-20:21, 58:7-14. For

example, as a Divisional Manager, Debra Dezego supervised four Regional Managers, 14 Sales

Managers, and approximately 100 loan officers. Dezego 13:14-21. And, as a Regional Manager,

Ms. Dezego was responsible for 60 loan officers on average. *Id.* 15:7-16:4.[10]

Consistent with this diffusion of management authority, HMCU has never issued any

policies, procedures or directives regarding how loan officers should spend their time generating

mortgage loan sales. Gates Decl. ¶5. In fact, HMCU's Senior Vice President responsible for all

retail mortgage operations testified:

---

[7] All declarations, depositions, and exhibits cited herein are attached to the Declaration of Michelle R. Barrett in support of this Motion.
[8] Regional Retail Mortgage Lending Managers manage retail residential mortgage production for smaller and/or less complex regions, while Senior Regional Retail Mortgage Lending Managers manage larger and/or more complex regions. Gates Decl. ¶4.
[9] Some of the case's Plaintiffs were employed in managerial positions during the conditional class period. However, the Court's conditional certification order only extends to loan officers. By citing to deposition testimony or other evidence relating to these individuals, Defendants do not concede these individuals' time spent as managers is properly included in this case.
[10] *See also* Kilfoil 12:15-13:7 (worked as loan officer, Team Leader, and Regional Manager).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                    6.                    C 07 2446 MMC [ECF])

Q.  ...Are the loan officers told how much time they're expected to spend at the bank branches or at – in the Mortgage Corp. offices or in home offices versus how much time they're expected to spend somewhere else out in the field.
A.  No....

Gates 65:12-66:8 (passage partially quoted).   Similarly, no one has ever instructed Divisional, Regional or Sales Managers or Team Leaders to issue such policies, procedures or directives.  Gates 72:7-12; Dezego 17:22-18:1, 18:8-19:5, 20:14-21; Keller 26:20-27:4; Kilfoil 30:6-15; Masseria 29:1-4, 29:11-20; Needham 100:18-103:17, 104:3-105:11; Nelson 25:8-26:15; Peters 43:22-45:14; Robinson 29:21-32:1; Young 171:22-172:1; Gates Decl. ¶5.  Rather, HMCU affords broad discretion to the Divisional, Regional, and Sales Managers to conduct business and whether to set any particular expectations they may have at the more localized or regional level.  Kilfoil 26:5-27:17; Ku 52:20-53:12, 93:7-94:4, 115:2-6, 115:13-17; Masseria 66:19-67:3; Needham 189:10-190:2, 190:20-24; Nelson 26:21-27:8; Young 124:18-125:9, 125:25-126:4; Gates Decl. ¶5.  HMCU expects each loan officer to operate autonomously and have substantial discretion in determining how best to generate mortgage loan sales.[11]   Gates Decl. ¶5; Kilfoil 84:8-85:9.  In fact, loan officers exercised such unfettered discretion in performing their jobs that no manager deposed in this case could testify generally as to how much time loan officers spent at various locations, yet they all testified that they did not dictate how loan officers spent their work time generating mortgage loan sales.  Gates 55:25-56:9; Dezego 37:5-19; Kilfoil 28:6-23; Ku 36:1-14, 36:20-37:1, 112:4-13, 113:9-114:2; Masseria 30:9-19, 32:20-33:19, 52:12-22; Needham 65:19-67:13, 88:6-15, 88:23-90:11, 90:22-91:23, 92:14-23, 94:16-95:10; Nelson 26:21-27:8, 27:23-28:1; Peters 45:15-46:19; Robinson 29:21-30:14; Young 116:7-118:12.

**C.     The Exemptions At Issue Require Individualized Inquiry Regarding How Each Loan Officer Performed His/Her Job.**

Defendants assert that Plaintiffs are exempt from FLSA overtime requirements as outside salespersons, and with respect to those Plaintiffs making more than $100,000 per year, as highly

---

[11] Like the employer in *Vinole,* HMCU employs another group of mortgage sales employees known as "telesales" employees.  Telesales employees are treated as inside sales employees paid on an hourly basis and eligible for overtime.  Also, unlike the retail mortgage loan officers in the instant action, telesales employees work from a fixed location and are not expected to go out into their communities to generate sales.  Gates Decl. ¶8; Gates 49:24-50:5; *see also* Smith Decl. ¶3 (prior inside sales position different from HMCU loan officer job).  *Vinole,* 571 F.3d at 938, n. 1.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

7.

C 07 2446 MMC [ECF])

1   compensated employees.   As illustrated below, application of those exemptions mandate fact

2   intensive inquiries regarding the myriad differences in how loan officers performed their job duties

3   in light of the absence of any corporate policy dictating how loan officers should spend their work

4   time. *Oetinger*, 2009 U.S. Dist. LEXIS 61877 at \*8-9.   *Cf. Vinole*, 571 F.3d at 945.   Simply put, this

5   case would require the Court to conduct more than 100 "mini-trials with respect to each [loan

6   officer's] actual work performance." *Id.* at 947.

### 1.     Overview of Applicable Exemptions

#### a.     The Outside Salesperson Exemption

9       The U.S. Department of Labor's regulations define outside salespersons to include "any

10   employee":

> (1)     Whose primary duty is:
>         (i)     making sales within the meaning of section 3(k) of the Act, or
>         (ii)    obtaining orders or contracts for services or for the use of facilities
>         for which a consideration will be paid by the client or the customer; and
> (2)     Who is customarily and regularly engaged away from the employer's
>         place or places of business in performing such primary duty.

15   29 C.F.R. § 541.500.   The term "primary duty" refers to "the principal, main, major or most

16   important duty that the employee performs."   29 C.F.R. § 541.700.   The term "customarily and

17   regularly" "means a frequency that must be greater than occasional but which, of course, may be less

18   than constant."   To qualify as "customar[y] and regular[]" work, the work must be performed

19   "normally and recurrently . . . every workweek."   29 C.F.R. § 541.701.

20       While making "sales" includes the direct solicitation and completion of the a product's sale

21   (including loans), ancillary activities—necessary to carry out and generate and complete the sale—

22   can also be considered "exempt" activities.   *See Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545,

23   550-51 (E.D. Mich. 2004).   The Department of Labor has opined that "activities such as making

24   phone calls, sending e-mails, and meeting with clients in the office are considered exempt if

25   performed incidental to or in conjunction with the...loan officer's own outside sales activities."

26   DOL Op. Letter, FLSA 2006-11 (Mar. 31, 2006) (citing 29 C.F.R. § 541.503).   Similarly, a loan

27   officer's efforts to cultivate referral sources in support of his/her sales, such as referrals from realtors

28   or developers, should be considered "exempt" activities.   *See Olivo*, 374 F. Supp. 2d at 550-51.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                    8.                    C 07 2446 MMC [ECF])

b.     **The Highly Compensated Exemption**

The DOL's regulations also include an exemption for highly compensated employees:

> An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part.

29 C.F.R. § 541.601.  Highly compensated employees' "total annual compensation . . . must include at least $455 per week paid on a salary or fee basis."  29 C.F.R. § 541.601(b)(3).  But employees' "total annual compensation" may include "commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period."  *Id.*  For partial years of employment, an employee may still be covered by the "highly compensated" exemption, provided that the employee "receives a pro rata portion" of the $100,000, which is based upon the number of weeks that the employee will be or has been employed during the year. 29 C.F.R. § 541.601(3).

In addition, this exemption requires that employees "customarily and regularly" have at least one exempt executive, administrative or professional duty or responsibility.  29 C.F.R. § 541.601. The DOL provides that "administrative" employees' duties include work that "directly [relates] to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  The DOL has stated that the administrative exemption may cover mortgage loan officers who service their employer's financial products, advise customers regarding products, and recommend products to customer.  DOL Op. Letter, FLSA 2006-11 (Sept. 8, 2006).  This may include analyzing information relating to customers' needs and financial circumstances.  *Id.*; *see also* 29 C.F.R. § 541.203(b).

D.     **Widely Varying Factual And Employment Settings Of Individual Plaintiffs Warrant Decertification.**

"Merely being classified as exempt does not give rise to a right of action under 29 U.S.C. §216(b)."  *Oetinger*, 2009 U.S. Dist. LEXIS 61877 at *8.  Rather, to determine whether employees are "similarly situated" for a collective action there must be uniform rules or policies that would ameliorate the differences in disparate employment settings.  *Id.* at *7.  Here, even a cursory glance

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF CONDITIONAL CLASS

9.

C 07 2446 MMC [ECF]

at the record shows that HMCU has no company-wide policy, plan or directive governing loan officers' duties and daily activities, and loan officers engage in a variety of sales methods implicating the outside sales and highly compensated exemptions.[12]

### 1. Loan Officers Maintain Independence And Discretion Over How They Performed Their Job Duties.

The common axiom "no two fingerprints are alike" applies equally to loan officers' work experiences. Discovery has confirmed that there is no single method commonly used by loan officers to generate mortgage loan sales and that supervisors did not dictate how the work should be performed. For example, almost all loan officers said that to their knowledge, each loan officer approached his or her job differently. *See, e.g.,* Brooks 57:24-58:4; Cohen 89:11-25; Gora 100:23-25; Montesinos 66:16-19; Moore 61:3-8; Russell 65:10-12; Sanchez 29:6-8; Santangelo 69:17-20; Spronck 59:5-13, 60:19-61:2, 124:5-125:25; Conte Decl. ¶11; O'Connor Decl. ¶12; Pogorzelski ¶18, 19; Schneider Decl. ¶11, 18; Schultz Decl. ¶ 14; Slapo Decl. ¶8, 9, 11. By way of illustration, the disparity in how the following loan officers performed their jobs demonstrates the fact finder's dilemma in this case:

**Louis Sabater**. He testified that during his early employment as a retail mortgage loan consultant he engaged in "heavy field work" developing outside referral sources:

> Basically, from that point on I would go do field work, heavy field work. I would go out, knock on doors, introduce myself to different builders, realtors, exchange business cards. Sometimes we would have networking events which I would go to also to meet builders, realtors, exchange business cards.

Sabater 24:10-22. He spent "windshield" time driving to and from potential referral sources seeking business:

> I spent quite a bit of time traveling, you know, to the different venues throughout my whole career. The only difference was that I spent more time traveling initially canvassing then I did actually visits these referral sources and meeting clients, but the actual mileage is fairly consistent. It did increase slightly as I got more active, but more or less the bulk of the time spent was windshield time, driving.

Sabater 98:4-17. Later in his employment, Sabater focused more on Community Reinvestment Act ("CRA") loan products, which are focused on lower and moderate income neighborhoods. Sabater

---

[12] There is no dispute that loan officers' primary duty was selling loans. *See* Exs. AA, BB.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

1  25:16-17.[13]  This caused him to modify his approach: "[g]radually, it would as I developed more

2  business, CRA business, that limited the time that I had in the field to go out there  and cultivate

3  business, because I was actually dealing one-on-one with customers." *Id.* 25:16-20.  He testified

4  that, at that time, he would meet more frequently with non-profit and governmental entities outside

5  the loan production office. *Id.* 32:22-25, 33:1-6.

6       Sabater spent a significant amount of time outside of Defendants' offices.  *Id.*  However,

7  unlike Russell, discussed below, Sabater focused on selling both standard retail loans and CRA

8  loans.  Sabater 25:16-17.  His change in focus to CRA loans allowed him to concentrate his sales

9  efforts on developing sales through referrals from various non-profit entities, but throughout his

10  employment, Sabater engaged in a substantial outside activities in his sales efforts. *Id.* 27:10-19,

11  56:5-9, 98:4-17.   Absent this specific information regarding how Sabater performed his job at

12  various times, it would be incredibly difficult for the trier of fact to determine if he was exempt.

13  **Ara Kachadourian**.  At the time Kachadourian joined HMCU in Southern California, HSBC

14  and HMCU were "fairly new" to the area.  Kachadourian 28:13-21.  Because he had worked as a

15  mortgage loan officer prior to joining HMCU, he had already developed many contacts in Southern

16  California. *Id.* 28:7-12, 37:24-38:1.

17       Kachadourian was aware that, as a loan officer, he was responsible for selling loans.  *Id.*

18  35:21-37:6.  As part of his efforts to sell loans, he developed referral sources within the real estate

19  community by attending open houses, visiting local real estate broker officers, networking with real

20  estate professionals and being involved with the local realtor board.  *Id.* 38:7-17.  He also tried to

21  develop business through builders and contractors.  *Id.* 46:13-48:1.  Generally, he engaged in these

22  activities for approximately 23 hours every week; however, in weeks where activities such as open

23  houses and realtor visits overlapped the weekly number of hours spent on these activities might be

24  slightly less. *Id.* 39:5-13, 45:2-13, 45:14-46:2, 47:4-48:11, 57:3-58:24.  Kachadourian viewed these

25  activities as essential to selling loans.  During his employment "[m]ost of [his] referrals would have

26  been from [his] center of influence and [his] networking efforts." *Id.* 60:4-24.  ("center of influence"

27  meaning "individuals that are either past clients or other referral partners." *Id.* 60:4-24.)

28  ---

[13] *See also* Blanchette 95:18-96:21.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

11.

C 07 2446 MMC [ECF])

1    To determine whether he was an exempt outside salesperson, a finder of fact would need to

2    conduct an individualized inquiry as to whether he customarily and regularly engaged in sales

3    activities outside of Defendants' offices, focusing in part on the frequency in which Kachadourian

4    engaged in such activities.

5    **Darlene Russell**.  Russell, a Florida-based loan officer, had a very different experience than

6    that of Kachadourian and Sabater.  Because she focused on CRA loans, Russell testified that her

7    primary method of generating sales leads was through "contact and visitation" with non-profit

8    organizations. Russell 105:7-10.  In fact, Russell was assigned a bank branch for only a brief period

9    of time, and in April 2006, stopped visiting the bank branch altogether. *Id.* 71:21-25.  Russell also

10   "did home buyer education workshops and seminars, foreclosure prevention workshops and

11   seminars, credit fairs," and routinely met with customers, builders and nonprofit organizations

12   outside the office. *Id.* 83:13–84:8.  Indeed, from April 2006 until July 2008, she spent "90 to 100

13   percent" of her time outside the loan production office. *Id.* 84:9-14.

14   Obviously, Russell spent a significant amount of time away from any HSBC office engaged

15   in a myriad of activities intended to help her sell loans.  Accordingly, like Kachadourian and

16   Sabater, a fact finder would need to conduct a careful, individualized inquiry into the frequency and

17   nature of Russell's outside activities to determine her exemption status.

18   **Michael Cohen**.  Cohen worked as a loan officer in Red Bank, New Jersey.  Cohen 35:4-25

19   He testified that he assigned to two different loan production offices during his employment,

20   and that he covered at least two different bank branches. Cohen 40: 8-17, 77:14-21.  Cohen believed

21   that he was primarily "going to originate loans through banking customers with HSBC," and spent

22   more than 50 percent of his time in Defendants' offices. *Id.* 33:23-25, 107:9-108:1.  But Cohen also

23   believed that the development of outside referral sources, like realtors, was important to generating

24   outside loan sales. *Id.* 53:16-21.  He would develop such outside referral sources and potential

25   customers by regularly attending open houses every Saturday and Sunday. *Id.* 58:1-14.

26   Additionally, he visited realtors at their offices, and even met his customers at their homes regarding

27   their mortgage applications. *Id.* 55:3-5, 85:17-20.

28   Resolution of Cohen's exempt status would require the fact finder to determine whether he

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                    12.                    C 07 2446 MMC [ECF])

was "customarily and regularly" engaged in sales activities away from a fixed site. This determination requires analysis of the total amount of time Cohen spent outside Defendants' offices, the nature of his activity within the office in support of his outside sales efforts, and the frequency that he engaged in such activities.

### 2. Plaintiffs' Work Experiences Varied Due to A Multitude of Factors That Prevents Resolution Of This Case On A Collective Basis.

The disparate examples listed above as to how different loan officers performed their jobs are, however, merely the tip of the iceberg. Not surprisingly, factors such as each loan officer's prior experience in the mortgage loan or real estate industry, the real estate market in the geographic area where they work, their contacts within their community, their approach to sales, their manager(s), and proximity to HBUS bank branches and HMCU loan production offices affected how they chose to generate mortgage loan sales. Gates Decl. ¶6; Kilfoil 26:5-27:17 (call reports used with less experienced loan officers); Young 67:3-68:20 (how job done affected by product changes and loan officer's "seasoning"). In addition, due to changing economic circumstances, loan officers adjusted their methods of generating mortgage loan sales, so for each loan officer, how they spent their work time is not static over the statutory period. Blanchette 96:10-20 (CRA focus); Hamilton 51:17-23 (changed focus from CRA loans to international borrowers with higher dollar loans); Keller 39:21-40:7 (stopped using condo association arrangements to solicit customers); Kilfoil 48:6-49:4; Kilinski 10:6-10, 12:22-25, 136:7-16 (more refinances due to lower interest rates); Ku 98:4-99:8, 101:2-12 (branch staffing needs changed over time); Moore 53:11-20 (as market declined, fewer open houses); Sabater 25:1-23 (changed focus on loan type); Santagelo 82:18-84:4 (transfer to New Jersey provided him with bank branch time); Turk 192:22-130:4 (office time changed following manager's decision to assign him bank branch time instead of LPO time); Schultz Decl. ¶19; Smith Decl. ¶5, 10.

As set forth in further detail below, loan officers customarily and regularly engaged in one or more of the following activities to generate their own mortgage loan production: meetings with real estate developers, realtors, accountants, attorneys, title company representatives; making presentations or seminars to first time home buyers; attending trade shows; attending Chamber of

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

13.

C 07 2446 MMC [ECF])

1   Commerce sponsored events; attending open houses; canvassing business districts for referral

2   sources; working with non-profit community development centers and public agencies; and

3   networking at church and with parents at children's sporting events.  Gates Decl. ¶7; Gates 104:7-

4   105:1; Dezego 30:11-31:9; Keller 22:11-23:1; Kilfoil 71:11-74:12, 89:18-92:13; Masseria 21:6-21,

5   74:2-75:23; Needham 86:10-87:23; Nelson 21:7-15; Peters 40:19-41:5, 51:13-52:11, 53:8-15;

6   Robinson 23:8-15; Sabater 27:6-19; Schneider Decl. ¶7-10.  These activities involved both work

7   time away from a fixed site of business, and work from a fixed site in support of their own sales

8   production.

9              a.      **Managerial Expectations of Loan Officers Differed.**

10          Some Plaintiffs reported to Team Leaders or Sales Managers while others reported to

11  Regional or Senior Regional Managers.  Individual managers, moreover, gave loan officers different

12  incentives and/or required loan officers to perform certain activities that other loan officers had no

13  responsibility to perform – a factor that weighs heavily in favor of decertification.  *See Reed*, 2010

14  U.S. Dist. LEXIS 6517 at *58 (no single policy concerning overtime practices, "[employees']

15  experiences varied] from assignment, to supervisor to supervisor, and from individual to

16  individual").

17          For example, some Plaintiffs testified that they were required to attend mandatory in-person

18  meetings with their manager and other area loan officers assigned to that particular geographic

19  area.[14]   Kilinksi 64:5-65:1; Noda 40:8-18; Sabater 36:2-6; Sanchez 20:16-21:9; Turk 21:18-23;

20  Conte Decl. ¶12; O'Connor Decl. ¶11; Pogorzelski Decl. ¶15; Schultz Decl. ¶18; Smith Decl. ¶12.

21  During such meetings, the manager would provide guidance to loan officers on increasing sales or

22  would introduce new products that HMCU was offering to its customers.  Noda 40:21-25; Russell

23  65:24-66:6; Turk 48:15-23.  Some managers requested their loan officers to spend a certain amount

24  of time at new housing developments, join community groups, or, alternatively, attend open houses

25  on weekends.  Sabater 30:1-4; Rojas 35:4-8, 36:4-14; Exh. CC.  Still others required that loan

26  officers develop sales business plans, monthly calendars, call reports, loan tracking forms, and/or

---

27  [14] Some meetings occurred telephonically—leaving loan officers the ability to multi-task.  Robinson

28  14:7-24.  Some meetings occurred infrequently while others occurred on a more regular basis.  Ku
    90:1-21; Young 85:4-23.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF          14.          C 07 2446 MMC [ECF])
CONDITIONAL CLASS

1    action plans.  Exh. DD-FF.  Some managers used these plans, reports, or forms as a tool to focus

2    some or all loan officers' sales efforts and other managers used them to approve a loan officer's

3    activities on an annual, monthly or even weekly basis and monitor performance.  Blanchette 65:12-

4    22; Dezego 46:7-18; Flanagan 129:14-21; Keller 27:5-28:3; Kilfoil 24:23-26:4; Kilinski 10:11-

5    11:24, 63:19-25; Ku 203:21-204:24; Peters 45:15-46:19; Robinson 45:21-46:3; Russell 89:20-90:2.

6        Managers' practices concerning bank branch and loan production office assignments also

7    varied greatly.  Some did not mandate that loan officers spend a specific amount of time at bank

8    branches or LPOs.[15]   Dezego 18:8-19:5, 20:14-21; Kachadourian 34:15-35:2; Keller 15:13-19;

9    Kilfoil 38:6-23, 53:20-54:17 (loan officer only need be available by telephone for mandatory LPO

10   time); Ku 200:11-201:2, 206:21-207:17; Masseria 38:4-16, 40:14-41:17; Needham 192:25-193:22;

11   Nelson 29:6-14, 33:16-19, 48:1-8; Noda 26:4-6; Robinson 30:25-31:3.  Other managers, however,

12   required loan officers to spend time in bank branches and/or at loan production offices.  Cohen 90:9-

13   11; Hamilton 42:16-19; Hor 56:20-24, 73:14-20; Kilinski 48:12-20; Peters 46:25-48:3; Rojas 20:15-

14   22; Santangelo 89:14-19; Shearn 85:13-22; Turk 52:22-53:3; Young 64:20-65:17.  Managers'

15   decisions concerning branch and loan production office assignments (or lack thereof) depended on

16   their preferences, the needs of that particular geographic region, and loan officers' response to any

17   assigned requirement.   Masseria 44:23-45:19; Keller 36:20-37:8; Robinson 45:21-46:3 (only

18   required LPO time for a period of time because loan officers did not show up to do LPO time);

19   Coyne Decl. ¶12 (branch assignment a "reward" for high production); Kilfoil Decl. ¶10.

20       For those who struggled to make sales, some managers helped them develop outside referral

21   sources.  For example, Sabater testified that at one point he struggled to meet his loan production

22   requirements.  Sabater 86:21–87:10.  Consequently, his manager, Melinda Knight, introduced him to

23   her own canvassing techniques for developing outside referral sources.  *Id.* 90:7-16.  *See also* Turk

24   80:13-81:14.  Yet other managers required struggling loan officers to complete call reports to show

25   their sales efforts.  Dezego 21:14-22:4; Kelter Decl. ¶12.

26

27   [15] In addition, the particular bank branch's expectations and customer traffic could greatly affect
     how much time a loan officer was asked or expected to spend time at a bank branch.  Keller 30:17-
28   31:13, 32:5-11 (branch time sometimes one to two days per week but can go as low as one-half day
     per week); Kilfoil 41:16-42:17 (could possibly spend up to three day in one branch per week).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF                    15.                    C 07 2446 MMC [ECF])
CONDITIONAL CLASS

On the other hand, Plaintiffs like Mario Montesinos had little guidance from his supervisor regarding methods to develop sales prospects or referral sources.[16]  Montesinos 31:6-20, 62:10-13, 66:16-22.  *See also* Brooks 59:13-60:11; Schneider Decl. ¶4, 5.  Other loan officers stated that they rarely had contact with their managers with the exception of sporadic emails and telephone calls and were not often required to attend meetings.  Conte Decl. ¶9; Oommen Decl. ¶9; Slapo Decl. ¶9.

### b.   Circumstances Unique To Particular Geographic Regions Affected Plaintiffs' Work Activities.

Plaintiffs' activities were also affected by the geographic region where they worked.  For example, a loan officer's expected volume for loan closings depended upon how his/her Divisional or Regional Managers set goals:  by units, applications, or dollar amount.  Dezego 43:2-23; Keller 23:22-24:16 (units and dollar amount); Kilfoil 80:1-10 (units and volume); Young 25:12-19 (volume).  In addition, in Northern California, where HBUS had only recently opened bank branches in certain communities, and HMCU did not have name recognition, loan officers initially had few contacts within the real estate community.[17]  Consequently, Plaintiffs Wong and Chaussy (who were only employed in Defendants' initial "start up" period in California) claim they spent a majority of their time in the bank branches and principally relied on bank branch customers and referrals for their sales.  Chaussy 69:12-16, 72:3-10, 123:14-20; Wong 48:3-14, 101:9-102:6.

However, Wong's and Chaussy's experiences were not uniform throughout California even in the "start up" period for Defendants - let alone in any other geographic area where HMCU's loan officers worked.  Plaintiffs working elsewhere in California testified that they relied more on outside referrals, and that they actively pursued sales by attending open houses and networking with referral sources like realtors and title companies.  Hor 59:11-60:10; Kachadourian 38:2-17, 44:9-45:1, 46:13-23; Lim 154:15-18, 154:22-155:18; Exh. GG-II.  Indeed, some of these Plaintiffs testified that they were very successful in cultivating outside referral sources.  Kachadourian 60:4-61:8; Kim Decl.

---

[16] Moreover, other evidence demonstrates HMCU's *laissez faire* approach to allowing loan officers to generate mortgage sales as they deemed appropriate.  *See, e.g.*, Ku 85:22-86:5; Needham 37:25-43:19 (no requirement to attend business development opportunities sourced by HMCU).

[17] Because the HMCU footprint was not as well-established in California, California loan officers were subject to a different pricing procedure that required special permission to make exceptions. This special procedure affected how only California loan officers did their jobs.  Needham 196:5-197:25.  And, even California-based managers did not approach this procedure consistently.  Young 95:1-96:17 (did not agree with Ku's approach).

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415 433 1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                                16.                        C 07 2446 MMC [ECF])

1    ¶17, 18.

2         If one contrasts various California loan officers' experiences with the experiences of loan

3    officers around the country, it is readily evident that they were very different.[18]  On the East Coast,

4    HBUS' and HMCU's names and reputations were well-established.  Santangelo 36:8-13; Coyne

5    Decl. ¶16.  Consequently, loan officers were able to more effectively market HMCU's loans without

6    relying principally on bank branch referrals.  Gora 49:8-50:2; Schultz Decl. ¶17.  Many loan officers

7    spent more time away from any fixed location, and instead, met, on a regular basis, with referral

8    sources and/or customers in their communities.  Flanagan 81:22-83:20, 87:20-88:22, 93:5-15, 94:10-

9    24, 96:4-18; Santangelo 60:10-64:14.  One New York loan officer testified that she principally relied

10   on "cold calling" and networking in her community to obtain potential customers or referral sources

11   to obtain new business.  Gora 49:8-50:2.  Additionally, because of the high-priced real estate market

12   in certain areas, many loan officers typically sold larger loans.[19]  Gora 89:7-22; Kim Decl. ¶27; Lee

13   Decl. ¶27; Lin Decl. ¶19; Schultz Decl. ¶26.  Consequently, they made more in commissions, and in

14   some cases, earned upwards of $100,000 per year.  Flanagan 67:24-68:3; Gora 52:5-55:15; Spronck

15   43:3-9; Conte Decl. ¶15; Kim Decl. ¶10; Lee Decl. ¶32; O'Connor Decl. ¶19; Oommen Decl. ¶17;

16   Slapo Decl. ¶18

17        In further contrast to the loan officers discussed above, many Florida Plaintiffs enjoyed a

18   more diverse, active housing market.  In South Florida, condominium conversions were popular.

19   Kilinski 72:4-15 ("A big thing that was going down here in South Florida were all of the condo

20   buildings and apartment condos coming from just rental units to conversion over to buying them.").

21   Plaintiffs there testified that they often solicited business and made sales at various condo

22   developments and typically attended open houses on a regular basis.  Kilinski 71:22-73:2.

23   Additionally, several Florida Plaintiffs specialized in CRA loans.  Brooks 27:22-28:2; Hamilton

24   31:14-32:4; Rojas 15:11-16:21; Russell 56:6-10.  As described *infra*, such loans required loan

25   officers to regularly meet outside the office with government agencies and non-profit organizations.

26

27   [18]  In fact, whether HBUS served as primary customer referral source depended upon the location
     where a loan officer worked and a loan officer's working style.  Gates 55:4-24; 57:7-58:6.

28   [19]  A loan officer's decision to specialize in a certain type of loan is sometimes affected by a loan
     officer's geographic location.  Gates 104:7-105:1.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                    17.                    C 07 2446 MMC [ECF])

1    Brooks 42:19-43:13; Hamilton 37:7-40:11; Rojas 22:7-23:13.

2         Moreover, Florida Plaintiffs' focus on certain types of loans changed over time to reflect the

3    prevailing financial condition.  For instance, Sabater testified his focus began with standard retail

4    mortgage loans and changed to CRA loans in response to the demands in his particular community.

5    Sabater 25:13-23.   Yet another Florida Plaintiff, John Kilinski, testified that as mortgage rates

6    dropped and the market slowed, refinancing loans became the top driver of loan activity.  Kilinski

7    136:7-16.  *Cf.* Turk 87:3-88:7 (due to market, he focused on FHA and CRA loans).  But Maria

8    Hamilton, another Florida-based Plaintiff, testified that, in addition to CRA loans, she also tried to

9    pursue international borrowers.  Hamilton 50:12-16.

10              **c.    Plaintiffs Utilized A Variety Of Methods To Sell Loans.**

11         While both geographic location and Plaintiffs' assigned managers played a role in Plaintiffs'

12   work activities, Plaintiffs' own individual styles played an even more substantial role in how

13   Plaintiffs sold mortgage loans.  Gates 55:4-24, 56:10-57:6, 68:8-13.  While some Plaintiffs were

14   reluctant to generate outside referrals and relied principally on bank branch referrals, others were

15   expressly prohibited from seeking bank branch referrals.  Brooks 57:14-58:4; Chaussy 123:14-20;

16   Wong 101:9-102:6, 197:5-9; Lee Decl. ¶8.

17         Other Plaintiffs cultivated different referral sources including realtors, developers,

18   government agencies, non-profit agencies, title companies, attorneys and accountants.  Blanchette

19   32:25-35:18; Brooks 38:16-39:10 (99% of business was her personal referral sources); Hamilton

20   38:8-11; Kachadourian 60:4-20; Rojas 57:15-58:1, 58:15-21; Santangelo 19:5-22, 60:17-61:7;

21   Spronck 24:24-27:8; Turk 71:2-22; Exs. JJ-NN.  Others focused on certain communities, such as the

22   Venezuelan community in Florida or the Jewish community in New York, and on word of mouth

23   from previous customers and that particular community's members.  Gora 45:4-25; Hamilton 51:17-

24   23; Sanchez 33:1-5; Oommen Decl. ¶4 (95% of business from Long Island's East Indian

25   community); Schultz Decl. ¶8 (international clients).  Still others focused on the Real Estate Owned

26   business (foreclosures) to generate sales.  Keller 49:22-51:3.  No two loan officers' sales techniques

27   were alike.  Gora 49:8-11, 60:6-13 (relied on cold calling); Smith Decl. ¶13 (90-95% of customer

28   contact face-to-face); Chan Decl. ¶6 (90% of customer contact face to face).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                                    18.                                 C 07 2446 MMC [ECF])

d.   **Plaintiffs Spent Varying Amounts Of Time At Loan Production Offices Or Bank Branches.**

Plaintiffs Wong and Chaussy contend that they spent every day working from one of HBUS' bank branches, and that they only sourced loans from referrals generated through their particular bank branches.   Chaussy 69:12-16, 72:3-10, 123:14-20; Wong 48:3-14, 101:9-102:6, 197:5-9. Unlike Wong and Chaussy, Plaintiff Shearn claimed that she spent about 50% of her time working from home, even though she had bank branches available to her, as well as an LPO.  Shearn 101:13-18.  In contrast, other loan officers working in other areas were not assigned a specific bank branch, and spent 100% of their time cultivating referral sources from sources like realtors, attorneys, title companies, developers, non-profit entities and from previous customers.  Gora 68:3-10; Lim 78:3-22; Nelson 30:12-19, 32:2-5, 33:3-11 (top producer not assigned to bank branch); Santangelo 75:19-76:18 (no bank branches because assigned to other loan officers); Pogorzelski Decl. ¶14.  *See also* *Gates* 53:19-55:3; Needham 269:5-270:2;

Conversely, others testified that they were required by their manager to spend a specific amount of time per week in a particular bank branch or loan production office,[20] but would spend other days of the week attending outside meetings to cultivate referral sources or meeting with customers.[21]  Brooks 25:25-22:21, 25:1-6; Moore 65:2-66:12; Flanagan 139:11-140:3.  Still others stated that some loan officers were only assigned a bank branch if they had been highly successful in securing loans.  Coyne Decl. ¶12; Kelter Decl. ¶8; Kilfoil Decl. ¶10.  And still more stated that they voluntarily agreed to spend a mutually agreed upon (by the loan officer and bank branch personnel) amount of time at a bank branch.  Schneider Decl. ¶13-14; Schultz Decl. ¶15.[22]  *See also* Robinson 37:5-39:3; Turk 53:4-12; Exh. OO.

For example, Sabater testified that for a period of time he was required to spend one to two days per week at a loan production office.  Sabater 32:12-17.  *Cf.* Rojas 43:6-45:11 (spent about 3

---

[20] For periods of time, some regions did not even have LPOs.  Young 165:14-25, 171:14-21.

[21] Deposition testimony also confirms that the amount of time spent in a bank branch or LPO depended upon the loan officer's particular situation.  Some used the branch or LPO to do paperwork, to make a few calls, or even to meet with customers for their own loan production efforts while others used the space differently. Dezego 22:19-24:7, 25:21-26:18; Robinson 35:5-16.

[22] In contrast to those who testified they were subject to either a bank branch's or a managers expectations, some loan officers stated they had control over their branch schedules.  Blanchette 58:10-20; Smith Decl. ¶8-9, 11.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                                      19.                        C 07 2446 MMC [ECF])

days per week at his assigned bank branch but would leave for his CRA non-profit appointments). Another Florida Plaintiff, Lashea Brooks, testified that her "floor time" at HMCU's loan production office was not "constant", but she was generally required to spend at least one day per week at her assigned loan production office. During her employment, Brooks' LPO closed, and thereafter, she worked out of her home office or at various non-profit offices that served as her CRA loan referral sources. Brooks 21:25-22:21, 25:1-6. Despite being required to spend a certain amount of time at her assigned loan production office, Brooks had no assigned desk, and "as matter of fact, they made a point of telling us that nobody had a desk, that anybody can come in and use a desk at any time." *Id.* 31:25-32:12. In contrast, Russell testified that after she concentrated on selling CRA loans, she was not assigned to a bank branch and generated all of her sales from outside referral sources. Russell 71:21-25. Indeed, Russell testified that she spent 90 percent of her time outside of LPOs. *Id.* 84:9-14. *See also* Schneider Decl. ¶16 (only visited LPO one time).

Alysse Gora testified that she spent a majority of time in Defendants' offices and "cold-called" potential customers. Gora 49:8-11. But another New-York based loan officer, Michael Santangelo, principally relied on referrals from realtors, attorneys and accountants, and obtained only some referrals from bank branches. Santangelo 19:5-22, 71:20-72:22. Similarly, Mario Montesinos testified that his assigned branch had very little foot traffic. Montesinos 40:5-15, 57:15-23 ("For the most part, this type of branch was run by ghost customers, meaning those that transact by email, by phone, by fax, no people that physically go to a branch.") *Cf.* Moore 63:25-64:10.

### E. Defendants Will Be Required To Present Individualized Rebuttal Evidence For Each Plaintiff.

Although HMCU did not maintain any company-wide policies and practices governing loan officers' day-to-day work activities, HMCU required loan officers to generate a certain minimum amount of loan sales. Sabater 86:21-87:10; Turk 57:5-10. To help loan officers achieve their sales goal, HMCU provided training to loan officers, during which loan officers learned about effective sales techniques, and were advised about the importance of developing a network of outside referral sources in their communities. Blanchette 23:14-25:19, 25:14-19; Ku 106:21-107:25; Moore 39:7-40:18, 43:6-44:21; Sabater 20:1-21:14.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS

20.

C 07 2446 MMC [ECF])

Similarly, with respect to those Plaintiffs who claim to have spent a majority of time in bank branches or loan production offices, but also engaged in outside sales-related activities, Defendants will present evidence that these Plaintiffs engaged in outside sales activities on a customary and regular basis, including attending open houses, meeting with customers at their homes or other non-HSBC related locations, and/or attending community events like local chamber of commerce meetings. *See, e.g.,* Blanchette 68:3-8; Gora 45:23-46:5, 102:22-25; Kachadourian 38:7-17, 46:13-23; Moore 82:23-83:23, 85:9-86:7.  Such evidence may include Plaintiffs' own emails, the testimony of Plaintiffs' managers, as well as the Plaintiffs' own testimony at deposition and/or trial.

### 1.   Application Of The Outside Salesperson Exemption  Requires An Analysis of Each Loan Officer's Job Duties.

The experience of virtually every Plaintiff deposed confirms the fact finding dilemma faced by a trier of fact if Plaintiffs are allowed to pursue this matter as a collective action.  Unquestionably, application of either the outside salesperson exemption or the highly compensated exemption requires a fact intensive inquiry of each Plaintiff's activities.  *Vinole,* 571 F.3d at 945; *Oetinger,* 2009 U.S. Dist. LEXIS 61877 at *8-9.  In analyzing the outside sales exemption, the trier of fact would have to determine first whether loan officers' primary duty was exempt "sales" under 29 U.S.C. § 13(k), and to what degree the particular work they performed was considered exempt as "incidental and in conjunction" with their individual sales, including, but not limited to, marketing activities, activities to develop loan referral sources, and time spent performing tasks necessary to ensure the sale of the loan, such as obtaining application information from customers. 29 C.F.R. § 541.500.  From there, the trier of fact would need to determine, for each loan officer, whether that loan officer was "customarily and regularly" engaging in exempt activities away from a fixed business site. *Id.*

### 2.   Application Of The Highly Compensated Exemption Criterion Also Requires An Individual Analysis.

The highly compensated exemption similarly requires an individualized inquiry into the particular circumstances and work duties of employees earning more than $100,000.  Gora 52:5-55:15; Flanagan 67:24-68:3, 69:3-16; Spronck 43:3-10.  In order to conduct this analysis, the fact finder would need to first determine whether the employee's annual salary meets that exemption's

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS
21.
C 07 2446 MMC [ECF])

1   requirements, which requires analysis of both the employee's weekly salary and the total amount of

2   the employees' compensation, including commissions.   Next, the trier of fact would need to

3   ascertain whether an employee has performed at least one exempt duty during the same time period.

4   *See, e.g.,* Gora 88:18-89:6 (administrative duties); Flanagan 193:8-19 (administrative duties);

5   Spronck 41:4-15, 42:3-19 (executive managerial duties).   Obviously, like the outside sales

6   exemption, the highly compensated exemption requires that this Court make factual determinations

7   regarding the details of these employees' job duties.[23]

8               **3.      Damage Calculations Will Be Highly Individualized.**

9                    **a.      The Trier of Fact May Be Required To Determine Which Periods**
                              **Of Time Each Individual Plaintiff Met The Requirements Of The**
10                            **Outside Salesperson and/or Highly compensated Exemptions.**

11          Plaintiffs' individual experiences present a significant challenge for determining appropriate

12   damages.   In some cases, a particular Plaintiff may not have engaged in significant exempt sales

13   activities outside of Defendants' offices during several months, but later, after developing more

14   referral sources and/or changing their loan focus, spent time customarily and regularly outside

15   Defendants' offices performing such activities.   Blanchette 96:18-97:9.   In contrast, a Plaintiff's

16   manager may have increased the number of bank branches that the Plaintiff covered during the

17   course of that Plaintiffs' employment.   *See* Santangelo 82:18-84:4, 89:13-19.   In these

18   circumstances, the Plaintiff performed more or less exempt duties away from Defendants' offices

19   during certain time periods of their employment.   While the time spent performing qualifying

20   exempt duties is not the "sole test" for determining whether an employee is exempt, Plaintiffs may

21   argue that they were entitled to damages during some periods of their employment, but not others,

22   thereby complicating any damage determination.   29 C.F.R. § 541.700(b).

23          Likewise, some Plaintiffs may have earned in excess of $100,000 during only certain years of

24   their HSBC employment.   Such Plaintiffs, however, would only be entitled to damages during the

25   time period in which they did not meet the highly compensated exemption's annual salary

26   _____

27   [23] Note that even if a highly compensated loan officer did not meet the highly compensated
     exemption, the loan officer could still meet the outside sales exemption. *See, e.g.,* Gora 102:21-25

28   (weekly outside visits to customers), 45:23-46:1-5 (attendance at various events with attorneys,
     accountants and realtors to develop outside referral sources).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF                    22.                    C 07 2446 MMC [ECF])
CONDITIONAL CLASS

1  requirements and/or satisfied that exemption's exempt duties requirement, thereby requiring the trier

2  of fact to determine damages for only select periods of time during their employment as a loan

3  officer. 29 C.F.R. § 541.601. *See also Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 743 (6th Cir.

4  2000) (concluding that employee met the professional exemption requirements during four different

5  pay periods, but not a fifth pay period in which he did not meet the salary requirements of the

6  exemption).

**b.   Plaintiffs' Positions During The Relevant Statutory Time Period Also Impacts Their Damages.**

Additionally, some Plaintiffs were employed as loan officers *and* Team Leaders or non-

exempt Sales Assistants during their employment with HMCU.  With respect to those Plaintiffs who

held various positions during their employment, the trier of fact would need to determine which

periods of time they may be eligible to receive damages if they did not meet an exemption

requirement.  For example, Ibis Noda worked for a period of time as a loan officer, but also worked

as a non-exempt field assistant.  Noda 43:3-11; *see also* Shearn 19:4-7, 23:6-21.  During the time

period for which she was employed as a field assistant, Noda would not be entitled to any damages

in this action.  Similarly, John Kilinski worked as a sales manager – an exempt managerial employee

– but also worked as a loan officer.  Kilinski 10:6-10. *Cf.* Spronck 16:22-17:21, 20:6-21:23, 42:6-

19, 45:19-47:4 (worked as loan officer and team leader); Exh. PP.[24]  With regard to these individuals,

a trier of fact cannot simply determine the period of time during which they were employed by

HMCU.  Instead, one must inquire further about their employment and determine which periods of

time they worked in particular positions.

**c.   Plaintiffs' Work Hours Also Affect Any Determination Of Damages.**

Plaintiffs and managers have testified that a wide variety of hours are worked.  Some worked

a standard 8 hour day, Monday through Friday schedule, took regular lunch breaks and did not work

from home or on weekends.  Montesinos 60:16-25, 68:6-8, 69:5-10; Sanchez  95:7-11; Turk 148:25-

149:8, 151:12-152:6; Smith Decl. ¶15; Exs. QQ-RR.  Others worked upwards of 60 hours every

---

[24] Team leaders and/or sales managers were paid a guaranteed salary in addition to being able to earn commissions. Peters 13:1-14:5.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108-2693
415.433.1940

1    week and regularly performed work on Saturdays and Sundays.[25]  Kachadourian 75:18-23; Rojas

2    95:3-7; Turk 144:6-22.  Others testified that loan officers took time off during their day to attend to

3    personal activities, such as picking-up children from school or coaching a basketball team.  Moore

4    100:19-101:3; Nelson 15:6-20.  Yet another testified that he held other full-time employment for a

5    different employer at the same time he worked as an HMCU loan officer, but that he still managed to

6    work 55 hours per week for HMCU.  Santangelo 113:16-20.

7         For those Plaintiffs who claim to have worked in excess of 40 hours per week and do not

8    satisfy an exemption, the fact finder would need to determine the number of hours for which each

9    Plaintiff was entitled to overtime payment based upon evidence that the parties may provide

10   concerning Plaintiffs' work hours.[26]

11        **F.    Fairness And Procedural Considerations Strongly Support Decertification.**

12        To evaluate fairness and procedural considerations, courts must consider whether the

13   objectives of a collective action "to lower costs to the plaintiffs through the pooling of resources,"

14   and "to limit the controversy to one proceeding" will be satisfied.  *Reed*, 2010 U.S. Dist. LEXIS

15   6157 at *66; *see also Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  But "'the Court

16   must also determine whether it can coherently manage the class in a manner that will not prejudice

17   any party.'"  *Reed*, 2010 U.S. Dist. LEXIS 6157 at *66 (quoting *Johnson v. TGF Precision*

18   *Haircutters, Inc.*, 2005 U.S. Dist. LEXIS 44259 at *7 (S.D. Tex. Aug. 17, 2005)).

19        In this case, the significant variance in how, when, and how often duties were performed by

20   loan officer negates the benefits of a collective action.  *See Oetinger*, 2009 U.S. Dist. LEXIS 61877

21   at *11 ("Here, the disparity between the duties, responsibilities, and amount of work performed by

22   individual [sic] probably negates both benefits of a collective action.");  *Reed*, 2010 U.S. Dist.

23   LEXIS 6157 at * 66-67 (holding that because of plaintiffs' "varying factual and employment

---

25  Some managers testified that the loan officers they supervised rarely contacted them before or
after regular business hours or on weekends and that the volume of contact depending on time of the
month, season, and loan officer experience levels.  Keller 16:20-17:12; Ku 84:6-18; Nelson 16:21-
25; Peters 36:1-16; Young 62:20-63:7; Smith Decl. ¶16.
26  The loan officers' varying compensation structures (salary plus bonus, draw plus commissions,
salary plus commissions) also complicate any damage determinations requiring mini-trials.  *See,*
*e.g.,* Kachadourian 33:10-12; Moore 36:8-10; Rojas 26:23-27:3; Russell 85:1-2; Spronck 15:21-
16:18.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                                24.                    C 07 2446 MMC [ECF])

1   settings," "[p]roceeding collectively in this case would, in short, be unmanageable, chaotic and

2   counterproductive") (citing *Smith*, 2007 U.S. Dist. LEXIS 60729 at *8). First and foremost, there is

3   no representative loan officer experience. Plaintiffs engaged in different sales activities and spent

4   varying degrees of time outside of Defendants' offices and/or the loan officers' home offices, which

5   also changed over time. Plaintiffs, moreover, were supervised by a significant number of managers

6   who had no uniform policy or practice regarding the amount of time they required Plaintiffs to spend

7   in bank branches and/or loan production offices. Because of these variations in sales activities and

8   supervisory methods, any trial in this action "would consist of a large number of separate mini-

9   trials," requiring the trier of fact to determine whether each individual met the outside salesperson

10  exemption and/or highly-compensation exemption criterion. *Reed*, 2010 U.S. Dist. LEXIS 6157 at

11  *66-67. (citing *Reyes v. Texas Ezpawn L.P.*, 2007 U.S. Dist. LEXIS 1461 at * 6 (S.D. Tex. Jan. 8,

12  2007)).

13      In sum, hearing Plaintiffs' claims together would not preserve judicial resources or otherwise

14  benefit Plaintiffs, but trying the case on a representative basis would cause serious due process

15  violations by preventing HMCU from defending based on the unique circumstances of each Plaintiff.

16  As one court has observed when faced with disparate factual settings, hearing the class' claims

17  together "would not preserve significant judicial resources, it would deplete them." *Reed*, 2010 U.S.

18  Dist. LEXIS 6157 at *68. Such a result "weighs heavily in favor decertification." *Id.*

19  **IV.   CONCLUSION**

20      For the reasons discussed herein, Defendants respectfully request that their Motion to

21  Decertify the Conditionally Certified FLSA Class be granted and avoid the necessity of over 100

22  mini-trials.

23

24  Dated: March 19, 2010

25                                          /s/ *Michelle R. Barrett*
                                            LITTLER MENDELSON
26                                          A Professional Corporation
                                            Attorneys for Defendant
27                                          HSBC MORTGAGE CORPORATION (USA)
                                            AND HSBC BANK USA, N.A.
28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415.433.1940

DEFS' MOT. FOR DECERTIFICATION OF
CONDITIONAL CLASS                    25.                C 07 2446 MMC [ECF]